**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 6 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JENNIFER BEASLEY, DR. KIFFANY PRIDE,
LAURA SHIRLEY AND NICOLE TOWNSEND                    PLAINTIFFS

VS.                      CASE NO. 4:18cv508-. JM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools of the
Pulaski County Special School District; the BOARD
OF DIRECTORS of the Pulaski County Special
School District; and the PULASKI COUNTY SPECIAL
SCHOOL DISTRICT, a public body corporate              DEFENDANTS

**COMPLAINT**
**I. BACKGROUND**

This case assigned to District Judge _Moody_
and to Magistrate Judge _Volpe_

1. In 2000, this Court entered an Order approving a plan for the creation of a

unitary school system approved by representatives of a black student class and the school

district itself.  In the intervening years, the school district has been deficient in meeting

the overall objectives of Plan 2000. No less than six separate superintendents of the

district's schools have served during this time. Dr. Jerry Guess held the position between

July, 2011 and July, 2017.  He was terminated by the Board in the summer of 2017

because of commitments regarding staff that were made to the United States District

Court and to the representatives of the class regarding desegregation commitments. See

Exhibit 1, Letter dated May12, 2017 (the Roberts letter).  The district also terminated

district counsel Allen Roberts.   One of the commitments made to class counsel by Guess

and Roberts was that Dr. Janice Warren, an African American female, then serving as

1

Assistant Superintendent for Equity and Pupil Services and Director of Elementary Education, would be recommended to serve as Deputy Superintendent of Schools. Dr. Warren served as Assistant Superintendent for Equity and Pupil Services and Director of Elementary Education. The Board rejected Dr. Guess' recommendation. When the Board abruptly discharged Guess in July, 2017, the Board hired Dr. Warren as the Interim Superintendent to serve for the remainder of the 2017-2018 school year. Upon becoming Interim Superintendent, Dr. Warren became responsible for the implementation of the entirety of Plan 2000. Because she received additional complaints that a school district senior Caucasian employee was acting contrary to Plan 2000 with respect to establishing equal schools in the predominately African American sections of the district, Dr. Warren conducted a separate investigation. She issued two reports regarding her findings. The reports were presented to the United States District Court and to the school board. See Exhibits 2 and 3 – Reports dated August 25, 2017 and September 5, 2017.

The school official responsible for the misrepresentations of actions regarding school construction, Derek Scott, promptly resigned. The Court's expert also issued a report with respect to comparisons of certain facilities in the district. Dr. Guess had committed to investigate Scott's possible indiscretions. Guess had also committed that Chief Executive Officer Paul Brewer would not be employed for the 2018-19 school year. Brewer had served as Interim Chief Executive Officer for seven years. The actions and recommendations of Dr. Guess and Dr. Warren regarding Derek Scott, on information and belief, caused at least three of the district's board members to become upset and more adverse to Dr. Warren. The board members who expressed concern were President Linda Remele, Alicia Gillen and Eli Keller. Remele had induced Dr. Guess and Derek

2

Scott to advance a huge costly enhancement project at Sylvan Hills High School so that it would be comparable to Joe T. Robinson and other high end schools constructed in west Little Rock. Board member Brian Maune touted the Robinson construction project located in his neighborhood but which was not a part of the court approved plan known as Plan B. These board members were opposed to building equal facilities in the areas where African American persons predominately lived.

2. Dr. Warren held regular monthly meetings with the school principals during which she emphasized the importance of compliance with the requirements of Plan 2000. For example, in January 2018, Dr. Warren relied upon her reports and the report of the Court's expert in order to demonstrate to the principals the pitfalls of bad faith compliance with the provisions of Plan 2000. Most of the secondary principals were Caucasian. At least one of the principals, Lance LaVar at Robinson Middle School, objected to Dr. Warren's comments and reported them to the Board President Linda Remele and Board member Alicia Gillen. LaVar was a protégé of Remele. She was instrumental in his selection as a principal. Because of Dr. Warren's emphasis to the principals, Remele and Gillen became more negative to Warren. They encouraged the Board to promptly seek a new superintendent in order to replace Dr. Warren.

3. When the Board approved the superintendent search in January, 2018, Dr. Remele assured Dr. Warren that she would be fairly considered for the permanent position of superintendent. Remele and Gillen publicly asserted that a new superintendent should have "prior experience as a school superintendent in a large school district" as prerequisite to selection. Of the applicants whom the Board considered, only Dr. Warren had superintendent experience in a large school district. The Board then

3

selected Dr. Charles McNulty as the new superintendent of the Pulaski County Special

School District. McNulty's objective qualifications for the position were and are inferior

to those of Dr. Warren. Dr. Warren had more than ten years superintendent experience

(in the Crossett, Arkansas school district, a 3000 student school district; and in PCSSD, a

10,000 plus student school district). McNulty's superintendent experience was limited to

a 500 student school district for a short period of time. Exhibit 4- Excerpt from McNulty

application. Despite her service to PCSSD, the Board refused to afford Dr. Warren the

courtesy of a Board interview for the position. It only interviewed the Caucasian

applicant, Dr. Charles McNulty; and then it hired him on the spot!

4. The hostility toward Dr. Warren because of her insistence upon holding staff

accountable for adherence to Plan 2000 commitments was expressed overtly by Board

members Remele, Gillian and Mike Kemp beginning in March, 2018 and continuing

throughout her tenure as Superintendent. Those Board members yelled at, berated and

expressed open hostility toward Dr. Warren during at least two public board meetings on

April 28, 2018 and June 11, 2018. Despite their hostility, Dr. Warren recommended the

reemployment of staff for the 2018-19 school year. She informed the Board of the

progress in student achievement that was being made by the curriculum instruction team

of "program administrators" which she had assembled. Three program administrators

are African American (three of the plaintiffs) and two are Caucasian.[1] They reported to

Dr. Warren through Dr. John Tackett, Director of Secondary Education and Ms. Linda

Goodwin, Interim Director of Elementary Education. Tackett and Goodwin are

Caucasian.

---

[1] . Two additional members of the team were assigned to Will Reid, Chief Technology Officer, with the title of Senior
Instructional and Professional Development Facilitators. Reid and these team members were Caucasian. They were
unaffected by the Board directed budget cuts.

5. In the presence of Dr. Warren on April 10, 2018 and April 19, 2018, the Board expressly directed Paul Brewer to make recommendations of staff for termination and to collaborate with Dr. McNulty.  Exhibits 5 and 6 - Facebook posts dated April 11 and April 20, 2018.  Brewer did not consult with Warren regarding his proposed recommendations; nor did McNulty.

6. This case involves the school district Board of Directors' rejection of Dr. Warren's recommendation regarding retention of staff members for the 2018-19 school year.  The judgment of Dr. Warren was that budget cuts necessitated by loss of revenue could rationally be addressed by attrition.  She informed the Board in February or March, 2018 of the likely resignations of a number of administrators each of whom earned salaries of $100,000 or more. Exhibit 7 – Warren's Attrition List.  The Board was not satisfied with Dr. Warren's "attrition rationale" for budget reductions.  It then directed Paul Brewer to recommend cuts which expressly included the plaintiff program administrators and plaintiff Laura Shirley. The Board did not direct specific cuts of Caucasian staff.

In April, 2018, Brewer consulted with Dr. McNulty by phone regarding the cuts. McNulty stated that he wanted to eliminate the program administrators but gave no explanation for his decision.  Brewer reported McNulty's decision to the school board in April 19, 2018.  Brewer then made his balancing act of "one to one" cuts by cutting four Caucasian staff and himself.  Brewer's view was that race would not be considered a factor in his approach because he equally affected African American and Caucasian staff. His decision had an adverse impact upon African American staff and was contrary to the promises set forth in the Roberts' letter. Brewer's view later was that plaintiffs could not

argue that race was a factor in his approach to budget cuts because they equally adversely affected African American and Caucasian staff. McNulty spoke to plaintiffs in April and May, 2018 by email, in person and by telephone. McNulty was thus an active participant in the decision to terminate and/or reduce in status each plaintiff.

Moreover, during this process, Brewer did not provide a business case or written justification to the Board for the recommended budget cuts. In previous years, Dr. Guess' and Dr. Warren's budget cut recommendations presented to the Board were in writing with justification. The cut list McNulty and Brewer presented "gutted" the heart of the district's core curriculum and instruction team.

7. Guess authorized Dr. Warren to oversee more substantive implementation of the educational commitments of Plan 2000 which included the Ross Plan. Plaintiffs Beasley, Pride and Townsend were central to and expressly involved in addressing remediation of academic differences between African American and Caucasian students. Under Dr. Warren's leadership, that staff had the responsibility of aligning curriculum, training staff and meeting the requirements of the Arkansas Department of Education (ADE) focused upon enhancing learning and remediating the achievement gap between African American and Caucasian students.

8. Plaintiff Shirley oversaw and monitored the district's Gifted and Talented (G/T) program. The parties agreed and this Court approved that the G/T program was unitary. Shirley worked with Plaintiffs Beasley, Pride and Townsend and with Dr. Warren for the purpose of enhancing learning and remediating the achievement gap between African American and Caucasian students.

9. Of the five white employees who were cut, Leta Ray and Brandy Beckman

worked as "program administrators." Both were new to the position. Danny Ebbs and JoAnn Kohler were both Caucasian, over Athletics and Fine Arts, respectively. Neither was central to the work of Plaintiffs. Dr. McNulty decided to keep Caucasian program administrator Leta Ray and he gave her the new Instructional Strategist position. Brewer assisted Caucasian program administrator Brandy Beckman with securing employment in her home town adjacent Benton, Arkansas school district. At the end of the school year, only the three African American program administrators had not secured employment. Brewer saw to it that Ms. Kohler could use seniority to secure her position and her pay in the district. Shirley's critical position was not equally accommodated.

10. In the process their interaction about cuts which included members of the Board, Dr. McNulty told Brewer that Brewer's job would be safe for the 2018-19 school year, even though the Board had expressly cut it. Brewer has served as de-facto Deputy Superintendent of Schools since July 1, 2018. McNulty did not post the position held by Brewer as required by district policy. It may be regarded that McNulty and the Board rewarded Brewer for faithful service in helping to implement their discriminatory scheme by not requiring him to use the district's purported nondiscriminatory approach by not posting his position and by not making it competitive as he did for the three African American program administrators.

11. Brewer recommended that Plaintiff Shirley's position be reduced in pay by $10,000 or more. Her contract was reduced from twelve months to eleven months. Plaintiff Shirley had the Learning Services task of addressing the district's overall Gifted and Talented programs. Plaintiff Shirley's employment circumstance is comparable to that of JoAnn Kohler, the Caucasian Director of Fine Arts. Brewer cut her pay also by

7

twenty-eight days for a similar amount of approximately $10,000.00. He then reinstated
Ms. Kohler's days by giving her additional work.

Kohler informed Plaintiff Shirley that Brewer told her that he had offered similar
extra work to Shirley which Shirley had declined. Brewer stated that he did so because
Shirley was senior to Kohler. Brewer claimed further that Shirley's reduction in pay does
not amount to a RIF but he treated Kohler's circumstances, i.e., so as to address seniority
by first making an apparent offer to Shirley and then to Kohler. Shirley requested that
she be allowed to "bump" a junior in seniority person serving as a school principal.
Brewer informed Shirley that he could not honor her request because she had not been
reduced in force. Accordingly, Plaintiff Shirley was denied the opportunity to return to
her former position of principal despite her seniority. Brewer had no legitimate,
nondiscriminatory reason to diminish either Plaintiff Shirley's or Kohler's pay by one
month. He initially reduced Ms. Kohler's pay in order to mask his racial decision
regarding Plaintiff Shirley. Further, neither Brewer, McNulty nor the PCSSD have
legitimate nondiscriminatory reasons to eliminate the program administrator positions
which Plaintiffs Beasley, Pride and Townsend held during the 2017-18 school year.

## II. JURISDICTION AND BASIS FOR RELIEF

12. The court's jurisdiction is pursuant to 28 USC §1343 and 42 USC §
2000(e) et seq. The pendent state law claim is pursuant to ACA § 1501, et. seq.

13. The parties are all residents of Pulaski County, Arkansas. Venue is thus
appropriate in Little Rock, Pulaski County, Arkansas.

14. Plaintiffs assert and rely upon for relief the Due Process Clauses of the 14th
Amendment, 42 USC § § 1983 and 2000(e), et. seq. and Arkansas Code Annotated § § 16-

8

17-1501, et. seq., 16-17-1502 (2), 1503(2) (c), and 1506(b) (1).

15.     Plaintiffs bring this action in order to redress racially discriminatory and
arbitrary treatment directed by the defendants toward them which resulted in their loss
of employment (Beasley, Pride and Townsend) or by the reduction in pay (Shirley).

### III. PARTIES

16. Plaintiffs are Jennifer Beasley, Kiffany Pride, Laura Shirley and Nicole
Townsend.  Each plaintiff is a United States citizen of African ancestry. They were
employed as teachers for the Pulaski County, Arkansas Special School District (PCSSD)
during the 2017-18 school term. A.C.A. § 6-17-1502. During the 2017-18 school term, each
plaintiff satisfied the work expectations as teachers employed by the PCSSD. Each
plaintiff had an expectation of continued employment for the PCSSD for the 2018-19
school year until each plaintiff received notice of either termination or nonrenewal for the
2018-19 school year.

17. Defendants are Dr. Charles McNulty, Superintendent of Schools of the PCSSD;
and the corporate Board of Directors of the Pulaski County Special School District. The
School Board is prohibited from making or directing employment decisions for its staff
other than the Superintendent of Schools. A.C.A. §6-17-1506(b) (1); A.C.A. § 6-13-620.622,
PCSSD Certified Personnel Policies, p. 131, Exhibit 10.  The Defendant Board is being
sued because it forced Interim Superintendent Janice Warren to make administrative,
racial and arbitrary decisions which she advised the Board were financially and
educationally unsound.  She refused to defend the decisions during the administrative
proceedings held before the Board on June 11, 2018.  Paul Brewer defended case during
the June 11th proceedings for the district with heavy reference to the input from Dr.

McNulty and defendant board members. The PCSSD is an "employer" as that term is defined within 42 USC § 2000e, et. seq.

18. Plaintiff Jennifer Beasley is a graduate of University of Louisiana at Monroe (BS) and Grand Canyon University (M.Ed.). Plaintiff Beasley was employed by the PCSSD beginning with the 2012-13 school year. She has served as an Instructional Technology Specialist, School Improvement Specialist, and as Program Administrator. Her work for the school district was regarded as commendable.

19. Plaintiff Kiffany Pride is a graduate of Hendrix College (BS); the University of Arkansas – Little Rock (UALR) (M. Ed); Walden University (MA); and Harding University, (Ed. S) and (Ed.D.). She began work in PCSSD as a Program Administrator during the 2012-13 school year. Her work for the school district was regarded as commendable.

20. Plaintiff Laura Shirley is a graduate of Harding University (BS) and the University of Central Arkansas (UCA) (M.Ed.) (BS) and (M.Ed.). At the time of partial nonrenewal, Plaintiff Shirley worked as Director of Gifted and Talented Education. Shirley has been employed by the PCSSD for 24 years. She has held the positions of teacher, Middle School Assistant Principal and Middle School Principal. Her work for the district was regarded as commendable.

21. Plaintiff Nicolle Townsend is a graduate of Jones College (BS) and the University of Phoenix (MBA). She previously worked as a math teacher, elementary math coach, elementary assistant principal, elementary principal and High school vice principal. She began work during the 2017-18 school year as a Program Administrator. Her work for the district was regarded as commendable.

22. The challenged decisions were all made by the Caucasian leadership of school district, Dr. Charles, McNulty, Mr. Paul Brewer, Mr. Will Reid, Dr. John Tackett, and school board members Dr. Linda Remele and Ms. Alicia Gillen. However, the persons normally responsible for the personnel decisions at the time were Dr. Janice Warren and Ms. Shawn Burgess, Director of Human Resources both African American persons. Neither agreed with the cuts of plaintiffs.

## IV. THE FARCE OF THE BUDGET CUTS

23. Since July 1, 2016 the defendant Board has not seen fit to address reduction of staff for budgetary reasons. On information and belief, it has increased the size of its staff administrative staff for the 2018-19 school year. Moreover, it has yet to request or require defendant McNulty or CFO Palmer to address budget cuts from the category of restricted funds. There is not a line item budget regarding restricted funds. The last one that appears on line is for the 2014-15 school term.

24. In February, 2018, the defendant Board informed Dr. Warren that it wanted to reduce the budget for the next year by about one million dollars. Dr. Warren informed the defendant Board that this would be achieved by attrition. Soon thereafter, the Board voted to replace Warren with defendant McNulty effective July 1, 2018. The board then instructed Brewer to develop cuts from within the curriculum department of the central office. It did so to accommodate defendant McNulty to allow him to redirect the curriculum. The curriculum department was majority African American, three African American Program Administrators and two Caucasian program administrators. One of the Caucasian Program Administrators was conditionally certified. Both were in their first year. Two of the three African American Program administrators were in their

11

sixth year. Defendant McNulty met specifically with the program administrators and informed them that he wished to change the direction of the curriculum department and that he would be offering reemployment to all of the affected department staff. At the time he met with the program administrators, the curriculum team was successfully addressing the curriculum needs of the district. Dr. McNulty reneged on his commitments of re-employment to the plaintiff Program Administrators.

25. Brewer supplemented the cuts of the Program Administrators by reducing by $10,000 the salaries of three people and by cutting himself, Directors Goodwin and Tackett. Their three salaries total approximately $475,000.00. The difference between the Warren cuts and the McNulty/Brewer cuts is that Warren's were all through attrition. Moreover, Brewer had no intention of resigning and he was aware that one of the Program Administrators, Beckman had found employment elsewhere. In essence, the cuts recommended by Brewer actually amounted to approximately $330,000.00. That figure represents three one thousandths of one percent of the district's budget for the 2018-19 school year.

26. Caucasian Program Administrator Leta Ray was in her first year with the district. Ray was not certified as an administrator. She was hired with an Additional Licensure Program (ALP) for the 2017-18 school year, while Plaintiffs Beasley, Pride, and Townsend were fully certified as administrators. Defendant McNulty, the Board and Brewer retained and rehired Ray notwithstanding Ray's lesser experience and objective qualifications. They offered no justification for Ray's retention. Defendants McNulty and Board treated Paul Brewer in the same manner as they treated Leta Ray. They rehired Brewer without posting.

27. Plaintiffs submit for comparison the budget cuts for 2018-19 represented by

Dr. Warren to those presented by McNulty and Brewer. They are as follows:

| Warren Attrition | | McNulty/Brewer Cuts | |
|---|---|---|---|
| Althsul, NB | $136,000.00 | Beasley | $101,000.00 |
| Brewer, NB | 169,500.00 | Beckham-NB | 89,000.00 |
| Goodwin, NB | 150,000.00 | Brewer –NB | 169,500.00 |
| Scott, NB | 181,000.00 | Ebbs – NB | 10,000.00 |
| Tackett, NB | 157,000.00 | Goodwin- NB | 150,000.00 |
| Viswathan, NB | 105,000.00 | Pride | 113,500.00 |
| Wheeler, NB | 100,000.00 | Ray – NB | 96,500.00 |
| | | Shirley | 10,000.00 |
| | | Tackett- NB | 157,000.00 |
| | | Townsend | 105,000.00 |
| Total | $998,500.00 | Total | $1,001, 000.00 |

Brewer, McNulty, Board Members Remele, Gillen and Chief Financial Officer

Denise Palmer guided the decision to "gut" the district's curriculum department. They

should have known that the plaintiff Program Administrators were employed pursuant to

funds specifically derived from and restricted by the Arkansas Department of Education

(ADE).  Exhibit 8 - Preliminary State Aid Notice 2017-18, lines 11, 20, 33.  The Defendant

Board knew or should have known that CFO Denise Palmer had not prepared any

budgets appraisals or numbers that addressed the limitations of law with respect to use

of restrictive funds.

Neither Brewer nor McNulty explained the fiscal impact of the budget cuts

directed by the Board upon the restricted budget of the district. Further, when the school

board acted to require termination of the Program Administrators, there was no business

case, nor educational justification presented by the McNulty or Brewer for the cuts

[initiated by Gillen and Remele and enforced by the Brewer and McNulty].

28. Pulaski County Special School District hand delivered non-renewal letters of

13

teacher contracts to the plaintiffs indicating to reduce expenditures of local unrestricted funds and elimination of their positions as District Curriculum Program Administrator.

29. Defendant McNulty, Remele, Brewer and Gillen should have known that the source of funding for plaintiffs' Program Administrators' salaries was restricted funds (categorical) Special Needs – National School Lunch Act. National school lunch state categorical funds were allocated for the purpose of employing Curriculum Specialists/Data Coaches, such as plaintiffs; they were employed for the purposes that are research based and aligned to the Arkansas Content Standards for improving instruction and increasing achievement of students at risk who were not meeting challenging academic standards. In addition, the plaintiff Program Administrators provided research-based professional development in the areas of literacy, mathematics, and science in grades K-12. Also, the plaintiff Program Administrators in the PCSSD were tasked to assist to assist the district in meeting unitary status in student achievement.

The recommendation submitted by Paul Brewer to the Board for Reduction in Force budget cuts is set forth in Exhibit 9, "PCSSD Certified Allocations". The positions to be cut as submitted by Brewer included:

| Position | Change | |
|---|---|---|
| Chief Executive Officer/HR | RIF | (page 2) |
| Director of Elementary Education | RIF | (page 4) |
| Director of Secondary Education | RIF | (page 4) |
| Program Administrator (5) | RIF | (page 5) |

30. Brewer and McNulty represented to the school board that the budget cuts which they were recommending were pursuant to a district wide Reduction in Force. See Exhibit 10, Board Policy; and A.C.A. § 6-17-2407. See also Brewer's testimony, Exhibit

11, hearing June 11, 2018.

The RIF policy required a district wide evaluation of staff for RIF purposes. Brewer did not perform a district evaluation of staff before he made the recommendation for proposed cuts. Brewer, however, told the Board that because he was not recommending that RIF apply, the RIF policy did not apply. Brewer's comments are set forth in a hearing before the Board held on June 11, 2017.  See Exhibit 11, pages 80-86.

31. Brewer, himself, defendants McNulty and the Board knew that Brewer was not Riffing himself.  McNulty's knowledge is evident because he simply rehired Brewer on or about July 5, 2018 without a posting, an opportunity for competition for the position, and at an exorbitant salary which the Board had already decided to cut. McNulty did not consider the three African American Program Administrators for the position.  Each plaintiff was qualified for the position awarded to Brewer.

Defendant McNulty's bad faith and racial actions are reflected in his discussions and written communications with Plaintiffs Beasley, Pride and Townsend. He applauded their work, promised them continued employment and then almost simultaneously denigrated their work by supporting a false reason for their termination. He then rehired Leta Ray despite her lower qualifications than Beasley and Pride for no discernable reason. Although Townsend and Ray were first year employees, there was no legitimate, nondiscriminatory reason that McNulty could use to justify the unfavorable treatment of plaintiffs Beasley, Pride, Townsend and the favorable treatment of Leta Ray.

Defendant McNulty formally took office on July 1, 2018.  His first act was to rehire Brewer.  Brewer advised McNulty to hire one African American person as Program

Administrator/Instructional Strategist and another as Deputy Superintendent. McNulty, as the Board had done earlier, rejected Dr. Warren, the Assistant Superintendent for Equity and Pupil Services and former Interim Superintendent Warren, as the Deputy Superintendent.

There were two additional Caucasian employees who worked with the plaintiffs regarding curriculum, Casey Dailey and Rachel Blackwell. Each performed essentially the same duties and work expectations as Plaintiffs Beasley, Pride and Townsend. They reported, however, to a noncertified, non-educator named Will Reid, a Caucasian male.[2]  However, they were not affected by Brewer's decision to RIF staff. Dailey was actually paid from the same source of funds as the African American Program Administrators. The objective qualifications for the work which Dailey and Blackwell performed are below those of the three African American Program Administrators.  This is confirmed by their Arkansas Department of Education certification and by their respective educational degrees.

32. In previous years, <u>justification</u> for budget cuts was developed and presented in writing.  They were generally signed by Dr. Warren, Assistant Superintendent for Equity and Pupil Services. For the 2018-19 school year budget cuts, Brewer did not present <u>justification in writing </u>and he expressly informed the Board that the proposed cuts were arbitrary. Exhibit 12, Excerpt from Brewer testimony on 6/11/18, p.74.

### VI. THE RIF DECISIONS ARE BOTH PRETEXTUAL AND RETIALATORY

33. The Defendants articulated reason for the adverse employment decisions regarding the African American Program Administrators and the Gifted and Talented

---

[2] . Brewer had informed the defendant Board that Reid participated in the RIF decision made by him.

(G/T) Director is that the decision was made "in order to meet the district's need to reduce expenditures to match available revenue and to more efficiently manage district resources". (Exhibit 13 – Letter to Plaintiffs directed to be signed by Interim Superintendent)  The reason is pretextual.

34.  First, according to Paul Brewer, neither his recommendation nor the Board's action were regarded RIFs because Brewer and McNulty did not make a district wide comparison of employees as required by the Board's RIF policy and state law.  Exhibit 10. Second, neither McNulty nor Brewer defined or set forth the amount of money these cuts would achieve in order to match available revenue and to more efficiently manage district resources.  Third, the decisions of McNulty and Brewer were specifically focused on RIF's of the majority African American Learning Services department which included Plaintiff Shirley. Fourth, the RIF was opposed by the Interim Superintendent, Dr. Warren because: a) normal attrition would achieve the proposed amount of budget cuts; b) there was no educational nor financial justification for the specific budget cuts regarding the curriculum staff; c) "no school district anywhere on earth cuts its entire curriculum department"; and d) the positions were critical to the implementation the education components of Plan 2000 commitments. Fifth, Defendants rehired Brewer notwithstanding the RIF.  Sixth, McNulty promised to reposition plaintiffs Beasley, Pride and Townsend; then he advertised four positions and failed to rehire either of them.

35.  In order to avoid claims of racial discrimination, defendant McNulty hired four African American staff for four of the six positions he created (including the Brewer position) Defendant McNulty thus denigrated the qualifications and worth of plaintiffs Beasley, Pride, Townsend as well as Dr. Warren.

36.  The district has a long standing policy, practice, custom and usage of promoting employees from within the district before it opens the positions to outside applicants.  It did not follow its pre-existing policy, practice, custom and usage when it refused to employ Warren, Beasley, Pride and Townsend; and to reinstate Shirley to a 12 month administrative or G/T position.  Each was qualified for each position that Defendant McNulty chose to fill with outside the district applicants.

## THE INTENT STANDARD OF PROOF SHOULD NOT APPLY

37. On May 9, 2017, the Defendant school district, through Superintendent Jerry Guess and district counsel Allen Roberts, submitted to the Court for approval a staffing agreement which would allow declaration of unitary status in that area of Plan 2000. The agreement was approved by Intervenors counsel.   While the agreement was pending for Court approval, board members Remele, Keller and Gillen decided that they would remove Guess because of the stipulation regarding staffing and the Roberts' letter and because they were hostile to further negotiations regarding related matters which kept the district under court supervision. See Exhibits 14 and 15.  The Court's Order approving the staffing stipulation was entered on June 14, 2017.  Defendant Board terminated Guess and Roberts on July 18, 2017.

38. The Court had consistently admonished the parties to reach agreements regarding issues about Plan 2000 which remain under court supervision.  The Court emphasized the importance of voluntary agreements when it directed monthly meetings between the parties and their counsel.

39. Defendant Board was aware of the court directed monthly meetings being regularly held between the parties. The school district counsel regularly made reports to

18

the Court in public sessions where school board members were present.  The reasons

given for terminating Roberts and Guess are therefore retaliatory.

40. On July 13, 2017, counsel for the Little Rock School District with the

agreement of other counsel herein, filed a Motion for Continuance in Covington, et al. v

Key, et al.  The purpose of the motion was to allow a brief period of time for them to

explore further discussions for overall resolution of the court related issues between the

parties. Exhibit 16.

41. Upon receipt of an email from a constituent on July 15, 2017, Board member

Eli Keller immediately rallied Board members to an emergency board meeting on July

18, 2017, the subject of which was the continued employment of counsel Allen Roberts

and Superintendent Guess.  Exhibits 17 and 18.   In the executive session, Dr. Guess was

implored to summarily terminate Roberts or possibly terminated himself.  In the public

session, the Board terminated Roberts and gave Dr. Guess the option of continuing as

Superintendent but only in the event that he utilized other counsel and did not pursue

the commitments of the Roberts letter. When Guess declined, he was terminated for

cause.  By termination of Guess and Roberts for cause related to compliance with Plan

2000 and the Roberts' letter, defendant Board effectively rescinded the administrative

commitments that Guess had made during the regular meetings between the parties as

reflected in the Roberts' Letter of May 12, 2017.  By rejecting the administrative

commitments of the Roberts letter, and by Guess and Roberts, defendant Board

effectively violated its own staffing agreements and representations to the Court.  The

defendant Board's terminations of Guess and Roberts and its administrative refusal to

allow continuance of the committed interventions regarding personnel, defendant Board

engaged in actions which had racial impact and direct racial impact upon the plaintiffs specifically. All of the recommendations by Guess as reflected in the Roberts' letter were discontinued. Dr. Warren, instead of being elevated was diminished.

42. The Court is asked to conclude that because of the defendant school board's decision to retreat from the commitments of the stipulation and for administrative actions which were made by Dr. Guess in the Allen letter, the Board's conduct must be held to have been in bad faith. Such bad faith compliance warrants rescission of the Court's Staffing Order entered on June 14, 2017. Plaintiffs submit that because of defendant Board's bad faith with respect to the staffing submissions and its treatment of Guess and Roberts, the defendants should not be allowed to argue that plaintiffs are required to prove intentional discrimination as prerequisite for their relief.

### DEFENDANTS VIOLATED THE DUE PROCESS AND EQUAL PROTECTION RIGHTS OF PLAINTIFFS AFTER TERMINATING THEM AND THEN NEGLECTING TO RECALL THEM IN JULY, 2018

43. Pursuant to notice by Brewer and notice directed by the Defendant Board, Plaintiffs were given verbal and written notice that they were being reduced in force (RIF-ED). In July, 2018, the PCSSD decided to fill the positions which plaintiffs Beasley, Pride and Townsend held with persons outside the district or with less experience within the district who applied. The positions were given the Title of Instructional Strategist. The Instructional Strategist and Program Administrator duties were basically the same. There was no salary for Instructional Strategist. By changing the title to Instructional Strategist, defendants sought to circumvent their Reduction in Force policy (RIF). The RIF policy essentially states that positions RIF'ed should not be filled with less experienced persons whether inside or outside the district. The justification for the RIF

was related to a shortage of revenue to fund the positions. The filling of Program

Administrator vacancies with a new title of Instructional Strategist is evident that

shortage of revenues was a pretext for the termination of Beasley, Pride and Townsend.

## THE FUNDS FROM WHICH PLAINTIFFS
## PROGRAM ADMINISTRATORS WERE PAID WERE RESTRICTED

44. The funds from which plaintiff program administrators were paid

were restricted. Defendant board members are obliged to use restricted funds in

compliance with the restrictions imposed. Defendants argue that they were unrestricted.

Exhibit 8, the preliminary State Aid Notice, lines 20 and 33 demonstrate that the source

of funds from which plaintiffs are paid are NSL state funds which are restricted.

45. Paul Brewer and defendant Board gave verbal and written notice to

plaintiffs that they were being RIF-ed. In July 2018, PCSSD decided to fill positions

which were formerly held by plaintiffs Beasley, Pride, and Townsend new persons rather

to afford recall rights to the plaintiffs. The new job title for two of the positions was

Instructional Strategist. It was essentially the same position as the Program

Administrator position. Exhibits 19 and 20 (old and new job descriptions). The new

position is not on the salary schedule and has no historical significance to Learning

Services. Plaintiffs contend that the defendants have violated the district's RIF Policy in

that their former positions should first have been offered to them and should not be filled

with lesser experienced persons from either inside or outside the district. The

justification for the RIF was related to a shortage of revenues to fund the positions;

therefore, the position now asserted is pretextual, follows no sense of logic and is not

stated in policy or allocations.

## DEFENDANTS ACTIONS VIOLATE THE PROVISIONS
## OF TITLE VII OF CIVIL RIGHTS ACT OF1964

46. Title VII of the Civil Rights Act of 1964 prohibits the Defendants from

discriminating against employees on the basis of race, color, gender, and certain other

attributes.  The Defendant school district is an employer as defined by the Act. Title VII

forbids discrimination in any aspect of employment such as hiring, firing, assignment,

transfer, lay-off, recall, or enabling a hostile work environment among other things.

47. On or about July 15, 2018, plaintiffs each gave notice to the Equal Employment

Opportunity Commission (EEOC) that they wished to file complaints of discrimination

due to race and a hostile work environment because of defendants actions in giving them

notice of termination or non-renewal or loss of pay and then taking adverse action

against each of them on or about June 11, 2018.  Plaintiffs incorporate their EEOC claims

into this complaint with the expectation that upon receipt of Notices of Right to Sue, they

will amend this complaint.   They seek relief as provided by Title VII that is equitable

and for damages for each of them in the amount of $300,000.00 as allowed by the statute.

## DEFENDANTS' CONDUCT VIOLATES THE CIVIL RIGHTS
## ACT OF 1866 AND 42 U.S.C. § 1983

48. 42 U.S.C. § 1983 requires that each person who under color of law, custom,

policy or practice subjects any citizen of the United States to the deprivation of rights,

privileges or immunities secured by the 14th Amendment shall be liable to injured parties

in an action at law suit in equity or other proper proceeding for redress. Defendants

actions herein, as set forth infra, were taken under color of law to the detriment of

plaintiffs. Plaintiffs were entitled to equal, nondiscriminatory treatment with respect to

the terms and conditions of their employment.  That included their right not only to enter

into contracts but to be able to enjoy the benefits of the contract without defendants arbitrarily and discriminatorily adversely impacting same. Defendants Board of Directors of the PCSSD and Charles McNulty acted in concert with employees of the district to deprive plaintiffs of employment for no legitimate nondiscriminatory reason and for reasons which were otherwise admitted to be arbitrary and discriminatory. Defendants thus created and continued a work environment hostile to plaintiffs due to their race or color and because they were working to fulfill the requirements of a federal court decree known as Plan 2000 entered by the United States District Court for the Eastern District of Arkansas.  Exhibit 12, p. 74 – Testimony of Brewer regarding the arbitrary decisions he made that adversely affected the plaintiffs.

## DEFENDANTS' CONDUCT VIOLATES THE ARKANSAS FAIR TEACHER DISMISSAL ACT

49. In March, 2018, Defendant Board directed a subordinate employee to the Superintendent of Schools, Paul Brewer, to make recommendations to it for budget cuts and to do so in consultation with a non- employee of the school district.  It was the role of the Superintendent to make the budget cut recommendations upon her considered judgment.  She declined to make any cuts because they were not justified by reasons of financial feasibility and educationally sound reasons. Defendant Board, on April 28, 2018, directed the Superintendent to sign letter of nonrenewal and/or termination.  Under duress, the Superintendent did so.  Defendant Board thus performed an administrative action and then on June 11, 2018, made judgments regarding their own actions. Defendant Board thus deprived the plaintiffs of a fair tribunal to consider the reasons proffered for their nonrenewal, reduction in force or termination.

50. Defendant Board actions violated its own policies and state law. Arkansas Code

Annotated § 16-17-1501, et seq.  Defendant Board aggravated its decision by acting
without information and for reasons that were false.

51.  Defendant Board's decision reached in executive session was on a tie 3-3
vote.  When the Board voted in public, its vote was so confusing until there was no
decision regarding whether the plaintiffs were discharged. The Board then adjourned.
Several board members left the meeting.  The Board members then met with Jay
Bequette, counsel for the school district, during the hearing, outside the presence of
plaintiffs' counsel.  A board member then moved to rescind the adjournment because
there was uncertainty about what actually happened regarding the 3-3 vote.  A 3-3 vote
would have left each plaintiff employed.

<h2 align="center">CONCLUSION</h2>

52.  The plaintiffs have each been deprived of due process, equal protection of the
laws, rights secured to them by 42 U.S.C. § 2000e, et. seq., rights secured to them by the
Arkansas Fair Teacher Dismissal Act, A.CA. § 6-17-1501, et. seq. and of rights secured to
them by the Defendant Board policies, practices, customs and usages as reflected in their
contract of employment.   Defendant Board directed the adverse actions challenged
herein and was responsible for the racial and arbitrary decisions made by its Board
members and its agents including Paul Brewer, Dr. McNulty and Dr. Janice Warren.

53.  Defendant McNulty, though not authorized by law made personnel decisions
which adversely affected the plaintiffs' continued employment and treatment before his
authority began on July 1, 2018. Agent Paul Brewer made arbitrary decisions where he
sought out African American staff who performing necessary work required by Plan 2000
to be cut for no legitimate, nondiscriminatory reason. Defendants Board and McNulty

24

provided false public reasons which were pretextual in their judgment to remove

plaintiffs from employment on the same terms and conditions as they endured during the

2017-18 school year.

Defendants are well informed of the rights of these employees because they have

engaged in frequent litigation over many of the same issues. The rights of plaintiffs to be

free from the treatment perpetrated upon them by the defendants are so well known as to

be beyond cavil.   Plaintiff have no effective recourse for redress of their grievances other

than this action for relief as provided by law and equity.   Any other course of action

would be so costly, time consuming and uncertain as to deny effective relief.

54. The aforestated claims of the plaintiffs establish that defendants have

deprived plaintiffs of well-known and well established rights for which plaintiffs are

entitled to relief pursuant to the Civil Rights Acts of 1866 and 1964, the Equal Protection

Due Process Clauses of the 14th Amendment, the Arkansas Fair Teacher Dismissal Act,

and the policies of the school district regarding RIF's which were incorporated pursuant

to Plaintiffs' contracts of employment with the school district.   The rights of plaintiffs to

be free from discrimination due to race and to be otherwise treated in accord with the

laws and policies cited herein are so well known and well established that defendants

may not assert immunity of any kind.

55. Each plaintiff is claiming "make whole" relief including back wages, restoration

benefits lost compensatory damages, punitive damages and an injunction forbidding

defendants from engaging in discriminatory and/or retaliatory conduct in the future due

to their race or color or for having engaged in protected activity related to or arising out

of the facts alleged herein.

WHEREFORE, plaintiffs respectfully pray that this matter be set for early hearing and that the Court thereafter enter judgment on their behalf individually for declaratory, equitable and injunctive relief which requires their reinstatement and forbids retaliation for having engaged in protected activity.

They further pray for compensatory damages in the amount of $300,000 each as provided by Title VII of the 1964 Civil Rights Act in order to compensate them for their damages suffered because of defendants arbitrary and otherwise unlawful conduct. Plaintiffs further pray for punitive damages because of the exceeding and reckless disregard of plaintiffs' reputation, standing in the community, loss of employment and because of the actual intent of several identifiable defendants and agent Brewer to cause each of them harm because of race and/or because each of them opposed the defendants' actions which defendants directed be taken in order to harm the plaintiffs. The damages being sought under 42 U.S.C. §1983 are $500,000 for each plaintiff.  Plaintiffs seek equitable relief which consists of back pay and benefits lost including but not limited to insurance, sick and vacation leave, retirement benefits, educational leave and any other benefits offered to district employees for the purpose of making them more competent in their profession.

.      Finally, plaintiffs pray for their costs, including but not limited to expert witness fees, attorneys fees pursuant to 42 U.S. C. § 1988 and such other alternative or further

relief as the court may deem necessary in order to vindicate the civil rights of each

plaintiff.

Respectfully submitted,

John W. Walker - AB64046
Shawn G. Childs
John W. Walker, P.A.
Email: johnwalkeratty@aol.com
1723 Broadway
Little Rock, Arkansas  72206
501-374-3758
501-374-4187 facsimile

August 6, 2018

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JENNIFER BEASLEY, DR. KIFFANY PRIDE,
LAURA SHIRLEY AND NICOLE TOWNSEND                    **PLAINTIFFS**

VS.                          CASE NO. _____

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools of the
Pulaski County Special School District; the BOARD
OF DIRECTORS of the Pulaski County Special
School District; and the PULASKI COUNTY SPECIAL
SCHOOL DISTRICT, a public body corporate              **DEFENDANTS**

## EXHIBITS TO COMPLAINT

Exhibit 1 – Roberts Letter dated May 12, 2017
Exhibit 2 – PCSSD 8/25/17 Report to Court re Facilities
Exhibit 3 – PCSSD 9/5/17 Report to the Court re Facilities
Exhibit 4 – Excerpt from McNulty Application
Exhibit 5 –Gillen Facebook post dated April 11, 2017
Exhibit 6 - Gillen Facebook post dated April 20, 2017
Exhibit 7- Warren's Attrition List
Exhibit 8 –Preliminary State Aid Notice 2017-18, lines 11, 20, 33
Exhibit 9 –PCSSD Certified Allocations
Exhibit 10-PCSSD Reduction in Force Policy
Exhibit 11-Excerpt from Board hearing dated 6/11/18, pages 60-86
Exhibit 12-Excerpt from Board hearing dated 6/11/18, page 74
Exhibit 13-Notice Letter of Nonrenewal
Exhibit 14- Email dated 5/14/17 from Board member Keller
Exhibit 15– Email dated 5/19/17from Remele to Board members
Exhibit 16 – Motion for Continuance – Covington, et al v Key, e tal
Exhibit 17 – Email dated 7/15/17 between Keller and patron
Exhibit 18 – PCSSD 7/18/17 Board minutes
Exhibit 19 – Program Administrator job description
Exhibit 20 – Instructional Strategist job description

Respectfully submitted,

_____

/s/ John W. Walker - AB64046
Email: johnwalkeratty@aol.com
1723 Broadway
Little Rock, Arkansas  72206
501-374-3758
501-374-4187 facsimile

August 6, 2018

**EXHIBIT**

_1_

# ALLEN P. ROBERTS, P.A.
## ATTORNEYS AT LAW

Allen P. Roberts
allen@aprobertslaw.com
Nate Roberts
nate@aprobertslaw.com
Camden Office
325 Jefferson St. /P.O. Box 280
Camden, AR 71701

Telephone:  (870) 836-5310
Facsimile:  (870) 836-9662

Whitney F. Moore
whitney@aprobertslaw.com
Little Rock Office
1818 N. Taylor St., Ste. B
PMB 356
Little Rock, AR 72227

May 12, 2017

**PERSONAL AND CONFIDENTIAL COMMUNICATION**

*Via Electronic Mail Only*
johnwalkeratty@aol.com
John W. Walker
John W. Walker, P.A.
1723 Broadway
Little Rock, Arkansas  72206

> Re:     PCSSD Stipulation

Dear John:

John, I believe the following accurately reflects my comments during our phone conversation on Monday, 8 May 2017, following my receipt of your CONFIDENTIAL COMMUNICATION email received by me at 1:26 p.m. on that date.  This is the written response I promised you reflected those comments.

1. Dr. Warren will be recommended by Dr. Guess as Deputy Superintendent with full authority of a Deputy at the meeting of PCSSD school board in June, 2017.

2. Dr. Guess has directed Whitney Moore and me to make our first order of business the investigation of certain allegations and complaints against Derek Scott.

3. I represent to you in good faith it is my belief that Mr. Paul Brewer intends to retire at the end of this year or next year.

4. No.

5. I will review the personnel files of Donald Booth, Tony Adams, and Dr. Veronica Perkins to identify anything therein that might justify a name-clearing for any of them.

6. Whitney and I will be able to negotiate in good faith to resolve the complaints of:

        a. Mr. Kenneth Moore
        b. Mr. Danny Bryan
        c. Ms. Cindy D'Abadie
        d. Ms. Marion Carter

7. Joshua may provide information to PCSSD regarding potential applicants, and the Human Resources department shall consider that information when filling future positions, in accordance with current PCSSD policies.

8. All administrators who are quartered within the PCSSD central office will be required by 2018-19 to hold the certification considered necessary by ADE for the job held by that particular employee.

Thank you very much.

Sincerely,

*/s/ Allen P. Roberts*

Allen P. Roberts



**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION DIVISION**

**LITTLE ROCK SCHOOL DISTRICT**                                        **PLAINTIFF**

**V.**                                   **NO. 4:82CV00866DPM**

**PULASKI COUNTY SPECIAL SCHOOL**
**DISTRICT NO. 1, ET AL.**                                             **DEFENDANTS**

**MRS. LORENE JOSHUA, ET AL.**                                        **INTERVENORS**

**PCSSD'S STATUS REPORT TO THE COURT**
**FOR SEPTEMBER 8, 2017 STATUS CONFERENCE**

**I. SUMMARY**

1. This Court declared the PCSSD unitary as regards Section L of Plan 2000 "Staffing" and dismissed court supervision over the PCSSD in all areas of staffing.

2. The PCSSD continues the construction of a new Mills High School and a new Robinson Middle School and both projects are on schedule.

3. The voters approved a ballot measure on June 13, 2017 to extend the existing millage thus allowing the District to complete the sale of bonds on July 26, 2017. The bond issue generated the net sum of $66,278,675.02 to devote to new construction projects. The District previously successfully sold a refunding bond issue on July 11, 2017 that resulted in over $800,000 in net present value debt service savings.

4. The District intends to spend approximately $65,000,000 of these funds to improve and rehabilitate Sylvan Hills High School.

5. On July 18, 2017 the District Board of Directors relieved Dr. Jerry Guess of his duties as Superintendent and named Dr. Janice Warren as interim Superintendent.

6. In addition to the appointment of Dr. Janice Warren, Sherman Whitfield has been appointed interim assistant Superintendent for Equity and Pupil Services taking on a role previously performed by Dr. Janice Warren. Linda Goodwin was recently hired as interim Director of Elementary Education a role that Dr. Janice Warren also previously occupied.

7. On September 20, 2017, the District will update Joshua, ADE and Margie Powell regarding discipline issues and outcomes for the previous school year.

8. On October 18, 2017, the District will release new student achievement outcomes particularly ACT ASPIRE results and update progress toward closing the student achievement gap for grades 3-11.

## II. ELABORATION

1. The Court's Order was entered on June 14, 2017.

2. The new Mills High School construction project is on schedule. Steel erection is approximately 90% complete. The brick facade is currently being applied to the classroom tower. The hardened storm shelter vertical structural construction is complete. Sheetrock will commence within the next few weeks in the southeast portion of the new structure and it will progress through the facility on the phased schedule set out by the CM. The multipurpose facility (MPF) is nearing completion and 'move in' is imminent. Approximately 95% of the MPF furniture and fixtures have been delivered and are in place. The overall project is on schedule for a 2018-2019 school year opening. Due to the extreme technical nature of the performing arts area, this portion will be ready for occupancy three to four months after the start of the 18-19 school year. This is similar to the Maumelle High project which delivered the performing arts area in mid December after the school year started.

The new Robinson Middle School construction project is on schedule. Steel erection is approximately 85% complete. The brick facade is progressing well on the classroom tower. The hardened storm shelter space is structurally complete. Sheetrock will commence within the next couple of weeks and will progress through the building as construction allows. The multipurpose facility (MPF) is substantially complete with punch list items currently being corrected. The overall project is on schedule for a 2018-2019 school year opening. This project does not have a performing arts center and the cafeteria doubles as the auditorium.

3. No further elaboration.

4. The District intends to embark upon an estimated $65 million construction project to place a major addition for Sylvan Hills High. This addition will include an academic wing with classrooms, a seminar room, multiple science labs, a media center and administrative space. The new construction will also include a cafeteria, arena to seat approximately 2,200, a multipurpose facility and a performing arts complex. Construction is expected to commence in December of 2017 with all portions complete before the start of the 2019-2020 school year. Renovations to the existing high school could take place after the major addition is complete and would be funded with other funds.

5. No further elaboration.

6. No further elaboration.

7. The District's Annual Report regarding discipline for the 2016-2017 school year has been approved by the Board and shared with Joshua.

8. In addition, representatives of the District met with Joshua and representatives of the Donaldson Scholars program on August 21, 2017 to obtain updates regarding the plans for how

3

the Donaldson Scholars Program and the sponsoring institutions of higher learning as well as the

District might continue to collaborate in the future.

Respectfully submitted,

By:

   /s/ M. Samuel Jones, III
M. Samuel Jones III (76060)
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8800
Facsimile: (501) 688-8807
E-mail: sjones@mwlaw.com

Attorneys for Pulaski County Special School
District

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification such to:

All counsel of record

   /s/ M. Samuel Jones, III

4

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## EASTERN DIVISION DIVISION

**LITTLE ROCK SCHOOL DISTRICT**                                    **PLAINTIFF**

**V.**                                  **NO. 4:82CV00866DPM**

**PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.**                                          **DEFENDANTS**

**MRS. LORENE JOSHUA, ET AL.**                                   **INTERVENORS**

### PCSSD'S SUPPLEMENTAL STATUS REPORT FOR THE
### SEPTEMBER 8, 2017 STATUS CONFERENCE

## I. FACILITIES

After completing the successful opening of school, the new administration has turned its

attention to assessing the status of various projects ongoing in the PCSSD including the status of

construction of a new Mills High School, the conversion of the old Mills High School to a new

middle school, the demolition of Fuller Middle School and the construction of the new Robinson

Middle School. Both the new Mills and Robinson projects involve the construction of athletic

facilities which are required to be at least equivalent to those constructed at Maumelle High

School. Both facilities appear to be at least equivalent to or exceed the athletic facilities at

Maumelle High School. However, there are indications, which are being evaluated and further

explored, that certain aspects of the facilities at Robinson may involve features that could be

subjectively if not objectively regarded as superior to certain of those at Mills.

The Administration doubts that it can make a definitive report to the Court and the parties

by the time of the status conference scheduled for September 8, 2017. However, the District has

concluded that it would be prudent to inform the Court and the parties about the items it is

currently investigating.



EXHIBIT
3

Issues being evaluated include:

1. Whether or not there are size differences in the weight rooms, indoor practice facilities and coaches and athletic personnel offices which need to be further assessed and addressed if necessary.

2. Whether or not there are differences in interior finishes, including wall, ceiling and floor treatments that need to be further assessed and addressed if necessary.

3. Whether or not there are differences in lighting and window placement in the athletic facilities being constructed that are of sufficient magnitude as to require further assessment and further address if necessary.

4. Why the athletic facilities at Robinson are currently being utilized but those at Mills are not? (This is probably explained by a granite out crop that was encountered during construction at Mills)

5. Overall, whether or not the expenditures currently budgeted for Mills High School, when completed, comport with this Court's Order of January 12, 2015, which Order approved the motion of the District proposing the expenditure of "circa $50,000,000" for the new Mills High School and "circa $5,000,000" for the conversion of Mills High School to a middle school? Whether or not the District is keeping separate, to the extent separation is required, approximately $15,350,000 in final year "desegregation funding" and devoting those dollars exclusively to the Mills projects.

Thus far the questions that have arisen are limited to the athletic facilities at the two schools. Construction of the academic facilities has not yet progressed to the point where the District is unable to remedy any equitable issues that might be present in the construction plans. Those are being assessed and addressed.

2

The District has now met twice with the architects for the Mills projects. The District has received reasonable assurances that, if necessary, additional windows can be added to the indoor practice facility at Mills, that the lighting and light fixtures can be enhanced at Mills to bring them on par with those at Robinson and that the concrete columns can still be wrapped in sheet rock at Mills although the architects differ as to whether or not this is a wise or prudent move in any event.

The Maumelle athletic facilities will overall be inferior to those at Mills because Mills will have an indoor practice facility as well a track and Maumelle has neither. It is the understanding of the administration that the design for the Mills athletic facilities began by using the Maumelle facilities as a starting point.

More broadly the administration is investigating:

1. What has been spent to date at Mills? What has been spent to date at Robinson?

2. What were the original budgets for each project?

3. Have the respective budgets changed, who proposed the changes and who approved the changes?

4. We understand that the original design of Mills that was presented to the Advisory Board and the Commissioner has been changed. When did the Advisory Board and the Commissioner approve the changes?

5. What can be done at this stage to equalize the projects if in fact they are not substantially equal in terms of expenditures overall?

6. Again, it appears to the administration that at this stage overall the athletic facilities at Mills are not as refined as those at Robinson and are behind the completion date for those projected at Robinson. However, the administration is working to determine and reassure the

3

public, the parties and the Court that once completed the overall facilities, which, after all, are primarily the academic components of those facilities, will be equalized.

7. What can we do at this point to make sure we have complied with the January 12, 2015 Order of Judge Marshall?

## II. PRELIMINARY FINDINGS

On June 9, 2015, the District filed an application for a permit to issue bonds with the State Board of Education in the amount of $56,265,000 for the purpose of equipping school facilities, constructing a new Mills High School and converting and renovating the existing Mills High School to a middle school ($55,000,000) and to pay the cost of issuance and underwriters discount. The application further provided that any remaining funds will be used for other capital projects and equipment.

On June 9, 2015, the Superintendent and Commissioner both approved a resolution authorizing the issuance of second lien bonds for the construction of a new Mills High School and the renovation of the current Mills High School Facility for use by Fuller Middle School.

It appears that on March 14, 2016, the architects for Mills were directed to work toward a $35,000,000 construction budget for the new Mills high School. The District is inquiring further as to how that figure was derived and the authority for that directive.

On March 15, 2016, the Superintendent and Commissioner approved a recommendation to construct the Mills High School replacement project and to convert the existing high school into a middle school and to demolish the existing Fuller Middle School and to also construct a new Middle School and campus support facilities for the Robinson Middle School replacement project reflecting a cost for all projects of $80,000,000 and describing the funding source as the building fund and second lien bond proceeds.

4

As to the athletic facilities, the District suggests that the Court authorize Ms. Margie Powell to assist the District in making its current evaluations and assessments and that a report be made to the Court as soon as reasonably practical.

Respectfully submitted,

By:

_/s/ M. Samuel Jones, III_
M. Samuel Jones III (76060)
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8800
Facsimile: (501) 688-8807
E-mail: sjones@mwlaw.com

Attorneys for Pulaski County Special School
District

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification such to:

All counsel of record

_/s/ M. Samuel Jones, III_

3/26/2018                                    McNulty, Charles Application



EXHIBIT
4



## Application for Superintendent of Schools
### CLOSED! Pulaski County Special School District - Deadline March 12, 2018

**Name:** McNulty        Charles        Robert        **Date:**    3/6/2018
          Last          First          Middle

**Address:**                                                      **E-mail:**
          Street              City            State    Zip

**Phone:**                                                        **Fax:**
          Home          Business            Cell

| **Present Position:** | Associate Superintendent for Educational Services | **School District:** | Waterloo Community School District, Waterloo, IA |
|---|---|---|---|
| **District Enrollment:** | 10,800 | **Number of Certified/Classified Staff:** | 1700 |
| **Annual Budget:** | $130,000,000 | **Annual Base Salary (including any annuity):** | $152,000 |

## Educational Record

| Name and Location of Institution Attended: | Year(s): | Degree: | Major(s): | Minors(s): |
|---|---|---|---|---|
| University of Wisconsin - Madison, Madison, WI | 2011 | Ph.D, | Educational Leadership | |
| Portland State University, Portland, OR | 1996 | NA | Administrative Certification | |
| Portland State University, Portland, OR | 1991 | Masters of Science, Ed. | Special Education | |
| Lewis and Clark College, Portland, OR | 1987 | B,S, | Political Science/Psychology | |
| University of British Columbia, Vancouver, BC Canada | 1994-95 | NA | Multicultural Education (started PhD.) | |

1. Do you hold a superintendent license for this position?        [X] YES  [ ] NO
2. Are you eligible for a superintendent license for this position?  [X] YES  [ ] NO

## Employment Experience

*List in consecutive order beginning with the most recent position.*

| Dates | Position/Institution/Location | Supervisor's Name/Title | Supervisor's Phone |
|---|---|---|---|
| **To:** Present | **Position** Associate Superintendent for Educational Services | **Name** Dr. Jane Lindaman | **(Business)** |
| **From:** July, 2014 | **Institution/Location** Waterloo Community School District, Waterloo, IA | **Title** Superintendent | **(Home)** |
| **Reason For Leaving (Please be specific)** Desire to work with a community striving for excellence with equitable outcomes for all students. | | | **District Enrollment** 10,800 |
| **To:** June/2014 | **Position** Assistant Professor | **Name** Dr. Nick Pace | **(Business)** |
| **From:** August/2011 | **Institution/Location** University of Northern Iowa, Cedar Falls, IA | **Title** Dept. Chair | **(Home)** |
| **Reason For Leaving (Please be specific)** Offered the position of Associate Supt., Waterloo, IA. | | | **District Enrollment** NA |
| **To:** June/2011 | **Position** Superintendent | **Name** Cary Holland | **(Business)** |
| **From:** July/2008 | **Institution/Location** Blackhawk School District, South Wayne, WI | **Title** Board President | **(Home)** |
| **Reason For Leaving (Please be specific)** Was offered the position of Assistant Professor with the University of Northern Iowa. | | | **District Enrollment** 500 |
| **To:** June/2008 | **Position** Principal | **Name** Dr. Peter Flynn | **(Business)** |
| **From:** June/2001 | **Institution/Location** Carl Sandburg Middle School | **Title** Superintendent | **(Home)** |
| **Reason For Leaving (Please be specific)** Offered Superintendent position with the Blackhawk School District | | | **District Enrollment** 5000 |

## References

*Provide the names of four persons who can discuss your experience and qualifications in detail.*

| Name/Official Position | Business Phone | Home Phone | Cell Phone |
|---|---|---|---|
| Dr. Peter Flynn Superintendent (Retired) Freeport School District | | | |
| Dr. Beverly Smith Associate Superintendent for Human Resources and Equity | | | |
| Amy Schmidt Principal, Irving Elementary School | | | |
| Dr. Nick Pace Dept. Chair Educational Administration, University of | | | |

 **Alicia Gillen PCSSD School Board Zone 5**
April 11 · 🌎

Last night the PCSSD School board met for our regular monthly meeting. Here is a brief recap of the action... and lack of action that was taken.

•Approved a three-year contract for Dr. Charles McNulty, who was selected by the board last week to be the district's new superintendent, effective July 1.The board voted 6-0 for the agreement that provides a first-year salary of $205,000 and a $10,000 a year annuity for McNulty

•REJECTED administrative proposals for the 2018-19 school year that reduce district contributions to employee benefits and freeze step increases paid to eligible employees for their additional year of work experience.

• Listened to options for the possible issuing of second lien bonds to raise as much as $20 million to cover capital expenses such as construction, equipment and bus purchases. Second-lien bonds are financed with money generated by existing debt service tax mills in the school system and do not require a vote of the public.

• Voted to put an immediate freeze on the hiring of all central office personnel.

• Directed the district's executive director of human resources to consult with McNulty to present staff allocations for the coming school year that will avoid hiring new certified and support staff.
• Set a special board meeting for 5 p.m. April 19 to consider revised staffing allocation proposals.

Please feel free to contact me if you have any questions. I am honored to represent the amazing families in the Maumelle Area and will continue to advocate for our teachers, administrators....and most importantly our children!



👍 **Like**          💬 **Comment**          ↗ **Share**

👍❤ 18                                        Oldest ▾



**Katie Mitchell-Jordan** So happy to hear you guys have found a superintendent! That's not an easy task.

Like   Reply · 5w

**Laura Frazer Gassaway** Thx for the update!

Like   Reply · 5w

**Kim Phillips** Yay! Thank you so much Alicia Payseno Gillen!

So can we use Donor's Choose again 😜 😆 😺 🔥 🐸?

Like   Reply · 5w                    ❤ 1

↳   1 Reply

**Karen Michelle** Well DONE!

Like   Reply · 5w

**Karen Michelle** Kathy Hubbard Young they cut the middle men~

Like   Reply · 5w                    👍 1

 **Alicia Gillen PCSSD School Board Zone 5**
April 20 · ⚙

•••

EXHIBIT

6

Thursday evening the Board met for a special meeting to discuss allocations for the 2018-19 school year for certified and classified staff. During the last board meeting we instructed the Human Resources Director Paul Brewer to aggressively look at the District and find ways to cut the budget. My personal intent on this direction was to make sure that the remaining salaries and benefits across the district would remain positive, and we would not have to make any additional cuts in personnel. In addition, I felt that it was very important that the new Superintendant was consulted on every decision regarding the reduction in staffing. Dr. McNulty will have to assume the result of our actions last night. I fully support the recommendations that were presented last night and voted to approve them. I also would like to state that the decision to cut any position within the district was not taken lightly. I understand that the actions of the board may result in loss of jobs for some. These tough decisions, for the overall welfare of district, is what this I was elected to do. The included article givs more details on the meeting last night. As always, if you have any questions please feel free to contact me at agillen@pcssd.org.

www.arkansasonline.com/.../district-oks-staffing-cost-cuts-.../...



ARKANSASONLINE.COM
**District OKs staffing cost cuts, changes**
The School Board for the Pulaski County Special School District on…

👍 Like          💬 Comment          ↪ Share

👍❤ 4                                                      Oldest ▾

 **Kim Phillips** Thanks for keeping the students a priority! Thank you so much!

👍 1

Like · Reply · 4w

EXHIBIT
7

# RESIGNATIONS AND ATTRITION

| Employee | Salary |
|---|---|
| Altshul | $136,000.00 |
| Brewer | $169.500.00 |
| Goodwin | $150,000.00 |
| Scott | $181,000.00 |
| Tackett | $157,000.00 |
| Viswathan | $105,000.00 |
| Wheeler | $100,000.00 |
| Total | $998,500.00 |

LEA: 6003
County: PULASKI
District: PULASKI COUNTY

Preliminary
State Aid Notice 2017-18
July 31, 2017

Refer to corresponding Commissioner's
Memo for additional information

## DATA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. | 2016 Real Assessment | $ | 1,950,635,134 | 15. | Initial Per-Student Revenue | $ | 5,392.92 |
| 2. | 2016 Personal Assessment | $ | 581,133,535 | 16. | Initial Per-Student Foundation Funding Amount | $ | 6,713.00 |
| 3. | 2016 Utility Assessment | $ | 109,282,380 | 17. | Initial Per-Student State Foundation Funding Aid | $ | 1,320.08 |
| 4. | 2016 Total Assessment | $ | 2,641,051,049 | 18. | PY ALE FTEs (Qtrs. 1-4) | | 191.974713 |
| 5. | 98% of URT X Assessment | $ | 64,705,750.70 | 19. | CY English Language Learner Students | | |
| 6. | Net Revenues | | | 20. | PY NSL Students (Free and Reduced) | | 6,572 |
| 7. | 2016 Calendar Year Calc. Misc. Funds[1] - R | | 406,769 | 21. | Adjusted 1/1/05 Scheduled Debt Payment | $ | 4,310,595.00 |
| 8. | 2017 Calendar Year Calc. Misc. Funds[1] - R | | | 22. | State Wealth Index for Bonded Debt Assistance | | 0.00000 |
| 9. | 2015-16 ADM (Qtrs. 1-3 Avg.) | | 12,417.39 | 23. | PY ADM of Isolated School Area | | |
| 10. | 2016-17 ADM (Qtrs. 1-3 Avg.) | | 12,073.71 | 24. | Isolated Funding Amount Per Student 6-20-603 | $ | 0 |
| 11. | **2016-17 ADM (Qtr. 4) for SGF** | | 12,062.40 | 25. | District Square Miles | | 634.11 |
| 12. | 2017-18 ADM (Qtr. 1) for SGF | | | 26. | District Total Millage Rate in effect as of 1/1/16 | | 40.70 |
| 13. | 2017-18 ADM (Qtr. 2) for SGF | | | 27. | District Total Millage Rate in effect as of 1/1/17 | | 40.70 |
| 14. | 2017-18 ADM (Qtr. 3) for SGF | | | | | | |

EXHIBIT 6

## FUNDING

| | Funding Category | | Amount | Statutory Code/Acts of 2017 | Restricted | Revenue Code | Fund/SOF Code |
|---|---|---|---|---|---|---|---|
| 28. | State Foundation Funding Aid ($6,713) | $ | 15,938,296 | 6-20-2303, 6-20-2305, 6-20-2308, Acts 741, 743 | No | 31101 | 2001 |
| 29. | 98% of URT X Assessment less Net Revenues[2] | $ | | 6-20-2303, 6-20-2305, Act 741 | No | 31103 | 2001 |
| 30. | Educational Excellence Trust[3] - R | $ | 1,751,583 | 6-5-301 et seq. | Yes | | |
| 31. | Alternative Learning Environment ($4,640) - R | $ | 890,763 | 6-20-2303, 6-20-2305, Act 743 | Yes | 32370 | 2275 |
| 32. | English Language Learners ($338) - R | $ | | 6-20-2303, 6-20-2305, Act 743 | Yes | 32371 | 2276 |
| 33. | **NSL State Categorical[4] ($526/$1,051/$1,576) - R** | $ | 3,456,872 | 6-20-2303, 6-20-2305, Act 743 | Yes | 32381 | 2281 |
| 34. | NSL Transitional Funding[4] (Rate Varies) - R | $ | 0 | 6-20-2305 | Yes | 32381 | 2281 |
| 35. | NSL State Categorical Withholding[4] | $ | | 6-20-2305 | | | |
| 36. | NSL Growth Funding[4] - R | $ | 0 | 6-20-2305 | Yes | 32381 | 2281 |
| 37. | Professional Development ($26.05) - R | $ | 314,520 | 6-20-2303, 6-20-2305, Act 743 | Yes | 32256 | 2223 |
| 38. | Bonded Debt Assistance ($18.03) - R | $ | 0 | 6-20-2503, Act 931 | Yes | 32915 | 2001 |
| 39. | Isolated Funding | $ | | 6-20-601, 6-20-603 | Yes | 31500 | 2212 |
| 40. | Special Needs Isolated Funding[5] | $ | | 6-20-604 (c), (d) & (e), Act 129 | Yes | 31500 | 2212 |
| 41. | Special Needs Small District Funding[5] | $ | | 6-20-604 (f) | No | 32249 | 2920 |
| 42. | Special Needs Isolated Transportation[5] | $ | | 6-20-604 (h) | Yes | 32248 | 2228 |
| 43. | Declining Enrollment Funding[5] - R | $ | 1,153,562 | 6-20-2305 | No | 31460 | 2218 |
| 44. | Declining Enrollment Adequacy | $ | | 6-20-2305 | No | 31460 | 2218 |
| 45. | Student Growth - PYQtr.4 + CYQtrs.1,2 & 3[5] - R | $ | | 6-20-2303 & 2305, Act 741 | No | 31450 | 2217 |
| 46. | Enhanced Transportation Funding | $ | 0 | Act 743 | No | 31400 | 2222 |

ACA-Arkansas code annotated, ADM-average daily membership, ALE-alternative learning environment, Avg.-average, Calc.-calculated, CY-current year, FTE-full-time equivalent, FY-fiscal year, LEA-local education agency, Misc.-miscellaneous, NSL-national school lunch, PY-prior year, Qtr.-quarter, R-state board rule, SGF-student growth funding, SOF-source of fund, URT-uniform rate of tax

1) Miscellaneous funds are defined and calculated as per ACA § 6-20-2303 (12), ACA § 6-20-2308, and ACA § 6-20-2503 (a) (3).
2) Negative funding amounts for 98% of URT X assessment less net revenues indicate funds owed to the state.
3) Educational excellence trust funds are included in state foundation funding aid and are restricted pursuant to ACA § 6-5-307. Except in the final year-end calculation of EETF, the effect of the November 2013 desegregation settlement agreement (USDC No. 4:82-CV-866) is not reflected on this state aid notice.
4) The combination of NSL state categorical (plus), NSL transitional (plus or minus), NSL state categorical withholding (minus), and NSL growth funding (plus) equals the total net NSL state categorical funding received by a school district. The NSL state categorical funding rate increases or decreases in $175 increments for districts in transition.
5) Eligible school districts shall receive the higher of student growth funding plus special needs (isolated/small district/transportation) funding or declining enrollment funding. No school district shall receive both declining enrollment funding and student growth funding or special needs (isolated/small district/transportation) funding. The initial FY18 state aid notice provides declining enrollment funding that has not been compared to student growth funding and/or special needs (isolated/small district/transportation) funding. Additional information regarding the calculation of SGF pursuant to Act 741 of 2017 will be published in a separate commissioner's memo.



EXHIBIT

9

# PCSSD
# CERTIFIED
# ALLOCATIONS



PULASKI COUNTY SPECIAL SCHOOL DISTRICT

2018-2019

*passed*
*4/19/18*

# PCSSD
# CERTIFIED
# ALLOCATIONS



PULASKI COUNTY SPECIAL SCHOOL DISTRICT

2018-2019

*passed*
*4/19/18*

# C O N T E N T S

|  | PAGE |
|---|---|
| Superintendent | 1 |
| Human Resources | 2 |
| Equity and Pupil Services | 3 |
| Learning Services | 4 |
|     Secondary | 6 |
|     Elementary | 8 |
|     Early Childhood | 9 |
|     Special Education | 10 |
|     Vocational Programs | 11 |

RECOMMENDED STAFFING ALLOCATIONS FOR _____2018-2019_____ SCHOOL YEAR   CERTIFIED_____X_____ SUPPORT STAFF_____

DEPARTMENT_____Superintendent's Office_____   DIVISION_____Superintendent_____

RECOMMENDED BY_____Janice Warren_____   DATE_____April 2, 2018_____

APPROVED BY_____SUPERINTENDENT   DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Superintendent | Teacher Salary | Contract set by Board | No Change (244 days) |

RECOMMENDED STAFFING ALLOCATIONS FOR _____2018-2019_____ SCHOOL YEAR    CERTIFIED____X____ SUPPORT STAFF_____

DEPARTMENT_____Human Resources_____    DIVISION_____Human Resources_____

RECOMMENDED BY_____Paul Brewer_____    DATE_____April 2, 2018_____

APPROVED BY_____SUPERINTENDENT    DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Chief Executive Officer/Human Resources | Teacher Salary | Teacher Salary x Index Factor | RIF (Delete) (244 days) |
| Asst. Superintendent for Human Resources | Teacher Salary | Teacher Salary x Index Factor | New Position (244 days) |
| Director of Human Resources | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |

RECOMMENDED STAFFING ALLOCATIONS FOR _____2018-2019_____ SCHOOL YEAR

CERTIFIED_____X_____ SUPPORT STAFF_____

DEPARTMENT_____Equity and Pupil Services_____

DIVISION_____Equity and Pupil Services_____

RECOMMENDED BY_____Janice Warren_____

DATE_____April 2, 2018_____

APPROVED BY_____SUPERINTENDENT

DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Assistant Superintendent for Equity and Pupil Services | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Director of Pupil Services | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Coordinator of Equity Initiatives and Multi-Cultural/AIMMS | Teacher Salary | Teacher Salary x Index Factor | No Change (202 days) |

RECOMMENDED STAFFING ALLOCATIONS FOR ____2018-2019____ SCHOOL YEAR    CERTIFIED____X____ SUPPORT STAFF_____

DEPARTMENT_____Learning Services_____    DIVISION_____Learning Services_____

RECOMMENDED BY_____John Tackett_____    DATE_____April 2, 2018_____

APPROVED BY_____SUPERINTENDENT    DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Deputy Superintendent for Learning Services (1) | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Director of Elementary Education (0) | Teacher Salary | Teacher Salary x Index Factor | RIF (Freeze) (244 days) ✓ |
| Director of Secondary Education (0) | Teacher Salary | Teacher Salary x Index Factor | RIF (Freeze) (244 days) ✓ |
| Director of Federal Programs, Categorical State Funding, Professional Development and Special Initiatives (1) | Title II A/Professional Dev. | Teacher Salary x Index Factor | No Change (244 days) |
| Director of Special Education (1) | Children with Disabilities (LEA Sp Ed Supervisor) | Teacher Salary x Index Factor | No Change (244 days) |
| Director of Career Education (1) | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Director of Counseling Services (1) | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Director of District Athletics (1) | Teacher Salary | Teacher Salary x Index Factor | Decrease length of contract from ✓ 244 days to 216 days |
| Director - K-12 Fine Arts (1) ELL or ESL | Teacher Salary | Teacher Salary x Index Factor | Decrease length of contract from ✓ 244 days to 216 days Update |
| Director of Special Programs (1) | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Director of Talented/Gifted Programs/Coordinator of ELL (1) | Teacher Salary | Teacher Salary x Index Factor | Decrease length of contract from 244 days to 216 days ✓ |

-4-

RECOMMENDED STAFFING ALLOCATIONS FOR _____2018-2019_____ SCHOOL YEAR   CERTIFIED_____X_____ SUPPORT STAFF_____

DEPARTMENT_____Learning Services_____   DIVISION_____Learning Services_____

RECOMMENDED BY_____John Tackett_____   *Not per Supervisor*   DATE_____April 2, 2018_____

APPROVED BY_____ SUPERINTENDENT   DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Assessment Specialist Coordinator - ELL (1) | Teacher Salary | Teacher Schedule | No Change (215 days) |
| Program Administrator (0) | ELL | Teacher Schedule x Index Factor | No Change (202 days) |
| RTI Specialist/504 Coordinator (1) | NSLA | Teacher Schedule x Index Factor | RIF (Delete) 5 (244 days) |
| Temporary School Improvement Specialist (2) | Federal | Teacher Schedule x Index Factor | No Change (202 days) |
| Title I Feeder-Area Reading Teacher (2)* | Teacher Salary | Teacher Schedule x Index Factor | No Change (216 days) |
| | Teacher Salary | Teacher Salary | No Change (195 days) |

*To support reading comprehension and scholastic achievement at Fuller Middle School and Mills University Studies High School

RECOMMENDED STAFFING ALLOCATIONS FOR _____2018-2019_____ SCHOOL YEAR

CERTIFIED_____X_____ SUPPORT STAFF_____

DEPARTMENT_____Secondary Principal_____

DIVISION_____Learning Services_____

RECOMMENDED BY_____John Tackett_____

DATE_____April 2, 2018_____

APPROVED BY_____ SUPERINTENDENT

DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Senior High Principal (4) | | | |
| Middle School Principal (4) | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Ninth/Tenth Grade Campus Principal (1) | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Assistant High School Principal (10)* | Teacher Salary | Teacher Salary x Index Factor | No Change (244 days) |
| Assistant Middle School Principal (7)* | Teacher Salary | Teacher Salary x Index Factor | No Change (207 days) |
| | Teacher Salary | Teacher Salary x Index Factor | No Change (207 days) |

*Includes SHHS Ninth/Tenth Grade Campus

RECOMMENDED STAFFING ALLOCATIONS FOR _____ 2018-2019 _____ SCHOOL YEAR    CERTIFIED _____ X _____ SUPPORT STAFF _____

DEPARTMENT _____ Specialty Programs _____              DIVISION _____ Learning Services _____

RECOMMENDED BY _____ Janice Warren _____              DATE _____ April 2, 2018 _____

APPROVED BY _____ SUPERINTENDENT              DATE _____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Teacher of English Language Learners (13) | Teacher Salary | Teacher Schedule | No Change (190 days) |

RECOMMENDED STAFFING ALLOCATIONS FOR _____2018-2019_____ SCHOOL YEAR    CERTIFIED_____X_____ SUPPORT STAFF_____

DEPARTMENT_____Elementary Principal_____    DIVISION_____Learning Services_____

RECOMMENDED BY_____Janice Warren_____    DATE_____April 2, 2018_____

APPROVED BY_____SUPERINTENDENT    DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Elementary Principal (16) | Teacher Salary | Teacher Salary x Index Factor | No Change (216 days) |
| ABC Pre-School Principal/District Director (1) | ABC Grant | Teacher Salary x Index Factor | No Change (216 days) |
| Assistant Elementary Principal (10) | Teacher Salary | Teacher Salary x Index Factor | No Change (202 days) |

RECOMMENDED STAFFING ALLOCATIONS FOR ___2018-2019___ SCHOOL YEAR     CERTIFIED_____X_____ SUPPORT STAFF _____

DEPARTMENT_____Early Childhood Program_____     DIVISION_____Learning Services_____

RECOMMENDED BY_____Linda Goodwin_____     DATE_____April 2, 2018_____

APPROVED BY_____SUPERINTENDENT   DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| School Psychology Specialist (.8) | Special Ed(Federal) | Teacher Salary x Index Factor | No Change (192 days) |
| Behavior Intervention Specialist (.4) | Special Ed (Federal) | Teacher Salary Schedule | No Change (190 days) |
| Early Childhood Teachers (2) | Special Ed (Federal) | Teacher Salary Schedule | Increase by .5 FTE (transferred from classroom) (190 days) |

RECOMMENDED STAFFING ALLOCATIONS FOR _____ 2018-2019 _____ SCHOOL YEAR    CERTIFIED_____ X _____ SUPPORT STAFF_____

DEPARTMENT_____ Special Education _____    DIVISION_____ Learning Services _____

RECOMMENDED BY_____ John Tackett _____    DATE_____ April 2, 2018 _____

APPROVED BY_____SUPERINTENDENT    DATE_____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Behavior Intervention Specialist (.6) | Special Ed/Federal | Teacher Salary Schedule | No Change (190 days) |
| Coordinator of Special Education (5) | Teacher Salary | Teacher Salary x Index Factor | No Change (192 days) |
| School Psychology Specialists (6.2 filled/1 frozen)* | Federal/Teacher Salary | Teacher Salary x Index Factor | RIF (Freeze) 1 (192 days) |
| Facilitator for Visually Impaired (1 filled/1 frozen) | Teacher Salary/Federal | Teacher Salary x Index Factor | RIF (Freeze) 1 (187 days) |
| Facilitator for Hearing Impaired (1) | Teacher Salary/Federal | Teacher Salary x Index Factor | No Change (187 days) |
| Homebound/Special Services Teacher | Teacher Salary/Federal | Teacher Salary | No Change (195 days) |

*One (1) current School Psychology Specialist (certified) to be hired as Psychological Examiner (support staff) for 2018-2019 school year (no additional personnel)

RECOMMENDED STAFFING ALLOCATIONS FOR _____ 2018-2019 _____ SCHOOL YEAR     CERTIFIED _____ X _____ SUPPORT STAFF _____

DEPARTMENT _____ Career Education _____

DIVISION _____ Learning Services _____

RECOMMENDED BY _____ John Tackett _____

DATE _____ April 2, 2018 _____

APPROVED BY _____ SUPERINTENDENT

DATE _____

Attach job description and justification for any new or reclassified position.

| POSITION TITLE | SOURCE OF FUNDING | SALARY SCHEDULE RANGE | POSITION COMMENT: NEW, RIF, CONTRACT LENGTH, RECLASSIFIED, TRANSFERRED OR NO CHANGE |
|---|---|---|---|
| Coordinator of Adult Education (1) | General Adult Ed/ Adult Basic Ed./D & E* | Teacher Salary x Index Factor | No Change (244 days) |
| Coordinator for Jacksonville Workforce Alliance for Growth in the Economy (WAGE) (1) | Adult Ed | Teacher Salary x Index Factor | No Change (244 days) |
| Adult Education Teachers, 9 mos. (1) | Adult Basic Ed. | Teacher Schedule | No Change (190 days) |
| Part-time ABE Teachers (15) | Adult Basic Ed. | Hourly @ $22.00/hr (TS) | No Change (244 days) |
| GED (General Equivalency Diploma) Examiner (1) | General Adult Ed. | Hourly @ $25.00/hr | No Change (244 days) |
| Part-time ELL Teachers (5) | General Adult Ed. | Hourly @ $22.00/hr (TS) | No Change (244 days) |
| Part-time GAE Teachers (10) | General/Adult Ed. | Hourly @ $22.00/hr | No Change (244 days) |
| Part-time D & E Teacher (10) | D & E | Hourly @ $22.00/hr | No Change (244 days) |

*D & E (Direct and Equitable)



EXHIBIT

**REDUCTION IN FORCE**

**Administrators:**

**Layoff**

1. The Superintendent will recommend and the Board will approve the administrative classifications and number of positions to be reduced.

2. The Executive Director of Human Resources will provide the Superintendent with a list of administrators in the administrative position(s) to be reduced ranked by administrative seniority.

3. The list prepared in item two (2) will be used to identify the person(s) with the least seniority within each administrative position that will be affected by the District's layoff plans.

4. An affected administrator is eligible to "bump" into any lower level job previously held by the affected administrator, provided the affected administrator has more cumulative seniority in previous and any higher level position(s) than the least senior employee in that job position.

5. When the affected administrator bumps into a lower graded job position, the administrator with the least seniority within that position will be bumped. Each administrator who is bumped from a job position may likewise bump into any lower graded job position previously held by that administrator. This process will be repeated until the administrator with the least seniority within a position has been absorbed in a lower graded job position or has been laid off.

**Recall**

1. As vacancies or staff buildup in each job position occurs, the employees displaced or laid off from those job positions will be recalled to them in reverse order of layoff. An individual may not be recalled to a higher position.

2. A recall notification will be mailed to a displaced or laid off employee's last known address. It is the responsibility of the employee to keep the District advised of his or her current address.

3.  An employee receiving a recall notification must advise the District of his or her acceptance of the position within 24 hours after the receipt of such notification. Failure to respond or to accept the position within 24 hours will result in termination of the employee's recall rights.

**Teachers:**

**Reduction in Force Procedures – Attrition**

1.  Any reduction in the number of positions in the District should be affected when possible through attrition.

2.  For purposes of this section, "attrition" means the creation of a vacant position through the resignation, retirement or death of a full time or part time teacher.

**Reduction in Force Procedures – Layoffs**

1.  In the event that a reduction of teaching personnel becomes necessary, layoffs will be made in reverse order of District seniority by certification area in which staff reductions are made.

2.  The Board shall make no new appointments while there are eligible individuals on the recall list.

**Reduction in Force Procedures – Recall**

1.  A seniority list will be maintained by certification area(s).

2.  Teachers who are laid-off are entitled to be recalled in order of District seniority as vacancies occur in areas in which they are certified.

3.  The District shall grant laid-off teachers recall rights unless specifically waived in writing by the teacher.

4.  The District shall grant recall rights to a similar supplemental contract position to teachers who are reassigned or removed from a supplemental contract(s) as a result of a reduction in force.

5.  A teacher holding an extended contract position who is reassigned or removed from that position as a result of a reduction in force shall have recall rights to a similar extended contract position.

6.  A laid-off teacher may not receive a promotion or an extended contract, beyond that which he/she held prior to the reduction in force, by reason of the recall procedures.

7.  Notice of recall will be sent by certified/return receipt requested mail to the laid-off teacher's last known address on file in the Human Resources Division.

    a.  When a teacher is recalled to a position, they must accept the position within 24 hours of receiving notification or he/she will forfeit his/her recall rights.

    b.  The Executive Director of Human Resources or designee will place a laid-off teacher back onto the recall list according to seniority in that certification area, if the teacher can justify to the Assistant Superintendent's satisfaction, why she/he was unavailable to respond to the recall notice.

8.  It is the responsibility of each teacher on layoff status to keep the Human Resources Division informed of his/her current address and telephone number.

9.  A teacher notified of recall who accepts the position and, if under a current contract to another school district, must provide the District with proof of release of contract from that school district, within fifteen (15) days from the date the recall notice is mailed.

10. Failure to accept the position or to provide the proof of release of contract will result in loss in recall rights.

11. Any teacher reemployed by recall will be paid at the prevailing rate of pay and receive prevailing benefits appropriate to the position, the teacher's qualifications, and credited experience at the time of layoff.

12. Experience obtained during the time of layoffs shall be credited in accordance with Board Policy.

13. Any education attained during the time of layoff shall be credited in accordance with Board Policy.

14. Teachers will have recall rights for a period of two (2) years from the date of lay-off.

## Reduction in Force Procedure – Retraining

1. A laid-off teacher may, during the term of the lay-off and prior to recall, obtain additional certification to broaden the opportunity for recall.

2. The laid-off teacher must provide a copy of the new certification with additions to the Human Resources Division upon completion to obtain eligibility for recall in an additional certification area.

## New School Staffing

1. In staffing a new school, all certified teachers in the District can apply, be interviewed, and be considered for any position for which they are certified.

2. Seventy five (75%) percent of the regular certified teaching positions needed to initially staff a new school must be selected from within the District.

3. A maximum of twenty (20%) percent of the staff for the new District school will be selected from any one (1) District school.

4. If requests to transfer to the school are not sufficient to meet the requirements of this Policy, the percentages specified above may be disregarded.

5. Transfer requests received ten (10) days after posting will not be considered until eligible involuntary transfers are assigned.

## Staffing Allocations

Staffing allocations are determined on a District-wide formula based on projected school enrollment with a review for possible changes in allocations being made within the first month of school.

**Affirmative Action**

1. The Board's goal is to maintain a racially balanced certified staff in each school and to seek to recruit and retain identifiable minorities.

2. The Office of Desegregation will conduct an annual review of the District's Affirmative Action Transfer procedure and provide a monitoring report to the Human Resources Division.

**School Conversions**

1. When a current school is reconfigured, converted, or merged with another school, the staff at the school or schools involved will be given the choice of remaining in the reconfigured, converted, or merged school or being involuntarily transferred.

2. The involuntary transfer of teachers in such situations will follow Board Policy.



**LEAVES AND ABSENCES**

**Extended Leave of Absence**

1.      To obtain an extended leave of absence, an employee must make a request in writing to the superintendent of schools. In the letter requesting leave, the employee should state the reason for the leave, the dates the leave is to begin and end, and all other information related to the reason for the particular leave necessary to enable a decision to be made on granting or denying the leave request.

2.      The Board of Directors grants leaves or extends leaves of absence upon the recommendation of the superintendent of schools. A leave of absence is granted for the balance of the semester or school year only. All such leaves are without pay. An employee desiring to extend a leave of absence for an additional semester or school year shall request the extension in writing to the superintendent at least thirty (30) days prior to the scheduled expiration of the leave.

3.      In granting a leave, the Board of Directors signifies its intention to re-employee the person upon expiration of the leave; provided, however, that there must be a vacancy which, in the judgment of the superintendent of schools, the returning employee is qualified to fill.

4.      An employee desiring to return from a leave of absence must indicate that desire in writing to the superintendent at least thirty (30) days prior to the scheduled expiration of the leave. An employee not requesting return in this manner shall be conclusively deemed to have voluntarily resigned employment without further action by the superintendent or school board.

5.      Leaves are not granted for the purpose of pursuing other full time employment. Any employee accepting full time employment during a leave of absence shall be conclusively deemed to have voluntarily resigned employment without further action by the superintendent or school board. This restriction does not apply to an employee whose leave is related to application of the district's reduction in force policy.

6.      **Repealer**. This policy is effective July 1, 2016. All portions of the PCSSD Certified Personnel Policies Manual existing prior to the adoption of this Leave of Absences policy that are inconsistent with this Leave of Absences policy are hereby repealed and held for naught.

136

```
 1            PULASKI COUNTY SPECIAL SCHOOL DISTRICT

 2

 3   IN THE MATTER OF:                    ┌─────────────────┐
                                          │    EXHIBIT      │
 4   KIFFANY PRIDE                        │                 │
     LAURA SHIRLEY                        │      11         │
 5   JENNIFER BEASLEY                     │                 │
     NICOLE TOWNSEND                      └─────────────────┘

 6

 7        The above-entitled matter was heard by the Board of

 8   Education, on Monday, June 11, 2018, beginning at 6:07

 9   p.m., in the Board Room of the Administrative Offices,

10   Pulaski County Special School District, 925 East Dixon

11   Road, Little Rock, Pulaski County, Arkansas.

12   BOARD MEMBERS:

13
     DR. LINDA REMELE (not present)
14   SHELBY THOMAS
     BRIAN MAUNE
15   MIKE KEMP
     ELI KELLER
16   TINA WARD
     ALICIA GILLEN

17

18        ON BEHALF OF THE DISTRICT:

19            GEORGE 'JAY' BEQUETTE, JR., ESQ.
              Bequette & Billingsley
20            425 West Capitol Avenue, Suite 3200
              Little Rock, Arkansas  72201

21

22        ON BEHALF OF THE EMPLOYEES:

23            JOHN WALKER, ESQ.
              Walker Law Firm
24            1723 Broadway
              Little Rock, Arkansas  72206        COPY

25
```

1  A     Yeah.   School Board Member Code of Ethics.

2  Q     You're aware that under the -- in the blackened

3  areas, the Board is to "Function as a part of the

4  legislative policy making body-not as an administrative

5  officer."  It's to "work through the administrative

6  employees of the Board-not over or around them."  Can't

7  have secret sessions.  Are you aware of that?

8  A     Sure.

9        Yes.  I'm sorry.

10 Q     This is the Reduction in Force Policy?

11 A     This is the what?

12 Q     Reduction in Force Policy.

13 A     Oh, I'm sorry.

14       Yes.

15 Q     Now, part of your document -- part of your document

16 with reductions has in it reduction in force; is that

17 right?

18 A     Yes.

19 Q     Under your Reduction in Force Policy, isn't it true

20 that if you're going to have a reduction in force policy,

21 that you have to deal with all of the employees and then

22 have objective standards before you do so?

23 A     In the -- in the place of a true RIF, that's true.

24 Q     All right.  Now, when you had on your certified

25 allocations the term "RIF," what did you refer to?  Was

1  it a true RIF or an untrue RIF, if there is such a thing?

2  A    If it said -- if it says on the allocation true --

3  "RIF delete," that means the job was non-renewed and that

4  job was deleted from all allocations.

5  Q    Well, there is nothing in your policy that says

6  that, though; is there?

7  A    No.

8  Q    Here are the allocations -- do you have the

9  allocation?

10  A    No.

11  Q    All right.  This is -- let me make sure we -- you

12  don't think I'm deceiving you.

13  A    No.  I know what it said.  I can tell you.

14  Q    All right.  Call your attention to the allocations.

15              HEARING OFFICER:  Are you showing him

16         something that the record needs to know what it

17         is?

18              THE WITNESS:  He's showing me a copy of

19         the allocations we're using for a question

20         here.

21              All of our RIFs -- all of your --

22              HEARING OFFICER:  Well, Mr. Walker, do you

23         have that in your exhibits?

24              MR. WALKER:  Yes, it's in there.

25              HEARING OFFICER:  Okay.  What number is

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1          it?

2              MS. WARD:  Seventeen.

3              HEARING OFFICER:  Okay.

4 BY MR. WALKER:

5 Q    All right.  We have on Page 4 of the allocations,

6 Director of Elementary Education, RIF, Director of

7 Secondary Education, RIF, and pro --

8 A    Right.

9 Q    You knew that wasn't a RIF.  Didn't you?

10 A    Yes.

11 Q    Because you knew you had already received a

12 resignation of those two people?

13 A    It wouldn't have mattered.

14 Q    Yeah, but you have a RIF --

15 A    We are RIF'ing it -- no, we're not RIF'ing it.  We

16 are freezing it, because the Board might want to bring it

17 back in the future.

18 Q    All right.  So it's RIF -- you've got a RIF and a

19 freeze; right?

20 A    That's correct.

21 Q    So RIF and in parenthesis freeze, they mean the same

22 thing; right?

23 A    Freeze means we're not going to hire them back as a

24 of this allocation.  It would take Board action and

25 recommendation of a Superintendent.

1  Q    Now, these program administrators are on Page 6;

2  isn't that correct?

3  A    That's correct.

4  Q    That source of funding is what?

5  A    NSLA.

6  Q    This budget that Ms. Denise Palmer prepared does not

7  involve NSLA, does it -- funding, does it?

8  A    I -- I don't know.

9  Q    You don't know?  You're the person who made these

10  decisions.

11  A    About the NSLA?

12  Q    No.  No.  You're the person who made the

13  recommendations to the Board.  The one-page document.

14  A    Oh, that.

15  Q    It's Exhibit 5.

16       Now, this -- this says nothing about NSLA.  Does it?

17  A    That's correct.

18  Q    Now, how much -- how much money did you save by

19  cutting these teachers who were being paid out of NSLA?

20  A    Five -- I'm going to say around 500,000.

21  Q    All right.  But it didn't come from the operating

22  budget over here.  Did it?

23  A    No, I didn't -- that wasn't part of my thinking.  I

24  was just cutting the -- I was --

25  Q    Now, that -- now, if that money is not spent, what

1   happens to it?

2        You lose it.  Don't you?

3   A    I don't think we lose it.

4   Q    You don't?

5   A    I think it's reallocated where you can use some of

6   the district funds instead of using the NSLA funds.

7   Q    But you don't know that.  Do you, Mr. Brewer?

8   A    I've got a pretty good idea.  I've been doing it for

9   20 years.

10  Q    All right.  Well, let me ask.  If you're going to do

11  that, if you're going to cut people, why did you

12  submit -- why did you submit this document through

13  Ms. Palmer in justification of your cuts when it has

14  nothing to do with NSLA funds?

15  A    Has to do with saving money.

16  Q    Well, how much money did you set out to save?

17  A    As much as we could and still --

18  Q    How much is that, Mr. Brewer?

19  A    As much as --

20  Q    $100 or $10 million?  How much was it?

21  A    It ended up -- it ended up being, if we left all the

22  RIFs as it was, about 1.2 million.

23  Q    If you had?  How much was it, Mr. Brewer, in the

24  final analysis?

25  A    That's about where it is now.

1  Q     I see.

2  A     Unless he doesn't hire anybody back.  If he hires

3  people back, then you have to subtract it for that

4  amount.

5  Q     How much of that comes out of NSLA funds?

6  A     None of mine.  None of my salary.  I'm not paid out

7  of NSLA funds.

8        Dr. Tackett, I don't think, is paid out of NSLA

9  funds.

10 Q     All right.  Did you ever have a discussion with

11 Dr. Warren about how you could -- how you could

12 effectuate these cuts?

13 A     How I could do what?

14 Q     How the cuts -- how the budget reductions that may

15 have been desired could have been effectuated?  Did you

16 ever have such a discussion with her?

17 A     We discussed that when she got back.

18 Q     Well, tell me what day was that; sir?

19 A     Tuesday.

20 Q     Was that before the Board meeting?

21 A     The following -- no, the following --

22 Q     Was that before this Board meeting?

23 A     The day before.

24 Q     Did she tell you that she didn't agree with you?

25 A     She did.

1  Q     Did you tell her why you did it?

2  A     I did.

3  Q     Did she tell you she still didn't agree with it

4  after you told her?

5  A     She did.

6  Q     All right.  Now, you were aware that -- you had

7  already prepared --

8  A     Now, she didn't disagree with me cutting my salary,

9  I didn't hear her say that; but she did disagree with the

10 other.

11 Q     All right.  She told you also it wasn't necessary to

12 reduce the district's budget by $1 million to cut these

13 people.  Didn't she?

14 A     What Dr. Warren --

15 Q     Didn't she tell you that?

16              HEARING OFFICER:  Let him -- let him

17         answer, Mr. Walker.

18 BY MR. WALKER:

19 Q     Go ahead if you want to answer.

20 A     What we discussed was that it would be much better

21 for him to left everything in place and then recut it

22 next year, if he chose to do it or resign.  Now,

23 that's -- that's Administration 101.  If you take on a

24 new job, you don't want to go in there and start changing

25 things before you get in there, but he wanted a chance to

1  have a start of these folks the way he may want to

2  implement his program.

3  Q    Did you get a call from Dr. McNulty asking you to

4  make budget cuts?

5  A    No.

6  Q    So the call that -- that you had with Mr. McNulty --

7  Dr. McNulty, was generated by this Board.  Wasn't it?

8  A    I was directed to make sure he was included.

9  Q    I see.

10      Now, did this Board ever tell you how much in cuts

11  you were to effectuate?

12  A    No.

13  Q    Well, it could have been a hundred dollars or a

14  thousand dollars?

15  A    Could have been $50, could have been 12 million.

16  Q    I see.

17      Now let's go on to the next exhibit.

18  A    Where are we at?

19  Q    Under the RIF, under the RIF Policy, the RIF policy

20  says, "The Executive Director" -- this is No. 2 in the

21  RIF policy, "The Executive Director of Human Resources

22  will provide the Superintendent with a list of

23  administrators in the administrative position(s) to be

24  reduced ranked by administrative seniority.

25      "The list prepared in item two (2) will be used to

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1  identify the person(s) with the least seniority within

2  each administrative position that will be affected by the

3  District's layoff."

4      Now, did you -- did you provide such a list?

5  A   We have such a list and --

6  Q   Did you provide -- prepare such a list?

7  A   We all -- we constantly have a list.

8  Q   No --

9  A   But these were nonrenewals; these were not RIFs.

10 Q   It doesn't matter.  Did you prepare a list for RIF?

11 A   We keep a list for RIF.  We constantly -- we're

12 constantly updating it.

13 Q   Well, just a moment.

14      Did you prepare, on instructions from the Board, a

15 list of the people to be considered for RIF?

16 A   No, because we wasn't looking at RIF then.

17 Q   Well, this document you have a dozen positions that

18 are called RIFs.  Don't you?  Let me go over them and

19 make sure, other than the ones we've covered.

20      Page --

21 A   Are you looking at the RIF policy or what are you --

22 Q   I'm looking at the allocations.

23 A   Allocation?

24 Q   Yes.

25 A   It will say "RIF freeze," which means we're not

1            PULASKI COUNTY SPECIAL SCHOOL DISTRICT

2

3   IN THE MATTER OF:

4   KIFFANY PRIDE
    LAURA SHIRLEY
5   JENNIFER BEASLEY
    NICOLE TOWNSEND
6

7        The above-entitled matter was heard by the Board of

8   Education, on Monday, June 11, 2018, beginning at 6:07

9   p.m., in the Board Room of the Administrative Offices,

10  Pulaski County Special School District, 925 East Dixon

11  Road, Little Rock, Pulaski County, Arkansas.

12  BOARD MEMBERS:

13
    DR. LINDA REMELE (not present)
14  SHELBY THOMAS
    BRIAN MAUNE
15  MIKE KEMP
    ELI KELLER
16  TINA WARD
    ALICIA GILLEN
17

18       ON BEHALF OF THE DISTRICT:

19          GEORGE 'JAY' BEQUETTE, JR., ESQ.
            Bequette & Billingsley
20          425 West Capitol Avenue, Suite 3200
            Little Rock, Arkansas   72201
21

22       ON BEHALF OF THE EMPLOYEES:

23          JOHN WALKER, ESQ.
            Walker Law Firm
24          1723 Broadway
            Little Rock, Arkansas   72206
25

1  do it?

2  A    I didn't hear her say she couldn't do it.

3  Q    Did you have any discussion with her at all

4  regarding any cuts?  Yes or no?

5  A    After she got back the following week.

6  Q    Did you before she left?

7  A    No.  I did not.

8  Q    After the board meeting the next day, did you talk

9  to her about it?

10  A    No.  She was not here.

11  Q    Okay.  Tell me this, did you develop any written

12  standards for cuts?

13  A    No.

14  Q    All right.  Did you have any documents on which you

15  relied for determining how much and how many you would

16  cut?

17  A    No.

18  Q    So it was arbitrary on your part?

19  A    Arbitrary on whatever cuts we could handle, however

20  McNulty wanted to do it.

21  Q    I see.

22  Now, did you have any -- anything in writing from

23  Dr. McNulty saying what he wanted?

24  A    I do not.

25  Q    I see.



EXHIBIT
13

# PULASKI COUNTY SPECIAL SCHOOL DISTRICT

925 East Dixon Road/P.O. Box 8601
Little Rock, Arkansas 72216-8601

April 27, 2018

**HAND DELIVERED**

Ms. Nicole Townsend
133 Summit Drive
Maumelle, Arkansas 72113

Dear Ms. Townsend:

Pursuant to the Arkansas Teacher Fair Dismissal Act, ARK. CODE ANN. §§ 6-17-1501, *et seq.*, I am recommending that your employment contract with the Pulaski County Special School District be non-renewed for the 2018-2019 school year. The reason for this recommendation is as follows:

1. In order to meet the District's need to reduce expenditures to match available revenue and to more efficiently manage District resources, your position with the District is being eliminated.

You have a right to request a hearing on this recommendation pursuant to the Arkansas Teacher Fair Dismissal Act. If you wish to request such a hearing, you must make a request for the hearing, in writing by certified or registered mail, or delivered in person to the president, vice president or secretary of the board of directors, with a copy to the Superintendent, within thirty (30) calendar days from the date you receive this letter.

If you request a hearing, it will take place at an agreed upon time, or, if no agreement can be reached, no sooner than five (5) and no more than twenty (20) calendar days from the receipt of your hearing request. The hearing may be public or private at your request, and, if you so request in writing, a record of the hearing will be made and a transcript provided to you at no cost. You may be represented by an attorney or other person(s) of your choosing, and the Board may also be represented.

Sincerely,

Dr. Janice Warren
Interim Superintendent of Schools

c:      Personnel File

_____
Employee's Signature

4-30-2018 (received)
_____
Date



**From:** REMELE, LINDA
**Sent:** Tuesday, May 16, 2017 5:55 PM
**To:** GUESS, JERRY
**CC:** BOARD MEMBERS
**Subject:** Re: Message from "COF2SUPEROFFICE01MFP"

Dear Board Members,
Here is the email Dr Guess sent us last Tuesday, May 9th with the stipulated
agreement attached. This is the entire agreement on staffing. He sent it to us prior to
it being released to the press.
Linda Remele

On Tue, May 9, 2017 at 4:56 PM, GUESS, JERRY <jguess@pcssd.org> wrote:
Submitted Stipulation
---------- Forwarded message ----------
From: <donotreply@pcssd.org>
Date: Tue, May 9, 2017 at 2:49 PM
Subject: Message from "COF2SUPEROFFICE01MFP"
To: Dr Guess <jguess@pcssd.org>


This E-mail was sent from "COF2SUPEROFFICE01MFP" (MP C6004).

Scan Date: 05.09.2017 14:49:10 (-0500)
Queries to: scanners@pcssd.org



--
Dr. Jerry Guess
Superintendent of Schools
Pulaski County Special School District
925 E. Dixon Road
Little Rock, AR 72206
501-234-2001
jguess@pcssd.org

--
LInda Remele, Ed.D.
PCSSD School Board
Zone 3

.



EXHIBIT
15

**From:** KELLER, ELI
**Sent:** Friday, May 19, 2017 11:07 AM
**To:** GUESS, JERRY
**CC:** BOARD MEMBERS
**Subject:** Re: Concerns

I am certain that you have a full plate right now.  Thank you for responding.

On Fri, May 19, 2017 at 10:59 AM, GUESS, JERRY <jguess@pcssd.org> wrote:
This to acknowledge receipt of emails from board members.

As you know, we have graduation tomorrow and the last days of school are taking their toll on all of us.  ☺

I will answer these concerns as soon as possible but certainly by early next week.

On Thu, May 18, 2017 at 9:44 PM, KELLER, ELI <ekeller@pcssd.org> wrote:
Dr. Guess,

I had a couple of things that I wanted to bring up that give me a little concern.  I am including the entire Board in this, so as to keep everyone in the loop.

The first item of concern I have, is that I have seen Joshua Intervenors wearing PCSSD employee badges.  I am not sure what their "official titles" are on the PCSSD badges, but it is quite alarming to me that we are providing them with any item that a teacher/student/parent could misconstrue as someone that is representing the District.  The Joshua Intervenors are not employees of this District and I believe that they are being misrepresented as such.  It is my understanding that they are "observers", but I have seen them ask students and faculty questions, while wearing their PCSSD badges, and therefore faculty and students are under the incorrect assumption that they are required to answer their questions and/or interact with them.  How many Joshua Intervenors have been issued PCSSD badges?  I strongly feel that this error should be corrected and that the badges should be immediately recovered.  If this needs to be a Board issue, then I would request that it be put onto the agenda for a discussion.

The second item falls into the realm of the Desegregation case.  Moving forward, I would like to request that we be updated monthly on any potential agreements or stipulations that are being negotiated.  As a Board Member, I would like some involvement in the agreement process, especially since the outcome will dictate the

way the District progresses forward and have the potential to force me to vote in
certain ways to stay in compliance with any said agreement.

Thank you for your time and patience.

Eli Keller


--
Dr. Jerry Guess
Superintendent of Schools
Pulaski County Special School District
925 E. Dixon Road
Little Rock, AR  72206
501-234-2001
jguess@pcssd.org



## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

PARENT PLAINTIFF LAKESHA DOE                    PLAINTIFFS
and her minor child, DENNIS DOE;
PARENT PLAINTIFF CLAUDIUS
JOHNSON, and his minor child,
CHRISTIAN DOE; PARENT PLAINTIFF
EVELYN DOE and her minor child,
EDWARD DOE; PARENT PLAINTIFF
CANDICE DOE and her minor children,
JAMES DOE and JADE DOE and her
minor child, JONNY DOE; JOY; and
PARENT PLAINTIFF SONYA DOE
and her minor child, JOHNNY DOE;
JOY C. SPRINGER; and JIM ROSS

v.                          CASE NO. 4:15-CV-000623 DPM

MICHAEL POORE, in his official                  DEFENDANTS
capacity as Superintendent of the
Little Rock School District

## JOINT MOTION FOR CONTINUANCE

Michael Poore, in his official capacity as Superintendent of the Little Rock School

District (Poore), Johnny Key, in his official capacity as the person exercising the authority of the

LRSD Board of Education (Key) and the Doe Plaintiffs, for their Joint Motion for Continuance,

state:

1.     This motion is based in part on developments that impact both this case and the

related case of *LRSD v. PCSSD*, No. 82-866.  PCSSD and the Joshua Intervenors are open to

immediate and intensive discussions to resolve all remaining unitary status issues, with the goal

of doing so within sixty (60) days.

2.     When PCSSD is declared unitary, LRSD, PCSSD, the Arkansas Department of

Education, the Joshua Intervenors and the Doe Plaintiffs are open to discussions concerning

boundary changes among the Pulaski County School Districts which would likely have a

substantial impact on LRSD.  Counsel for PCSSD and counsel for Joshua have agreed that these

discussions preliminary to a declaration of unitary status for PCSSD will not constitute a

violation of any provision of the Settlement Agreement dated November 18, 2013, and approved

by this Court on January 13, 2014 in case number 4:82-cv-866-DPM

      3.     Poore, Key and the Doe Plaintiffs believe that most, if not all, of the remaining

issues in this case can be resolved in the context of the broader discussions concerning the future

contours and governance of the school districts in Pulaski County.

      WHEREFORE, for the reasons set forth above, the parties jointly request a continuance

of the trial of this case of at least ninety (90) days in order to engage in the efforts described in

this motion to resolve outstanding education issues affecting students throughout Pulaski County.

Respectfully submitted,

Christopher Heller (#81083)
Khayyam M. Eddings (#2002008)
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol, Suite 2000
Little Rock, AR 72201-3493
(501) 370-1506
Email: Heller@fridayfirm.com
Email: Keddings@fridayfirm.com

John W. Walker (#64046)
Shawn G. Childs (#99058)
Omavi Shukur (#2016067)
John W. Walker, PA
1723 Broadway
Little Rock, AR 72006
(501) 374-3758
Email: Johnwalkeratty@aol.com
Email: Schilds@gabrielmail.com
Email: Oshukur@jwwlawfirm.com

By: /s/  Christopher Heller
    Christopher Heller

By:  /s/ John W. Walker
    John W. Walker

Attorneys for Defendant
Superintendent Michael Poore, in his
official capacity as Superintendent of
the Little Rock School District

Attorneys for Doe Plaintiffs

2

Patrick Hollingsworth (#84075)
Rosalyn L. Middleton (#2001257)
Assistant Attorneys General
323 Center Street, Suite 200
Little Rock, AR 72201-2610
(501) 682-8122
patrick.hollingsworth@arkansasag.gov
rosalyn.middleton@arkansasag.gov

By: /s/ Patrick Hollingsworth
     Patrick Hollingsworth

Attorneys for Johnny Key, in his official
capacity as the person exercising the authority
of the LRSD Board of Education

Allen P. Roberts (#64036)
ALLEN P. ROBERTS, P.A.
325 Jefferson St., S.W. P.O. Box 280
Camden, Arkansas 71711-0280
Phone: (870) 836-5310
Facsimile: (870) 836-9662
Email: allen@aprobertslaw.com

Whitney F. Moore (#2009193)
Allen P. Roberts, P.A. – Little Rock Office
1818 N. Taylor, St., Suite B
PMB 356
Little Rock, AR 72207
Telephone: (870) 818-5490
Fax: (870) 836-9662
Email: whitney@aprobertslaw.com

By: /s/ Allen P. Roberts
     Allen P. Roberts

Attorneys for Pulaski County Special School
District

3

## CERTIFICATE OF SERVICE

I certify that on this 13th day of July, 2017, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to all counsel of record.

By:     */s/ Christopher Heller*
        Christopher Heller



**From:** KELLER, ELI
**Sent:** Saturday, July 15, 2017 3:12 PM
**To:** wgaston@comcast.net
**CC:** mkemp@pcssd.org; TINA WARD; sthomas@pcssd.org; REMELE, LINDA; bmaune@pcssd.org; GILLEN, ALICIA
**Subject:** Re: PCSSD MOTION


Mr. Watson,

Good afternoon.  Thank you so much for taking the time to express your thoughts and concern regarding this matter.  I will go on record by saying that I agree with you completely on all of your points.  These actions are foolhardy, unethical and I believe that they are done mostly out of spite.  I have gotten countless texts and phone calls from residents in my ward, and they are unanimous in their outrage for the actions of Jerry Guess and his attorneys.  I fully intend to be a voice of opposition to this blatant attempt to dismantle the PCSSD for the sole benefit of certain persons and areas of the County.  I will make every effort to put a stop to this transgression against our students and faculty.  I am researching the requirements for an emergency board meeting, so please believe that your concerns are being taken seriously by me.  If you have any other questions or concerns, then I am more than happy to hear them.

Sincerely,

Eli Keller

On Sat, Jul 15, 2017 at 12:13 PM, <wgaston@comcast.net> wrote:
July 15, 2017

William E. Gaston
24009 Kanis Rd.
Little Rock, AR   72223

Pulaski County Board Members:
Mike Kemp, Zone 1
Tina Ward, Zone 2
Dr. Linda Remele, Zone 3
Shelby Thomas, Zone 4
Alicia Gillen, Zone 5
Eli Keller, Zone 6
Brian Maune, Zone 7

Members of the Board,

When this article was forwarded to me, I fell out of my chair.  Not because of the content of the article, but the manner in which it was done.  As reported:

**"Late last night came a filing in federal court that says the State of Arkansas, the Little Rock and Pulaski County school districts and the so-called Joshua intervenors, the representatives of black families led by state Rep. John Walker are amenable to the settlement of all remaining issues in county desegregation issues."**
½ O
I'm sure several members of this board were blindsided as well.  How can a motion of this nature be filed without so much as vote or at least thoughtful input from an elected board that represents the interests of the voters, taxpayers and most importantly the students who reside in the district.


This is an 11th hour tactic employed by Dr. Jerry Guess and his attorneys.  The endgame is still a mystery to me, but the questions are obvious:


Why does one file a motion with the courts late at night?

Why does one hide behind a veil of secrecy?

Where is the transparency in this act?

Why was the board not given the chance to have constructive input?

To me these answers are obvious and clear.  Dr. Guess files a motion late at night in a deliberate fashion so the board has no time to intervene.  Dr. Guess has no interest in your input.  I would be insulted.  Dr. Guess is moving in the shadows like a seedy Washington politician attempting to pull a fast one before anybody can assess the long term impact of what he is trying to do, which in and of itself is a mystery.

I insist that an emergency meeting of the PCSSD board is called to discuss this issue.  You have no time because time is a tactic that Dr. Guess is using against you guys.  Once again, why does one file a motion on a late Thursday evening?= 2 So you can spend three days trying to figure out what

to do, while the other party knows exactly what he's doing and how this timing can manipulate board members. I'm sure Dr. Guess is counting on your perceived inability to rally on this issue. He is counting on your perceived inability to function as a cohesive board. If I were in your shoes, this would insult me beyond words.

I have taken to the phones and spoken to parents with children in the PCSSD. To most of them, the issue is how can he do this? How can one individual with a team of lawyers pull this off without so much as a whisper from an elected board? Secondary to this issue is the merging of a solvent well managed district, with the LRSD and I will hold my tongue on that issue…for now.

As a constituent, a tax payer and a voter with a child in the district, I urge you to please call an emergency meeting where this can constructively be discussed. I know there are board members who side squarely with Dr. Guess. I know there are board members who do not. I know there are board members who are on the fence. For you fence riders, please proceed with caution, deliberation and careful thought as to not only what this means today, but also what it means to the future of education in this city as the potential legacy of this move will be yours as well.

Thank you for your attention and consideration.


Regards,


William Gaston



# Board Meeting Minutes: July 18, 2017

This regular meeting of the Pulaski County Special School District was held on Tuesday, July 18, 2017, in the Board Room of the PCSSD Administrative Building (925 East Dixon Rd.).

**In Attendance:** Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

**Absent:** (None)

### 1. Call to Order

### 2. Roll Call

- All members present.

### 3. Action Items - New Business

1. Discussion of Legal Representation by Allen P. Roberts, P.A., Attorneys at Law
    - Mayor Kemp made a motion to continue legal representation by Allen P. Roberts, P.A. Law Firm. The motion failed for lack of a second. Ms. Ward made a motion to immediately remove Allen P. Roberts, P.A. Law Firm from the District. The motion was seconded by Ms. Gillen and passed. The Board adjourned into Executive Session at 5:00 p.m. for the purpose of discussing Dr. Jerry Guess' contract. The Board reconvened at 6:10 p.m. Mr. Maune made the motion to immediately terminate Dr. Jerry Guess as Superintendent, and the motion was seconded by Mr. Keller. The motion passed. The Board adjourned back into Executive Session at 6:11 p.m. for the purpose of discussing an Interim Superintendent. The Board reconvened at 6:40 p.m. Mr. Keller made the motion to promote Dr. Janice Warren to the position of Interim Superintendent beginning immediately through June 30, 2018. The motion was seconded by Ms. Ward and passed. Dr. Remele reiterated the Board's desire for the District to obtain Unitary Status and informed the public that Sam Jones would be working with the District to that end.
    - Vote to continue legal representation by Allen P Roberts, P.A. Law Firm
    Motion by Mike Kemp
    Seconded by
    In Favor: Opposed: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    - Vote to immediately remove Allen P. Roberts, P.A. Law Firm from the District
    Motion by Tina Ward
    Seconded by Alicia Gillen

In Favor: Alicia Gillen, Eli Keller, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward Opposed:
Mike Kemp

- Vote to immediately terminate Dr. Jerry Guess as Superintendent
Motion by Brian Maune
Seconded by Eli Keller
In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina
Ward Opposed:
- Vote to promote Dr. Janice Warren as Interim Superintendent starting immediately through June
30, 2018
Motion by Eli Keller
Seconded by Tina Ward
In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina
Ward Opposed:

## 4. Adjournment

- Ms. Gillen made a motion to adjourn. The meeting was adjourned at 6:43 p.m.

## Our Leadership (/#)

Annual Report to the Public (https://www.pcssd.org/2017-2018-annual-report-to-the-public)

Board of Education (http://pcssd.org/board-of-education)

Board Policies (/board-policies)

Board Meeting Information (http://www.pcssd.org/board-meeting-information)

Board Meeting Agendas (https://www.pcssd.org/board-meeting-agendas)

PCSSD Board Meeting Minutes (/board-meeting-minutes)

Board Zoning Map (/board-zones)

📄 Legal Transfer Form (https://pcssd.s3.amazonaws.com/equity/legal-transfer-form.pdf)

Personnel Policy Committee (Classified) (/classified-personnel-policy-committee)

Personnel Policy Committee (Certified) (/certified-personnel-policy-committee)

Meet our Superintendent (/meet-our-superintendent)

# PROGRAM ADMINISTRATOR

### Pulaski County Special School District



**EXHIBIT**
*19*

**Category:**          Administrative Job Postings

**Employment Type:**          Full Time

**Building:**          LEARNING SERVICES

**Location:**          ARKANSAS

### Summary

POSITION TITLE:  PROGRAM ADMINISTRATOR

QUALIFICATIONS:  Master's Degree in English or Math
Valid K-12 Arkansas Teaching License, Elementary K-6/1-6
Curriculum/Program Administrator or Building Level Administrator Licensure
A minimum of five years experience as a teacher

REPORTS TO:   Deputy Superintendent for Learning Services

JOB GOAL:   To provide leadership and professional development in the implementation of Arkansas State Standards for K-12.

Qualification

PERFORMANCE RESPONSIBILITIES:

1.   Develop, plan, and provide job-embedded quality professional development to assist administrators, instructional coaches, media specialists, and classroom teachers in the implementation of Arkansas State Standards.  This will include twenty-first century researched-based best practices, sound pedagogy, higher-order thinking skills and effective integration of instructional technology.
2.   Coordinate the process of formative assessments for all schools in the district
3.   Disaggregate, analyze, and interpret formative and interim assessment data to help the school and the district develop a plan for school improvement
4.   Evaluate the effectiveness of instructional practices and devise plans for systemic improvement
5.   Monitor the district curriculum to ensure it is aligned with State Standards in English, Math , Science and Social Studies
6.   Possess a working knowledge of principles of supervision, curriculum mapping, researched-based best practices, and student-centered coaching models
7.   Possess good oral and written communication skills and relationship skills with all people
8.   Oversee the district curriculum committee to review and revise the curriculum on an annual basis
9.   Stay abreast of new ideas and innovations concerning classroom instruction, curriculum, and current research and be able to implement these ideas into the district's overall plan and vision
10.   Direct the textbook adoption process as outlined in board policy
11.   Research the options of electronic textbooks and other resources and make recommendations to the Deputy Superintendent
12.   Assist the Director of Counseling with the process of course approval /revisions
13.   Assist in the process of course catalog/description revision
14.   Identify and request needed resources
15.   Assist with PLC's and building job-embedded professional development
16.   Assist in the recommendation of hiring instructional coaches, media specialists, and other classroom teachers  as requested by the administrator
17.   Work collaboratively with the other members of Learning Services to ensure continuity of program delivery throughout the district and increase student achievement in all schools
18.   Work with the media specialists and instructional technology to infuse the utilization of instructional media  and appropriate technology resources by teachers and students

19.   Provide leadership in the recommendation of policies related to instruction and media
20.   Promote the role of media services and informational technologies in the school and community
21.   Support and assist the district in meeting the goals of the Desegregation Plan 2000
22.   Perform other duties as assigned by the Deputy Superintendent

Program Administrator cont.


TERMS OF EMPLOYMENT:

Salary Range:      Teacher Salary Schedule  x Certified Administrative Index
Length of Contract:   244 contract days


EVALUATION:

Performance of this job will be evaluated in accordance with the provisions of the Board's policy of Evaluation of Professional Personnel.


APPLICATION PROCEDURE:

Interested and qualified applicants should submit an online application at www.pcssd.org.  Personnel currently employed by the district who meet the necessary qualifications may apply by submitting an online District application.


APPLICATION DEADLINE:   May 3, 3017 (or until filled)


IT IS THE POLICY OF THE PULASKI COUNTY SPECIAL SCHOOL DISTRICT TO PROVIDE EQUAL OPPORTUNITIES WITHOUT REGARD TO RACE, COLOR, NATIONAL ORIGIN, RELIGION, SEX, AGE, QUALIFIED DISABILITY, OR VETERAN IN ITS EDUCATIONAL PROGRAMS AND ACTIVITIES, EDUCATION SERVICES, FINANCIAL AID, AND EMPLOYMENT.  THE DISTRICT WILL MAKE SPECIAL EFFORTS TO EMPLOY AND ADVANCE WOMEN, BLACKS AND DISABLED PERSONS.  EQUITY CONCERNS MAY BE ADDRESSED TO THE ASSISTANT SUPERINTENDENT FOR EQUITY AND PUPIL SERVICES.


Qualification Details
**A:** Has any of the following endorsement(s):
- CURR PROG ADM CURR
- CURR SPEC K-12
- Curr/Prog Admin/ Curriculum 7-12
- PROG/CURR ADMIN 7-12
- PROG/CURR ADMIN P-8

**B:** Has one of the following degree(s) or above:
- Master's Degree

Posting Schedule
The posting is open for internal applicants
Open Date: At the start of 5/8/2017
Close Date: Open until filled

The posting is open for external applicants

Open Date: At the start of 5/8/2017

Close Date: Open until filled

# EMERGENCY

**PLEASE POST**                                                    **PLEASE POST**

## PULASKI COUNTY SPECIAL SCHOOL DISTRICT
### CERTIFIED POSITION AVAILABLE
#### July 11, 2018

> **EXHIBIT**
> tabbies
> _20_

**POSITION TITLE:**          **DISTRICT INSTRUCTIONAL STRATEGIST**

**QUALIFICATIONS:**          **Master's Degree**
**Valid K-12 Arkansas Teaching License**
**Curriculum/Program Administrator or Building Level Administrator Licensure**
**A minimum of five years' experience as a teacher**

**REPORTS TO:**          **Superintendent of Schools**

**JOB GOAL:**          **To provide leadership and professional development in the implementation of Arkansas State Standards for K-12.**

**PERFORMANCE RESPONSIBILITIES:**

1. Implement the district's desegregation plan in the Learning Services Division through monitoring to preclude discrimination on the basis of race, gender, age or handicap, and annually report the results of monitoring to the Superintendent of Schools.
2. Coordinate, co-design, implement and assess district content area committees to ensure common core curriculum is viable and accessible to professional staff and students.
3. Coordinate and link multiple assessments to content area scope and sequence to ensure viable student performance outcomes.
4. Provide support for the disaggregation, analysis, and interpretation of student performance data to ensure a data driven school and district improvement plan.
5. Provide guidance for professionals on the district curriculum to ensure alignment with State Standards
6. Possess good oral and written communication skills and relationship skills with all people
7. Stay abreast of new ideas and innovations concerning cultural competency, classroom instruction, curriculum, and current research and  to support the district's overall plan and vision
8. Direct the textbook adoption process as outlined in board policy
9. Assist the Director of Counseling with the process of course approval /revisions
10. Assist in the process of course catalog/description revision
11. Assist with the development of PLC's
12. Assist in the recommendation of hiring instructional coaches, media specialists, and other classroom teachers as requested by the administrator
13. Work collaboratively with the other members of Leaning Services to ensure continuity of program delivery throughout the district and increase student achievement in all schools
14. Work with the media specialists and instructional technology to infuse the utilization of instructional media and appropriate technology resources by teachers and students
15. Provide leadership in the recommendation of  policies related to instruction and media
16. Perform other duties as assigned by the Superintendent.

**EVALUATION:**

**Performance of this job will be evaluated in accordance with the provisions of the Board's policy of Evaluation of Professional Personnel.**

**District Instructional Strategist cont.**

## TERMS OF EMPLOYMENT:

Salary Range:          Teacher Salary Schedule x Certified Administrative Index
Length of Contract:    244 contract days

## EVALUATION:

Performance of this job will be evaluated in accordance with the provisions of the Board's policy of Evaluation of Professional Personnel.

## APPLICATION PROCEDURE:

Interested and qualified applicants should submit an online application at www.pcssd.org.  Personnel currently employed by the district who meet the necessary qualifications may apply by submitting an online District application.

## APPLICATION DEADLINE:       July 18, 2018 (or until filled)

IT IS THE POLICY OF THE PULASKI COUNTY SPECIAL SCHOOL DISTRICT TO PROVIDE EQUAL EMPLOYMENT OPPORTUNITIES WITHOUT REGARD TO RACE, COLOR, NATIONAL ORIGIN, RELIGION, SEX, AGE, QUALIFIED DISABILITY, OR VETERAN IN ITS EDUCATIONAL PROGRAMS AND ACTIVITIES, EDUCATION SERVICES, FINANCIAL AID, AND EMPLOYMENT.  THE DISTRICT WILL MAKE SPECIAL EFFORTS TO EMPLOY AND ADVANCE WOMEN, BLACKS AND DISABLED PERSONS.  EQUITY CONCERNS MAY BE ADDRESSED TO THE ASSISTANT SUPERINTENDENT FOR EQUITY AND PUPIL SERVICES.