Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

```
 1              PULASKI COUNTY SPECIAL SCHOOL DISTRICT
 2
 3   IN THE MATTER OF:
 4   KIFFANY PRIDE
     LAURA SHIRLEY
 5   JENNIFER BEASLEY
     NICOLE TOWNSEND
 6
 7         The above-entitled matter was heard by the Board of
 8   Education, on Monday, June 11, 2018, beginning at 6:07
 9   p.m., in the Board Room of the Administrative Offices,
10   Pulaski County Special School District, 925 East Dixon
11   Road, Little Rock, Pulaski County, Arkansas.
12   BOARD MEMBERS:
13
     DR. LINDA REMELE (not present)
14   SHELBY THOMAS
     BRIAN MAUNE
15   MIKE KEMP
     ELI KELLER
16   TINA WARD
     ALICIA GILLEN
17
18         ON BEHALF OF THE DISTRICT:
19             GEORGE 'JAY' BEQUETTE, JR., ESQ.
               Bequette & Billingsley
20             425 West Capitol Avenue, Suite 3200
               Little Rock, Arkansas  72201
21
22         ON BEHALF OF THE EMPLOYEES:
23             JOHN WALKER, ESQ.
               Walker Law Firm
24             1723 Broadway
               Little Rock, Arkansas  72206
25
```

Page 2

```
 1   A P P E A R A N C E S (continued):
 2   HEARING OFFICER:
 3       SHARON STREETT, ESQ.
 4   ALSO PRESENT:
 5   Dr. Janice Warren
 6   Paul Brewer
 7   Kiffany Pride
 8   Laura Shirley
 9   Jennifer Beasley
10   Nicole Townsend
11   Joy Springer
12   Denise Palmer
13   Linda Goodwin
14   Shawn Burgess
15   Dr. Yolaundra Williams
16   Jo Ann Kohler
17                  ---o---
```

Page 3

```
 1                    I N D E X
 2                                                   PAGE
 3   Statement by Mr. Kemp                              8
 4   Instructions by the Hearing Officer                9
 5   Motions by Mr. Walker                             11
 6   WITNESSES
 7   DENISE PALMER
 8     Direct by Mr. Bequette                          38
 9     Cross by Mr. Walker                             41
10     Examination by the Board                        56
11   PAUL BREWER
12     Direct by Mr. Bequette                          57
13     Cross by Mr. Walker                             67
14   LINDA GOODWIN
15     Direct by Mr. Walker                           116
16   SHAWN BURGESS
17     Direct by Mr. Walker                           122
18   KIFFANY PRIDE
19     Direct by Mr. Walker                           124
20     Examination by the board                       128
21     Redirect by Mr. Walker                         128
22   DR. YOLAUNDRA WILLIAMS
23     Direct by Mr. Walker                           129
24   NICOLE THOMPSON
25     Direct by Mr. Walker                           133
```

Page 4

```
 1     Examination by the Hearing Officer             135
 2   LAURA SHIRLEY
 3     Direct by Mr. Walker                           135
 4   JENNIFER BEASLEY
 5     Direct by Mr. Walker                           142
 6   JO ANN KOHLER
 7     Direct by Mr. Walker                           149
 8   DR. JANICE WARREN
 9     Direct by Mr. Walker                           152
10     Examination by the Hearing Officer             169
11     Redirect by Mr. Walker                         170
12     Examination by the Board                       171
13     Further redirect by Mr. Walker                 190
14     Re-examination by the Board                    196
15     Further redirect by Mr. Walker                 199
16   EXHIBITS
17   DISTRICT
18   KIFFANY PRIDE
19   1     Administrator's Contract for 2017-
20         2018 School Year
21   2     Notice of Non-Renewal from Dr. Janice
22         Warren to Kiffany Pride, dated April
23         27, 2018
24         Reduction in Force Policy
25         Certified Administrative Index 2017-
```

EXHIBIT 2

Case 4:18-cv-00508-DPM   Document 33-2   Filed 06/18/20   Page 2 of 7

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

**PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 37**

1  MR. WALKER: Well, let me answer this
2  first. The law requires that if are you going
3  to have a RIF -- and this started off as a
4  RIF -- you have to have a district-wide RIF;
5  you can't go in and focus in on two or three or
6  four or five people that you may or may not
7  like. Ten or 12, you can't -- this is a
8  district that employs hundreds of people. You
9  cannot --
10  HEARING OFFICER: Okay. So you are --
11  MR. WALKER: The Board cannot do that.
12  HEARING OFFICER: Okay. So you are not
13  making an argument that they chose these people
14  for an impermissible reason?
15  MR. WALKER: I'm saying that they chose
16  them for a reason that they didn't -- that was
17  beyond their authority; they did not have a
18  right --
19  HEARING OFFICER: Okay. So you're saying
20  they were -- they were acting outside of their
21  authority --
22  MR. WALKER: That's right.
23  HEARING OFFICER: -- but you're not saying
24  that they have chosen them for an impermissible
25  reason?

**Page 38**

1  MR. WALKER: I'm saying they also chose
2  them because -- because -- these four because
3  of race. Now, we'll be able to prove that
4  otherwise. I'm not saying all the board
5  members, but I'm saying Ms. Gillen lead that,
6  and she will support --
7  HEARING OFFICER: Okay. Well, I guess you
8  can -- you can put that on on your evidence.
9  And here is what I'd saying about your motions
10  is I'm going to reserve ruling on your motions
11  until the end of the hearing.
12  MR. WALKER: Well, maybe we should reserve
13  motion and ruling and we should also have the
14  motion briefed. I would like to receive that
15  decision, but we'll -- we'll -- I have no --
16  no -- I cannot dispute you and we have to go
17  forward and we'll go forward.
18  HEARING OFFICER: Okay.
19  MR. BEQUETTE: May we call our first
20  witness?
21  HEARING OFFICER: Yes.
22  MR. BEQUETTE: We'll call Denise Palmer.
23  EXAMINATION OF DENISE PALMER
24  BY MR. BEQUETTE:
25  Q   State your name and your position in the district

**Page 39**

1  for the record, please.
2  A   I'm Denise Palmer, Chief Financial Officer.
3  Q   All right.
4  MR. BEQUETTE: And, Ms. Streett, and
5  members of the Board, we're going to be in
6  the -- the Jennifer Beasley exhibit packet
7  first, but we're going to be talking about an
8  exhibit that's common to all four cases.
9  BY MR. BEQUETTE:
10  Q   Please turn to Exhibit 5 on Page 6.
11  A   Yes.
12  Q   Ms. Palmer, can you identify Exhibit 5 on Page 6?
13  A   Yes. This is the Preliminary Budget Projection for
14  School Year 2018-2019.
15  Q   And who prepared Exhibit 5?
16  A   I did.
17  Q   All right. And why did you prepare Exhibit 5?
18  A   To present to the Board the Preliminary Budget for
19  2018-2019, and what we were facing as a district in the
20  possible decline of the legal fund balance.
21  Q   And explain what concerns you presented to the Board
22  based on this Preliminary Budget Projection for the
23  '18-'19 school year?
24  A   Well, if you look at the top, on the revenue
25  projected, the loss of the desegregation at 20,804,000,

**Page 40**

1  and then a decrease in our tax revenue for the year of
2  68,917. Also you see the Foundation Funding there, we
3  still do not have the number, we did not then when I
4  presented it to the Board, we still do not know what
5  the -- the ADM will be doing, we do not know if it will
6  be increasing or declining, and that's on the revenue
7  side. Pretty much the revenue is going to be consistent
8  with the '17-'18 revenue.
9      On the expense side, again, you see the expenses.
10  If we're losing the desegregation on the revenue side,
11  we're losing -- we will be losing the 20,000 --
12  20,800,000 on the expenditure side, so that's a wash on
13  both sides.
14      I show the increase in the Scheduled Debt Payments
15  on line 30. We, the district, is looking at a
16  $4.6 million increase for school year '18-'19.
17      Also the discussion has been for the possible second
18  lien bonds, and at that time the projection was possibly
19  15 million. That payment would be $856,000.
20      We have salary and benefits, which are step
21  increases for '18-'19. These are not pay increases,
22  salary increases, they are actually step increases for
23  years of service to the district, that's 1,206,000. And
24  then a possibility of buses -- that had been discussed
25  with myself and the Director of Transportation, that he

Case 4:18-cv-00508-DPM   Document 33-2   Filed 06/18/20   Page 3 of 7

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

**Page 41**

 1   will be bringing a motion to -- to purchase buses for
 2   '18-'19, so that expenditure of 400,000.
 3       So projecting the revenue, pretty much staying
 4   consistent with the -- this school year and a -- excuse
 5   me -- an increase in the expenditures of 8 million, that
 6   would give us a deficit of 7.6 million, which would leave
 7   us a legal fund balance of 9.6.
 8   Q   Ms. Palmer, did you have any concerns about the
 9   district's ability to comply with the state law that
10   prohibits the district from having declining fund
11   balances?
12   A   Yes.
13   Q   Can you explain that?
14   A   Well, having come into this district, this district
15   was placed in fiscal distress for a declining fund
16   balance, and that is what projected this with us
17   declining at a 7.37 percent legal fund balance, that
18   could possibly put -- throw the district into fiscal
19   distress again.
20   Q   And did you agree that proactive steps needed to be
21   taken in order to attempt to reduce the amount of the --
22   the amount that the fund balance would decline?
23   A   That's correct.
24           MR. BEQUETTE: Okay.  Pass the witness.
25           EXAMINATION OF DENISE PALMER

**Page 42**

 1   BY MR. WALKER:
 2   Q   Ms. -- Ms. Palmer, what is the date of this, that
 3   you created this document?
 4   A   I presented it in -- at the February board meeting.
 5   Q   Okay.  Did anybody ask you to prepare this?
 6   A   No.
 7   Q   Did you talk with any board members before you
 8   presented it?
 9   A   No.
10   Q   At that time was there a discussion involving the
11   reduction of staff?
12   A   No.
13   Q   Did you have a discussion with either Mr. Brewer or
14   with Dr. Warren about your preliminary budget projection?
15   A   I had discussions with Dr. Warren and I, in fact we
16   presented this.  We -- she knew that I was presenting
17   these in February.
18   Q   Does this budget take into account the reductions of
19   any particular amount of money for staff?
20   A   It doesn't.
21   Q   Ma'am?
22   A   It does not.
23   Q   Does not?
24       Is there included on this budget what is known as
25   National School Lunch Funds, NSLA Funds?

**Page 43**

 1   A   No.
 2   Q   It does not?
 3   A   Not in particular, but it's -- the NSLA is included
 4   in that.
 5   Q   On this particular budget, can you draw my attention
 6   to where NSLA funds are included?
 7   A   Well, NSLA funds are part of --
 8   Q   Listen to my question.  Where are they on this
 9   document included?
10   A   They would be included in -- in the revenue, but on
11   the revenue projection would be funds 1000, but I'm
12   stating up there 1013.
13   Q   So you're saying that you don't have the NSLA Funds
14   included in your projection?
15   A   No, because they are restricted.
16   Q   Okay.  Are these persons, these four people, paid
17   out of the NSLA Funds?
18   A   Yes.
19   Q   I see.
20       How does having them off the payroll affect what you
21   have done as a preliminary budget projection?
22   A   It would -- it -- it would free --
23   Q   Listen only to my question.  How would it affect
24   this particular document?  Do you have another document
25   that shows that?

**Page 44**

 1   A   No.
 2   Q   Thank you.
 3   A   I would -- not at this time.
 4   Q   All right.  Now --
 5   A   But I can -- can I finish that or is that the --
 6   Q   Pardon?
 7   A   Did you -- are -- if you are reducing expenditures
 8   in the NSLA, your intent would be to -- to redistribute
 9   some of the operating expenditures into -- to be paid by
10   NSLA.
11   Q   How much money came out of the operating funds for
12   these four people?
13   A   I don't have that figure.
14   Q   So you don't have any idea.
15       Did any board member ever ask you about this
16   preliminary budget projection?
17   A   No.
18   Q   Did Mr. Brewer ever ask you about it?
19   A   No.
20   Q   All right.  Now, in terms of your declining fund
21   balance, you are aware that the $20 million that you-all
22   were getting was supposed to be set aside specifically
23   for construction.  Weren't you?
24   A   That is correct.
25   Q   So it's not appropriate for it to be in your

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

**Page 45**

```
 1  operating budget.  Is it?
 2  A   The reason it is in --
 3  Q   No, no --
 4  A   Well, sir, let me answer, the reason we had to list
 5  it in --
 6  Q   Now, listen to --
 7  A   -- the operating budget coming in and show the
 8  expenditures coming out is because that's what the State
 9  requires us to transfer, to show the revenue coming into
10  the operating and then showing it being transferred out.
11  Q   Well, the point of this document, would you not
12  agree, that the revenue for 2000 -- well, I don't have
13  the revenue here for 2018 and '19.  Where is that?
14  $122,000?  $122 million?
15  A   Projected; correct.
16  Q   And what was it for last year?
17  A   The revenue -- I don't have it.  Well, you see the
18  revenue budget for 2017-'18 on Line 10.
19  Q   I see that, but it's basically more this year than
20  it was last year.  Wasn't it?
21  A   Okay.  Are you talking about '18-'19?
22  Q   If you look at 2017, Item No. 8, you will see --
23  A   That's --
24  Q   No, Item No. 10, you will see revenue budget,
25  meaning money coming in, except NSLA money, of 143,000 --
```

**Page 46**

```
 1  143 million; and then for 2018, you have -- for 2017, you
 2  had money coming in, $144 million; is that right?
 3  A   That's correct.
 4  Q   All right.  It's basically the same amount of money
 5  for each year.  Isn't it?
 6          HEARING OFFICER:  You're talking about the
 7      same years.
 8          THE WITNESS:  Right.  The projected
 9      revenue for 2018 is 122 million versus the
10      revenue for '17-'18 at 143 million.
11  BY MR. WALKER:
12  Q   Well, no.  The 143 million, that -- that projected
13  revenue of $143 million included the $20 million.  $122
14  million does include that.
15  A   I see.  You're right.  I see what you're saying.
16  Q   That's right.  So you have more revenue coming in
17  this year than you had last year, don't you, according to
18  your projection?
19  A   To -- in '18-'19?
20      No, it would be -- it would be a little bit -- about
21  the same.
22  Q   Well, $122 million is more than $121 million.  Isn't
23  it?
24  A   A little bit, yes.
25  Q   All right.  So there is no reason -- in terms of
```

**Page 47**

```
 1  what you're losing, there is no loss here.
 2      Now let me ask you something, did anybody ever ask
 3  you to figure up how much money you needed to save by
 4  discharging employees rather than allowing attrition?
 5  Did anybody ever ask you to make that computation?
 6  A   No.
 7  Q   All right.  You understand that each year there is
 8  attrition.  Don't you?
 9  A   Yes.
10  Q   And you are aware that this year -- already you are
11  aware that Sam Altschul, Mr. Brewer, Mr. -- Dr. Goodwin,
12  Derek Scott, Mr. Tackett, and Ms. Viswathan, and
13  Mr. Wheeler have all given notice of resign --
14  resignation; isn't that correct?
15  A   I have had people tell me that.  Yes.
16  Q   All right.  And those total amounts, would you not
17  agree --
18          MR. WALKER:  Pass this to her, please.
19  BY MR. WALKER:
20  Q   Now, those -- those are right at a million dollars?
21  A   (Nodding head up and down.)
22  Q   That's $2,000 less than a million.
23      Now, the cuts that were directed by the Board -- you
24  were here when the Board directed cuts; right?
25      You heard the Board say we told Mr. Brewer to -- to
```

**Page 48**

```
 1  come back with some cuts?
 2  A   What meeting was that?  The board meeting?
 3  Q   Well, take February or March; did you hear the
 4  Board -- were you present at those meetings?
 5  A   I was at the February meeting.  I don't remember it
 6  being directed at the February meeting.
 7      There was no meeting in March.
 8      There was a meeting in April.  Maybe the April
 9  meeting.
10  Q   All right.  So if they directed Mr. Brewer to make
11  these cuts and there was no meeting in March, that means
12  it had to either come in February or before; right?
13  A   Because I have no knowledge of that --
14  Q   All right.  Now, the Board, the ones that -- the
15  cuts that Mr. Brewer recommended involved the following
16  people: Ms. Beasley --
17          MR. WALKER:  Stand up, Ms. Beasley.
18          And Ms. Beckman.  I don't know if she's
19      here.
20          MS. BEASLEY:  She's not.
21          MR. WALKER:  She's a white lady.
22          You may sit back down.
23          Mr. Brewer, you can see Mr. Brewer over
24      there.
25          Mr. Danny Ebbs, he's not here, but he is
```

Case 4:18-cv-00508-DPM   Document 33-2   Filed 06/18/20   Page 5 of 7

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

### Page 49

```
 1    being -- he was being reduced by 10 -- reduced
 2    by $10,000.
 3         Ms. Goodwin -- stand up there,
 4    Ms. Goodwin.
 5         Your annual salary would have been
 6    $150,000?
 7         MS. GOODWIN: (Nodding head up and down.)
 8         MR. WALKER: All right. Dr. Pride, stand
 9    up.
10         Her salary would have been 113,500, this
11    includes benefits.
12         Ms. Ray is a white lady who is not here,
13    she was just employed; her salary would have
14    been, with benefits, 96,500.
15         Ms. Shirley, stand up.
16         Ms. Shirley was gifted and talented, and
17    her amount was being reduced by 10,000.
18         Mr. Tackett, are you here?
19         We asked him to be a witness.
20         Mr. Tackett, he gave up a salary of
21    157,000 by resignation the same night --
22    BY MR. WALKER:
23  Q  You heard them -- you knew that he was resigning.
24    Didn't you -- didn't you, ma'am?
25  A  I heard after the fact.
```

### Page 50

```
 1  Q  But you knew at the night of the Board meeting that
 2    he had resigned. Didn't you?
 3  A  No, sir.
 4  Q  All right. But you've seen his resignation?
 5  A  I haven't seen his resignation.
 6  Q  All right. But you know he resigned?
 7  A  I heard, yes.
 8  Q  All right. And Ms. Townsend --
 9         MR. WALKER: Ms. Townsend, stand up.
10         Hers was 105,000 -- pass that to her.
11    BY MR. WALKER:
12  Q  Look at those amounts. That would have taken place
13    just by attrition. What is the difference in savings, if
14    one had been by attrition, as recommended by your primary
15    administration, and the other was recommended by Mr. --
16    by Mr. Brewer, that's what difference? $2,000?
17  A  2,500.
18  Q  $2,500?
19  A  (Nodding head up and down.)
20  Q  Now --
21         All right. Now, in terms of the budget, have you
22    ever been directed by this Board to reduce or come to it,
23    either through Dr. Warren or through any other person
24    acting as Superintendent, including Dr. Guess, to come to
25    it with a budget that took into account any specific
```

### Page 51

```
 1    number or amounts of money -- number of people or amounts
 2    of money for reduction?
 3  A  Have I? No, sir.
 4  Q  No?
 5         All right. So if you want to say -- if you want to
 6    get rid of -- isn't it true, if you want to get rid of
 7    anybody, you can say it right now, we're doing it because
 8    of the loss of desegregation funds. Isn't that right?
 9  A  No, sir.
10  Q  Fifty -- is there -- you -- you --
11  A  The reason we're doing the -- the budget cuts this
12    year are due to the fact that the revenue was not
13    increasing and the expenditures are increasing.
14  Q  Well, just a moment. The projected revenue for
15    2018-'19 is increasing?
16  A  I think we said 1 million --
17  Q  Well, just a moment. Ms. -- Ms. -- Ms. Palmer, if
18    we look at '18-'19, which is Line 21 --
19         HEARING OFFICER: Okay. Mr. Walker, I
20    think she answered your question.
21         MR. WALKER: Okay. Just a moment.
22    BY MR. WALKER:
23  Q  If we look at -- let's make sure.
24         If we look at Line 19 -- the board members have
25    it -- the projected revenue for 2018-'19 was 122 million;
```

### Page 52

```
 1    is that right?
 2  A  That's correct.
 3  Q  The actual revenue for 2017-'18 was $20 million --
 4    $20,900,000; right?
 5  A  The actual revenue budget for 2017-'18? Is that
 6    what you said, sir?
 7  Q  Yes, ma'am.
 8  A  Was 143,859,000.
 9  Q  When you take out the $20 million, how much was it?
10  A  That would be -- gosh, you're making me do this
11    without a calculator. 123,055,497 -- 123,059,497.
12  Q  So that -- now, this is before -- you are not in a
13    position to say how many students, how much other revenue
14    you're going to get or anything. Are you?
15  A  That's correct; we don't know if it's increasing or
16    decreasing.
17  Q  All right. Now, the biggest decrease that you-all
18    have had has come because you-all have developed second
19    lien -- lien funds; isn't it?
20  A  The bonds, yes.
21  Q  That's yes or no.
22  A  Well, the -- yes, we have -- the bonds are
23    increasing, the budget payment is increasing.
24  Q  All right. You don't have -- you don't have that
25    figure in 2017-'18. Do you?
```

Pulaski County Special School District v.
Kiffany Pride, et al.                                                                June 11, 2018

### Page 53

1  A   I don't have it broken out in there, no. So, but
2  it --
3  Q   All right. It's not anywhere in there in 2017-'18.
4  Is it?
5  A   Yes, sir. In the expenditures, yes.
6  Q   In the expenditures?
7  A   Yes, sir.
8      If you look at 21, Line 21, the expenditure budget
9  for 2017-'18, that does include bond payments.
10 Q   Well, so the amount that was being spent for
11 Robinson, Mr. Maune's school, and others are now, like,
12 $7 million more than it was a year before?
13 A   4.6 million.
14 Q   All right. That's where the money went. Isn't it?
15 A   The money -- well, what money went?
16 Q   Well, you had -- the Court ordered you only to
17 address Mills, and you-all went and built Robinson, and
18 you used these district funds for that purpose. Didn't
19 you?
20 A   Sir, I wasn't here when that decision was made so I
21 can't speak to that.
22 Q   But you did -- but you did spend a large amount of
23 money that's included in this budget on Robinson. Didn't
24 you?
25 A   No, sir. That 4.6 million, our -- our bond

### Page 54

1  payment -- I don't have that in front of me -- but our
2  bond payment this year was 12 million.
3  Q   That's right.
4  A   Our -- our -- our bond debt payment. And like I
5  said, I don't have it in front of me, was 12 million, I'm
6  thinking is what was going up; so maybe 10 million, but
7  anyway, it was -- our bond payment with interest and
8  principal was 10 million something less for '17-'18.
9  Q   Well, you don't have any reason for it to be less
10 this year. Do you?
11 A   No, sir, that's not what I'm showing. I'm showing
12 it increasing, so it's going up to --
13 Q   No. If it's 10 million, this figure here for bonds,
14 second lien bonds, you put it together with the most
15 liberal calculation of mathematics would be six and a
16 half million dollars rather than ten. And I guess the
17 point I'm making here is this -- this is projected, it's
18 a one-sheet summary, and it's not -- it is not carefully
19 prepared. Isn't that correct?
20 A   No, sir, it was carefully prepared; but it is
21 true -- it is what it says at the top, a Preliminary
22 Budget Projection.
23 Q   When is the actual budget to be prepared?
24 A   The actual budget, we have until the end of
25 September to submit.

### Page 55

1  Q   So is there any particular reason to do this
2  particular one right now?
3  A   Yes, sir. Because of what we were facing and the --
4  Q   Because of what?
5  A   Because of what we were facing and the declining
6  balance.
7  Q   Who -- who told you that? What you were facing?
8  Who told you what you were facing?
9  A   Well, I'm the CFO and that's part of my job.
10 Q   Well, could --
11     COURT REPORTER: I didn't hear the answer.
12 I couldn't hear your answer.
13     THE WITNESS: I am the CFO and part of my
14 job is the financial stability of the district.
15 BY MR. WALKER:
16 Q   Well, you just became the CFO in the last two years.
17 Isn't that correct?
18 A   Three years.
19 Q   All right. Now, did anybody direct you the year
20 before to do a preliminary budget projection?
21 A   No, sir.
22 Q   All right. This is the first time you've ever done
23 a preliminary budget projection. Isn't it?
24 A   Yes. That is correct.
25 Q   All right. Now -- excuse me.

### Page 56

1      Now, did Dr. Warren direct you to make this?
2  That's yes or no.
3  A   No.
4  Q   You did it on your own?
5  A   Correct.
6  Q   All right. Now, how much of -- in this budget do
7  you project for salary cuts to reduce the budget? Can
8  you tell me and give me the line item?
9  A   I didn't project any salary cuts in this.
10 Q   You didn't?
11     This budget doesn't have any projected salary cuts?
12 A   No.
13 Q   Yes or no?
14 A   No. This was a preliminary one, as notates.
15     MR. WALKER: No more questions.
16     MR. BEQUETTE: No further questions.
17     HEARING OFFICER: Board, do you-all have
18 any questions for her?
19     MR. BEQUETTE: Call Mr. Brewer.
20     MR. MAUNE: Yes, I had a question.
21     HEARING OFFICER: Mr. Maune.
22     MR. MAUNE: Mr. Walker referred to the
23 individuals that were -- left because of
24 resigning or attrition or whatever.
25     How many of those individuals would we

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD;
NICOLE TOWNSEND, 06/11/2018 — Page 57

```
 1      have rehired for '18-'19 school year?
 2           MR. BEQUETTE: I think that will be a
 3      question for Mr. Brewer, Mr. Maune.
 4           MR. WALKER: Well, Mr. Brewer -- it's
 5      speculation, he's an interim person, he's
 6      already retired, he has no authority for
 7      determining who would have been --
 8           HEARING OFFICER: Let's -- let's hear it
 9      from Mr. Brewer -- from Mr. Brewer. They are
10      calling him as a witness, Mr. Walker.
11              EXAMINATION OF PAUL BREWER
12 BY MR. BEQUETTE:
13 Q   Please identify your -- yourself for the record and
14 your position in the district.
15 A   I'm Paul Brewer, Interim CFO -- CEO of the Human
16 Resources Department.
17 Q   And, Mr. Brewer, this Spring, did you -- did you
18 engage in the process of identifying some cost savings
19 that could be done by either reducing the number of
20 licensed staff and classified staff or changing contracts
21 to reach or accrue savings?
22 A   Let me clarify. In April school board meeting I
23 presented the allocations for the following school year,
24 '18-'19. And the Board took a look at those and asked
25 me, and I assumed with Dr. Warren, directed us to: One,
```

```
 1 contact the new Superintendent that will be starting in
 2 July to get -- make sure that he knew kind of we were
 3 looking at reductions in -- in the Central Office; that
 4 was directed the Central Office. I did not say --
 5    We knew attrition would take place, as it always
 6 does, I believe around 20 teachers, which would be close
 7 to a million dollars.
 8    If you can hire non-tenured teachers who maybe had
 9 30-40 years of experience and hire in new teachers with
10 bachelor's degrees, it's a substantial savings to the
11 district, which is what we try to do. It's never a
12 perfect world but that's what we try to do.
13    At that meeting, I believe, Dr. Remele, along with
14 other members of the Board, asked us to go back and look
15 at the Central Office and see what cuts, if any, could be
16 made, and to make sure that we included Dr. McNulty, who
17 would be the new Superintendent, prior to making any kind
18 of recommendations.
19    I did that.
20    Dr. Warren, unfortunately, lost a family member the
21 following day, had to be out. She was out the following
22 day. I knew I had about a week to get this done, along
23 with her, hopefully.
24    I did not have Mr. McNulty's phone number. I called
25 Dr. Remele and asked her if she had his number, because I
```

```
 1 found out -- I guess it was at the Tuesday meeting --
 2 found out Thursday, I guess, sometime that Dr. Warren
 3 would not be back until the following Tuesday. I didn't
 4 feel like I could wait that long to contact Dr. McNulty,
 5 so I called Dr. Remele, got his phone number, introduced
 6 myself, told him the task that he -- that the Board had
 7 asked us to work on. He appreciated that.
 8    And so it certainly wasn't pointed at any
 9 individuals. Let me make sure the record stands
10 straight, I never discussed with Ms. Gillen ever about
11 any specific cuts to anybody in this district. That's
12 never been discussed.
13    I did discuss it with Dr. Remele.
14    I talked to Dr. Tackett -- I know he's not here,
15 but -- and I did talk to Will Reid because they were kind
16 of heading up this -- I was not a part of that, don't
17 know a lot about it, the School of Innovation, that maybe
18 some ways that we need to look at in the future to maybe
19 restructure some things. I don't know if they ever
20 talked to Dr. McNulty or not; they never gave me that
21 information and I didn't ask him.
22    In taking a look at the Central Office staff, what
23 Dr. McNulty wanted to do was take a look at what we had
24 in place now and how he might could restructure that and
25 restructure some of the job descriptions to fit maybe
```

```
 1 what he wanted to do. But I explained to him, because of
 2 the May 1st deadline, that people would be
 3 automatically renewed and he would not have that
 4 opportunity if we waited until he got here. The people
 5 would be in place, their jobs would be as it stood, as it
 6 was last year.
 7    He said that, "I would like to non-renew those
 8 people, interview them myself, take a look at what we
 9 have and bring in what we want to do." My understanding
10 is he did talk to them, was very impressed with them, as
11 I've always been. Very, very capable people and they are
12 all, I consider, good colleagues of mine and friends.
13    The first person I cut was myself, because I didn't
14 plan on coming next year.
15         THE WITNESS: And let me set the record
16    real, real straight, John. Nobody has offered
17    me a job in this district next year, because
18    nobody here except the Superintendent can
19    recommend that and the Superintendent won't be
20    here until July 1.
21         I do plan to resign. I already resigned.
22    I got a letter just like these ladies did.
23    Mine just said I don't have a job.
24         Now, if the district would like for me to
25    stay, that would be up to Dr. McNulty and this
```