## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

------------------------------------------------

JENNIFER BEASLEY; DR. KIFFANY
PRIDE; LAURA SHIRLEY; and
NICOLE TOWNSEND,

PLAINTIFFS,

VS.        NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools
of the Pulaski County Special School
District; PULASKI COUNTY SPECIAL SCHOOL
DISTRICT BOARD OF DIRECTORS; and
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
a public body corporate,

DEFENDANTS.

------------------------------------------------

---o---

DEPOSITION

OF

PAUL BREWER

---o---

TUESDAY, JUNE 4, 2019

---o---

## Page 2

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

JOHN WALKER, ESQUIRE
JOY SPRINGER, Administrative Assistant
John Walker Law Firm
1723 South Broadway Street
Little Rock, Arkansas 72206

ON BEHALF OF DEFENDANTS:
W. CODY KEES, ESQUIRE
Bequette and Billingsley
425 West Capitol Avenue
Suite 3200
Little Rock, Arkansas 72201

ALSO PRESENT:
DR. KIFFANY PRIDE
MS. LAURA SHIRLEY
MS. NICOLE TOWNSEND

---o---

2

## Page 3

### INDEX

WITNESS:                                    PAGE:

PAUL BREWER
   Direct Examination.............................    5
   Cross Examination..............................  100
   Redirect Examination...........................  102

---o---

### EXHIBITS

Exhibit One..........................................   36
Exhibit Two..........................................   40
McNulty Exhibit Two.................................  103
McNulty Exhibit 3a..................................  103

---o---

Reporter's Certificate.............................  109

---o---

3

## Page 4

1        The deposition of Paul Brewer was taken
2   before me, Debbye L. Petre, Certified Court Reporter
3   and notary public within and for the County of
4   Pulaski, State of Arkansas, duly commissioned and
5   acting, on Tuesday, June 4, 2019, beginning at the
6   hour of 2:15 p.m., at the offices of Pulaski County
7   Special School District, Administration Building, 925
8   East Dixon Road, Little Rock, Pulaski County,
9   Arkansas.
10       Said deposition being taken in
11   accordance with the Rules of Federal Procedure and
12   pursuant to the provisions of the Arkansas Rules of
13   Civil Procedure at instance of counsel for the
14   Plaintiffs in the above-styled case in the United
15   States District Court, Eastern District of Arkansas,
16   Western Division.
17                ---o---
18   THEREUPON, the following proceedings were had,
19   to-wit:
20                ---o---
21
22

EXHIBIT
3

## Page 5

1    P R O C E E D I N G S
2    WHEREUPON,
3         PAUL BREWER,
4    having been called for examination, and having been
5    first duly sworn, was examined and testified as
6    follows:
7         DIRECT EXAMINATION
8    BY MR. WALKER:
9    Q    What is your name?
10   A    Paul Brewer.
11   Q    Where do you work?
12   A    Pulaski County Special School District.
13   Q    What is your position?
14   A    I'm an Assistant Superintendent -- Interim
15   Assistant Superintendent for Human Resources.
16   Q    Mr. Brewer, did you participate in the
17   employment decisions that were made in April --
18   March, April, and May of 2018?
19   A    Yes.
20   Q    Did you receive any directive from any source
21   as to how you were to participate in those decisions?
22   A    I did.
23   Q    From whom did you receive them?
24   A    The School Board, the night that we presented
25   the allocations, were not happy with that because

## Page 6

1    there wasn't enough funds cut from the allocations.
2    So, they instructed Doctor Warren and I to go back
3    and take a look and see where we could possibly cut
4    Central Office.
5    Q    I have looked for a Board minute directing you
6    all to do that.  Was there ever a Board minute to
7    that effect?
8    A    I don't know.
9    Q    Did you hear the Board act by way of a motion?
10   A    I don't remember a motion.  It was more like a
11   directive.
12   Q    Well, how do you get a directive from an
13   amorphous Board which does not have identity?
14   A    I just know it was the contention of that
15   Board, I felt like it was unanimous, that they said
16   they were not going to accept the allocations, and
17   that we were to go back and take a look at where we
18   could cut staff out of the Central Office.
19   Q    Out of the Central Office?
20   A    That was what they said.  And take a look at
21   others, as well.  And that would have included
22   support staff, which was not directly homed in the
23   Central Office, but they were pertaining to security
24   and some other positions, possibly clerical.
25   Q    Were any of your -- are any of your beliefs

## Page 7

1    about what your instructions are reduced to writing?
2    A    No.
3    Q    Is there any record of your verbal instructions
4    that were given?  Is there any way we can validate
5    them?
6    A    Not that I'm aware of.
7    Q    Did Doctor Remele preside over the meeting on
8    that night?
9    A    She did.
10   Q    Did she make any comments that you remember
11   from that night?
12   A    I just remember her saying that they had taken
13   a look at our recommendations for allocations for the
14   following year, and said that they wanted us to go
15   back -- "they" meaning the Board, there was head
16   nods, possibly like that.  There was no -- it was
17   more of a directive.  She was the one that directed
18   us to -- "us" meaning Doctor Warren and myself, to
19   take a look and see where we could possibly cut.
20   Q    Did she make that comment?
21   A    Did she make the comment?
22   Q    Yes.
23   A    Yes.
24   Q    If she said she didn't, would you differ with
25   her?

## Page 8

1    A    I would have to, because that's the only way I
2    knew to go do it.
3    Q    If Doctor Warren indicates that she was not
4    told to do that, would you disagree with her?
5    A    Yes.
6    Q    Now, who developed the allocations for
7    presentation to the Board on that night?
8    A    Directors and department heads of each
9    department.
10   Q    So, the allocations were not made by you?
11   A    I did not develop the allocations.  I presented
12   the allocations to the Board.
13   Q    Did you present them with the approval of
14   Doctor Warren?
15   A    Yes.
16   Q    Did she have anything to do with their
17   development?
18   A    I would say "yes," she had to.  This is -- now,
19   we are talking about the Board meeting that they take
20   a look at the allocations and decided they wanted us
21   to go back and cut some at that point.
22   Q    Did they tell you at that time what was too
23   much?  They said your allocations were too much, is
24   that what you said?
25   A    The allocations did not represent enough money

1    cut positions.
2    Q    Did they tell you how much they wanted cut?
3    A    They said, "Go back and cut as much as you
4    think you can.  It's a big operation."
5    Q    As much as you think you can?
6    A    Right.
7    Q    Did they tell you from where to cut?
8    A    No.
9    Q    Was it at that meeting -- was that at the
10   meeting at the time when they decided to hire Doctor
11   McNulty?
12   A    I believe they hired Doctor McNulty a month or
13   two prior to this meeting.
14   Q    So, he was hired in April.
15   A    I don't recall exactly when he was hired.
16   Q    And it is his testimony, I believe, that he was
17   hired on April 5th.  Do you disagree with that?
18   A    No.
19   Q    So, that means that if he was hired on April
20   5th, and it was a month or two later, that means your
21   allocations would have been, then, in June.  Does
22   that sound right?
23   A    No.  We normally did allocations in April.
24   Q    So, were your allocations presented at the same
25   time as he was hired?

1    A    I don't recall.
2    Q    How much time lapsed between the date when you
3    perceived them to tell you to go back and redo it and
4    the time you actually did it?
5    A    Well, we presented them -- I'm doing recall
6    now.  So, we presented them in April, the regular
7    School Board meeting.  I want to say they said, "We
8    will have a special meeting in about one week."  I
9    can't be exact on recall.  But it was the next five
10   to six, maybe, days from that time.  And we were to
11   come back and present any cuts that we possibly could
12   have made.
13   Q    Now, that would have meant that you revisited
14   the issue and went back before the Board, say, on or
15   about the 12th, somewhere a week after the 5th?
16   A    If we met at the normal Board meeting, which is
17   normally held the second Tuesday of each month, then
18   it would have been around the 12th to 15th, depending
19   on how that Tuesday fell.
20   Q    So, it would have been around the 12th or the
21   15th?
22   A    If we had the Board meeting at the normal time.
23   Q    All right.  But at any rate, it happened in the
24   month of April?
25   A    The initial allocation presentation to the

1    Board happened at the regular School Board meeting in
2    April.
3    Q    And then, you took about ten days or so to
4    develop -- between five and ten days to develop some
5    new allocations?
6    A    Yes.  I don't recall the exact --
7    Q    Do you have a written process -- or did you
8    have a written process to guide your decisions with
9    respect to revised allocations?
10   A    Well, there is not --
11   Q    That's "yes" or "no".
12   A    That would be a "no".
13   Q    All right.  Now, did you develop an outline for
14   the manner in which you would proceed with the
15   revised allocations?
16   A    No.
17   Q    Did you convene a group of people to help you
18   with the revised allocations?
19   A    Yes.
20   Q    Did you have any standards for determining who
21   would help you with them?
22   A    Only people that we felt like that were in
23   positions where they felt like they would have enough
24   input and knowledge as to what we would need to cut.
25   Q    Well, you convened the group.  So, did you have

1    any criteria for determining who was in the group?
2    A    No.
3    Q    Did you make a decision as to who would be in
4    the group to help advise you?
5    A    I did.
6    Q    And did you have any criteria for determining
7    who went into that group?
8    A    No.  Other than --
9    Q    "No" was your answer.
10   A    No.
11   Q    Now, who were the people who went into the
12   group?
13   A    I had two people.  One was the head of
14   Technology and one was an Assistant Superintendent --
15   or Director of Secondary Education.
16   Q    Had they ever participated in any allocation
17   revision or development in previous years?
18   A    Yes.
19   Q    Had both of them done so?
20   A    Yes.
21   Q    Had anybody else participated in the allocation
22   process earlier that year before April 5th?
23   A    Each department head.  We were --
24   Q    That's fine.  Each department head.  Any other
25   person by title?

Page 13

1   A    They wouldn't have had information how they
2   could cut their individual, or add to the allocation
3   of --
4   Q    I'm just asking -- Paul, I'm asking you who
5   else participated.  I'm not asking --
6   A    Each department head.
7   Q    Each department head.  Were there any black
8   department heads?
9   A    Oh, I'm sure there were.  I would have to think
10  back.
11  Q    Who do you think the black department heads
12  were?
13  A    I'm trying to think back to that period of
14  time.
15  Q    That's just a year ago.
16  A    Yeah.  Well, we had the department head of
17  Security.
18  Q    Who else?
19  A    Doctor Warren, who was the Superintendent.
20  Q    Who else?
21  A    I'm trying to think of who all the department
22  heads are.  I don't recall the rest of them.
23  Q    Now, were you in regular association with Mr.
24  Will Reed in Technology?
25  A    Yes.

Page 14

1   Q    So, you saw him almost every day?
2   A    Practically.  It certainly wouldn't be every
3   day.
4   Q    And who was the Assistant Superintendent that
5   you spoke with?  Was that Doctor John Tackett?
6   A    He was Director of Secondary Education.
7   Q    Was he also the Assistant Superintendent?
8   A    He was Interim.
9   Q    Interim.  Okay.  You spoke with him almost
10  every day, too?
11  A    About the same as, practically.
12  Q    I see.  You were aware that the group that
13  pulled together the -- what do you call it,
14  allocation?
15  A    Allocation.
16  Q    Was bi-racial?
17  A    Sure, yes.
18  Q    Is there any particular reason it was one race
19  when you did the revisions?
20  A    It was not one race.
21  Q    Who were the black people who participated in
22  the revised allocation?
23  A    Now, are you talking about the one after the
24  regular Board meeting?
25  Q    Yes, sir.

Page 15

1   A    It would have been John Tackett and Will Reed.
2   Q    Well, my question is this.  Since there were
3   three people on the revised committee, you and two
4   white people, all men, is there any reason that you
5   did not have it inclusive?
6   A    Doctor Warren was not here.  She would have
7   been included.
8   Q    I understand Doctor Warren to have given
9   testimony earlier in the hearing that she was
10  available but was not consulted.  Do you disagree
11  with that?
12  A    She was not physically here.
13  Q    Well, that wasn't the issue.  The question was,
14  do you disagree with what she said, that she was
15  available?
16  A    Possibly through some telephone.
17  Q    Well, do you disagree with it?  Either you
18  agree with her or disagree.
19  A    She was not present
20  Q    All right.  And you said she was not available
21  earlier.  Now, did you seek to involve her, even
22  though she was not in the facility at the time?
23  A    No.
24  Q    Did you seek to involve any other
25  African-American, mindful of your district commitment

Page 16

1   that all of your committees would be bi-racial?
2   A    This was not a committee.  It was me seeking
3   information from them.
4   Q    Well, but you sought out what amounted to a
5   committee to help you deal with the allocation; isn't
6   that correct?
7   A    Yes.
8   Q    Let me see what a committee is.  A committee is
9   a group of people, right, which has a purpose?  Did
10  you ever meet with Tackett and Reed together?
11  A    No.
12  Q    Well, tell me, then, since you all never met
13  together, how did you go about pulling the allocation
14  together?  And before you answer, let me ask you
15  this.  Did you just go from your office to Reed's
16  office or call Reed into your office regarding the
17  allocation?
18  A    I called Reed to my office.
19  Q    Did you go to Tackett's office or call Reed to
20  your -- or call Tackett to your office?
21  A    I went to Tackett's office.
22  Q    You went to Tackett's office.  So, you went to
23  just three white -- two white people's offices?
24  A    That's correct.
25  Q    Now, there were black people who were in

Page 17

1 positions of management that you chose not to go to.
2 Is that fair to say?
3    A   No.
4    Q   I'm not saying you didn't do it because of
5 race. But you chose not to go to them?
6    A   I chose to go to just those two people.
7    Q   That's right. Now, does that mean that you
8 chose to go to those two people because you made a
9 preliminary determination that you wanted to have
10 people cut whom they supervised?
11          MR. KEES:  Object to form.
12 BY MR. WALKER:
13    Q   You may still answer. Did you make a judgment
14 -- did you go to those two people in part because you
15 had made the judgment that the cuttees, the people to
16 be cut, were coming from their departments?
17    A   No.
18    Q   How did you make the judgment as to which
19 departments from which would come the cuttees that
20 you would recommend?
21    A   There would be several departments that we
22 would cut.
23    Q   Well, we would. But it was just you -- the
24 "we" you refer to is you, Tackett, and Reed; right?
25    A   I only asked them about the people they

Page 18

1 possibly -- that they supervised.
2    Q   Who else is involved in the "we", when you say,
3 "We would cut"?  Is that just you?
4    A   Me and Doctor Warren.
5    Q   You and Doctor Warren. Now, Doctor Warren has
6 testified that she didn't have anything to do with
7 it.
8    A   Okay.
9    Q   Do you disagree with her?
10    A   No.
11    Q   All right. So, it was just you; right?
12    A   I informed her what I was doing when she got
13 back.
14    Q   I understand. But in terms of the actual
15 decision-making, it was entirely on you; is that
16 correct?
17    A   I would say "yes".
18    Q   All right. And I want to be sure. You went to
19 Reed and Tackett, and you said that you involved
20 them. Why did you go to those two people if you had
21 not formed an opinion to cut staff within their
22 departments?
23    A   Well, can I explain?
24    Q   Yes, sir.
25    A   Okay. One was that Mr. Reed was heading up our

Page 19

1 School of Innovation, which directly or indirectly
2 reflected Learning Services, and what was being
3 participated in, if any, and what could be cut either
4 from his department or -- because he had some of his
5 staff working on School of Innovation. Or if not,
6 explain to me, because I wasn't directly involved in
7 the School of Innovation, how we could better prepare
8 for the School of Innovation. I went to Doctor
9 Tackett -- well, I will wait and let you ask. That
10 was the extent of him.
11    Q   What about Doctor Tackett?
12    A   Doctor Tackett, I went to him because he was
13 directly over Learning Services at that time.
14    Q   All right. So, that means that you made the
15 decision to focus upon Learning Services. Is that
16 fair to say?
17    A   No.
18    Q   Well, you went to -- you said -- let me
19 understand this. You said earlier that you went to
20 Reed because he was involved with Learning Services
21 via the School of Innovation.
22    A   Correct.
23    Q   And then, you went to Tackett because he was
24 directly over Learning Services. Did I misstate what
25 you said?

Page 20

1    A   No.
2    Q   So, that meant that you went and focused on
3 Learning Services. Is that not fair to say?
4    A   With those two people.
5    Q   With those two people. Now, is it fair to say
6 that you did not consult anybody else for cuts
7 outside those two departments, outside that one
8 general area, Learning Services?
9    A   That I went to to consult with?
10    Q   Yes.
11    A   No.
12    Q   That's fair to say?
13    A   It's fair to say I did not.
14    Q   Thank you. All right. Did you propose to cut
15 anybody who was outside of Learning Services?
16    A   Yes.
17    Q   Did you have any criteria for deciding which
18 jobs to cut? Did you have any criteria?
19    A   The criteria I used --
20    Q   No. Did you have any?
21    A   No.
22    Q   No. Okay. You had no criteria and you didn't
23 consult any person, is that fair to say, outside of
24 Learning Services?
25    A   Security was outside of Learning Services.

Page 21

1    Maintenance was outside of Security -- outside of
2    Learning Services, Custodial was outside of Learning
3    Services.
4    Q    All right.
5    A    And Human Resources was outside of Learning
6    Services.
7    Q    Anybody else?
8    A    Student Services was outside of Learning
9    Services.
10   Q    All right. That's fine. Did you consult the
11   heads of those departments before you made your cuts?
12   A    I did.
13   Q    Do you have any reason you didn't tell me that
14   earlier?
15   A    I don't understand what you are asking.
16   Q    You had told me before that you only consulted
17   two persons for the purpose of making cuts. Do you
18   want to revise that?
19   A    I do.
20   Q    All right.
21   A    You said "in Learning Services".
22   Q    Pardon?
23   A    You talked about in Learning Services.
24   Q    No. You gave me two names. You gave me Reed
25   and Tackett.

Page 22

1    A    Dealing with Learning Services.
2    Q    No. I had asked you for anybody else on this
3    imaginary committee that you referred to for purposes
4    of advising about cuts. Who else was on your
5    advisory committee?
6    A    We never had a committee.
7    Q    Who was on your mental advisory committee in
8    terms of discussing cuts? What other persons?
9    A    Security.
10   Q    Who was the head of -- who was the person with
11   whom you consulted?
12   A    What was his name? He's gone now.
13   Q    You don't remember his name. We will just say
14   no name. And then, who within --
15   A    Maintenance.
16   Q    Who within Maintenance did you consult?
17   A    Glen Shook.
18   Q    And then, who within Custodial did you consult?
19   A    Tommy Farmer.
20   Q    And with Human Resources, whom did you consult?
21   A    Shawn Burgess and myself.
22   Q    And who within Student Services?
23   A    Doctor Warren.
24   Q    Now, did Doctor Warren give you any input into
25   anybody in Student Services whom she would recommend

Page 23

1    to be cut?
2    A    No.
3    Q    Did Ms. Burgess give you any input into anybody
4    in Human Resources that should be cut?
5    A    Yes.
6    Q    Did Ms. Farmer give you any input?
7    A    No.
8    Q    Did Mr. Shook give you any input?
9    A    No.
10   Q    When you asked these people for input, did you
11   give them a list of criteria to be applied in being
12   fair and nondiscriminatory in the process?
13   A    No.
14   Q    Do you agree that the district policies in
15   writing required that all of your personnel actions
16   be nondiscriminatory, expressly?
17   A    Sure.
18   Q    Did you give them any instructions in writing
19   as to what you expected their process to be in making
20   recommendations?
21   A    No. Can I clarify?
22   Q    Not yet.
23        THE WITNESS: What did he say?
24        MR. KEES: Not yet.
25   BY MR. WALKER:

Page 24

1    Q    Not yet. Now, when you asked Doctor Warren
2    regarding persons to be cut, do you recall what she
3    told you?
4    A    Not word for word.
5    Q    Well, tell me the best of your recollection
6    what she told you.
7    A    That she was acting as Superintendent and Mr.
8    Whitfield was acting in her stead, and they were
9    shorthanded as it was.
10   Q    What did Ms. Burgess tell you?
11   A    She felt like we could cut the secretary
12   position that was open and one of the personnel
13   director positions was open.
14   Q    Was that personnel position filled?
15   A    It was this year.
16   Q    No. Was it filled at the time?
17   A    No.
18   Q    Was the secretary's position filled at that
19   time?
20   A    No.
21   Q    What did Mr. Foreman tell you?
22   A    Mr. Foreman?
23   Q    Ms. Foreman or Mr. Foreman? You said --
24   A    Oh, Farmer. Tommy.
25   Q    Farmer. All right.

## Page 25

1   A   No, he didn't.  He didn't have any suggestions
2   for cuts.
3   Q   What about Mr. Shook?
4   A   He did not.
5   Q   So, it's fair to say that nobody had any
6   suggestions for current employee actual reductions?
7   A   They had already done that.
8   Q   All right.  Now, you are aware that I have
9   spoken with Doctor Tackett?
10  A   I'm not aware that you talked to him.
11  Q   Did you participate in the hearing in this
12  process for these teachers?
13  A   Yes.
14  Q   Did Doctor Tackett come to that hearing?
15  A   I don't recall.
16  Q   You are aware that he was requested to come?
17  A   I will say "yes".
18  Q   And you were aware that he refused to come?  In
19  fact, right after you announced the cuts in the
20  allocation, he resigned.  Is that fair to say?
21  A   I would say "no".
22  Q   Did he resign or did he retire?
23  A   I don't know.  But I know he was working.
24  Q   All you know is that he left employment soon
25  thereafter?

## Page 26

1   A   I don't know if he retired or if he just
2   resigned.
3   Q   Well, you know retirement is a process that
4   takes a little time.
5   A   Right.
6   Q   Resignation doesn't take as much time; is that
7   right?
8   A   You can resign today.
9   Q   I understand.  But he resigned in the middle of
10  the year, near the end of the year, didn't he?
11  A   I don't recall the date.
12  Q   But he didn't --
13  A   He did not finish his contract.
14  Q   That's right.  Do you have any notes from
15  Doctor Tackett regarding his participation or refusal
16  to participate in this process that you developed?
17  A   No.
18  Q   Mr. Reed has since resigned; is that right?
19  A   Yes.
20  Q   So, in a sense, you are the last man standing
21  of that triumvirate?
22  A   I'm used to that.
23  Q   All right.  And that is the truth, isn't it?
24  A   Yes.
25  Q   All right.  So, the only people you say came up

## Page 27

1   with persons for reduction were Tackett and Reed?
2   A   For Learning Services.
3   Q   And who did Reed come up with?
4   A   He didn't come up with any particular
5   individuals.  He said he felt like -- do you want me
6   to ad lib or do you want me to just stick to a "yes"
7   or "no" answer?
8   Q   First of all, did he come up with anyone?
9   A   No.
10  Q   All right.  So, nobody from Reed's department
11  was actually cut?
12  A   No.
13  Q   So, that meant that you only had someone from
14  Doctor Tackett's?
15  A   In Learning Services -- I mean, and Human
16  Resources.
17  Q   Well, nobody from --
18  A   And Security.
19  Q   Well, just a moment.  In Human Resources,
20  nobody lost a job, because you only cut out positions
21  that were unfilled?
22  A   Well, right.
23  Q   All right.  Now, in terms of Learning Services,
24  did Doctor Tackett recommend the termination of Ms.
25  Pride, Ms. Beasley, and Ms. Townsend?  That's "yes"

## Page 28

1   or "no".
2   A   I would say "yes".
3   Q   You would say "yes".  Is there a document that
4   reflects that?
5   A   No.
6   Q   If he says that he did not do that, what would
7   be your response?
8   A   I don't know if I would have a response.
9   Q   All right.
10  A   I mean, he --
11  Q   Now, did you confirm with him in writing that
12  those were his recommendations before he left?
13  A   No.
14  Q   Can you explain why he refused to come and
15  testify at their nonrenewal hearings?
16  A   No.
17  Q   Were these three people performing their jobs
18  satisfactorily?
19  A   Which three people?
20  Q   The ones I asked you about, Ms. Pride, Ms.
21  Beasley, and Ms. Townsend?
22  A   Yes.
23  Q   Now, who is Mr. Beckham?
24  A   Beckham?
25      MS. BEASLEY:  Ms. Beckham.

## Page 29

BY MR. WALKER:

1  Q   Ms. Beckham, Ms. Beckham.

3  A   Okay.

4  Q   Was she in Learning Services?

5  A   What was her first name?

6      MS. BEASLEY:  Brandi.

7  BY MR. WALKER:

8  Q   Brandi?

9  A   Yes.  I knew her by Brandi.  I will apologize.

10  Q   I see.  Now, did you consult Ms. Goodwin in

11  terms of your allocation?

12  A   No.

13  Q   Was she included in your allocation?

14  A   Her position was eliminated.

15  Q   Was her -- was she included in your allocation

16  to be eliminated when you made your presentation to

17  the Board?

18  A   Are you talking about the Board meeting in

19  April or the Board meeting after?

20  Q   Either meeting, either meeting.

21  A   No.

22  Q   All right.  The truth of the matter is that

23  Ms. Goodwin gave her resignation after the

24  allocation?  She was scheduled to retire?

25  A   Yes.

## Page 30

1  Q   All right.  So, she wasn't in your allocation?

2  A   No.

3  Q   Was Ms. Ray in your allocation?

4  A   She was cut.

5  Q   So, she was in your allocation?

6  A   Her position was eliminated.

7  Q   So, she and Ms. Beckham were, along with these

8  three people, in the cut positions; is that correct?

9  A   That's correct.

10  Q   Was Mr. Tackett included in your allocation as

11  a cut?

12  A   Yes.

13  Q   But he was -- you told him you were cutting

14  him?

15  A   He resigned, and I decided not to replace him.

16  Q   Well, that wasn't for you to decide, was it?

17  A   It was.

18  Q   All right.  Did he resign before you made the

19  allocation to the Board?

20  A   Yes.

21  Q   Are you sure of that?

22  A   Well, he was on the list when I presented it to

23  the Board to be eliminated.

24  Q   Well, that's not an allocation.  That was not a

25  position that was cut.  He had already resigned, so

## Page 31

1  he was just not presented as a person to be cut, was

2  he?

3  A   His position was cut.

4  Q   Have you replaced his position?

5  A   No.

6  Q   What was his position?

7  A   Director of Secondary Education.  He was an

8  Interim Assistant Superintendent.

9  Q   Well, who is performing his tasks now?

10  A   Doctor McNulty.

11  Q   I see.  Of the people who are not wanting to

12  return -- of the people who were returning -- or

13  wanting to return, is it fair to say that the only

14  people that you recommended to be allocated, or cut,

15  were Beckham, Beasley, Pride, Ray, and Townsend?

16  A   No.

17  Q   Who else did you recommend?

18  A   Danny Ebbs.

19  Q   I said "to be terminated".

20  A   Oh.  You are talking about RIFed?

21  Q   Yes, sir.

22  A   There was people in Security.  You are talking

23  about in Learning Services, or do you want everybody?

24  Q   Well, anybody?

25  A   Because I've got my list out there.

## Page 32

1      MR. WALKER:  Do we have the whole list

2  -- his list of RIFs?

3      MS. SPRINGER:  Yes, we've got the RIFs.

4  BY MR. WALKER:

5  Q   Now, let's go to Mr. Ebbs and Ms. Shirley.  Is

6  it coincidental that you came up with the $10,000.00

7  reduction for both of them, for Shirley and Ebbs?

8  A   What was your question?

9  Q   Is it just coincidental that the amounts of

10  their reductions were $10,000.00?

11  A   Well, it was positions that we felt like we

12  could cut, you know.  We had lost Jacksonville.

13  Q   No, no.  Is it just coincidental that there

14  were two people that you reduced in pay, both had the

15  same amount of salary reduction?

16  A   Other than myself.  I took the largest cut.

17  Q   I'm saying -- leave you out of it.

18  A   Leave me out of it.  I eliminated my position.

19  Q   Leave you out of it because you weren't cut.

20  A   My position was cut.

21  Q   You still kept your position?

22  A   No.

23  Q   You were in the same position come July 1.

24  A   No.

25  Q   What position were you in July 1?

Page 33

```
1    A    Interim Assistant Superintendent.
2    Q    Well, what position were you in in April of
3    2000 --
4    A    Chief Executive Officer.
5    Q    So, you were CEO?
6    A    That's correct.
7    Q    Were you getting extra pay for CEO?
8    A    I was. It was on the salary schedule.
9    Q    But was your pay reduced?
10   A    $20,000.00.
11   Q    That's not on any document.
12   A    It is on the ones I have.
13   Q    On the ones you have. All right. So, you cut
14   your pay by $20,000.00?
15   A    That's correct.
16   Q    To $169,000.00?
17   A    Well, that included benefits. $20,000.00
18   probably was more like 30-something thousand, if you
19   count benefits.
20   Q    I see. All right. So, let's leave you out of
21   it. The two other people that you were doing the
22   cutting of in terms of reducing pay was Shirley and
23   Ebbs, and their amounts were the same. Now, let me
24   go straight to them. It was your position -- when
25   you left CEO, did you take on a new job?
```

Page 34

```
1    A    I did.
2    Q    Did you apply for it?
3    A    No.
4    Q    Now, in order for these people to have gotten
5    new jobs with the district, were they required --
6    when I say "these people", Beasley, Pride, and
7    Townsend, did they have to reapply?
8    A    Yes.
9    Q    Why did they have to reapply and you didn't?
10   A    Because I was asked to stay on as Interim.
11   Q    So, somebody asked you to stay on?
12   A    Yes.
13   Q    But your position wasn't even posted, either,
14   was it?
15   A    No.
16   Q    When were you asked to stay on?
17   A    Right after I resigned.
18   Q    When was that?
19   A    Probably, I'm just guessing, late April, early
20   May.
21   Q    I see. And who asked you to stay on?
22   A    At that time, I don't think anybody had.
23   Q    But you were asked to stay on. So, who asked
24   you?
25   A    No, I didn't ask to stay on.
```

Page 35

```
1    Q    You said you were asked to stay on. Who asked
2    you to stay on? Who requested that you stay on?
3    A    It wasn't Doctor Warren. I want to say it was
4    maybe Doctor McNulty asked me if I would be
5    interested in staying on. He didn't say he was
6    asking me to stay on.
7    Q    So, somebody before July 1 had asked you to
8    stay on?
9    A    They had asked me if I would be interested in
10   staying on.
11   Q    No. Did anyone ask you --
12   A    Nobody offered me the job.
13   Q    I see. But you continued to work after July 1
14   without anybody asking you; isn't that correct?
15   A    No. I was not hired back until the July Board
16   meeting.
17   Q    Well, somebody had to ask you --
18   A    So, I was off. In fact, I missed a paycheck.
19   Q    You missed the July paycheck?
20   A    Yes.
21   Q    I thought you were hired back in the July
22   meeting.
23   A    Second week of July, when the regular Board
24   meeting was.
25   Q    Did you miss the whole month?
```

Page 36

```
1    A    No. I missed the first paycheck. I got 25 pay
2    instead of 26.
3    Q    You missed half a paycheck?
4    A    No. I missed --
5    Q    We call it a whole paycheck. But you missed --A I
6    missed two weeks pay.
7    Q    All right. I'm going to give you what we
8    called the allocations, here. I ask if you can --
9         MR. WALKER: This would be Exhibit One
10   to your testimony.
11        (WHEREUPON, Exhibit Number One was
12   marked for identification.)
13   BY MR. WALKER:
14   Q    Can you identify that document?
15   A    Certified Allocations, 2018-'19.
16   Q    Did you develop this document?
17   A    Me, along with each department head.
18   Q    With each department head?
19   A    Yes.
20   Q    Well, you previously testified --
21   A    Is this -- I've got to make sure I know what
22   I'm looking at here. Is this the one after the
23   regular School Board meeting when we were --
24   Q    This one is dated -- this one is dated 4-19,
25   2018. According to your testimony, it would have
```

Page 37

1   been after the 12th. So, this seems to be that.
2   A   (Witness reviews document.)
3   Q   Can you identify that document?
4   A   Well, the dates are April 2nd.
5   Q   Well, the document on the outside says --
6   A   The outside says the 19th.
7   Q   Yes.
8   A   But these were put together on April 2nd.
9   Q   All right. Well, let's go down them. That
10  would have been before the April Board meeting on the
11  5th, wouldn't it?
12  A   Yes.
13  Q   Do you have any document that you created that
14  says something other than April 2nd?
15  A   Well, this is the only document I have.
16  Q   Which means, then, that if you presented this
17  on April 2nd -- this was done on April 2nd, it was
18  presented to the Board, and it was never revised;
19  isn't that fair to say? If it was revised, there
20  would have been another document; right?
21  A   This document?
22  Q   Yes, sir.
23  A   (Witness reviews document.) Ask your question
24  again. I'm not sure.
25  Q   Is there another allocation that you prepared?

Page 38

1   A   Not in this form.
2   Q   All right. That's fine. Now, did you prepare
3   an allocation in a different form which you presented
4   to the Board after April 5th, 2019?
5   A   Well, I revised one after the regular Board
6   meeting.
7   Q   You did? Where is it?
8   A   It's not in this format. It was a presentation
9   of the cuts that we were recommending.
10  Q   So, you didn't have allocations again
11  presented, it was just a single sheet of paper?
12  A   It was certified and classified.
13  Q   Certified and classified. You said one single
14  piece of paper?
15  A   Yes.
16      MR. WALKER: Do you have that?
17      MS. SPRINGER: No.
18      MR. WALKER: We would like to ask for
19      it. We would like to have that single piece
20      of paper. We have asked for it in the
21      hearings that they had and we didn't get it.
22      All right.
23  BY MR. WALKER:
24  Q   Can you describe the document that you said
25  that you presented to the Board, other than what has

Page 39

1   been marked to your testimony as Exhibit One?
2   A   Explain what it was?
3   Q   Describe it so we will know.
4   A   Okay. It was a listing of all the positions,
5   which ones would be cut, and how much the savings
6   would be.
7   Q   And it was not in the form that Exhibit One
8   manifests to represent?
9   A   No.
10  Q   All right.
11      MR. WALKER: Since we are here in the
12      office, would you recess -- can we recess
13      and have him get that document?
14      MR. KEES: Is it a power point?
15      THE WITNESS: I think so. It just
16      showed a list of all the positions and the
17      savings.
18      MR. KEES: Do you still have that,
19      something you can pull up and print?
20      THE WITNESS: I've got a hard copy on
21      my desk.
22      MR. KEES: Okay.
23      MR. WALKER: We would appreciate it.
24      MR. KEES: Can you make a copy?
25      THE WITNESS: Do you want to make a

Page 40

1   copy?
2       MR. KEES: Yes. Have Susan make like
3       two or three.
4       THE WITNESS: Okay.
5       (WHEREUPON, the witness left the
6       deposition room.)
7       (WHEREUPON, a break was taken.)
8       (WHEREUPON, Exhibit Number Two was
9       marked for identification.)
10  BY MR. WALKER:
11  Q   Would you describe what you've given to me that
12  we have now marked as Exhibit Two?
13  A   Okay. What you have before you is a copy of
14  the positions that were recommended to the Board at
15  the special Board meeting for cuts to positions. And
16  if you will look to the right, the line indicates
17  what the salary was, and to the right of it, if you
18  add the benefits, it's the total savings. And if
19  it's in red, it's a savings, if it's in black, it is
20  an add-back to cost.
21  Q   All right. Let me go over this with you.
22  A   All right.
23  Q   Page one is?
24  A   Page one is classified, is what I told you.
25  Q   All right.

Page 41

1   A   And certified is page two.
2   Q   All right.  Let me go over this with you.
3   A   All righty.
4   Q   With respect to the secretary to Director of
5   Human Resources, that had never been filled; is that
6   correct?
7   A   It had been a position filled that someone had
8   resigned from or retired from, and we didn't fill it
9   back.
10  Q   Fine.  All right.  The person who was secretary
11  to the Director of HR got a pay increase; right?
12  A   What that person was, we eliminated the top
13  position, the secretary --
14  Q   No, no, no.  Let me just stay here with what
15  you have here.  I'm just asking what the document
16  shows.
17  A   Well, if I can't explain it, then you're not
18  going to --
19  Q   You will get a chance to do that.  I'm just
20  looking at what the document says.  Whoever the
21  Personnel Specialist was had an increase of pay, for
22  whatever reason, of $12,000.00.  Then, under Pupil
23  Accounting, was somebody actually eliminated from
24  that position?
25  A   Yes.

Page 42

1   Q   Who was that?
2   A   I don't have a name.
3   Q   Well, there has to be a name.
4   A   Well, it's positions.
5   Q   Well, you don't know who that was?
6   A   There was nobody in that position.
7   Q   There was nobody in the position at the time?
8   A   Yes.  So, we eliminate positions, not people.
9   Q   All right.  But there was nobody in the
10  position at the time?
11  A   Right.
12  Q   Secondary auxiliary bookkeeper, was anybody in
13  that position?
14  A   No.
15  Q   Accounting specialist, was anybody in that
16  position?
17  A   No.
18  Q   Auxiliary bookkeeper, was there somebody in
19  that position?
20  A   That was an add-back.
21  Q   But somebody was in the position and then that
22  person got a pay increase; right?
23  A   No.
24  Q   Well, on the left column is $8,208.00, the
25  right column is $10,834.00.

Page 43

1   A   And look at the top of the page.
2   Q   But that says "Benefits"; right?
3   A   That's right.
4   Q   So, it's the same amount.  Okay.  That's fine.
5   Now, the --
6   A   Dyslexia.
7   Q   -- Dyslexia, was anybody in that position?
8   A   No.
9   Q   Was anybody in the Executive Director of
10  Operations position?
11  A   Yes.
12  Q   Who was that?
13  A   Derek Scott.
14  Q   You didn't have Derek Scott on your cut list,
15  did you?
16  A   We cut the position, not the name.
17  Q   But Derek had already resigned, hadn't he?
18  A   Yes.  I guess.  I don't remember the date.
19  Q   And then, Director of Safety, was that position
20  actually --
21  A   That position was cut.
22  Q   Was there a person in the position at the time?
23  A   There was.
24  Q   That position was cut?
25  A   Yes.

Page 44

1   Q   Was that a black person?
2   A   It was.
3   Q   Coordinator of Safety and Security?
4   A   Was an add-back.
5   Q   So, was somebody in that position -- or were
6   somebodys in those positions?
7   A   Yes.
8   Q   So, you had two people there?
9   A   Yes.
10  Q   So, they go from $138,000.00 to $182,000.00?
11  A   No.  That was including benefits.
12  Q   I understand.  But according to the way you
13  presented, I'm dealing with --
14  A   They didn't go to that.  That was including
15  benefits.  Their salary is $138,000.00.  That's for
16  two people.
17  Q   All right.  So, they weren't cut, were they?
18  A   Yes.
19  Q   What was their race?
20  A   The Coordinator of Safety and Security?
21  Q   Yes.
22  A   $138,104.00 divided by two.
23  Q   No, no.  My question is, what is their race?
24  A   Black.
25  Q   All right.  And Facilitator of Safety and

Page 45

```
 1    Security?
 2    A    Was an add-back.
 3    Q    Well, that's --
 4    A    Those are positions that were created to be
 5    cost savings.
 6    Q    Now, the last number is the summary of the
 7    total?
 8    A    Of the total.  That's the total.
 9    Q    Right.  So, this document, for support staff
10    allocations, the only people who were actually
11    working who were cut were two black people; is that
12    right?
13    A    I'm not sure about the accounting specialist.
14    Q    Well, the ones that you know about, the ones
15    you have identified, you have two black people.
16    A    Actually, no.  The secretary to the Director of
17    Human Resources was white.
18    Q    But she wasn't cut.  It was a position that had
19    not been filled.
20    A    The position was cut.
21    Q    No, we're not talking -- we're talking about --
22    listen to my question, Mr. Brewer.  Where you had
23    actual people to be cut.  Of the actual people to be
24    cut, the only cuttees were black; is that correct?
25    A    Yes.
```

Page 46

```
 1    Q    All right.  That's on page one.
 2    A    Total savings of $446,000.00.
 3    Q    Well, it's no savings if you were not spending
 4    the money, was it?
 5    A    Yes.
 6    Q    Let me ask you this.
 7    A    Those positions were allocated on the first
 8    one.
 9    Q    The allocation is one thing.  But if you don't
10    fill the position, it's no money saved, is it, or no
11    money lost?  I mean, it's neutral.
12    A    No.  If you had the position allocated and you
13    don't hire, it's a savings.
14    Q    Well, you are not required to hire and fill
15    every position allocated, are you?
16    A    No.
17    Q    No.  So, you are just cutting out items that
18    were in the previous budget?
19    A    Positions.
20    Q    Positions.  Yes.  And the impact among your
21    classified staff, support staff, was black.  Let's go
22    to your front page, number one.
23    A    Second page.
24    Q    Second page.  Okay.  All right.  You're number
25    one, Chief Executive Officer.
```

Page 47

```
 1    A    My salary was $128,000.00.
 2    Q    Yes.  But with benefits to $169,000.00?
 3    A    That's correct.
 4    Q    Now, that was not a real loss, was it?
 5    A    Some people wouldn't think so.
 6    Q    Because you came back in as assistant -- you
 7    put yourself back in.
 8    A    I didn't put myself anywhere.
 9    Q    Well, on this document --
10    A    The Assistant Superintendent for Human
11    Resources' salary was cut back, it was cut back to
12    $123,064.00.
13    Q    Mr. Brewer, stay with me.  You were the CEO;
14    right?
15    A    That's correct.
16    Q    And that position was cut out?
17    A    That's right.
18    Q    Were you also the Assistant Superintendent for
19    Human Resources?
20    A    No.
21    Q    Who was?
22    A    No one.
23    Q    Okay.  So, what happened to you was, you left
24    one title and took another.  And instead of
25    $20,000.00 loss of pay, it was $10,000.00, or
```

Page 48

```
 1    $11,390.00?
 2    A    No.
 3    Q    Well, here is where we are.  Look at it, Mr.
 4    Brewer.
 5    A    That is if you had the maximum amount of -- I
 6    was brought in at the maximum --
 7    Q    Mr. Brewer, Mr. Brewer, let's look at the
 8    document.  We are talking about savings now.
 9    According to this, the difference in the pay without
10    benefits, instead of it being $20,000.00 to
11    $30,000.00 is $8,000.00 -- $8,033.85.  That's the
12    difference in pay between your first job and the
13    second one; right?
14    A    No.
15    Q    Now, did you present this -- did you present
16    this as an allocation to the district?
17    A    To the School Board.
18    Q    Yes.  So, you put yourself in?
19    A    I didn't put myself in.  That position was put
20    in.
21    Q    Okay.  You put the position in and then you
22    filled it.  That's the same thing, isn't it?
23    A    No.
24    Q    Or somebody else designated you?  That's fine.
25         MR. KEES:  No, he didn't come in at
```

Page 49

1    that pay, John.
2        MR. WALKER:  Do what?
3        MR. KEES:  You are manipulating the
4    answer.
5        MR. WALKER:  Well, here is the point.
6    He said that he reduced his pay on one of
7    these documents by a hundred and --
8        MR. KEES:  He didn't come in at the
9    full pay.  You are not letting him explain.
10        MR. WALKER:  I understand that.  But
11    I'm just talking about -- we are talking
12    about what is proposed to be cut.  And what
13    is proposed to be cut is the maximum of the
14    range.
15  BY MR. WALKER:
16    Q    And the maximum of the range is what is here;
17  is that right, Paul?
18    A    No.
19    Q    All right.  Let's just deal with the document
20  you presented to the Board.  And you are telling them
21  what the savings are.
22    A    The savings was actually more because I made
23  $20,000.00 less.
24    Q    Well, just a moment.  Paul, on this document
25  there is a summary.  On the bottom you have in red

Page 50

1    for all the certified staff, $599,218.00.  And with
2    benefits, it's $788,245.00?
3    A    That's correct.
4    Q    So, you told them that they were being able to
5    cut the budget by $788,000.00 following this
6    approach; right?
7    A    Yes.
8    Q    And then, you put these both of these together,
9    $788,000.00 and $446,000.00, and you come up with a
10  million two; right?
11    A    That's about approximately right.
12    Q    All right.  Now, let's go on.  The Director of
13  Secondary Education had resigned, the Director of
14  Elementary Education had resigned, the Deputy
15  Superintendent for Learning Services was retained.
16  And who was that, Will Reed?
17    A    No.  That was added back with Ms. Smith this
18  year.
19    Q    Well, no, I'm not talking about this year.
20  That year?
21    A    Well, it was allocated.
22    Q    It was allocated?
23    A    So that we were going to hire it back.
24    Q    You were going to hire it back.  Did you hire
25  it back last year?

Page 51

1    A    We did.
2    Q    All right.  Who was the person who vacated that
3  position?
4    A    We cut the Deputy Superintendent's position.
5  There was not one.  The last one was June Elliott.
6    Q    All right.  So, basically, this was not a new
7  position as of April 18?
8    A    It was a new position.  It was not allocated
9  the two years before.
10    Q    All right.  But at the time of the cuts, you
11  didn't have anybody in it?
12    A    No.  The job didn't exist.
13    Q    It didn't exist.  Okay.  So, you can't cut
14  which doesn't exist; right?
15    A    We are not cutting it, we are adding it back.
16    Q    All right.  Now, Director of Talented and
17  Gifted, you cut that back by $15,000.00.  In order to
18  do that, you've got to have a white person, I
19  imagine.  That's Ms. Shirley; right?  So, then, you
20  also have right under Ms. Shirley, Director of
21  Athletics.  Now, you are mindful of how to balance
22  this stuff, Paul, one black, one white.  So, you have
23  Ms. Shirley at ten or 15, and then you go and get,
24  Paul, Mr. Ebbs, right, Danny Ebbs?
25    A    I didn't look at names or personalities, I

Page 52

1    looked at positions.
2    Q    Well, you knew who these people were, Paul.
3    A    Well, sure.  I knew who all these people were.
4    Q    You sure did.  So, Danny Ebbs, you cut his days
5  back to the same number of days as Ms. Shirley, and
6  he got a reduction of $17,000.00, or $14,000.00,
7  however you look at it.  He is white.  And then,
8  Coordinator of ELL.  Was anybody in that position?
9    A    Yes.
10    Q    Who was that?
11    A    What was her name?  She about wore me out down
12  there.
13        MS. PRIDE:  Coordinator of ELL?  Reva
14    Viswanathan.
15        THE WITNESS:  Reva, Reva.  Good luck
16    with spelling her last name.
17        MS. PRIDE:  Viswanathan.
18        MS. SHIRLEY:  Reva Viswanathan.  She
19    was white.
20        MR. WALKER:  She was white.  She was
21    white, and she had also been a big-time
22    complainant in the district, hadn't she,
23    with grievances?
24        MR. KEES:  I think we can agree with
25    that.

1     MR. WALKER:  She was a grievant.  Okay.
2  She had several grievances.
3     MR. KEES:  Her name popped up from time
4  to time.
5  BY MR. WALKER:
6  Q    So, what you did -- and this time -- the next
7  thing is the Program Administrators, three white --
8  three black, two white.  So, on the front page, it's
9  two blacks, and on the second page, it's three whites
10  and three blacks in a context where more than 50
11  percent of your staff is white; right?
12  A    Not in administration.
13  Q    Overall.  We are talking about overall?
14  A    Overall?
15  Q    Yes.
16  A    Well, no.  You just said "administration".  I
17  think you have to look at it different than your
18  teaching staff.  You should.
19  Q    Well, I don't know why you should.  Paul, do
20  you have a degree in Human Resources?
21  A    No.
22  Q    All right.  What is your degree in?
23  A    School administration.
24  Q    Do you have any training in courses in Human
25  Resources?

1  A    Yes.
2  Q    When?
3  A    Throughout my Masters degree.
4  Q    You don't have anything especially with that.
5  Your Masters degree was 30 years ago, wasn't it?
6  A    Or more.
7  Q    They didn't have Human Resources 30 years ago,
8  did they?
9  A    Yeah.  A lot of my courses were Human Resources
10  after my last --
11  Q    Paul, are you saying that there was a Human
12  Resources degree?
13  A    I took 60 hours after my Masters degree.
14  Q    You have a specialist degree?
15  A    I have equivalent of a specialist.  I never
16  took the test.
17  Q    Well, specialist is different.  In order to be
18  a specialist, you've got to have the certification.
19  You were not certified as a specialist, were you?
20  A    No.
21  Q    All right.
22     MR. KEES:  Are you trying to disqualify
23  him as an expert in this area, after 48
24  years of experience?
25     MR. WALKER:  No.  I have already said

1  that he wasn't doing the work.  I've told
2  him to his face that he wasn't doing
3  anything.
4     MR. KEES:  So, no amount of classroom
5  time is going to make up for 48 years of
6  experience in education.
7     MR. WALKER:  No, no.  It depends on
8  what you are doing.
9     MR. KEES:  And that's all in
10  administration, John.  So, you are just not
11  being fair with your questioning.  I'm
12  letting a lot of latitude, here.
13     MR. WALKER:  Well, just a moment.  I
14  agree with you that I may not be.  But
15  lawyers are not supposed to be fair in --
16     MR. KEES:  I know.  But I just want you
17  to recognize, that's all administration.
18     MR. WALKER:  Lawyers are like
19  policemen.
20     MR. KEES:  But I give you a lot of
21  leeway.  I don't want to interrupt your
22  questioning.
23     MR. WALKER:  Well, thank you.  I
24  appreciate that.
25     MR. KEES:  But at some point we have to

1  make sure we are on the same page, with
2  honest and good faith and fair dealing.
3  BY MR. WALKER:
4  Q    Now, this is what you presented to the Board.
5  And let me understand this.  Of the people in black
6  who were actually eliminated -- well, nobody in black
7  was eliminated except Ms. Shirley, and she wasn't
8  eliminated, she was reduced, and Mr. Ebbs.  So, Paul,
9  except for the people who were resigning or retiring
10  anyway, can you tell me what the effect of the budget
11  cuts was?
12  A    $788,000.00.
13  Q    Well, here is my point.  You knew that Tackett
14  and Ms. Goodwin -- you knew that Tackett, Goodwin,
15  and yourself were supposed to be leaving, right,
16  supposed to be?
17  A    Along with the ELL.
18  Q    And who was that person?
19  A    Reva.
20  Q    Reva.  What is her last name?
21  A    I can't say her last name.  I sure can't spell
22  it.
23  Q    Let's just deal with you three.  You three,
24  that's more than $500,000.00.  But only you didn't
25  leave.  You took another job that was planned by you,

Page 57

1    and you are not Interim -- the position you have is
2    not Interim, is it?
3    A    Yes.
4    Q    It's Interim --
5    A    Assistant Superintendent.
6    Q    -- Assistant Superintendent.  But it's not
7    listed here as Interim Assistant Superintendent?
8    A    These are positions that were put back.
9    Q    There is no position that is Interim Assistant
10   Superintendent of Human Resources, is there?
11   A    If you assign somebody to that position, they
12   are Interim.
13   Q    Paul, my point is that there is no position
14   listed as Interim; right?
15   A    No, not unless someone is hired that is not
16   interviewed.
17   Q    And you were not Interim Chief Executive
18   Officer, were you?
19   A    No.
20   Q    They had you as Chief Executive Officer.  But
21   you never applied for that job, did you?
22   A    I didn't want it.
23   Q    But you had it, and you never applied for it?
24   A    No.
25        MR. KEES:  He is talking about when you

Page 58

1    first got the position?
2        THE WITNESS:  No.
3        MR. KEES:  Years ago.
4        THE WITNESS:  I was interviewed by
5    Doctor --
6    BY MR. WALKER:
7    Q    Yes.  But you didn't apply for it.  You were a
8    friend of the guy who was there who happened to be a
9    black guy?
10       MR. KEES:  Hobson?
11       THE WITNESS:  Hobson.  I didn't know
12   him before I met him up here and he offered
13   me the job.
14   BY MR. WALKER:
15   Q    All right.  Well, he met you and offered you
16   the job, so you didn't apply.  All right.  Now, did
17   you ever see --
18       MR. KEES:  Haven't we done enough
19   trying to make you look stupid yet?
20       THE WITNESS:  It doesn't take much to
21   make me look stupid.
22       MR. WALKER:  Now, Paul -- we agree.
23   BY MR. WALKER:
24   Q    Now, look, you understood that Doctor Warren
25   had represented that she could achieve the same thing

Page 59

1    by attrition?
2    A    That's what she said.
3    Q    All right.  And we came up with a list of
4    people under her attrition.  Are you familiar with
5    this list?  And it's number 27 on a document filed in
6    court 8-6-18, page 13 of 19, in Beasley versus
7    McNulty.  Can you look at that?
8    A    (Witness reviews document.)  So, what am I
9    supposed to look at?
10   Q    Under her attrition, the amount of the cuts, if
11   you were added to it, like you were added in the
12   other one, her cuts would have been greater than
13   yours, wouldn't they?
14   A    No.
15   Q    Give it back.
16   A    Because these positions had to be added back.
17   Q    Well, just a minute.  Now, under the -- under
18   hers, with attrition, it's $998,000.00.  Under yours
19   is one million and one dollar.  And the only
20   difference between the two is that these five people
21   in Learning Services were cut, that is, Townsend,
22   Pride, Ray, Beckham, and Beasley.  So, if you take
23   those five out -- and she doesn't have them in hers.
24   You take those five out, your cuts are only a half
25   million dollars, while hers, to begin with, including

Page 60

1    the people --
2    A    She didn't include them.
3    Q    My point to you is that she didn't have to
4    include them, she was keeping them.  So, she is
5    keeping them and still saving $998,000.00 if you and
6    Tackett leave?
7    A    No.
8    Q    Okay.
9    A    Because the positions had to be added back.
10   Q    Well, there is no reason the position had to be
11   added back.
12   A    You've got to have a Director of Federal
13   Programs, you've got to have somebody over Human
14   Resources.
15   Q    Just a moment.  Who on this list was --
16   A    Sam Astsul.
17   Q    He is not on this list.
18   A    The first name.
19   Q    Just a minute.
20       MR. KEES:  What page of the Complaint
21   is that?
22       THE WITNESS:  Sam Astsul is on the top,
23   $136,000.00.
24       MR. WALKER:  Then, I stand corrected.
25   BY MR. WALKER:

Page 61

Q All right. Now, Sam Astsul wasn't cut the next year. So, let's just deal with what we are dealing for. Sam Astsul was not on your list.
A Sam Astsul left and we hired Darnell Bell for that position.
Q Well, no. Sam Astsul did not leave until the -- this current school year.
A No. I believe it was last year. I can't remember when he left. He left in the middle of the year sometime.
Q Oh, that's right. School had started. Now, you have to have a Director of Federal Programs?
A Yes.
Q Now, is there any reason why either one of these people couldn't have been, or Ms. Shirley couldn't have been Director of Federal Programs?
A I don't know.
Q Well, Paul, you were aware that Ms. -- that Ms. Shirley had been a middle school principal in this district, weren't you?
A That's what she told me. I was not here at the time.
Q You were not aware of it?
A No.
Q So, there is no reason that you had to go

Page 62

outside the district and hire somebody else, was there?
A We didn't. We promoted an elementary principal.
Q Who was that?
A Darnell Bell.
Q All right. And there is no reason for Mr. Bell to have been promoted over Ms. Shirley, was there?
A Not if she would have applied and interviewed and got the job.
Q No. But she had already been in the district a lot longer and she was already hired, and y'all transfer people, and you just hire people like yourself for no reason, no application, anything.
A That's not true.
Q Did you apply for the present job?
A No.
Q All right. Let me go on, now. I want to go back to how you did these cuts. Was Mr. Bell hired at the same time that the Program Administrators were let go?
A He was hired at the beginning of this school year.
Q So, that's a year in between; right?
A 2018.

Page 63

Q That's a year in between. Now, is there any particular -- but first of all, before you let these people go, is there any particular reason not to recall any of them for positions for which they were qualified in view of your desegregation plan? The desegregation plan called for you, didn't it, to search for African-Americans and to put them in positions?
A Yes.
Q All right. Now, Mr. Bell is already in the district. So, you didn't have to search for him, and he is already an administrator.
A He applied.
Q All right. But you also knew that these people wanted their jobs back, didn't you?
A The jobs were not cut.
Q They had been terminated.
A You are talking about Ms. Shirley.
Q Well, I'm not talking about just Ms. Shirley.
A Okay.
Q I'm talking about --
A Well, that's who you said. I'm sorry.
Q It's pretty clear that you could have assigned Ms. Shirley to the position that Mr. Bell got?
A Was it possible to have assigned her, that's

Page 64

true.
Q Yes.
A Would she have wanted it may be another one.
Q Well, maybe. But she came and talked to you, didn't she?
A After I had offered her a position where she could have kept her 12-month salary.
Q But you are going to add to her work responsibilities and duties; right?
A Sure.
Q Now, you gave the white lady that you offered it to some options that you did not give to her; isn't that correct?
A No.
Q What did you say to the white lady? And the lady testified, as you recall.
MR. KEES: Jo Ann?
THE WITNESS: Jo Ann Kohler?
MR. WALKER: Yes.
BY MR. WALKER:
Q Didn't she --
A I asked her if she would take on the ELL position if we would remain on a 12-month contract. The exact same thing I offered Ms. Shirley.
Q Yes. But she also said that she -- didn't she

Page 65

1   have something like bumping rights?
2   A   What?
3   Q   She did not have bumping rights.  Seniority
4   people have bumping rights, and Ms. Shirley had
5   bumping rights, didn't she?
6   A   That's why I went to her first.
7   Q   She did have bumping rights, didn't she?
8   A   I don't know about bumping.
9   Q   Well, you say that --
10  A   She has never held that position of ELL.
11  Q   But you understood that she had bumping rights?
12  A   She had seniority over Jo Ann, I know that,
13  because she has been here longer.
14  Q   Well, did you consider that she had bumping
15  rights?
16  A   You can't bump into a position you never held.
17  Q   Well, she could have bumped into an assistant
18  principal -- I mean, a middle school principal,
19  couldn't she?
20  A   I don't know exactly how long that expires.
21  But there would have had to have been an opening.  I
22  think after two years, you lose your bumping rights.
23  Q   Well, under bumping rights -- tell me how
24  bumping rights work.
25  A   Well, it would be a convoluted mess.  Shawn

Page 66

1   knows much more about that than I do.
2   Q   Well, I'm asking you.  You are the senior
3   person with presumably the most knowledge.
4   A   If you have held a position before and you were
5   laid off for whatever reason, something, within the
6   two-year period, then you can ask to be put back in
7   that position.
8   Q   That's one.  But that being put back in the
9   position, that's not bumping, because "bump" means
10  putting somebody else out of the position, doesn't
11  it?
12  A   That's correct.
13  Q   So, what are bumping rights, Mr. Director --
14  Personnel Director?
15  A   You can bump somebody out that you've got more
16  seniority than.
17  Q   Did you offer her bumping rights?
18  A   I didn't.  I don't believe Shawn did, either.
19  Q   Is there any reason you didn't?
20  A   There was no opening.
21  Q   Well, just a moment.  In order to have bumping
22  rights, you don't need an opening, do you?
23  A   No.
24  Q   But since you don't need an opening --
25  A   But you have to have held that position within

Page 67

1   the last two years.
2   Q   Well, where does it say in your document that
3   you have to have held it in the last two years?
4   A   I don't know.  That's just what Shawn told me.
5   Q   So, Shawn told you that --
6   A   I don't know.
7   Q   All right.
8   A   I told you to start with, I couldn't do a very
9   good job of telling you about bumping rights.
10  Q   That's one of the benefits of litigation.  Now,
11  did you explore giving her bumping rights?
12  A   No.
13  Q   All right.  Did she assert bumping rights?
14  A   You mean, did she ask if she could be bumped
15  into a position?
16  Q   Yes.
17  A   She asked me that.
18  Q   And you refused her; right?
19  A   No, I told her to talk to Shawn.
20  Q   Okay.  Do you know whether she talked to Shawn?
21  A   I do not.
22  Q   Is there any particular reason you didn't say,
23  "Well, I will look into it and get back with you"?
24  A   No.
25  Q   Is there any reason that Shawn did not present

Page 68

1   these allocations, since she was the more
2   knowledgeable person?
3   A   I wouldn't say she is more knowledgeable.
4   Q   But you just indicated that --
5   A   About the bumping rights.
6   Q   Yes, that's right.
7   A   Yes.
8   Q   Okay.  Now, did Ms. Beasley write a letter,
9   also, about bumping rights?
10  A   I don't recall a bumping rights letter.
11  Q   If she had spoken to you about it or written a
12  letter to you, would you have a record of it?
13  A   I don't recall getting a letter.
14  Q   What previous position, to your knowledge, did
15  Ms. Beasley hold in the district before she became a
16  Program Administrator?
17  A   My best guess would be a math teacher.
18  Q   That's your guess?
19  A   That's a guess.  I have no idea.
20  Q   I see.  All right.  Now, there is a document,
21  Paul -- I'm sorry, Mr. Brewer.  Did you prepare
22  Exhibit One to your testimony?
23  A   Susan Alford did.
24  Q   Did you prepare those allocations?
25  A   Well, me along with other department heads.

Page 69

1   Q   All right.
2   A   We just took into consideration what they
3   wanted to do as far as adjustments.  They might have
4   tried to add or take away from their departments.
5   This is a summation of what they were asking for.
6   Q   It is.  Is this what you presented to the
7   Board?
8   A   I would have to say "yes".
9   Q   All right.  Go to page four.
10  A   Okay.  (Witness complies.)
11  Q   You have in the last category, "Position
12  Comment".  Do you see that, on page four, last --
13  A   On the right?
14  Q   Yes.
15  A   Uh-huh.  (Indicated yes.)
16  Q   "Position Comment", and there are some things
17  there.  But under Doctor Warren's office, there were
18  no comments; right?
19  A   (No response.)
20  Q   Just go to page two -- I guess that would be
21  two.  I gave you the wrong page.  They are either out
22  of order.  It was number one.  I stand corrected.  Go
23  to page two.
24  A   Okay.  (Witness complies.)
25  Q   On page two, this came from you.  And at the

Page 70

1   bottom of the page, would you tell me what it says
2   next to "Chief Executive Officer/Human Resources" in
3   the last column?
4   A   "RIF (Delete)".  Delete that position.
5   Q   All right.  On page three, there is nothing.
6   Go to page four.
7   A   (Witness complies.)
8   Q   Under "Director of Elementary Education" and
9   "Secondary Education", in the last column, what does
10  it say?
11  A   "They are RIFed and being frozen."
12  Q   All right.
13  A   And for the record, "frozen" simply means we
14  could bring it back in the future if someone chose
15  to.
16  Q   All right.  And then, on page five, "Program
17  Administrator", in the last column, what does it say
18  for the person under "NSLA"?  Does it say, "RIF
19  (Delete)"?
20  A   Yes.
21  Q   Now, on page six, is it fair to say that under
22  Doctor Tackett's office, he is not listed in any way
23  as leaving as of this date, April 2nd, or April --
24  yes, April 2nd?
25  A   On page six?

Page 71

1   Q   Yes.
2   A   That's listing the building administrators.
3   Q   I understand.  But there is nobody in his
4   department leaving; right?
5   A   Well, that's not his department.
6   Q   Well, it says that it's recommended by Tackett.
7   He wouldn't be recommending --
8   A   Well, he is over them as far as that goes.
9   Q   Yes.  But there are no persons being
10  recommended for anything?
11  A   Well, you've got to have principals in the
12  buildings.
13  Q   Oh, yes.  But there were no --
14  A   We were not cutting any principals.
15  Q   That's right.  Nor was he being cut at that
16  time.  Now, let's go on to --
17  A   Now, go back with me, John, to page four.
18  Q   All right.  I will come back to you in just a
19  minute.  Let me finish, and I'm pretty close.
20  A   Well, his position was being cut.
21  Q   All right.  Let's go to page ten.
22  A   (Witness complies.)
23  Q   You have here "School Psychology Specialist"
24  and "Facilitator for Visually Impaired".  And the
25  last column also says, "RIF (Freeze)"; right?

Page 72

1   A   Yes.
2   Q   Why did you use the term "RIF"?
3   A   Because their positions were being eliminated.
4   Q   Are you familiar with the Reduction in Force
5   policy?
6   A   Well, sure.
7   Q   Were you implementing a Reduction in Force
8   policy at the same time of this?
9   A   If a position is being cut, we call it a RIF
10  and freeze.  That means it could be brought back in
11  the future.
12  Q   Well, was that pursuant to Exhibit Two to
13  McNulty?  Would you look at the RIF policy?
14  A   (Witness reviews document.)  So, what am I
15  looking at?
16  Q   Have you seen that document before?
17  A   Sure.
18  Q   Is that your RIF policy?
19  A   Layoff, yes, RIF, Reduction in Force.
20  Q   Is that what you were applying --
21  A   Well --
22  Q   Just a moment.  Is that what you were applying
23  to --
24  A   "Layoff" could be people nonrenewed, not
25  necessarily RIFed.

Page 73

1   Q   Just a moment. Is that what you were applying,
2   relating to when you use "RIF" in Exhibit -- this
3   exhibit? (Indicating.) Were you actually relating
4   to RIFs?
5   A   I don't know if RIFs are even listed on this
6   page. It's Layoffs.
7   Q   Well, just a moment. That page is -- what is
8   the title of that page, Mr. Brewer?
9   A   "Layoffs".
10  Q   Look at the top of the page. What does it say?
11  A   "Layoff" -- "Reduction in Force".
12  Q   It says "Reduction in Force". So, you don't
13  even know -- you don't know that that page applied to
14  the term "RIFs"?
15  A   Sure.
16  Q   Now, where does it say that when you nonrenew
17  somebody that that's not a RIF?
18  A   It could be that they --
19  Q   No, no. Where does it say in writing that a
20  nonrenewal is not a RIF?
21  A   Because a RIF --
22  Q   No. Where does it say it? I'm not asking for
23  your interpretation. Is there any document?
24  A   I don't know that it says it or doesn't say it.
25  Q   Isn't it true that you don't have a document

Page 74

1   that says that?
2   MR. KEES:  Object to form.
3   THE WITNESS:  I don't know if we have a
4   document that says that or not.
5   BY MR. WALKER:
6   Q   All right. Why would you use "RIF" if that's
7   not what you were doing?
8   A   Because that's what we were doing.
9   Q   You were RIFing?
10  A   We were reducing staff.
11  Q   So, did you RIF these people?
12  A   No, they were nonrenewed.
13  Q   But you RIFed them first, didn't you?
14  A   I don't think so.
15  Q   Well, you don't think so. You told -- isn't it
16  true that you told them that they were going to be
17  reduced in force?
18  A   I told them they would be nonrenewed.
19  Q   When did you tell them that?
20  A   I don't know. We had a meeting. I certainly
21  don't recall the date. But I called them all
22  together.
23  Q   Was that before April 2nd?
24  A   I have no idea.
25  Q   Was it before the second emergency Board

Page 75

1   meeting?
2   A   That that was going to be my recommendation.
3   Q   Well, didn't you also tell them that they were
4   going to be RIFed?
5   A   I don't recall that.
6   Q   Let me ask you, Paul, did you ever develop a
7   RIF plan in writing?
8   A   No.
9   Q   But you applied a RIF plan, according to this
10  document and the allocations? In order for you to
11  have a RIF plan, it has got to be in writing, hasn't
12  it?
13  A   It has got to be according to the policy.
14  Q   It has got to be in writing, and you have to
15  have goals and objectives, and you have to treat
16  everybody alike, don't you?
17  A   Yes.
18  Q   Did you ever develop anything in writing?
19  A   All of our allocations were developed in
20  writing.
21  Q   Did you ever develop a RIF plan in writing?
22  A   I don't recall one.
23  Q   Did you ever develop a plan for the nonrenewal
24  of people you decided to RIF in writing?
25  A   Well, there was no plan. We just nonrenewed

Page 76

1   them in a letter.
2   Q   Now, did Doctor Warren agree to nonrenew these
3   people?
4   A   She signed the forms.
5   Q   Wasn't she directed to sign the forms?
6   A   That might could be her answer.
7   Q   Well, no. You heard that. Did she tell you --
8   weren't you present at the School Board meeting when
9   she said she was not recommending their nonrenewal?
10  A   Yes.
11  Q   Which means that there is no administrative
12  recommendation for their nonrenewal?
13  A   That's correct.
14  Q   So, you didn't recommend their nonrenewal,
15  either, did you?
16  A   No.
17  Q   So, where is administrative evidence of
18  nonrenewal? Administrative evidence?
19  A   Right here. (Indicating.) What was presented
20  to the Board.
21  Q   You said that those are the people that you
22  could have adversely affected; right?
23  A   Well, sure.
24  Q   You could. But now, did the Board ever approve
25  that list in a meeting?

Page 77

1    A    Yes.
2    Q    So, it approved it by approving the
3    allocations; is that right?
4    A    That's correct.
5    Q    At the Board -- did you tell the Board the same
6    thing you have told me, that you were engaging in
7    RIFs?
8    A    I told them we were -- well, you are wanting me
9    to say "yes" or "no".
10   Q    Yes.
11   A    We were actually combining positions to try to
12   do cost savings, and downgrading some positions to
13   cost save.
14   Q    Now, isn't it true this was not a district-wide
15   Reduction in Force?
16   A    This one or this one?  (Indicating.)
17   Q    Either one?
18        MR. KEES:  What is the "this", for the
19   record?
20        THE WITNESS:  This one is
21   district-wide.
22   BY MR. WALKER:
23   Q    Which one is district-wide?
24   A    Both of them.
25   Q    All right.  That means you considered all the

Page 78

1    positions in the district?
2    A    Each department.
3    Q    Each department?
4    A    Uh-huh.  (Indicated yes.)
5    Q    Classified and nonclassified?
6    A    That's correct.
7    Q    But you had no criteria.
8    A    To cut the staff was our criteria.
9    Q    Well, just a moment.
10   A    Cost savings was the criteria.
11   Q    Did you do so by administrative seniority?
12   A    I would say "no".
13   Q    Did you reduce the people who had the least
14   seniority?
15   A    Probably not in all cases.
16   Q    Did you ever inform any persons who were being
17   reduced that they were eligible to bump into any
18   lower level job previously held?
19   A    Yes.  A lot of people were recalled to
20   positions.
21   Q    Did you ever tell them that they were able to,
22   quote, "bump" into any lower level job that they had
23   previously held?
24   A    In the classified ranks, Kim White did, in the
25   certified ranks, Shawn would have.

Page 79

1    Q    Do you know whether they did?
2    A    I do.  We bump -- we get a lot of people bump
3    every year when you start reducing staff.
4    Q    So, you have a bumping process that's beyond
5    the RIF?
6    A    Well, if people held those jobs and they were
7    cut and then a position came open, then we call them
8    for re-call rights.
9    Q    Now, have you all investigated -- developed
10   sophistication where in order to avoid bumping, what
11   you can do is change the job description and then put
12   a different title on it and keep all the duties
13   basically the same?
14   A    No.
15   Q    Weren't the persons that were -- let me ask
16   you.  Are you familiar with the position of District
17   Instructional Strategist?
18   A    Yes.
19   Q    Did you develop that -- did you develop that?
20   A    No.
21   Q    Who developed that?
22   A    I'm not sure.
23   Q    Did you approve it?
24   A    Yes.
25   Q    When did you approve it?

Page 80

1    A    I don't have the date unless it's on the --
2    should be on the back where Doctor Warren and I both
3    signed it.
4    Q    Doctor Warren?
5    A    Doctor Warren and I saw any -- we both signed
6    any change in any job description.
7    Q    Are you familiar with Exhibit 3a to McNulty,
8    Program Administrator?
9    A    I'm familiar with it, yes.
10   Q    Did you develop that one?
11   A    No.
12   Q    How was it developed?
13   A    It was developed prior to me becoming the CEO
14   of the district.
15   Q    Can you tell me what the difference in the two
16   positions is?
17   A    Not off the top of my head.
18   Q    Well, look at them a minute.
19   A    (Witness reviews document.)  Looks like this
20   one has less responsibility.
21   Q    Which one?
22   A    The new one.
23   Q    The new one has less responsibility?
24   A    Yes.
25   Q    Why do you say it's less responsibility?

Page 81

```
 1    A    Well, a lot of it could be incorporated into
 2    any sentence.  But obviously this one has got 22
 3    responsibilities, this one has got 16.
 4    Q    So, that's what you mean by "less"?
 5    A    Yes.
 6    Q    What is the goal of both?  Are the goals the
 7    same?
 8    A    Leadership.  Yeah, they are the same.
 9    Q    Are they identical?
10    A    Uh-huh.  (Indicated yes.)
11    Q    Yes.  Did you ever make a comparison of the job
12    descriptions of the two jobs?
13    A    Doctor Warren and I both did.
14    Q    Why did you develop a new job description --
15    you and Doctor Warren develop a new job description
16    for Instructional Strategist?
17    A    Because I think the intent was to hire some, if
18    not all, Program Administrators back under a
19    different job description.
20    Q    Whose intent was that?
21    A    I guess Doctor Warren.  I don't know.
22    Q    Well, how do you know what their intent was?
23    A    I don't.
24    Q    Well, you just -- you offered that.  I didn't
25    solicit it.  You offered it as that was the intent.
```

Page 82

```
 1    Did anybody tell you that that was their intent?
 2    A    No.
 3    Q    Did you ever discuss that position with anybody
 4    else?
 5    A    This position?
 6    Q    Yes.
 7    A    I talked to Doctor McNulty on the phone.
 8    Q    I see.  Now, before Doctor McNulty was made
 9    Superintendent, did you ever talk to him on the
10    phone?
11    A    Before he was officially hired?
12    Q    Before he officially -- before he -- let's say,
13    before April the 5th?
14    A    I don't recall.  I don't know the dates.
15    Q    Now, between April the 5th and July 1st, did
16    you ever talk to him?
17    A    Yes.
18    Q    Briefly?
19    A    I don't know how briefly.  Some might have been
20    longer than others.
21    Q    Approximately how many times do you recall
22    talking to him regarding personnel matters?
23    A    Three or four.
24    Q    Did you make any notes?
25    A    I hope not.
```

Page 83

```
 1    Q    Did you tell him what the Board had directed be
 2    done with respect to cutting staff?
 3    A    I told him that the Board directed Doctor
 4    Warren and I to not accept the recommendation of the
 5    allocations and to go back and see what Central
 6    Office jobs could be eliminated or cut or reduced.
 7    Q    Did you give him any dollar amount as to the
 8    amount of the cuts?
 9    A    No.
10    Q    Does the figure $5 million have any meaning to
11    you?
12    A    Well, I think the Board said we needed to cut
13    at least $5 million.  But that would be impossible in
14    the Central Office.
15    Q    No.  I'm just asking you what the Board said,
16    rather than --
17    A    I don't remember her saying $5 million.
18    Q    Do you remember telling Doctor McNulty that the
19    cuts should have been approximately $5 million?
20    A    No.
21    Q    Did you tell him -- did you give him any amount
22    of the cuts?
23    A    No.
24    Q    Was there any effort ever to cut the budget by
25    $5 million?
```

Page 84

```
 1    A    I'm not aware.
 2    Q    Have you had any more Reductions in Force since
 3    April of 2018?
 4    A    Which would include this coming year?
 5    Q    Yes.
 6    A    We are reducing around 65 teaching positions.
 7    Q    Do you have a written plan for it?
 8    A    I won't be here.
 9    Q    Well, the plan should have been developed.  So,
10    have you developed a plan for RIFs for this year?
11    A    I was not included in that.
12    Q    Who was included in it?
13    A    I would say Ms. Burgess, Doctor McNulty, Doctor
14    Williams, and Ms. Smith, the Deputy Superintendent.
15    Q    Is it fair to say that most of the positions
16    that were cut have been hired back?
17    A    No.  You mean, for this coming year?
18    Q    No.  For last year.  The ones that were cut in
19    '17-'18, most of those positions on your list were
20    rehired one way or another by some -- by either the
21    title or --
22    A    They were absorbed.  The Director of Elementary
23    Ed became Ms. Smith.  The Deputy Superintendent took
24    on that job.  The Director of Secondary Education
25    became Doctor McNulty's responsibility.  So, we
```

## Page 85

1  didn't hire those jobs back.
2  Q   Now, who became the Program Administrator?
3  A   There were two replaced, Ms. Ray, who was part
4  of the original group, and Doctor Strickland, who
5  came from Pine Bluff.
6  Q   So, they replaced Ms. Pride and Ms. Beasley?
7  A   I don't know about names.  They replaced those
8  positions.
9  Q   They did?  Why do you say that that happened?
10  A   Because that's the positions that were
11  developed and implemented and allocated, and those
12  are the people that applied and interviewed for the
13  job.
14  Q   So, those two -- the two descriptions that I
15  gave you, those are essentially the same positions,
16  aren't they?
17  A   I couldn't say that they are essentially the
18  same.  There is less responsibilities for the one
19  that was developed.
20  Q   So, you reduced the responsibilities?
21  A   It would appear so.
22  Q   Who took on the responsibilities that were not
23  added in the Instructional Specialist position?
24  A   They were probably absorbed to other positions.
25  Q   Probably, but you don't know that, do you?

## Page 86

1  A   Don't know for a fact.
2  Q   Was there any attempt to have them absorbed in
3  any plan that you developed?
4  A   We did a lot of absorbing, running two jobs
5  together in one.
6  Q   Well, look back at this.  If I were to suggest
7  to you that the positions are basic -- the strategist
8  and the administrator positions are the same, would
9  you disagree with me?
10  A   Yes.
11  Q   Well, let me ask you, are the Instructional
12  Strategists paid more or less or the same as the
13  Program Administrators?
14  A   You don't have that page on here.
15  Q   Well, I'm just asking you to tell me what the
16  pay is.
17  A   I can't recall it right off the top of my head.
18  Q   Well, I will give you the strategist's
19  position.  I don't see a pay on there.  Can you tell
20  me what it is?
21  A   You don't have the back page.
22  Q   Turn it over.
23  A   Okay.  Here it is.
24  Q   The back page is there.
25  A   "Salary range:  Teacher salary schedule plus

## Page 87

1  the certified administrative index."
2  Q   But that meant that there were no changes,
3  doesn't it --
4  A   I don't know --
5  Q   -- in pay?
6  A   -- without having the index in front of me.
7  Q   Now, let me have that back.  Now, Mr. Brewer,
8  did you know what those people did at the time you
9  recommended that they be cut?
10  A   No, I didn't have a -- I mean, I had a general
11  idea, but not in detail.
12  Q   I see.  Would you look at -- I'm going to go
13  over a few of them.
14  A   The job description?
15  Q   The job description.  I want you to compare the
16  two side by side.  The goals, to begin with, are the
17  same, aren't they?
18  A   Yes.
19  Q   And then, relating to the district's
20  desegregation planning and the Learning Services
21  Division is basically the same, isn't it?
22  A   I don't see it on the old one.
23  Q   You don't see it on the old one?  Well, that
24  was part of why you all had it in the first place,
25  isn't it?

## Page 88

1  A   I'm just saying, it's not in the same order.
2  So, it may be on here.  I haven't found it yet.
3  Q   But that was the reason you were doing it.  It
4  was to address the academic achievement deficiencies
5  of Plan 2000, wasn't it?
6  A   Yes.
7  Q   That's why Doctor Remele developed it, wasn't
8  it?  Doctor Remele developed that program for --
9  A   You mean, this one?
10  Q   Yes.
11  A   The old one?
12  Q   Yes.
13  A   I guess she -- I don't know if she did that.
14  Q   All right.
15  A   You are talking about when she was employed?
16  Q   Yes.
17  A   Yeah.  I would assume she did.
18  Q   All right.  Now, is the number eight on the old
19  one --
20  A   "Direct the textbook adoption" --
21  Q   Number eight on the new one the same as number
22  ten on the old one?
23  A   Yes.
24  Q   Is number 12 on the new one the same as number
25  nine -- no.  Number nine on the new one the same as

## Page 89

1  number 12 on the old one?
2  A  Yes.
3       (WHEREUPON, there was a telephone
4  interruption.)
5       THE WITNESS: Sorry about that.  Go
6  ahead.  I'm sorry.
7  BY MR. WALKER:
8  Q  That's all right.  Is number 12 on the new one
9  the same as number 16 on the old one?
10  A  Yes.
11  Q  And isn't number 15 on the new one the same as
12  number 19 on the old one?
13  A  Yes.
14  Q  And you do say that it was developed in order
15  to give these people an opportunity to be placed
16  again doing pretty much what they were already doing;
17  is that right to say?
18  A  Well, with a few reductions.
19  Q  With a few reductions.  Was their pay to be
20  reduced?
21  A  I don't have the pay in front of me.
22  Q  Well, was that the intent?
23  A  No.
24      All right.  Now, what other differences were
25  intended to be between Instructional Specialist and

## Page 90

1  Program Administrator?
2  A  Well, the difference would be to give the new
3  Superintendent input into how he wanted the
4  Instructional --
5  Q  That's the only difference; right?
6  A  The only difference in what?
7  Q  Between the two positions, pretty much?
8  A  To get his input?
9  Q  Yes.
10  A  I would hope so, along with anybody else,
11  Doctor Warren and everybody else who has to do with
12  Learning Services.
13  Q  All right.
14  A  And Ms. Smith.
15  Q  Now, we had a discussion about this earlier.
16  Doctor Warren said she was available to participate,
17  you said she was not present.  How did you know she
18  was not present?
19  A  She wasn't here.
20  Q  Did you go to her office to ascertain that --
21  A  I did.
22  Q  -- or did someone tell you?
23  A  I went to her office and I went to probably
24  several people, the secretary for the Superintendent.
25  Q  Well, now, isn't it true that you all often get

## Page 91

1  things done by communication without there being
2  actual presence, physical presence?
3  A  I haven't.
4  Q  But people -- are you literate by computer?
5  A  Not real good.
6  Q  You could have reached her by computer,
7  couldn't you?
8  A  I don't know if she had a computer.
9  Q  You don't know whether she has one or not?
10  A  Huh-uh.  (Indicated no.)
11  Q  Do you have one?
12  A  No.  I have one in my office.  You mean a
13  personal one?
14  Q  Well, no.  Where you could have reached her.
15  Have you ever communicated with her by computer?
16  A  Not very often.  I go down and talk to her face
17  to face.
18  Q  Have you ever communicated with her by an
19  exchange of e-mails or text messages?
20  A  I'm sure at some point in time we have over the
21  last ten years.  No, it wasn't that long when we
22  hired her.
23  Q  Did you want her input into this matter?
24  A  Sure.
25  Q  Did you make any effort to get it?

## Page 92

1  A  She wasn't here.
2  Q  No.  Did you make any effort to get it?
3  A  I did not call her, I did not e-mail her.
4  Q  Did you ask your secretary to reach her?
5  A  No.
6  Q  Did you ask Ms. Burgess or anyone else in the
7  district to reach her?
8  A  No.
9  Q  Which means you made no real effort to try to
10  reach her?
11  A  I knew we would have one day when she got back.
12  Q  When she got back, did you talk to her?
13  A  I did.
14  Q  Before you went to the Board?
15  A  Yes.
16  Q  She says that that didn't happen.
17  A  It did.
18  Q  Do you have any evidence that it did?
19  A  We sat down and went through all this.  I don't
20  know what you mean by "evidence".
21  Q  Well, do you have notes of that?
22  A  No.
23  Q  Who else was present?
24  A  She and I met in my office the day that she
25  came back.

Page 93

1    Q    For how long, Mr. Brewer?
2    A    Thirty minutes to an hour. I went through
3    these -- I went through what I was going to recommend
4    with her.
5    Q    Did she approve that?
6    A    She didn't agree with -- she agreed, as far as
7    I know, all of it except the Learning Services.
8    Q    All right. So, let me understand that. She
9    disagreed with the Learning Services?
10   A    That's correct.
11   Q    And what was the basis for her disagreement
12   with the Learning Services?
13   A    You would have to ask her. I have no idea.
14   Q    Are you saying that she didn't tell you?
15   A    She just thought we couldn't do that because
16   that's basically the instructional people in our
17   district.
18   Q    And you disagreed with her?
19   A    No, I didn't disagree with her.
20   Q    Well, since she disagreed with it, why would
21   you submit it to the Board?
22   A    Because I was asked to try to find cuts. The
23   Board didn't have to approve it.
24   Q    So, notwithstanding her disapproval, you
25   submitted them, anyway; is that right?

Page 94

1    A    She might not have agreed that I should have
2    been cut back to Assistant Superintendent. I didn't
3    ask her.
4    Q    Well, you really weren't. You can say it, but
5    you weren't. You kept your pay.
6    A    I did not keep my pay.
7    Q    And you kept your office all that time. You
8    never lost your office, did you?
9    A    Yes, I did. I lost a check, and I wasn't at
10   work for ten days.
11   Q    Well, that was voluntary, wasn't it?
12   A    No. Because I wasn't hired by the Board until
13   they had their meeting.
14   Q    Did anybody tell you that you were terminated?
15   A    I terminated myself. I sent a letter in to
16   retire.
17   Q    Oh, you did?
18   A    I did.
19   Q    I would like to have a copy of that.
20   A    Okay.
21        MR. WALKER: Would you get that, Cody?
22        MR. KEES: Yes.
23   BY MR. WALKER:
24   Q    And did you do that on or before July 1?
25   A    I did it -- I want to say it was April or May.

Page 95

1    Q    I see. When you presented your allocations to
2    the Board, did you tell the Board that Doctor Warren
3    disagreed with the Learning Services cuts?
4    A    I don't remember if I said that or not. I
5    would think I would have, but I can't say for sure.
6    Q    Didn't Doctor Warren also disagree with cutting
7    back on Ms. Shirley's position?
8    A    She never voiced that to me. She never voiced
9    cutting Danny Ebbs, either.
10   Q    Pardon?
11   A    She did not voice disagreement with cutting
12   Danny Ebbs, either.
13   Q    I didn't mention Danny Ebbs. Why you always
14   want to bring in the white person?
15   A    Well, because you are doing it one-sided. She
16   didn't agree with me on either one -- disagree.
17   Q    She didn't disagree with you on either one?
18   A    That's correct.
19   Q    Did she say anything one way or another?
20   A    I don't recall that she did.
21   Q    Okay. Why don't you just say you don't recall
22   rather than that she didn't? If you don't recall and
23   then on the other hand you say she didn't, that's
24   inconsistent, isn't it?
25   A    Well. I guess so.

Page 96

1    Q    All right.
2         MR. WALKER: Let me have a minute or
3         two, Cody, if you will. Before I go, Ms.
4         Springer has given this to me.
5    BY MR. WALKER:
6    Q    Is Laura Strickland working for you all?
7    A    She is. She is a Strategist.
8    Q    What was she doing the year before?
9    A    She worked at Pine Bluff. I want to say as
10   some type of administration, but I'm not totally sure
11   what her responsibilities were.
12   Q    Is she white or black?
13   A    Black.
14   Q    So, you brought a black lady in from Pine Bluff
15   to do what Ms. Townsend and Ms. Beasley and Doctor
16   Pride were doing?
17   A    They didn't apply.
18   Q    Well, if they were RIFed, they didn't have to
19   apply, did they?
20   A    Yes.
21   Q    So, it was your position --
22   A    They were nonrenewed.
23   Q    They were RIFed first, and then you called them
24   nonrenewed.
25   A    Gave them a Letter of Nonrenewal.

Page 97

```
1    Q    If you said that they were RIFed --
2    A    I never said they were RIFed.
3    Q    The document says that you had a RIF plan in
4    place.  Didn't you tell the Board also in a public
5    meeting that these people were being RIFed?
6    A    I told them they were being nonrenewed.
7    Q    You also told them, after they filed their
8    notices, that they were being nonrenewed.  But you
9    have publicly stated that these people were RIFed,
10   haven't you?
11   A    I don't recall that.
12   Q    And if they were RIFed, isn't it true that they
13   didn't have to reapply for their position?
14   A    It was a different job.
15   Q    Pardon?
16   A    It was a different job.
17   Q    Why was it a different job?
18   A    Two different job descriptions.
19   Q    It was two different job descriptions?  That's
20   fine.  Okay.
21   A    It looks to me like there are.
22   Q    Okay.  Can you tell me one material difference
23   in the two?
24   A    No.
25   Q    Okay.  Did you also give -- I notice that you
```

Page 98

```
1    all are cutting back, but you are also giving
2    stipends, aren't you?  You gave Ms. Laura Strickland
3    a stipend of $10,000.00, didn't you?
4    A    If it's a cost savings, we did approach that.
5    Q    Did you give Ms. Strickland a stipend of
6    $10,000.00?
7    A    In lieu of having to hire someone to be over
8    Dyslexia.
9    Q    But you took a stipend away from Ms. Shirley,
10   didn't you?
11   A    I'm not aware of a stipend being taken away.
12        MR. WALKER:  All right.  Give me a
13        minute or two, and I think I will be
14        finished with you, Paul.
15        THE WITNESS:  All right.
16        (WHEREUPON, a discussion was held off
17        the record.)
18        (WHEREUPON, a break was taken.)
19   BY MR. WALKER:
20   Q    Mr. Brewer, just a few more questions.  And I
21   appreciate you.  I just want to say that I have
22   always considered you, notwithstanding the tenor of
23   my questions and the like, to be my friend.
24   A    I agree.
25   Q    And I will always consider you to be.  All
```

Page 99

```
1    right.  Now, did the Board ask you to make cuts in
2    April of this year?
3    A    I wasn't involved in allocations this year.
4    Q    Well, you went to the Board meetings.  You
5    always went to the Board meetings.
6    A    I went to the Board meetings.
7    Q    Did you ever hear the Board state that they had
8    a determination this year to cut $5 million in staff?
9    A    I did not.  I'm not saying they didn't say it,
10   but I don't recall that.
11   Q    All right.  Now, when the Board -- when you all
12   didn't reach $5 million in cuts, did the Board ever
13   address that fact that you didn't reach $5 million,
14   or even $2 million, after April of 2017?
15   A    '17?
16   Q    Did they ever revisit the effects of the cuts
17   after the allocations were approved?
18   A    In 2017?
19   Q    Yes.
20        MR. KEES:  '18.
21   BY MR. WALKER:
22   Q    It was '18.  In 2018, did they ever readdress
23   that?
24   A    No, not that I'm aware of.
25   Q    In other words, nobody -- no Board resolution
```

Page 100

```
1    was passed indicating that they needed to have more
2    money cut or that the cuts were not satisfactory?
3    A    I didn't hear them say that.
4    Q    All right.
5    A    Because I cut -- you know, that was my
6    recommendation.
7    Q    I understand.  Now, listen, with respect to Ms.
8    Denise Palmer, did she participate in the budget
9    reduction process with you?
10   A    No.
11   Q    Did she ever come up with a plan for budget
12   reduction?
13   A    Not with me.
14        MR. WALKER:  Thank you very much.
15        MR. KEES:  Briefly.
16             CROSS EXAMINATION
17   BY MR. KEES:
18   Q    On Ms. Shirley here, her contract was cut from?
19   A    Twelve to 11.
20   Q    And did you offer her anything to make up the
21   difference?
22   A    I did.
23   Q    What did you offer her?
24   A    The position that was being eliminated for ELL,
25   E-L-L.
```

1  Q   E-L-L?
2  A   Yes.
3  Q   English?
4  A   English as a Second Language, ESL.
5  Q   You offered her that.  Did she accept it?
6  A   No.
7  Q   Would that have put her back on a 12-month?
8  A   Yes.
9  Q   And then, Ms. Beasley, Doctor Pride, and Ms.
10 Townsend, do you know if they applied for the open
11 Instructional Specialist positions?
12 A   Strategist?
13 Q   Instructional Strategists?
14 A   No.
15 Q   No, or you are saying they didn't?
16 A   I'm not aware that they applied.
17 Q   You just don't know?
18 A   No.  Ms. Townsend applied for an elementary
19 principal's position, but not for the Strategist
20 position, no.
21 Q   So, did Ms. Shirley tell you why she didn't
22 want to accept that stipend, or that additional duty
23 to get back on the 12-month?
24 A   No.
25 Q   And that was offered to her first, and then

1  when she declined it, it was offered to Ms. Kohler?
2  A   That's correct.
3  Q   She accepted it?
4  A   Yes.
5        MR. KEES:  That's all I've got.
6        MR. WALKER:  Let me ask.
7           REDIRECT EXAMINATION
8  BY MR. WALKER:
9  Q   Was Ms. Shirley qualified for the ELL position?
10 A   Yes.
11 Q   Or did it matter?  That's English as a Second
12 Language; right?
13 A   Right.
14 Q   You have to be able to speak Spanish, don't
15 you?
16 A   No
17 Q   Well, you have to be able to communicate with
18 the Hispanic population?
19 A   It would be better if you do.
20 Q   But you didn't seek to know whether she met the
21 qualifications?
22 A   Ms. Shirley?
23 Q   Yes.
24 A   She was qualified, because she was certified.
25 It requires a certified person.  And it doesn't

1  require a certified person in any subject.
2  Q   I see.
3        MR. WALKER:  Thank you, Mr. Brewer.
4  Hope you have a good evening.
5        (WHEREUPON, McNulty Exhibit Two and 3a
6  were marked for identification.)
7        (WHEREUPON, at 4:45 p.m., the taking of
8  the above-entitled deposition was
9  concluded.)
10           ---o---
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Exhibit One.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

```
 1   Exhibit Two.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 106

```
 1   McNulty Exhibit Two.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 107

```
 1   McNulty Exhibit 3a.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 108

```
 1           C E R T I F I C A T E
 2
 3   STATE OF ARKANSAS  )
 4                      ) ss.:
 5   COUNTY OF PULASKI  )
 6
 7        I, DEBBYE L. PETRE, Certified Court Reporter
 8   and notary public in and for the County of Pulaski,
 9   State of Arkansas, duly commissioned and acting, do
10   hereby certify that the witness herein was by me
11   first duly sworn to testify the whole truth and
12   nothing but the truth prior to taking down in
13   Stenotype the questions, answers, and proceedings
14   during said deposition, and from such recordation was
15   thereafter reduced to print by means of computer-assisted
16   transcription, and the same fully, truly,
17   and correctly reflects the proceedings had.
18        I FURTHER CERTIFY that the above deposition
19   was given by the witness and taken at the times and
20   in the place hereinabove set forth.
21        I FURTHER CERTIFY that I am not attorney or
22   counsel of any of the parties, nor am I relative or
23   employee of any attorney or counsel or party
24   connected with the action, and have no interest in
25   the outcome or results of this litigation.
```

1    WHEREFORE, I have subscribed my signature

2    and affixed my notarial seal as such notary public at

3    the City of Little Rock, County of Pulaski, State of

4    Arkansas, this the 24th day of June, 2019.

5

6

7        _____

8        DEBBYE L. PETRE, CCR

9        NOTARY PUBLIC IN AND FOR

10       PULASKI COUNTY, ARKANSAS

11

12

13

14   My Commission Expires:

15

16   August 4, 2020.

17

18        ---o---

19

109