Pulaski County Special School District v.
Kiffany Pride, et al.                                                               June 11, 2018

```
 1            PULASKI COUNTY SPECIAL SCHOOL DISTRICT
 2
 3    IN THE MATTER OF:
 4    KIFFANY PRIDE
      LAURA SHIRLEY
 5    JENNIFER BEASLEY
      NICOLE TOWNSEND
 6
 7         The above-entitled matter was heard by the Board of
 8    Education, on Monday, June 11, 2018, beginning at 6:07
 9    p.m., in the Board Room of the Administrative Offices,
10    Pulaski County Special School District, 925 East Dixon
11    Road, Little Rock, Pulaski County, Arkansas.
12    BOARD MEMBERS:
13
      DR. LINDA REMELE (not present)
14    SHELBY THOMAS
      BRIAN MAUNE
15    MIKE KEMP
      ELI KELLER
16    TINA WARD
      ALICIA GILLEN
17
18         ON BEHALF OF THE DISTRICT:
19            GEORGE 'JAY' BEQUETTE, JR., ESQ.
              Bequette & Billingsley
20            425 West Capitol Avenue, Suite 3200
              Little Rock, Arkansas  72201
21
22         ON BEHALF OF THE EMPLOYEES:
23            JOHN WALKER, ESQ.
              Walker Law Firm
24            1723 Broadway
              Little Rock, Arkansas  72206
25
```

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;                              Page 2
NICOLE TOWNSEND, 06/11/2018

```
 1   A P P E A R A N C E S (continued):
 2       HEARING OFFICER:
 3           SHARON STREETT, ESQ.
 4       ALSO PRESENT:
 5       Dr. Janice Warren
 6       Paul Brewer
 7       Kiffany Pride
 8       Laura Shirley
 9       Jennifer Beasley
10       Nicole Townsend
11       Joy Springer
12       Denise Palmer
13       Linda Goodwin
14       Shawn Burgess
15       Dr. Yolaundra Williams
16       Jo Ann Kohler
17                         ---o---
```

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;                              Page 3
NICOLE TOWNSEND, 06/11/2018

```
 1                        I N D E X
 2                                                          PAGE
 3    Statement by Mr. Kemp                                    8
 4    Instructions by the Hearing Officer                      9
 5    Motions by Mr. Walker                                   11
 6    WITNESSES
 7    DENISE PALMER
 8      Direct by Mr. Bequette                                38
 9      Cross by Mr. Walker                                   41
10      Examination by the Board                              56
11    PAUL BREWER
12      Direct by Mr. Bequette                                57
13      Cross by Mr. Walker                                   67
14    LINDA GOODWIN
15      Direct by Mr. Walker                                 116
16    SHAWN BURGESS
17      Direct by Mr. Walker                                 122
18    KIFFANY PRIDE
19      Direct by Mr. Walker                                 124
20      Examination by the board                             128
21      Redirect by Mr. Walker                               128
22    DR. YOLAUNDRA WILLIAMS
23      Direct by Mr. Walker                                 129
24    NICOLE THOMPSON
25      Direct by Mr. Walker                                 133
```

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;                              Page 4
NICOLE TOWNSEND, 06/11/2018

```
 1      Examination by the Hearing Officer                   135
 2    LAURA SHIRLEY
 3      Direct by Mr. Walker                                 135
 4    JENNIFER BEASLEY
 5      Direct by Mr. Walker                                 142
 6    JO ANN KOHLER
 7      Direct by Mr. Walker                                 149
 8    DR. JANICE WARREN
 9      Direct by Mr. Walker                                 152
10      Examination by the Hearing Officer                   169
11      Redirect by Mr. Walker                               170
12      Examination by the Board                             171
13      Further redirect by Mr. Walker                       190
14      Re-examination by the Board                          196
15      Further redirect by Mr. Walker                       199
16    EXHIBITS
17    DISTRICT
18    KIFFANY PRIDE
19    1      Administrator's Contract for 2017-
20           2018 School Year
21    2      Notice of Non-Renewal from Dr. Janice
22           Warren to Kiffany Pride, dated April
23           27, 2018
24           Reduction in Force Policy
25           Certified Administrative Index 2017-
```

**EXHIBIT 5**

Case 4:18-cv-00508-DPM   Document 33-5   Filed 06/18/20   Page 2 of 16

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; Page 57
NICOLE TOWNSEND, 06/11/2018

1  have rehired for '18-'19 school year?
2     MR. BEQUETTE: I think that will be a
3  question for Mr. Brewer, Mr. Maune.
4     MR. WALKER: Well, Mr. Brewer -- it's
5  speculation, he's an interim person, he's
6  already retired, he has no authority for
7  determining who would have been --
8     HEARING OFFICER: Let's -- let's hear it
9  from Mr. Brewer -- from Mr. Brewer. They are
10  calling him as a witness, Mr. Walker.
11     EXAMINATION OF PAUL BREWER
12  BY MR. BEQUETTE:
13  Q  Please identify your -- yourself for the record and
14  your position in the district.
15  A  I'm Paul Brewer, Interim CFO -- CEO of the Human
16  Resources Department.
17  Q  And, Mr. Brewer, this Spring, did you -- did you
18  engage in the process of identifying some cost savings
19  that could be done by either reducing the number of
20  licensed staff and classified staff or changing contracts
21  to reach or accrue savings?
22  A  Let me clarify. In April school board meeting I
23  presented the allocations for the following school year,
24  '18-'19. And the Board took a look at those and asked
25  me, and I assumed with Dr. Warren, directed us to: One,

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; Page 58
NICOLE TOWNSEND, 06/11/2018

1  contact the new Superintendent that will be starting in
2  July to get -- make sure that he knew kind of we were
3  looking at reductions in -- in the Central Office; that
4  was directed the Central Office. I did not say --
5     We knew attrition would take place, as it always
6  does, I believe around 20 teachers, which would be close
7  to a million dollars.
8     If you can hire non-tenured teachers who maybe had
9  30-40 years of experience and hire in new teachers with
10  bachelor's degrees, it's a substantial savings to the
11  district, which is what we try to do. It's never a
12  perfect world but that's what we try to do.
13     At that meeting, I believe, Dr. Remele, along with
14  other members of the Board, asked us to go back and look
15  at the Central Office and see what cuts, if any, could be
16  made, and to make sure that we included Dr. McNulty, who
17  would be the new Superintendent, prior to making any kind
18  of recommendations.
19     I did that.
20     Dr. Warren, unfortunately, lost a family member the
21  following day, had to be out. She was out the following
22  day. I knew I had about a week to get this done, along
23  with her, hopefully.
24     I did not have Mr. McNulty's phone number. I called
25  Dr. Remele and asked her if she had his number, because I

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; Page 59
NICOLE TOWNSEND, 06/11/2018

1  found out -- I guess it was at the Tuesday meeting --
2  found out Thursday, I guess, sometime that Dr. Warren
3  would not be back until the following Tuesday. I didn't
4  feel like I could wait that long to contact Dr. McNulty,
5  so I called Dr. Remele, got his phone number, introduced
6  myself, told him the task that he -- that the Board had
7  asked us to work on. He appreciated that.
8     And so it certainly wasn't pointed at any
9  individuals. Let me make sure the record stands
10  straight, I never discussed with Ms. Gillen ever about
11  any specific cuts to anybody in this district. That's
12  never been discussed.
13     I did discuss it with Dr. Remele.
14     I talked to Dr. Tackett -- I know he's not here,
15  but -- and I did talk to Will Reid because they were kind
16  of heading up this -- I was not a part of that, don't
17  know a lot about it, the School of Innovation, that maybe
18  some ways that we need to look at in the future to maybe
19  restructure some things. I don't know if they ever
20  talked to Dr. McNulty or not; they never gave me that
21  information and I didn't ask him.
22     In taking a look at the Central Office staff, what
23  Dr. McNulty wanted to do was take a look at what we had
24  in place now and how he might could restructure that and
25  restructure some of the job descriptions to fit maybe

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; Page 60
NICOLE TOWNSEND, 06/11/2018

1  what he wanted to do. But I explained to him, because of
2  the May 1st deadline, that people would be
3  automatically renewed and he would not have that
4  opportunity if we waited until he got here. The people
5  would be in place, their jobs would be as it stood, as it
6  was last year.
7     He said that, "I would like to non-renew those
8  people, interview them myself, take a look at what we
9  have and bring in what we want to do." My understanding
10  is he did talk to them, was very impressed with them, as
11  I've always been. Very, very capable people and they are
12  all, I consider, good colleagues of mine and friends.
13     The first person I cut was myself, because I didn't
14  plan on coming next year.
15     THE WITNESS: And let me set the record
16  real, real straight, John. Nobody has offered
17  me a job in this district next year, because
18  nobody here except the Superintendent can
19  recommend that and the Superintendent won't be
20  here until July 1.
21     I do plan to resign. I already resigned.
22  I got a letter just like these ladies did.
23  Mine just said I don't have a job.
24     Now, if the district would like for me to
25  stay, that would be up to Dr. McNulty and this

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

## Page 61

Board come July 1. I've been offered other jobs in other districts. Wanted to know if I would work another year. I said I hadn't made up my mind yet.

So -- and I do appreciate the $180,000 salary, that would be a good increase. I would appreciate that as well.

**HEARING OFFICER:** Are you saying that's not your salary, Mr. Brewer?

**THE WITNESS:** My salary is 129,000 plus benefits to be 169.

**HEARING OFFICER:** Thank you.

**THE WITNESS:** Salary next year, if I did stay in the position I'm in, would be $11,000 cut in pay.

I came back to the Board with the presentation that Dr. McNulty and I talked about.

Can you hand me that water, Jay? That taco salad is getting to me.

I came back to the Board and looked at ways we could consolidate some jobs. What Dr. McNulty said he would like to do is take the secondary principals himself, not have a secondary director; that cuts that position

## Page 62

out, substantial savings. Also he planned to not -- he planned to rehire a Deputy Superintendent that would strictly be over the elementary principals, oversee all of the elementary; he would oversee the secondaries.

I did explain to him at that time I think that's a big task for a Superintendent to take on, but he said that's what he wanted to do, and who am I to argument.

So we looked at cutting salaries. Looked at our Director of Gifted and Talented and our Athletic Director. They, like a lot of our coaches work, they will work 11 months and actually be on the clock 12; that's the way most people are that work 11 months, but they all have responsibilities throughout the summer, but it was a cost savings; not a popular, by the way. And this certainly can't be done on popularity. I would rather give them all a raise rather than cut their jobs.

The Coordinator of our ESL, English as a Second Language, we thought we could consolidate that position in with one of the other jobs that was being cut and reduced to an 11-month job. I first offered that to

## Page 63

Ms. Laura, the Gifted and Talented, because I knew she had had the most seniority, to keep her salary at 12 months and leave it the same if she would take on that job. She chose not to.

I offered it to the next person in line, who was Jo Ann Kohler, and she accepted that position. So the cost savings with that, just doing away with the coordinator of ELL, was a savings of about $80,000.

We did away with the -- well, I've already said that.

Altogether, if you cut these jobs -- but my understanding when I did make the presentation, that Dr. McNulty did plan on hiring back at least some if not all of these coordinators, administrators, and he planned to interview them when he comes back the last week of June. That was my understanding. That's the last discussion I've had with him.

Substantial savings, yes. Would some have to be put back, obviously that's what he wants to do if he gets permission from the Board to do so.

These positions are not allocated, but

## Page 64

they could be added back if the Board chose to.

I hope I answered your question.

**BY MR. BEQUETTE:**
Q   I think you did, Mr. Brewer. Can I ask you another one?
A   I won't take as long.
Q   Okay. So do you have the exhibit list and packet for Laura Shirley?
A   Probably, if you gave it to me.
Q   I did.
A   What -- is that No. 1?
Q   Here you go.
A   What -- what exhibit is it?
Q   Okay. So it's Exhibit 2 on Page 3.
A   Okay.
Q   And do you recognize this as the notice of a recommended -- recommended partial nonrenewal of Ms. -- Dr. Shirley's contact?
A   It is.
Q   And is Reason No. 1 in this letter true?
A   Yes.
Q   And was Dr. Shirley the only person who had her contract days reduced?
A   No.
Q   Okay. Then let's turn to the -- the exhibit packet

Case 4:18-cv-00508-DPM   Document 33-5   Filed 06/18/20   Page 4 of 16

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

## Page 65

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1  for Jennifer Beasley. Turn to Exhibit 2 on Page 3.
2  A   Okay.
3  Q   Ms. Beasley is a program administrator; correct?
4  A   Yes.
5  Q   And Ms. Beasley's contract is being non-renewed for
6      the 2018-2019 school year; correct?
7  A   Yes, correct.
8  Q   Is Reason No. 1 in Exhibit 2 on Page 3 true?
9          HEARING OFFICER: Exhibit 3 -- I mean, on
10         Page 3?
11 BY MR. BEQUETTE:
12 Q   Exhibit 2 on Page 3 in Beasley exhibit packet.
13 A   Now, I'm not going to put a fly in the ointment.
14     I'm just going to say that is true, not totally true,
15     because there is a chance that some of these might
16     possibly be brought back. This is true.
17 Q   Okay. It's true as of right now?
18 A   I can't forecast what Dr. McNulty might do.
19 Q   But is it true as of today?
20 A   As of today it's true.
21 Q   Okay. Now then, turn to the exhibit packet for
22     Nicole Townsend. Here you go, Mr. Brewer.
23 A   All right.
24 Q   Turn to Exhibit 2 on Page 3.
25 A   Okay.

## Page 66

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1  Q   Is Ms. Townsend also a program administrator whose
2      contract is being non-renewed for the 2018-2019 school
3      year?
4  A   It is.
5  Q   And is Reason No. 1 on Exhibit 2, Page 3, true?
6  A   Yes.
7  Q   And I'm going to hand you the exhibit packet for
8      Ms. -- Ms. Kiffany Pride.
9  A   Okay.
10 Q   Please turn to Exhibit 2 on Page 3. Ms. Pride is
11     also a program administrator; correct?
12 A   Yes.
13 Q   And the recommendation was that her contract be
14     non-renewed for the 2018-2019 school year; is that
15     correct?
16 A   Yes.
17 Q   And is Reason No. 1 in Exhibit 2 on Page 3 true?
18 A   Yes.
19 Q   And so the letters for Ms. Beasley, Ms. Pride, and
20     Ms. Townsend are the same because they were all three
21     program administrators and their employment contracts
22     were being recommended for nonrenewal for next school
23     year in order to meet the district's needs to reduce
24     expenditures and to match available revenue and to more
25     efficiently manage district resources; correct?

## Page 67

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1  A   Yes.
2          MR. BEQUETTE: Okay. Pass the witness.
3          EXAMINATION OF PAUL BREWER
4  BY MR. WALKER:
5  Q   Now, Mr. Brewer, we've known each other for about 25
6      years or more; right?
7  A   Yeah. Thirty, I would think.
8          HEARING OFFICER: Mr. Walker, would you
9          speak up just a little bit?
10         THE WITNESS: We've been knowing each
11         other for about 30 years.
12         HEARING OFFICER: No, I meant Mr. Walker.
13 BY MR. WALKER:
14 Q   You retired -- you retired from Camden-Fairview?
15 A   Yes, sir.
16         HEARING OFFICER: We can't hear you,
17         Mr. Walker.
18         MR. WALKER: I'll speak up.
19         HEARING OFFICER: Thank you.
20         MR. WALKER: I don't have a microphone
21         here. I'll do my best.
22 BY MR. WALKER:
23 Q   You retired with your highest salary being $75,000?
24 A   Yeah, about 80,000, I think, John, by the time --
25 Q   And then you came here in the Pulaski County School

## Page 68

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1      District and forced a salary of 120,000?
2  A   129.
3  Q   Although you were retired at --
4  A   129 --
5  Q   129, and they forced it on you?
6  A   They forced it.
7  Q   And they gave you an interim contract; is that
8      right?
9  A   That's correct.
10 Q   And that's been interim all these years; hasn't it?
11 A   That's correct.
12 Q   And could you explain to me why this Board never
13     considered you as a permanent employee?
14 A   This Board probably did expect me to be a permanent
15     employee.
16 Q   This one but not the last one?
17 A   I don't know.
18 Q   Why this Board?
19 A   I don't know that this Board -- I made -- I made
20     sure, and I'll --
21 Q   You said this Board did, probably. So why?
22 A   This -- this Board was made very well assured -- I
23     assured them that I --
24         MR. BEQUETTE: This is irrelevant to the
25         reasons we're here on today.

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018

Page 69

1       **HEARING OFFICER:** I totally agree, but you
2 have to object for me to rule on it.
3       **MR. BEQUETTE:** Pardon?
4       **HEARING OFFICER:** You have to object.
5       **MR. BEQUETTE:** I am objecting. This
6 relates to questions -- this line of
7 questions --
8       **MR. WALKER:** Ms. Streett -- Ms. Streett,
9 this is a matter about cutting budgets, and
10 we're talking about necessity --
11       **HEARING OFFICER:** Okay. Okay.
12 Mr. Walker, I don't think it matters --
13       **MR. WALKER:** And we're talking about
14 somebody who is just given a job, after he
15 retires, for $50,000 more than he ever made and
16 he's doing nothing and he's interim all the
17 time. What is that other than, per se, waste?
18       **HEARING OFFICER:** It's not relevant to
19 what you're here for, Mr. Walker --
20       **MR. WALKER:** Well, it is because you're
21 talking about budget cuts --
22       **HEARING OFFICER:** So you're saying they
23 should have gotten rid of him instead of them?
24       **MR. WALKER:** They shouldn't have hired him
25 in the first place, and they are required --

Page 70

1       **HEARING OFFICER:** Well, he just got
2 through saying -- well, Mr. Walker that
3 happened years ago.
4       **MR. WALKER:** No, no. It wasn't. Just
5 five years ago.
6       **HEARING OFFICER:** It's years ago from
7 here.
8       **THE WITNESS:** It was nine years.
9       **MR. WALKER:** Oh, nine years?
10 Okay. Well, then, you're doing very well
11 than --
12       **HEARING OFFICER:** Let's move on,
13 Mr. Walker. I don't think this is relevant.
14       **THE WITNESS:** Well --
15       **HEARING OFFICER:** We all know that
16 Mr. Brewer is making a lot of money compared to
17 other people sometimes.
18 **BY MR. WALKER:**
19 Q   All right. Mr. Brewer, let me just come back to
20 you. Are you friends with any of the board members?
21 A   Am I friends with any of them?
22 Q   Are you personal friends with any of the board
23 members?
24 A   Probably Dr. Remele to some degree, because we've
25 worked together here for several years.

Page 71

1 Q   Anybody else?
2 A   No.
3    Well, I won't say they are not friends. They are
4 not friends, like we don't go to Walmart together and
5 drink Cokes or anything, but --
6 Q   And now let me ask you this: On the issue of your
7 responsibility in the past, did you ever develop budget
8 cuts before this Board was -- was returned?
9 A   We've cut the budget --
10 Q   No. Did you --
11 A   -- every year --
12 Q   No. Did you, Paul Brewer, ever do so?
13 A   I've never -- I don't have the power to cut the
14 budget.
15 Q   That's right.
16    Did you ever make recommendations that were
17 presented to Mr. Johnny Key, before this Board came back,
18 that were over your name for budget cuts?
19 A   No. I -- I presented them to Dr. Guess and he
20 presented them to Dr. Key.
21 Q   Dr. Guess was the one who made any recommendation
22 for budget cuts; right?
23 A   Well, he had me do it, but I had to turn around --
24 he had me do it, yes. I get your point.
25 Q   And then you had Ms. Burgess do it?

Page 72

1 A   Ms. Burgess and I work very closely together, but
2 she handles most of the teaching center. She also works
3 with the other administrators, but she has not worked
4 with me on this project because of the instruction I was
5 given that Dr. McNulty be involved, I did not include --
6 Q   Do you recall --
7       **COURT REPORTER:** I can't hear you,
8 Mr. Brewer.
9       **THE WITNESS:** I'm sorry.
10    I did not include Shawn Burgess in this
11    decision because of the direction that I was
12    given to work through Dr. McNulty, so she was
13    not involved.
14 **BY MR. WALKER:**
15 Q   And you're saying this Board told you to work
16 through Mr. McNulty -- Dr. McNulty?
17 A   Said for me to give him a call and make sure he was
18 aware of what we were doing and keeping him abreast of
19 the things we were looking at cutting.
20 Q   I can look for a board minute that said that. Have
21 you seen such a board minute?
22 A   I -- I hadn't.
23    Says what?
24 Q   That says what you said, that you are supposed to
25 have Dr. McNulty involved in these decisions. Is there

Case 4:18-cv-00508-DPM   Document 33-5   Filed 06/18/20   Page 6 of 16

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

### Page 73

1  any board minute that says that?
2  A  I don't know.
3  Q  All right. Now, with respect to the Board, you said
4  the Board directed you to make these cuts?
5  A  I assumed it was me and Dr. Warren both.
6  Q  Just a moment, listen to what I said. Let me talk.
7     Did you say that the Board directed you to do it?
8  A  I took it the Board meant for me and Dr. Warren to
9  both take a look at cuts. Dr. Warren was not here; I
10 felt like I couldn't get it done in one day, so I went
11 ahead and talked to Dr. McNulty. I didn't have his
12 number. I called Dr. Remele to get his phone number.
13 Q  Just answer my question.
14 A  I'm trying to answer it.
15 Q  My question was did you state that the Board
16 directed you to make these cuts?
17    HEARING OFFICER: He's already --
18    THE WITNESS: I didn't -- I didn't say it,
19    but they actually did.
20 BY MR. WALKER:
21 Q  All right. Now, was Dr. Warren present at the
22 meeting where they asked you to do it?
23 A  She was.
24 Q  I see.
25    Did they -- did she they tell them that she couldn't

### Page 74

1  do it?
2  A  I didn't hear her say she couldn't do it.
3  Q  Did you have any discussion with her at all
4  regarding any cuts? Yes or no?
5  A  After she got back the following week.
6  Q  Did you before she left?
7  A  No. I did not.
8  Q  After the board meeting the next day, did you talk
9  to her about it?
10 A  No. She was not here.
11 Q  Okay. Tell me this, did you develop any written
12 standards for cuts?
13 A  No.
14 Q  All right. Did you have any documents on which you
15 relied for determining how much and how many you would
16 cut?
17 A  No.
18 Q  So it was arbitrary on your part?
19 A  Arbitrary on whatever cuts we could handle, however
20 Dr. McNulty wanted to do it.
21 Q  I see.
22    Now, did you have any -- anything in writing from
23 Dr. McNulty saying what he wanted?
24 A  I do not.
25 Q  I see.

### Page 75

1  Did you send him any documents setting out what you
2  were doing?
3  A  Sent him job descriptions. He wrote back and took a
4  look at the job descriptions and what changes he might
5  want to make to them.
6  Q  Do you recall we've asked you for all the documents
7  between you and McNulty? Did you provide those to us?
8  A  I didn't know you asked for them.
9  Q  I asked for everything.
10 A  I could give you the job description. I didn't know
11 that you asked for them.
12 Q  We have the job description.
13 A  Yes. All right.
14 Q  You said he wrote you back? Do you have any other
15 communication that you --
16 A  He didn't write me back. He sent back through a fax
17 that he reviewed and made notes on there of the changes
18 he wanted to make on the job descriptions.
19 Q  I see.
20    Now, did you -- did, to your knowledge, Dr. Warren
21 talk to Dr. McNulty?
22 A  I would assume she has. I don't --
23 Q  Has she talked to him with you present?
24 A  I don't think so.
25 Q  All right.

### Page 76

1  A  I don't recall it if she did.
2  Q  Now, Mr. Brewer, you know that you have a RIF
3  policy; right?
4  A  We do.
5  Q  And on the allocations there is a form that says --
6  on the form -- there is a form that says, allocations of
7  freeze; is that correct?
8  A  No.
9     Well, some positions are frozen. All the positions
10 in any hiring down here is frozen. We were instructed
11 that there would be no -- there would be a -- I think the
12 Board minutes read that there is a temporary hiring
13 freeze for the Central Office between now and when
14 Dr. McNulty gets here.
15    MR. WALKER: I would like to -- I would
16    like to have these passed out -- can you do
17    it -- to the board members.
18    HEARING OFFICER: Just go right ahead and
19    pass them out.
20    MR. WALKER: I'll let them be passed. I
21    don't want to slip and fall.
22    HEARING OFFICER: John, there's not enough
23    of these. We need two more.
24    MR. WALKER: Mr. Bequette, would you be
25    kind enough to share yours with this witness?

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

1  THE WITNESS: What have you got?
2  MR. BEQUETTE: I don't know.
3  THE WITNESS: Oh, well --
4  BY MR. WALKER:
5  Q   All right. Mr. Brewer, I'm going to go over these
6  exhibits with you.
7  A   Okay.
8  Q   Are you familiar with exhibit, which is marked at
9  the top, one, Powers and Duties of the Board?
10 A   I would say I'm somewhat familiar, as long as I've
11 been in the school district. Powers and Duties of the
12 Board.
13 Q   Can you tell -- can you tell me what this document
14 is? 1.7?
15 A   It's the Powers and Duties of the Board; legal
16 references, it gives that. I don't know if it's from a
17 school board association. I'm not really sure where it
18 came from.
19 Q   It's also in your policy. Isn't it?
20 A   It is.
21 Q   All right. The next page is 1.31. That's another
22 one of your policies. Isn't it?
23 A   I'll take your word for it. I don't have anything
24 in front of me.
25 Q   Look at the top of the page?

1  A   Yeah. School Board Member Code of Ethics.
2  Q   You're aware that under the -- in the blackened
3  areas, the Board is to "Function as a part of the
4  legislative policy making body-not as an administrative
5  officer." It's to "work through the administrative
6  employees of the Board-not over or around them." Can't
7  have secret sessions. Are you aware of that?
8  A   Sure.
9      Yes. I'm sorry.
10 Q   This is the Reduction in Force Policy?
11 A   This is the what?
12 Q   Reduction in Force Policy.
13 A   Oh, I'm sorry.
14     Yes.
15 Q   Now, part of your document -- part of your document
16 with reductions has in it reduction in force; is that
17 right?
18 A   Yes.
19 Q   Under your Reduction in Force Policy, isn't it true
20 that if you're going to have a reduction in force policy,
21 that you have to deal with all of the employees and then
22 have objective standards before you do so?
23 A   In the -- in the place of a true RIF, that's true.
24 Q   All right. Now, when you had on your certified
25 allocations the term "RIF," what did you refer to? Was

1  it a true RIF or an untrue RIF, if there is such a thing?
2  A   If it said -- if it says on the allocation true --
3  "RIF delete," that means the job was non-renewed and that
4  job was deleted from all allocations.
5  Q   Well, there is nothing in your policy that says
6  that, though; is there?
7  A   No.
8  Q   Here are the allocations -- do you have the
9  allocation?
10 A   No.
11 Q   All right. This is -- let me make sure we -- you
12 don't think I'm deceiving you.
13 A   No. I know what it said. I can tell you.
14 Q   All right. Call your attention to the allocations.
15     HEARING OFFICER: Are you showing him
16     something that the record needs to know what it
17     is?
18     THE WITNESS: He's showing me a copy of
19     the allocations we're using for a question
20     here.
21     All of our RIFs -- all of your --
22     HEARING OFFICER: Well, Mr. Walker, do you
23     have that in your exhibits?
24     MR. WALKER: Yes, it's in there.
25     HEARING OFFICER: Okay. What number is

1  it?
2      MS. WARD: Seventeen.
3      HEARING OFFICER: Okay.
4  BY MR. WALKER:
5  Q   All right. We have on Page 4 of the allocations,
6  Director of Elementary Education, RIF, Director of
7  Secondary Education, RIF, and pro --
8  A   Right.
9  Q   You knew that wasn't a RIF. Didn't you?
10 A   Yes.
11 Q   Because you knew you had already received a
12 resignation of those two people?
13 A   It wouldn't have mattered.
14 Q   Yeah, but you have a RIF --
15 A   We are RIF'ing it -- no, we're not RIF'ing it. We
16 are freezing it, because the Board might want to bring it
17 back in the future.
18 Q   All right. So it's RIF -- you've got a RIF and a
19 freeze; right?
20 A   That's correct.
21 Q   So RIF and in parenthesis freeze, they mean the same
22 thing; right?
23 A   Freeze means we're not going to hire them back as a
24 part of this allocation. It would take Board action and
25 recommendation of a Superintendent.

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

### Page 81

```
 1  Q   Now, these program administrators are on Page 6;
 2      isn't that correct?
 3  A   That's correct.
 4  Q   That source of funding is what?
 5  A   NSLA.
 6  Q   This budget that Ms. Denise Palmer prepared does not
 7      involve NSLA, does it -- funding, does it?
 8  A   I -- I don't know.
 9  Q   You don't know? You're the person who made these
10      decisions.
11  A   About the NSLA?
12  Q   No. No. You're the person who made the
13      recommendations to the Board. The one-page document.
14  A   Oh, that.
15  Q   It's Exhibit 5.
16      Now, this -- this says nothing about NSLA. Does it?
17  A   That's correct.
18  Q   Now, how much -- how much money did you save by
19      cutting these teachers who were being paid out of NSLA?
20  A   Five -- I'm going to say around 500,000.
21  Q   All right. But it didn't come from the operating
22      budget over here. Did it?
23  A   No, I didn't -- that wasn't part of my thinking. I
24      was just cutting the -- I was --
25  Q   Now, that -- now, if that money is not spent, what
```

### Page 82

```
 1      happens to it?
 2      You lose it. Don't you?
 3  A   I don't think we lose it.
 4  Q   You don't?
 5  A   I think it's reallocated where you can use some of
 6      the district funds instead of using the NSLA funds.
 7  Q   But you don't know that. Do you, Mr. Brewer?
 8  A   I've got a pretty good idea. I've been doing it for
 9      20 years.
10  Q   All right. Well, let me ask. If you're going to do
11      that, if you're going to cut people, why did you
12      submit -- why did you submit this document through
13      Ms. Palmer in justification of your cuts when it has
14      nothing to do with NSLA funds?
15  A   Has to do with saving money.
16  Q   Well, how much money did you set out to save?
17  A   As much as we could and still --
18  Q   How much is that, Mr. Brewer?
19  A   As much as --
20  Q   $100 or $10 million? How much was it?
21  A   It ended up -- it ended up being, if we left all the
22      RIFs as it was, about 1.2 million.
23  Q   If you had? How much was it, Mr. Brewer, in the
24      final analysis?
25  A   That's about where it is now.
```

### Page 83

```
 1  Q   I see.
 2  A   Unless he doesn't hire anybody back. If he hires
 3      people back, then you have to subtract it for that
 4      amount.
 5  Q   How much of that comes out of NSLA funds?
 6  A   None of mine. None of my salary. I'm not paid out
 7      of NSLA funds.
 8      Dr. Tackett, I don't think, is paid out of NSLA
 9      funds.
10  Q   All right. Did you ever have a discussion with
11      Dr. Warren about how you could -- how you could
12      effectuate these cuts?
13  A   How I could do what?
14  Q   How the cuts -- how the budget reductions that may
15      have been desired could have been effectuated? Did you
16      ever have such a discussion with her?
17  A   We discussed that when she got back.
18  Q   Well, tell me what day was that, sir?
19  A   Tuesday.
20  Q   Was that before the Board meeting?
21  A   The following -- no, the following --
22  Q   Was that before this Board meeting?
23  A   The day before.
24  Q   Did she tell you that she didn't agree with you?
25  A   She did.
```

### Page 84

```
 1  Q   Did you tell her why you did it?
 2  A   I did.
 3  Q   Did she tell you she still didn't agree with it
 4      after you told her?
 5  A   She did.
 6  Q   All right. Now, you were aware that -- you had
 7      already prepared --
 8  A   Now, she didn't disagree with me cutting my salary,
 9      I didn't hear her say that; but she did disagree with the
10      other.
11  Q   All right. She told you also it wasn't necessary to
12      reduce the district's budget by $1 million to cut these
13      people. Didn't she?
14  A   What Dr. Warren --
15  Q   Didn't she tell you that?
16          HEARING OFFICER: Let him -- let him
17      answer, Mr. Walker.
18  BY MR. WALKER:
19  Q   Go ahead if you want to answer.
20  A   What we discussed was that it would be much better
21      for him to left everything in place and then recut it
22      next year, if he chose to do it or resign. Now,
23      that's -- that's Administration 101. If you take on a
24      new job, you don't want to go in there and start changing
25      things before you get in there, but he wanted a chance to
```

**Page 85**

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; NICOLE TOWNSEND, 06/11/2018

1  have a start of these folks the way he may want to
2  implement his program.
3  Q   Did you get a call from Dr. McNulty asking you to
4  make budget cuts?
5  A   No.
6  Q   So the call that -- that you had with Mr. McNulty --
7  Dr. McNulty, was generated by this Board. Wasn't it?
8  A   I was directed to make sure he was included.
9  Q   I see.
10     Now, did this Board ever tell you how much in cuts
11 you were to effectuate?
12 A   No.
13 Q   Well, it could have been a hundred dollars or a
14 thousand dollars?
15 A   Could have been $50, could have been 12 million.
16 Q   I see.
17     Now let's go on to the next exhibit.
18 A   Where are we at?
19 Q   Under the RIF, under the RIF Policy, the RIF policy
20 says, "The Executive Director" -- this is No. 2 in the
21 RIF policy, "The Executive Director of Human Resources
22 will provide the Superintendent with a list of
23 administrators in the administrative position(s) to be
24 reduced ranked by administrative seniority.
25     "The list prepared in item two (2) will be used to

**Page 86**

1  identify the person(s) with the least seniority within
2  each administrative position that will be affected by the
3  District's layoff."
4      Now, did you -- did you provide such a list?
5  A   We have such a list and --
6  Q   Did you provide -- prepare such a list?
7  A   We all -- we constantly have a list.
8  Q   No --
9  A   But these were nonrenewals; these were not RIFs.
10 Q   It doesn't matter. Did you prepare a list for RIF?
11 A   We keep a list for RIF. We constantly -- we're
12 constantly updating it.
13 Q   Well, just a moment.
14     Did you prepare, on instructions from the Board, a
15 list of the people to be considered for RIF?
16 A   No, because we wasn't looking at RIF then.
17 Q   Well, this document you have a dozen positions that
18 are called RIFs. Don't you? Let me go over them and
19 make sure, other than the ones we've covered.
20     Page --
21 A   Are you looking at the RIF policy or what are you --
22 Q   I'm looking at the allocations.
23 A   Allocation?
24 Q   Yes.
25 A   It will say "RIF freeze," which means we're not

**Page 87**

1  going to hire; it will say "RIF delete," which means that
2  job disappears.
3  Q   Oh, so you -- was it necessary -- tell me this: Why
4  was it necessary -- since it wasn't district money, why
5  was it necessary to have the jobs for these program
6  administrators to disappear?
7  A   So that he could rehire them under a different
8  program. That was his reasoning.
9  Q   His reasoning?
10 A   Uh-huh.
11 Q   Was that in writing anywhere?
12 A   I hope not. Not that I'm aware of.
13 Q   Why do you hope not?
14 A   Well, because it -- it was his philosophy, what he
15 wanted, what I was following direction of the Board.
16         THE WITNESS: Can you hear me?
17         COURT REPORTER: Yes, sir.
18         THE WITNESS: Okay.
19 BY MR. WALKER:
20 Q   You were following the Board -- directions of the
21 Board?
22 A   To look at cost savings out of Central Office where
23 we could find money to cut savings.
24 Q   Well, now, the NSLA money doesn't go to any
25 expenditure of the Central Office. Does it?

**Page 88**

1  A   It does with the hiring of these individuals here.
2  Q   That's not included in your budget.
3  A   It's got to be in the budget somewhere on federal
4  money. Money is money, I mean.
5  Q   But Ms. Palmer -- you heard Ms. Palmer say it's not
6  included in this. Didn't you?
7  A   I think that's what she said.
8         THE WITNESS: Isn't that what you said?
9         MS. PALMER: It's in the projected budget
10        section --
11        COURT REPORTER: I'm having trouble
12        hearing Mr. Walker.
13        HEARING OFFICER: Mr. Walker, either move
14        your table this way some or -- or -- there you
15        go, maybe sit up. We're -- this wall is
16        blocking you.
17        MR. WALKER: All right. I'll speak up.
18        I'll speak up.
19        HEARING OFFICER: Okay.
20 BY MR. WALKER:
21 Q   On Page 7, there is another position here, I don't
22 know what it is, but it addresses Dr. Warren. And I
23 don't guess you feel that your -- it says -- I guess this
24 was anticipated. It says "new" and then "RIF" and then
25 "contract". What does that mean?

Case 4:18-cv-00508-DPM   Document 33-5   Filed 06/18/20   Page 10 of 16

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

**Page 89**

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; NICOLE TOWNSEND, 06/11/2018

1  A   I don't have that document in front of me. If I
2  could --
3  Q   Look on Page 7 of your document.
4  A   I don't have a document.
5  Q   Here you go. You've got it up there.
6  A   Oh, I do?
7  Q   Yeah.
8  A   I guess I have everything up here.
9       Is that on the allocations?
10          MS. SPRINGER: Yes.
11          MR. WALKER: Yes.
12          THE WITNESS: I don't see the allocations
13      in this packet.
14          MS. SPRINGER: Underneath that.
15          THE WITNESS: Oh, under here?
16          MS. SPRINGER: Right here.
17          THE WITNESS: No. That's not allocations.
18      If I could just take a quick look at what
19      you have.
20          MR. WALKER: Here, give him this one.
21  BY MR. WALKER:
22  Q   Go to Dr. Warren. Now hers is the only one that
23  says those three things, and it seems to give you the
24  option --
25  A   What page are you looking at?

**Page 90**

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; NICOLE TOWNSEND, 06/11/2018

1  Q   Page 7, I think it is.
2       It seems to give you the options to reduce her,
3  terminate her, or freeze her.
4       Do you see Dr. Warren's allocation?
5  A   Department Specialty Programs, Learning Services,
6  recommended by John -- or Janice Warren, April 2nd.
7  Q   No, look at the one where Dr. Warren's position is,
8  and it says "RIF" at bottom?
9           HEARING OFFICER: You-all need to show
10      each other what you're looking at what, because
11      what I'm --
12          MS. GILLEN: I don't know what he's
13      talking about.
14          HEARING OFFICER: We don't know what
15      you're talking about.
16          THE WITNESS: Are you talking about
17      Dr. Warren's position?
18  BY MR. WALKER:
19  Q   Yeah, that's right. Let me show you. See --
20  A   That's Page 4 -- 3.
21  Q   You said that's three -- that's 8.
22  A   That's Page 3.
23  Q   That's Page 8?
24          HEARING OFFICER: So what page are you-all
25      on?

**Page 91**

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; NICOLE TOWNSEND, 06/11/2018

1  BY MR. WALKER:
2  Q   Page 8. And it says, this is position and titles,
3  it has Learning Services, then you had anticipated that
4  there were going to be some positions new, RIF, contract?
5           HEARING OFFICER: Okay. Now, wait a
6       minute. It's important for the record, Page 8
7       says, Department Elementary Principal --
8           MR. WALKER: That's right.
9           HEARING OFFICER: -- recommended by Janice
10      Warren?
11          MR. WALKER: That's the one.
12          HEARING OFFICER: Is that the page you're
13      on?
14          MR. WALKER: That's the page I'm on, but
15      there are no recommendations.
16          MR. BEQUETTE: Object to the relevance of
17      this line of questioning.
18          THE WITNESS: Let me -- can I explain it?
19      Hopefully this will clarify it.
20          MR. WALKER: No. Just a moment. Let me
21      ask you --
22          HEARING OFFICER: Well, Mr. Walker, what's
23      the relevance?
24          MR. WALKER: Beg your pardon?
25          HEARING OFFICER: What's the relevance

**Page 92**

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEARD; NICOLE TOWNSEND, 06/11/2018

1  here?
2           MR. WALKER: The relevance here is to show
3       that they anticipated RIFs.
4           THE WITNESS: Can I clarify?
5           HEARING OFFICER: Then --
6           MR. WALKER: And since RIFs were
7       anticipated, it is pretty clear that they
8       didn't follow the RIF policy or even consider
9       it.
10          HEARING OFFICER: Okay. Let's let Mr. --
11          THE WITNESS: Okay. If you look on Page 8
12      under position and title --
13          HEARING OFFICER: -- Brewer explain.
14          THE WITNESS: -- source of funding, salary
15      schedule range, and then it says, position,
16      new, RIF, contract length, classified,
17      transferred, no change, that's the reference
18      point of what we're actually going to put down
19      there as one of the --
20          HEARING OFFICER: One of those, rather
21      those are your choices?
22          THE WITNESS: That's right.
23          And underneath there Dr. Warren has
24      recommended 13 -- 16 principals, an ABC
25      Pre-School Principal/Director; and Assistant

Pulaski County Special School District v. Kiffany Pride, et al.
June 11, 2018

**Page 93**

1  Principals, 10; funding change, the funding
2  source is Teacher Salary, for the ABC person is
3  the ABC Grant, and for the Assistant Principals
4  is Teacher Salary. And it is --
5  **HEARING OFFICER:** Okay. Let me ask you
6  this: Where it says position, comment, are
7  those all the possible choices?
8  **THE WITNESS:** Yes.
9  **HEARING OFFICER:** Okay. So --
10 **THE WITNESS:** So if we were going to have
11 RIFs or anything else over there, they would
12 have been listed over there.
13 **HEARING OFFICER:** They would have been
14 circled or --or --
15 **THE WITNESS:** It would have been listed,
16 what positions --
17 **HEARING OFFICER:** Okay. Those are just
18 the options?
19 **THE WITNESS:** Those are allocations,
20 that's what we're going to hire, because every
21 school has got to have a principal.
22 BY MR. WALKER:
23 Q  Now, let me ask you, Mr. Brewer, in your efforts to
24 reduce staff, did you take action to maintain a racially
25 balanced certified staff?

**Page 95**

1  Page 135, No. 1?
2  **HEARING OFFICER:** Okay. Mr. Walker, let
3  me see if I can cut through some of this.
4  Let me -- let me ask Mr. Brewer something.
5  Mr. Brewer, is what you're saying is the
6  Board directed you-all to look at Central
7  Office staff and see what you could reduce?
8  **THE WITNESS:** (Nodding head up and down.)
9  **HEARING OFFICER:** And this was the result
10 of your seeing what you could reduce?
11 **THE WITNESS:** Yes.
12 **HEARING OFFICER:** Not just these four
13 people, but these four people plus --
14 **THE WITNESS:** Plus myself, Danny Ebbs,
15 John Tackett, Dr. Goodwin, who are all
16 basically Caucasian.
17 **HEARING OFFICER:** Okay. And so you're not
18 looking at a district-wide RIF; you're looking
19 at --
20 **THE WITNESS:** Central Office.
21 **HEARING OFFICER:** -- Central Office, how
22 to reduce the staff in Central Office, per what
23 the Board is wanting to do?
24 **THE WITNESS:** Yes.
25 **HEARING OFFICER:** Okay.

**Page 94**

1  A  We always do that. Yes.
2  Q  Did you do it in these RIFs that affected these four
3  people?
4  A  We did.
5  Q  Isn't it true that the program administrators, these
6  three, Beasley, Townsend, and Pride, worked at the
7  elementary schools and they were the only program
8  administrators?
9  A  No. There was five.
10 Q  There were five?
11    There were two, but were the two other program
12 administrators in the elementary schools?
13 A  Some were secondary, some were --
14 Q  How many were secondary?
15 A  I don't know for sure.
16 Q  Two. And weren't these -- were not these persons in
17 the elementary section, and you recommended that all of
18 them in the elementary section be -- be eliminated?
19 A  I recommended all of them be eliminated --
20 Q  Well, I understand.
21 A  -- secondary and elementary.
22 Q  Well, how does that maintain a racially balanced
23 certified staff, where you have an objective -- the Board
24 has an objective that was required by the Board to seek
25 to recruit and retain identifiable minorities -- that's

**Page 96**

1  BY MR. WALKER:
2  Q  Well, Mr. Brewer, that's not true, is it? You
3  didn't -- you didn't affect your own office, other than
4  yourself. Did you?
5     You didn't -- you have -- you have a number of
6  people --
7  A  We have -- we had one that we cut, but we're hoping
8  to get it replaced back by Dr. McNulty.
9  Q  Just a minute.
10    You have a number of employees who report through
11 Ms. Burgess to you. Don't you?
12 A  We have five --
13 Q  Yes or no?
14 A  Okay. Ask -- ask your question --
15 Q  You have a number of persons who report to you in
16 the personnel department. Don't you?
17 A  All of them do.
18 Q  All right. And it's at these five. Isn't that
19 correct?
20 A  (Nodding head up and down.)
21 **HEARING OFFICER:** Say yes or no,
22 Mr. Brewer.
23 **THE WITNESS:** Yes.
24 BY MR. WALKER:
25 Q  All right. And you didn't recommend -- you didn't

Case 4:18-cv-00508-DPM   Document 33-5   Filed 06/18/20   Page 12 of 16

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BREWER; NICOLE TOWNSEND, 06/11/2018 — Page 97

1 recommend that any of them lose their jobs. Did you?
2 A   I did.
3 Q   Which one?
4 A   Terri Williams.
5 Q   All right. Terri Williams. Was he [sic] a
6 full-time employee?
7 A   Yes.
8 Q   She has been -- she has been out of your office for
9 a long time. Hasn't she?
10 A   I'm well aware of that. The whole year.
11 Q   Okay. So at the time, of the current employees who
12 are on a regular basis, you did not recommend that any of
13 them be cut. Did you?
14 A   Of our staff?
15 Q   Yes.
16 A   We've cut two out in the last three years.
17 Q   In -- in this particular --
18 A   No.
19    I do hope to get to replace the one we did cut.
20 Q   Now, you told this Board before -- do you recall, on
21 April 19th, you said all of these cuts were made in
22 consultation with Mr. John Tackett?
23 A   No.
24 Q   Dr. Tackett?
25 A   No.

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BREWER; NICOLE TOWNSEND, 06/11/2018 — Page 98

1 Q   And you said they were made in consultation with
2 Mr. Will Reid. Didn't you?
3 A   They both discussed it with me. They had nothing to
4 do with the decision.
5 Q   Here is what I recall you saying, and I listened
6 carefully. I went and I talked to them and we discussed
7 these cuts.
8 A   I didn't go and talk to them. They came to my
9 office and asked if they could visit with me.
10 Q   All right. So you went and consulted with them --
11 A   No.
12    HEARING OFFICER: No, Mr. Walker.
13    THE WITNESS: No. They came to me after
14    the --
15    HEARING OFFICER: Mr. Walker, stop. Stop.
16    Mr. Walker, when you ask a question, let
17    Mr. Brewer finish his answer before you ask
18    your next question.
19    MR. WALKER: In all due respect, you don't
20    have to yell at me.
21    HEARING OFFICER: Do what?
22    MR. WALKER: In all due respect, you don't
23    have to yell at me.
24    HEARING OFFICER: I'm sorry. I couldn't
25    make myself heard.

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BREWER; NICOLE TOWNSEND, 06/11/2018 — Page 99

1    MR. WALKER: And you know we made that
2    same objection with Mr. Kemp.
3 BY MR. WALKER:
4 Q   Now, you -- you have a lot of people in Central
5 Office that you like?
6 A   Not near as many as we used to have.
7 Q   You have a couple of hundred. Don't you?
8 A   No.
9 Q   How many people are at the Central Office?
10 A   I would guess right at 90 -- between 90 and 100.
11 Q   All right. But now the core, the people who address
12 the educational component of the district are the program
13 administrators; aren't they?
14 A   I would say to some degree it's everybody that works
15 in this office.
16 Q   I understand, but the ones who have direct
17 responsibility for curriculum are the program
18 administrators. Isn't that correct?
19 A   Yes. I would say that's not the only ones, but
20 those are certainly the major.
21 Q   Those are the ones -- those are the ones you cut;
22 isn't that correct?
23 A   It's the ones we recommended that their jobs be cut
24 so we can look at restructuring.
25 Q   Now, look, of that group you have six people -- five

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BREWER; NICOLE TOWNSEND, 06/11/2018 — Page 100

1 people?
2 A   Five.
3 Q   And it was -- it was a majority African-American.
4 Wasn't it?
5 A   Three to two.
6 Q   That's right.
7    MR. BEQUETTE: Objection. This is
8    repetitive --
9 BY MR. WALKER:
10 Q   And in the district --
11    MR. BEQUETTE: -- and it's argumentative.
12    HEARING OFFICER: Okay. Mr. Walker, you
13    told me earlier at the beginning when I asked
14    you that you weren't complaining about these
15    people being selected for an impermissible
16    reason --
17    MR. WALKER: No.
18    HEARING OFFICER: -- but it was the
19    process that you were having a problem with.
20    MR. WALKER: No. No. I told you also
21    that they had commitments that weren't being
22    followed.
23    MR. BEQUETTE: Well, that's in the deseg
24    case.
25    HEARING OFFICER: Okay. Okay. Wait just

**Page 101**

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY;
NICOLE TOWNSEND, 06/11/2018

1  a minute. That would be a process issue.
2      MR. WALKER: Now, just a moment. We've
3  got an exhibit before you. Part of the RIF
4  policy that has been approved by the Board
5  requires --
6      HEARING OFFICER: Okay. But he's just
7  said, we've just talked about that this is not
8  a RIF.
9      MR. WALKER: Well, he said it isn't but
10 it's whatever he wants it to be.
11     MR. BEQUETTE: Well, at this point he's
12 beating a dead horse.
13     HEARING OFFICER: Well, you can make that
14 argument.
15     MR. BEQUETTE: I mean this is repetitive.
16     HEARING OFFICER: You can make that
17 argument in your closing that it isn't what he
18 says it is.
19     MR. WALKER: All right. Look, look, look,
20 we've been on this --
21     HEARING OFFICER: I don't mean to -- I
22 don't mean to shortcut you and I don't want to
23 shortcut you, but I don't want to beat a dead
24 horse either.
25     MR. WALKER: Well, tell me this -- if it's

**Page 102**

1  part of the RIF policy, if this is part of the
2  RIF policy, you cannot go in and RIF people who
3  are of a certain -- of a certain
4  characteristic, that what you are seeking to
5  have them maintain and increase, and -- and
6  then say we don't have to follow this policy,
7  our own policy, and it's in your policy manual.
8      HEARING OFFICER: So your objection to
9  this tonight would be because it doesn't follow
10 deseg, not because it didn't follow process?
11     MR. WALKER: Well, also remember, the
12 policy -- the law requires that he cannot make
13 decisions on an arbitrary basis.
14     HEARING OFFICER: Well --
15     MR. WALKER: Now, he's told you in no
16 uncertain terms that his decisions were
17 arbitrary.
18     HEARING OFFICER: Well, ask him what basis
19 he did make it on.
20     MR. WALKER: I did. And he said -- first
21 of all I asked, Ms. Streett, if he had any
22 written standards and he said, no, it was then
23 that he just came up with something. And then
24 I asked him what were they and he couldn't --
25 he just said, I need to cut some money, and

**Page 103**

1  didn't know how much.
2      But let me ask the question.
3  BY MR. WALKER:
4  Q  Did you have any standards that you followed before
5  you took undertook this process?
6      MR. BEQUETTE: This has been asked and
7  answered. This is repetitive.
8      MR. WALKER: Well, no, let -- you asked
9  and answered to some degree --
10     HEARING OFFICER: Let Mr. Brewer state it
11 again.
12     How did you decide on the people that you
13 RIF'ed -- I mean, excuse me -- the people that
14 you decided to put on this list.
15     THE WITNESS: We looked at positions --
16 number one, we looked at positions that could
17 be consolidated.
18     HEARING OFFICER: Okay. There is one
19 criteria.
20     THE WITNESS: Yeah.
21     We also looked at jobs that maybe could be
22 done in less time than a full year, that could
23 be a substantial savings.
24     HEARING OFFICER: To reduce the amount of
25 days on a contract?

**Page 104**

1      THE WITNESS: Days.
2      We consolidated a couple of directors
3  positions into one position. I've already said
4  that, haven't I?
5      We cut the CEO of the district back to an
6  Assistant Superintendent, whoever that person
7  might be. Okay? That's a substantial savings.
8      We cut the Director of Secondary
9  Education. We cut the Director of Elementary
10 Education, but we're reintroducing a Deputy
11 Superintendent, which is still a substantial
12 savings.
13     That was the criteria we used, along with
14 Dr. McNulty, as to he wanted the chance to
15 restructure how the curriculum and how these
16 jobs that these ladies had could be
17 restructured to fit more what he would want to
18 have. He wanted a chance to come in,
19 interview, and possibly hire all of them or
20 part of them, along with whatever the Board
21 would allow. That was my instructions.
22     I came back and presented that stuff here
23 at the Board, and the Board accepted those
24 recommendations.
25 BY MR. WALKER:

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 105

1  Q   Now, Will Reid had a department too there. Didn't
2  he? Technology?
3  A   Does he have a department? Yes.
4  Q   Yes. In the Central Office?
5  A   Yes.
6  Q   And he has 20 or 30 employees or more. Isn't that
7  correct?
8  A   Probably close to 20.
9  Q   Several of those people also give support to these
10 three -- these three people. Don't they?
11 A   They should. I don't know if they do.
12 Q   All right. But those support staff have been
13 retained by you, haven't they?
14 A   Support staff?
15 Q   Yes. The people who back them up in the schools,
16 they were retained?
17 A   He didn't cut anybody this year, that I'm aware of.
18 Q   He didn't -- you left it up to Mr. Reid to determine
19 who to cut?
20 A   No.
21 Q   So then why didn't you go to his department, since
22 you were dealing with the Central Office?
23 A   Because he had already had cuts in his department
24 the last three or four years.
25 Q   So -- so you were trying to balance this thing out

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 107

1  developed and implemented before school starts?
2  A   I certainly think so, yes.
3  Q   All right. Isn't the normal path for people who
4  work in their positions to be working on that now and
5  through the summer and that's why they are 12-month
6  employees?
7  A   That's correct.
8  Q   And they are now -- at least the students of the
9  district won't be able to have them there as of July 1?
10 A   Probably not July 1. Possibly the week after.
11 Q   Possibly. But you have to then go through a posting
12 procedure. Don't you?
13 A   Unless they are hired as interim.
14 Q   Oh, unless they are hired as interim, like you?
15 A   That's right.
16 Q   All right. But now, your district policy,
17 Mr. Brewer, is to go ahead and post those positions,
18 isn't it?
19         MR. BEQUETTE: Objection. This is
20 irrelevant.
21         MR. WALKER: It is not irrelevant. We're
22 showing basically how the district -- how
23 the -- how the Board triggered elimination
24 of -- of a role for persons where education
25 would be diminished for no good cause.

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 106

1  because some cuts that had been made in previous years
2  and, basically, when the Board told you to cut, you took
3  into account what you've already -- what had already been
4  done and you were just trying to get around to this
5  department because it had not been affected before?
6  A   That department had been affected before.
7  Q   Well then you're going and gutting it, because you
8  got rid of all them?
9  A   Not gutting it. My idea was that I thought he was
10 going to put some of them back.
11 Q   Okay. But as of now --
12 A   As of now they don't have a job.
13 Q   As of now it's all -- that department is the only
14 one in your whole Central Office that's entirely gutted,
15 isn't it?
16 A   It's not entirely gutted. We've still got people up
17 there.
18 Q   The fact is --
19         HEARING OFFICER: Let him answer. Let him
20 answer.
21 BY MR. WALKER:
22 Q   It was only program administrators who were removed;
23 isn't that correct?
24 A   That's correct.
25 Q   Now, isn't it necessary for curriculum to be

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 108

1  Now --
2          HEARING OFFICER: Well, I think that's
3  your argument, you can make that argument,
4  Mr. Walker --
5          MR. WALKER: Well, well --
6          HEARING OFFICER: -- but I think he's
7  given you some criteria that he used to choose
8  these positions.
9          MR. WALKER: He just came up with those.
10 He first said he didn't have any.
11 BY MR. WALKER:
12 Q   Now, my point, you didn't have any written criteria,
13 did you, Mr. Brewer? Just say --
14 A   I hope I did not. I don't have one today.
15 Q   That's right. And whatever come to mind is what you
16 said?
17 A   Whatever I -- whatever the direction of the Board
18 and the new Superintendent, and along with Dr. Warren
19 asked me to do, I can either do that or go to the house.
20 Q   But Dr. Warren didn't you give you any criteria.
21 Did she?
22 A   Not on this subject, no.
23 Q   That's right.
24 A   On a lot of other subjects --
25         HEARING OFFICER: Okay. Mr. Walker. I

Pulaski County Special School District v.
Kiffany Pride, et al.

June 11, 2018

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 109

1   think we've discussed that enough. Have you
2   got other questions?
3       **MR. WALKER:** Yes.
4       **HEARING OFFICER:** Okay.
5   BY MR. WALKER:
6   Q   Now, Mr. Brewer, do you recall telling me that you
7   have had individual conversations with some of the board
8   members?
9       **HEARING OFFICER:** Mr. Walker, we can't
10      hear you. I'm sorry.
11  BY MR. WALKER:
12  Q   Do you recall informing me that you had had a
13  conversation with some of the board members?
14  A   **No, I do not.**
15  Q   Are you saying that you have never spoken with
16  Ms. Alicia Gillen about any of these subjects?
17  A   **I am.**
18  Q   Okay. And none of the other board members?
19  A   **Not that I'm aware of individually. They talked to**
20  **me as a group about that.**
21  Q   Where? Where?
22  A   **Here.**
23  Q   In a -- in a public board meeting?
24  A   **Yes.**
25  Q   Other than on April 19th?

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 111

1   there is something you can do?
2   A   I met with them. I can't say what per se --
3       **THE WITNESS:** Can you hear me --
4       **COURT REPORTER:** (Nodding head up and
5       down.)
6       **THE WITNESS:** I don't remember exactly
7       what I said. I wanted them to know this was
8       certainly no job performance recommendation, it
9       wasn't anything against their job performance
10      here, it was strictly a restructuring of a new
11      Superintendent, and that's what they had a new
12      opportunity to do. But I did tell them I
13      certainly enjoyed working with them, I hoped
14      that all of them had an opportunity to come
15      back. But I'll certainly give them a
16      recommendation where ever they wanted to apply
17      and they need a recommendation.
18  BY MR. WALKER:
19  Q   Well, let me go ahead and ask you, did you discuss
20  Ms. Palmer's budget with her before you made the
21  recommended cuts?
22  A   **No. I heard her make the recommendation. I heard**
23  **her make the presentation to the Board meeting.**
24  Q   I see.
25      But you didn't discuss --

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 110

1   A   **April 10th.**
2   Q   April 10th?
3       All right. And you do acknowledge that your
4   decisions were somewhat arbitrary?
5   A   **Probably some. Not totally.**
6   Q   I see.
7       Do you understand that you cannot engage, in dealing
8   with employee decision making, you cannot engage in
9   arbitrary decision making?
10  A   **Well --**
11  Q   You understand that that's the law. Don't you?
12  A   **I understand that's not. I understand not the way**
13  **you're asking.**
14  Q   Okay. All right. Thank you.
15      Let me go to the rest of my exhibits here.
16      Did you -- did you tell the program administrators
17  that they could reapply for any position?
18  A   **They could. Anybody can be apply for any position**
19  **that they are qualified -- that are certified in.**
20  Q   Did you work with these persons in order to try to
21  get them other jobs?
22  A   **They haven't asked me.**
23  Q   Maybe they didn't ask but did you go to them and
24  say, we know you're important, we want to keep you,
25  Dr. McNulty may want to keep you, but we want to see if

PCSSD v KIFFANY PRIDE; LAURA SHIRLEY; JENNIFER BEASLEY; NICOLE TOWNSEND, 06/11/2018 — Page 112

1   A   **No.**
2   Q   -- the budget?
3       All right. Is it your testimony that McNulty told
4   you to non-renew these people? Yes or no?
5   A   **Well, it's not a yes or no question.**
6   Q   Did he tell you to non-renew these people?
7   A   **He told me what he would like to do, and I said, in**
8   **order to do that, I made sure that he understood that if**
9   **I give these ladies a letter that says, your job is**
10  **non-renewed, that they are basically losing their job.**
11  **He said, I understand that, but what I would like to do**
12  **is have the opportunity to come and visit with them --**
13  **and I think he did -- talk to them about possibly**
14  **rehiring them into a position similar to what they had**
15  **but maybe with a different structure.**
16      **And I think I've answered that three or four times**
17  **already.**
18  Q   All right. Let me ask you --
19  A   **So it's not a yes or no. He didn't say, yeah, y'all**
20  **get rid of these people. It wasn't quite like that.**
21  Q   Did you -- you indicated that he told you that -- to
22  see if some of the jobs could be consolidated?
23      **MR. BEQUETTE:** Objection. This is ground
24      that's already been plowed.
25      **MR. WALKER:** I have not finished my

Case 4:18-cv-00508-DPM   Document 33-5   Filed 06/18/20   Page 16 of 16

Pulaski County Special School District v.
Kiffany Pride, et al.
June 11, 2018

## Page 113

1 question.
2 BY MR. WALKER:
3 Q  Which jobs did you determine could be consolidated?
4       MR. BEQUETTE: Same objection.
5       THE WITNESS: The Elementary Director and
6   the Deputy Superintendent. You can eliminate
7   one of those because both of them have about --
8   approximately, the same job description.
9 BY MR. WALKER:
10 Q  Well, among the people, these program
11 administrators, have any of those jobs been consolidated?
12 A  Well, I don't know. I haven't looked at the --
13 talking about their job --
14 Q  Yes.
15 A  -- being eliminated? Possibly they could be part of
16 the restructure they he has in mind.
17 Q  Do you know what these people actually did,
18 Mr. Brewer?
19 A  Not day to day. I mean, I kind of knew their
20 responsibilities.
21       MR. WALKER: Thank you.
22       THE WITNESS: You're welcome.
23       MR. BEQUETTE: No further questions.
24       HEARING OFFICER: Any --
25       MR. BEQUETTE: That concludes the

## Page 114

1  district's presentation.
2       HEARING OFFICER: Mr. Walker, do you have
3   any witnesses?
4       MR. WALKER: Yes. Ms. Gillen.
5       HEARING OFFICER: We're not calling --
6       MR. BEQUETTE: We object to calling the
7   board members, any board members as witnesses.
8       HEARING OFFICER: We're not going to call
9   a board member.
10       MR. WALKER: If we could call Ms. Gillen
11  we would proffer that she was involved in the
12  beginning in August, in September, she was
13  involved with the Maumelle Chamber of Commerce.
14       MS. GILLEN: Is there an objection
15  standing?
16       HEARING OFFICER: Mr. Walker, the way a
17  proffer works is you can make that after the
18  meeting and you can put it in writing and we'll
19  put it in.
20       Have -- I need to -- I also need to look
21  at the Board rules to see if a proffer is even
22  appropriate for a board meeting, I'm not
23  familiar with any rule.
24       Can you call a witness that is going to
25  say what you want to put in from her?

## Page 115

1       MR. WALKER: I didn't understand you.
2       HEARING OFFICER: Is this just -- I mean,
3   have you got a witness?
4       MR. WALKER: I mean, I --
5       HEARING OFFICER: Other than her?
6       MR. WALKER: I have a -- I have the
7   documents and they are -- they are before the
8   Board.
9       HEARING OFFICER: Okay. Do you want to
10  tell us which documents we should look at?
11       MR. WALKER: Well, he --
12       MR. BEQUETTE: This sounds like argument.
13       HEARING OFFICER: I think it is, but he
14  says he's got an exhibit so I think he can
15  point out the exhibits.
16       MR. WALKER: I don't know how the exhibits
17  can sound like arguing, Mr. Bequette.
18       MR. BEQUETTE: Well, the argument --
19       HEARING OFFICER: That --
20       MR. WALKER: The exhibit here is Exhibit
21  5 -- Exhibit 5.
22       HEARING OFFICER: Okay. Mr. Walker, if
23  you've got -- No. 5?
24       MR. WALKER: Yes.
25       HEARING OFFICER: Okay. Anything else?

## Page 116

1       MR. WALKER: Since you are not allowing me
2   to call her at this time and I -- I'll call
3   Dr. Warren.
4       No, instead of Dr. Warren, Ms. --
5   Dr. Goodwin. I'm sorry.
6       EXAMINATION OF DR. LINDA GOODWIN
7 BY MR. WALKER:
8 Q  State your name, please.
9 A  Linda Goodwin.
10 Q  Ms. Goodwin, are you employed by the Pulaski County
11 Special School District?
12 A  Yes, sir.
13 Q  What is your capacity?
14 A  Interim Director of Elementary Education.
15 Q  Were you serving in that position during the month
16 of April of this year?
17 A  Yes, sir.
18 Q  Did you -- did Dr. -- did Mr. Brewer ever come to
19 you to discuss budget reductions with you --
20 A  No, sir.
21 Q  -- regarding the people in your --
22 A  No, sir.
23 Q  Were these program administrators -- look at the
24 Board. Were these program administrators working under
25 your supervision?