Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JENNIFER BEASLEY; DR. KIFFANY
PRIDE; LAURA SHIRLEY; and
NICOLE TOWNSEND,

        PLAINTIFFS,

VS.    NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools
of the Pulaski County Special School
District; PULASKI COUNTY SPECIAL SCHOOL
DISTRICT BOARD OF DIRECTORS; and
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
a public body corporate,

        DEFENDANTS.

---o---

DEPOSITION

OF

NICOLE TOWNSEND

---o---

TUESDAY, OCTOBER 8, 2019

---o---

Page 2

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

    JOHN WALKER, ESQUIRE
    JOY SPRINGER, Administrative Assistant
      John Walker Law Firm
      1723 South Broadway Street
      Little Rock, Arkansas 72206

ON BEHALF OF DEFENDANTS:
    W. CODY KEES, ESQUIRE
      Bequette and Billingsley
      425 West Capitol Avenue
      Suite 3200
      Little Rock, Arkansas 72201

ALSO PRESENT:
    MS. JENNIFER BEASLEY
    MS. SHAWN BURGESS

---o---

2

Page 3

INDEX

WITNESS:                      PAGE:

NICOLE TOWNSEND
    Direct Examination..............................  5

---o---

EXHIBITS

Exhibit One........................................  7

Exhibit Two........................................  7

---o---

Reporter's Certificate.............................  43

---o---

EXHIBIT 6

Page 4

```
 1        The deposition of Nicole Townsend was
 2   taken before me, Debbye L. Petre, Certified Court
 3   Reporter and notary public within and for the County
 4   of Pulaski, State of Arkansas, duly commissioned and
 5   acting, on Tuesday, October 8, 2019, beginning at the
 6   hour of 11:40 a.m., at the offices of John Walker Law
 7   Firm, 1723 South Broadway Street, Little Rock, Pulaski
 8   County, Arkansas.
 9        Said deposition being taken in
10   accordance with the Rules of Federal Procedure and
11   pursuant to the provisions of the Arkansas Rules of
12   Civil Procedure at instance of counsel for the
13   Defendants in the above-styled case in the United
14   States District Court, Eastern District of Arkansas,
15   Western Division.
16             ---o---
17        THEREUPON, the following proceedings were had,
18   to-wit:
19             ---o---
20
21
22
```

Page 5

1  PROCEEDINGS
2  WHEREUPON,
3  NICOLE TOWNSEND,
4  having been called for examination, and having been
5  first duly sworn, was examined and testified as
6  follows:
7  DIRECT EXAMINATION
8  BY MR. KEES:
9  Q   How are you, ma'am? My name is Cody Kees, and
10 we met earlier. I'm counsel for the district, I'm
11 going to take your deposition today. Okay?
12 A   Good morning. Okay.
13 Q   And you sat in on Ms. Beasley's deposition;
14 correct?
15 A   Yes.
16 Q   So, you know the ground rules, you saw all that?
17 A   Yes.
18 Q   Have you ever done a deposition before?
19 A   No.
20 Q   Have you ever been in a lawsuit before?
21 A   No.
22 Q   This is your first time to be a party to a
23 lawsuit?
24 A   Yes.
25 Q   And you are at Pine Bluff School District, now?

Page 6

1  A   No.
2  Q   I have a contract here for '18-'19?
3  A   I was. I was at it until June 30th.
4  Q   Okay. And what is the reason that you are no
5  longer at Pine Bluff?
6  A   So, they were doing some restructuring, they
7  RIFed pretty much everyone that was there. And then,
8  in the midst of me being RIFed, then it was so far
9  away, it was causing a hardship on my family, because
10 I don't have any family here. So, when it came to --
11 when they did the RIF, it was pretty much a done deal.
12 So, it was pretty much a hardship to go travel back
13 and forth, because the drive was like an hour and 15
14 minutes one way.
15 Q   Where do you live?
16 A   Maumelle.
17 Q   Maumelle. Okay.
18 A   Yeah.
19 Q   So, after your termination from the county, did
20 you get immediate employment at Pine Bluff?
21 A   No. That's when I started -- I reached out and
22 started applying, and I also started consulting, just
23 writing curriculum.
24 Q   But you went on contract, and it looks like here
25 -- and I will make this Exhibit Two, your contract at

Page 7

1  Pine Bluff.
2  A   Uh-huh. (Indicated yes.)
3  Q   You went on contract in August?
4  A   2018.
5  Q   August 17, 2018?
6  A   Yes.
7  Q   So, you had about a month and a half that you
8  were off contract with no contract with a school
9  district?
10 A   Correct.
11 Q   And your pay went from $79,795.71 to $58,521.92?
12 A   Correct.
13        MR. KEES: I will make Exhibit One as
14        your PCSSD contract the last year you were
15        there, and Exhibit Two will be your Pine
16        Bluff contract.
17        (WHEREUPON, Exhibits Numbered One and
18        Two were marked for identification.)
19 BY MR. KEES:
20 Q   Okay. So, you went off contract at Pine Bluff
21 June 30th of this summer?
22 A   Right.
23 Q   And what are you doing now?
24 A   So, I write curriculum for Ed Report, review
25 curriculum for Ed Report. So, that's what I'm doing

Page 8

1  right now.
2  Q   Is that on your CV?
3  A   I just recently started that contract.
4  Q   How do you spell that, Ed Report?
5  A   Ed, like E-D, R-E-P-O-R-T.
6  Q   Is that a private company, or what?
7  A   Nonprofit.
8  Q   And what do you do -- can you explain kind of
9  what you do for them?
10 A   Review instructional materials.
11 Q   And how are you paid?
12 A   It's based on stipends, based on how much work
13 you complete at that time. And so, I send them an
14 invoice once it's completed. And so, they send a
15 stipend for like $1,750.00 a series. And so, just
16 complete the first series.
17 Q   Do you anticipate your pay in that job being
18 equivalent to what you were making at Pine Bluff?
19 A   No, not at all.
20 Q   So, are you looking -- are you actively looking
21 for other positions in district?
22 A   Yes, I'm looking for positions in districts. My
23 greatest concern is just looking at my retirement.
24 Because just looking at the average five years, it
25 affects my retirement, as well.

Page 9

1  Q  Because you are not contributing right now?
2  A  I'm not contributing right now. But also, just
3  having to live off of that retirement that I did
4  contribute those couple of years. And so, as my
5  salary decreases, it affects my retirement in the long
6  run, as well. Because they are going to take the
7  average of five years of your salary. So, the lower
8  my salary is, it affects my retirement in the long
9  run, as well.
10 Q  Are you pulling from retirement right now?
11 A  I had to.
12 Q  To make up the difference?
13 A  Uh-huh. (Indicated yes.)
14 Q  So, since you left Pine Bluff this summer, what
15 jobs in education have you applied for?
16 A  Well, as far as what was available, there wasn't
17 really anything available as far as based on the
18 salary that I'm qualified for. I applied for one in
19 Little Rock School District. And so, once I started
20 consulting, I had to make certain I was able to keep
21 up with that. And so, I will be starting back looking
22 again -- actually, I'm currently looking now. And so,
23 I get my e-mails, I make sure I schedule my e-mails so
24 I get updates. So, right now, I'm just getting a lot
25 of classified positions and not certified.

Page 10

1  Q  So, you applied for a Little Rock position over
2  the summer?
3  A  Well, no. Because over the summer, I was
4  working. And so, once I finished my contract with
5  Pine Bluff -- once the contract ended with Pine Bluff
6  June 30th, that's when I received the contract with
7  Ed Report. And so, I looked at Little Rock School
8  District for employment, and it has been classified
9  positions.
10 Q  Okay. You haven't applied for -- after Pine
11 Bluff, you haven't applied for anything certified?
12 A  There has not been anything certified for me to
13 apply for. It has been classified.
14 Q  Well, besides -- I mean, there have been
15 teaching positions, but you are saying something that
16 you are more qualified for?
17 A  I haven't seen any certified positions for me to
18 apply for. I haven't.
19 Q  What is your certification in?
20 A  My certification is in mathematics and
21 administration.
22 Q  So, you can do, what, K-12 math, or what?
23 A  Yes.
24 Q  And there haven't been any K-12 math positions?
25 A  No. I'm 4-8 math.

Page 11

1  Q  4-8?
2  A  Yes. And K-12 certified administration --
3  school administration.
4  Q  Got it.
5  A  That's my experience.
6  Q  With those two certifications, you are saying
7  nothing has become available in the Little Rock area?
8  A  Right.
9  Q  What schools are you looking at?
10 A  I'm looking at the whole district.
11 Q  What about North Little Rock, is what I'm
12 saying, what districts?
13 A  All districts. I'm looking at all districts.
14 Q  North Little Rock?
15 A  North Little Rock, Little Rock School District,
16 Benton, Bryant.
17 Q  Are you looking at the county?
18 A  And PCSSD, yes.
19 Q  Okay.
20 A  I looked at them before I left, too.
21 Q  Right. Okay. So, you did apply for one of the
22 instructional specialists positions, instructional
23 strategist?
24 A  I applied for two positions.
25 Q  What two did you apply for?

Page 12

1  A  I applied for the elementary principal.
2  Q  And then, the instructional strategist?
3  A  Yes. I applied for the elementary principal
4  position first.
5  Q  Which elementary?
6  A  I think it was for Landmark. But, you know, the
7  superintendent can put you anywhere. But it was for
8  an elementary position.
9  Q  Yes.
10 A  I think it was Landmark.
11 Q  Were you an elementary principal prior?
12 A  I was elementary principal at the high school
13 level. I have K-12 experience.
14 Q  And then, did you get an interview for the
15 elementary principal?
16 A  I did. And it was May -- the interview was May
17 14th, I applied May 9th.
18 Q  Okay. That's when you were still on contract?
19 A  Yes. Ms. Alford --
20 Q  May 14th interview?
21 A  Yes. And Ms. Alford, Paul Brewer's secretary,
22 was the one that asked me to apply.
23 Q  Do you remember your interview committee?
24 A  Yes.
25 Q  Who were they?

Page 13

1  A   Ms. Burgess, Ms. Goodwin, Doctor Bell, and Sam
2  Althsul.
3  Q   Burgess, Goodwin?
4  A   I'm sorry. Ms. Burgess, Ms. Goodwin.
5  Q   Doctor Bell?
6  A   Doctor Bell, and Mr. Althsul.
7  Q   The Federal Programs gentleman?
8  A   Right. I think he was principal at the time,
9  but, yes.
10 Q   Althsul, A-L-T-H-S-U-L, is that who you are
11 talking about?
12 A   Yes.
13 Q   He would have been Federal Programs, wasn't he?
14 A   Yes. And Doctor Bell was principal at the time.
15 Q   Yes. That makes sense. So, there were four
16 members of the committee?
17 A   There might have been a fifth person. It was
18 Ms. Watson, Lisa Watson, that's who it was.
19 Q   Lisa Watson. And did somebody call and tell you
20 that you were not recommended for the position?
21 A   I received an e-mail.
22 Q   E-mail. Who got that position?
23 A   It wasn't me. I don't know.
24 Q   You don't know?
25 A   Yes.

Page 14

1  Q   And then, you also applied for the instructional
2  strategist?
3  A   Yes. I interviewed for that July 23rd.
4  Q   You heard Ms. Beasley talk about the two
5  meetings with Doctor McNulty?
6  A   Yes.
7  Q   And you attended one of those?
8  A   The April 30th on that Monday, yes.
9  Q   And anything about that meeting that Ms. Beasley
10 didn't recall? It sounded like it was pretty
11 straightforward, he explained the process. Anything
12 else that you recall?
13 A   It was a very uncomfortable meeting, because my
14 question was, what was his decision based off of.
15 Because prior to that meeting, Paul Brewer met with
16 us, and Paul Brewer shared with us that him, Doctor
17 Tackett, and it was someone else, consulted with the
18 new superintendent and the Board. And he told us
19 about our positions being cut.
20 Q   This is the one that you recorded the meeting?
21 A   No. This is the meeting prior to that meeting
22 with Doctor McNulty. This meeting happened before the
23 meeting with Doctor McNulty.
24 Q   Well, no. You are talking about Paul Brewer's
25 meeting?

Page 15

1  A   Uh-huh. (Indicated yes.)
2  Q   Like I have a recording, and I thought it was
3  from your discovery. I mean, it was recorded. I
4  don't care who did it.
5  A   That was a separate meeting. But the meeting we
6  had with him --
7  Q   Who are you talking about "him"?
8  A   The meeting we had with Doctor McNulty was an
9  extension from the meeting we had with Mr. Brewer.
10 Q   I got it. Now, Brewer is the one I got a
11 recording of. But I don't have a recording of
12 McNulty. So, that's why I'm asking, do you recall
13 recording Doctor McNulty's meeting?
14 A   I recall being in a meeting with Doctor McNulty.
15 And you asked me about the meeting, how I felt about
16 the meeting.
17 Q   Right.
18 A   And my answer is that I did not feel
19 comfortable, because I didn't feel comfortable from
20 the initial meeting from where it derived from. My
21 question to Mr. Brewer was, "Oh, so Doctor McNulty is
22 here now, and he is official?" And he said, "No."
23 And so, he reiterated he consulted with Doctor McNulty
24 and the Board and Doctor Tackett. And so, he shared
25 with us that he wanted to -- that was back -- that was

Page 16

1  in April. Then, when Doctor McNulty came to meet with
2  us --
3  Q   April 30th?
4  A   -- April 30th, that Monday, I didn't feel
5  comfortable because of the process. And so, my
6  question to Doctor McNulty was, "How did you base your
7  decision" -- "How were you able to make your decision
8  or base your decision on how the district or whatever
9  should be restructured?" I said to him -- he wanted
10 to meet with us knowing exactly who was going to be
11 cut how you would base your decision. He shared that
12 it was purely fiscal. And my question was, "Just so I
13 can get understanding, it wasn't based on data," but
14 if it's purely fiscal, I knew where my salary was
15 coming from, it wasn't from Operating. So, that's why
16 I asked the question again, "So, you are saying no
17 other way you made your decision, it was just purely
18 fiscal?" And he said, "Yes." And again, I felt
19 uncomfortable because I knew where my salary was
20 coming from, because I understand budget.
21 Q   You are talking about NSLA?
22 A   Yeah. It was not Operating.
23 Q   Did he even go into that at all?
24 A   Huh-uh. Because once he shared with me -- once
25 he gave me that answer, again it derived from, also,

Page 17

1    the meeting -- the Board meeting that we attended, and
2    then the article, and also what was shared based on
3    Mr. Brewer receiving directives to cut positions -- or
4    cut personnel, but not positions. And there was a
5    difference with the attrition.
6    Q    Okay.
7    A    And so, that's why I said I felt uncomfortable,
8    because Mr. Tackett was not my supervisor. And I know
9    there has always been some issues there. But, no. We
10   had the meeting, I didn't feel comfortable with it.
11   Q    What were you over, math?
12   A    Yes.
13   Q    Over K-12?
14   A    I'm over math, and then I ended up doing some of
15   the secondary, as well.
16   Q    Math for K-12?
17   A    Yeah.
18   Q    So, you reported to Goodwin and to Tackett?
19   A    I reported to Ms. Goodwin.
20   Q    Okay.
21   A    And then, I was -- principals reached out to me
22   to do -- to come to their school, secondary.
23   Q    But you didn't go through Tackett for that?
24   A    I went to Doctor Warren.
25   Q    Warren?

Page 18

1    A    Doctor Tackett was in the meeting when the
2    principals requested. That was an October meeting,
3    the district instructional leadership meeting. I
4    think it was the Mills Feeder, the Mills Feeder
5    meeting.
6    Q    On October the 17th?
7    A    Uh-huh. And he was part of that meeting.
8    Because in the meeting, the principals -- the
9    elementary principals had to give a report out of the
10   things they were doing, just to actually increase
11   student achievement and also to account for what they
12   were doing when it came to Plan 2000, as well. The
13   principal reporting out the support, and the other
14   principals apparently had not received any support in
15   their buildings. And so, because of their status,
16   they requested immediate support. So, it was the
17   Mills Feeder pattern principals, myself, Ms. Bobette,
18   Doctor Warren, and Doctor Tackett.
19   Q    Okay. But you were in this position for one
20   year?
21   A    Uh-huh. (Indicated yes.)
22   Q    And your supervisor, as long as you were there,
23   was Doctor Goodwin?
24   A    Yes.
25   Q    And then, you had one meeting with Doctor

Page 19

1    McNulty on April 30th?
2    A    I had a face-to-face, yes, on April 30th.
3    Q    And I'm asking, it's okay if it was recorded, I
4    just don't have it, do you know if it was recorded?
5    A    It probably was, yes.
6    Q    Okay. Do you know who would have possession of
7    that?
8    A    Who would have possession of the recording?
9    Q    Right.
10   A    I mean, whoever recorded the meeting.
11   Q    You don't know who did that?
12   A    Huh-uh. (Indicated no.)
13   Q    Okay. Because you recorded the meeting with Mr.
14   Brewer; correct?
15   A    No.
16   Q    I saw that in discovery, I thought it came from
17   yours.
18   A    No. I didn't even know we was having a meeting
19   with Mr. Brewer. I had a meeting with Doctor McNulty.
20   Q    Well, you had had a meeting with Paul Brewer.
21   A    Right. He called us in in April.
22   Q    Got it.
23   A    And then, Mr. McNulty met with us -- Doctor
24   McNulty.
25   Q    And then, after that, Paul Brewer gave you your

Page 20

1    letter?
2    A    No, no. Initially, he tried to give us the
3    letter, and then the letter was rescinded. And then,
4    I didn't know at the time, I found later -- my
5    question was, when were we going to be known or
6    notified that our positions were going to be cut. It
7    just came out of the blue. And so, again, he just
8    repeated that he was directed by the Board to consult
9    with Doctor McNulty and the others, Mr. Tackett and
10   Will Reid, and they made their decision, and then we
11   went to the -- they called an emergency Board meeting,
12   it wasn't a regular Board meeting. They called an
13   emergency Board meeting April 28, that Saturday. And
14   Doctor Warren was actually handed the letters. So,
15   when the cuts were made, they knew who they were
16   cutting. It wasn't a matter of positions, they were
17   cutting people.
18   Q    So, my question, though, when you met with
19   Doctor McNulty on the 30th, then did Paul Brewer give
20   you the actual signed letter?
21   A    Yeah, we received it April 30th.
22   Q    From Paul Brewer?
23   A    Right. I don't know if it was before the
24   meeting or after the meeting, but it was on April
25   30th.

Page 21

1  Q  Okay.
2  A  Before May 1st.
3  Q  And you were not in a followup meeting with
4  Doctor McNulty a few days later?
5  A  I sent him an e-mail that I wasn't able to make
6  it because I had -- my son had a showcase to attend.
7  Q  Okay.
8  A  And then, he insisted that we meet. And so, he
9  asked could he call me, and I said, "Sure. You can
10 call me after work." And he called me Thursday, May
11 3rd, at 4:30.
12 Q  And explained to you that he was going to reopen
13 the position under the instructional strategist?
14 A  He just kind of talked about the deputy
15 superintendent position, he talked about the district
16 instructional strategist position. He asked me
17 questions about professional development. I know that
18 was discussed a lot, what the plans were, who was
19 doing it, and then he -- I forgot the statement he
20 made, but there was a question, and I said, "Well,
21 according to Arkansas, the teachers have to have" -- I
22 think it's something about flex time. And so, we
23 talked about that. So, he mentioned the positions and
24 then he sent a followup e-mail the next day with an
25 update about the positions.

Page 22

1  Q  Okay. And you didn't apply for the deputy
2  position?
3  A  No. I didn't apply for the deputy position, I
4  applied for the district instructional strategist.
5  Q  And principal?
6  A  Yes.
7  Q  So, did you have any conversations about those
8  positions with anybody, as in after the interview when
9  you didn't receive it, did you follow up with anyone
10 to ask about it?
11 A  I followed up with Doctor McNulty, he asked me
12 for -- I sent him an e-mail after the interview. And
13 I only talked to him, because he was the source, he
14 was the one that actually did the interview.
15 Q  Oh, for instructional strategist?
16 A  Strategist, yes. And so, I sent an e-mail to
17 thank him for the interview with a "thank you" letter,
18 and he replied and said that he would notify me that
19 Monday to let me know.
20 Q  And he didn't?
21 A  No.
22 Q  He did not?
23 A  No.
24 Q  But you didn't get it, you learned that somehow?
25 A  Yes.

Page 23

1  Q  And that was the last position you applied for?
2  A  At the county, yes.
3  Q  To-date?
4  A  No. I applied for Pine Bluff.
5  Q  No, no, no. That's the last position you
6  applied for at the county?
7  A  Yes, yes.
8  Q  Up until now?
9  A  Yeah.
10 Q  I asked Ms. Beasley if -- in the meetings with
11 Doctor McNulty if he ever made any statements about
12 race directly relating to you, and she denied hearing
13 that. So, I will ask you the same thing. Did race
14 ever come up that his decision was based on race or
15 equity or anything like that?
16 A  You mean, equity as far as with the students?
17 Q  No, no. Just with you?
18 A  Or with personnel?
19 Q  Really, just you?
20 A  It was the actions, it wasn't the statement. It
21 was more so the actions.
22 Q  Which we -- which you have described?
23 A  Yes. So, you don't have to say anything once
24 you do it. So, based on, again, the actions. Because
25 operating in an unofficial capacity, I mean, that says

Page 24

1  enough about what it is. So, I know he didn't -- he
2  did say it was three positions, three to four other
3  district instructional strategists, and it ended up
4  being two instructional strategist positions.
5  Q  That were open?
6  A  That became open, yeah. But he did say it would
7  be three, maybe four. But it was two.
8  Q  Okay. And I understand the context of why you
9  are filing this complaint with the racial undertones,
10 I get all of that. I'm just asking, as we sit here,
11 specifically did any administrator of the district
12 ever make a racial or racially-charged comment to you,
13 or racially-insensitive statement to you?
14 A  No. It was more so the actions, you know, not
15 wanting me in the building when I was scheduling to do
16 my rounds at the beginning of the year, it was Lawson
17 Elementary, Robinson Elementary. And then, I know
18 that just dealing with Doctor Tackett was a bit
19 hostile. When we would have meetings, just being
20 excluded from things to get the understanding so that
21 I could perform my duties to make certain that we are
22 meeting the needs, and what the requirements are,
23 especially for the Plan 2000. I know that just
24 receiving support, to support the district, it was
25 just -- it was just a little bit hostile.

Page 25

1  Q    What do you mean? What was hostile about your
2  working relationship with Doctor Tackett?
3  A    So, for an example, when just going in to
4  support the schools, he was present at the meeting
5  when they requested support. And then, later was --
6  he told the principals to not ask for my support, to
7  not ask for it. But they were not receiving support.
8  In a meeting, it was -- I asked the question to
9  understand the DRIVEN program, and he shared, "Well,
10 it's just for your information, I don't need you to do
11 anything." It was -- from my experience, it was just
12 hostile. It's just -- I just couldn't understand it.
13 It was hostile.
14 Q    Did you ever make a complaint about Doctor
15 Tackett to anyone?
16 A    I talked to my supervisor. We talked about it.
17 Q    Ms. Goodwin -- Doctor Goodwin?
18 A    Uh-huh, we talked about it. And I talked to
19 her, and I was satisfied. And then, again, time went
20 on, principals were requesting for me to support them
21 in a training, he did not like that. So, he actually
22 came back to work to stop that from happening.
23 Q    Well, what did he not like about you helping the
24 principals?
25 A    That's a good question.

Page 26

1  Q    You don't know the answer to that?
2  A    Yeah. I feel like it was racially motivated.
3  Q    That Doctor Tackett didn't want you assisting
4  the principals --
5  A    Yes.
6  Q    -- because you are African-American?
7  A    I just think that that's part of it.
8  Q    And what --
9  A    What reason would he not want me to support
10 schools so that we can close the achievement gap?
11 Q    He never gave you a reason?
12 A    Huh-uh, no.
13 Q    No?
14 A    No.
15 Q    So, you believe it was racially motivated?
16 A    Yes. Especially knowing that -- especially when
17 I'm knowing that he is giving insight on to cut my
18 position, yes.
19 Q    When he is collaborating with --
20 A    Yes.
21 Q    Let me finish just so the record is clean.
22 A    Oh.
23 Q    You said insight to cut your position, you are
24 talking about when he apparently talked with Mr.
25 Brewer about cutting these program administrator

Page 27

1  positions?
2  A    Right.
3  Q    So, in terms of the hostility you are
4  referencing, it is because Doctor Tackett -- or you
5  are alleging Doctor Tackett kept you from going into
6  schools, and you think that that was racially
7  motivated?
8  A    Yes.
9  Q    Okay.
10 A    What reason would that be?
11 Q    Okay.
12 A    That was my question.
13 Q    And we covered this, but you are referring to
14 Doctor Tackett's actions? There was nothing he ever
15 said to you that was racially motivated or racially
16 insensitive, et cetera?
17 A    Doctor Tackett just wouldn't -- he would not
18 interact with me.
19 Q    Okay.
20 A    Even during meetings, he would not interact with
21 me.
22 Q    He wasn't your direct supervisor, or he wasn't a
23 supervisor at all; correct?
24 A    No. But others weren't, either, and they
25 interacted with me.

Page 28

1  Q    Okay. When was the first time you learned that
2  the position, program administrator, may be, for lack
3  of a better word, in jeopardy, or may be cut?
4  A    From Paul Brewer in April.
5  Q    When he came to you --
6  A    Well, he called us all to a meeting.
7  Q    And that was after the Board meeting where he
8  was directed to change the financial planning?
9  A    Which Board meeting, because there were several?
10 Q    Well, there was one Board meeting where he
11 presented the allocations, and the Board, for whatever
12 you want to call it, essentially said, "Go back and
13 find more cuts," and it was a Saturday meeting that
14 you attended.
15 A    Well, it was presented to them -- it was
16 presented to the Board -- another plan was presented
17 to the Board about the benefits, not contributing to
18 the benefits. Also, there was another proposal. The
19 Board didn't like that proposal. So, there was a
20 proposal given. And so, he was told at the Board
21 meeting April 10th, I believe it was at that Board
22 meeting, to go back and aggressively look.
23 Q    And shortly after that, he met with the program
24 administrators?
25 A    Right. And during that Board meeting, I, again,

Page 29

1  had no idea that it was us --
2  Q   Okay.
3  A   -- that was being discussed from Central Office.
4  Q   And he made that known to you at that meeting
5  sometime in April after the April 10 Board meeting?
6  A   Yeah, that he was told to look at our positions.
7  Q   That was your first and only year with the
8  district?
9  A   Uh-huh, yes.
10 Q   But for the position being terminated, did you
11 plan to return?
12 A   Yes, most definitely. It was a perfect fit.
13 That's why I applied. Because I have no family here.
14 We are military. The one support I had,
15 unfortunately, her husband was murdered, so they had
16 to go back home -- well, she went back home. And so,
17 that's why it was difficult with me in Pine Bluff, it
18 was a hardship being able to get to my son's doctors
19 appointments and stuff like that.
20 Q   You are saying when you were at Pine Bluff?
21 A   Right.
22 Q   Okay.
23 A   Because it was so far away. So, if he had a
24 doctor's appointment, I mean, I had to miss a whole
25 entire day. There were times I just couldn't get

Page 30

1  home, bad weather, that kind of stuff. So, it just
2  created a great hardship.
3  Q   So, prior to PCSSD, you were a principal from
4  2012 to 2016?
5  A   Yeah. I was in Florida.
6  Q   That was Florida?
7  A   Yeah. Elementary.
8  Q   Was that Duvall County Schools?
9  A   Yeah.
10 Q   So, you were principal. And then, prior to
11 that, you were assistant principal for two years at
12 Duvall?
13 A   Yes.
14 Q   And then, prior to that, you were the elementary
15 math coach?
16 A   I was district math coach.
17 Q   District. And then, prior to that, you were a
18 math teacher?
19 A   Middle school, yes.
20 Q   Middle school. So, you were in the Duvall
21 County Public Schools in Florida?
22 A   For about 13 years.
23 Q   Thirteen years?
24 A   Thirteen to 15 years.
25 Q   And then, you were in the Army yourself, the

Page 31

1  National Guard?
2  A   Yes, I was in the Army.
3  Q   Army?
4  A   Active, until 2002.
5  Q   So, you were 13 years in Florida, then you moved
6  here because your husband was on orders?
7  A   Yes.
8  Q   And then, you have one year at Pulaski County?
9  A   Right. And now he has split orders.
10 Q   What does that mean?
11 A   That means he is going between states now. That
12 was a hardship, because I had no support.
13 Q   Because he is away?
14 A   Right.
15 Q   Where are his other orders?
16 A   DC.
17 Q   So, Jacksonville -- no, no. That's Air Force.
18 A   No. It's Arkansas and DC.
19 Q   Okay.
20 A   And that's why Pulaski County worked, because I
21 was closer to my son.
22 Q   Okay. And that's Lamar is your son?
23 A   Yes.
24 Q   Where does he go to school?
25 A   That's my baby. Maumelle High.

Page 32

1  Q   That's your baby?
2  A   Yes, it is.
3  Q   That's your only child?
4  A   Yes, it is. And I helped with my niece, but we
5  sent her back because we couldn't do it with the lack
6  of income.
7  Q   So, your husband gets income from the United
8  States military?
9  A   He better be, yes.
10 Q   And is that his only source of income?
11 A   Yes.
12 Q   And then, your income currently is from the --
13 remind me what it's called.
14 A   Ed Reports. And it's just a stipend. It's not
15 -- it's just a stipend. So, it's like $1,700.00 for a
16 series. So, it's not -- I mean, you are talking about
17 finding something.
18 Q   And you don't have any other kin in Arkansas?
19 A   It's just us.
20 Q   Where did you grow up?
21 A   In Florida. I'm originally from Lakewood, New
22 Jersey, Trenton, New Jersey, and then I moved to
23 Florida.
24 Q   Okay.
25 A   Well, we moved to Florida, my family and I.

Page 33

1  Q  Because of your husband's orders?
2  A  No, I didn't move to Florida for him. I moved
3  to Florida for my family.
4  Q  Okay.
5  A  And then, I moved to -- when I married my
6  husband, then I moved to Jacksonville.
7  Q  All right. So, you were in Florida, met him,
8  moved to Jacksonville for his orders?
9  A  Yes.
10 Q  Then, his orders brought him to --
11 A  We met in the military.
12 Q  Because you were active, as well?
13 A  Yes.
14 Q  And you don't have any interviews coming up,
15 because you just said you haven't found anything that
16 you can apply for?
17 A  No. I just checked.
18 Q  Just checked what?
19 A  I just checked my e-mail, because I get the
20 notifications.
21 Q  Have you seen a medical provider for any
22 treatment related to this incidence, or issues?
23 A  I have ulcerative colitis, it's been a bit
24 stressful. So, I was in remission, so I have been
25 having flare-ups. And so, my doctor just put me back

Page 34

1  on the medication, because I was off of it. So, it
2  has been a bit stressful.
3  Q  And is that Doctor Pitman?
4  A  Yeah. Now, he is my primarily. So, I have to
5  go to a specialist because ulcerative colitis is --
6  Q  Who is that?
7  A  It is Doctor Patel.
8  Q  Patel. Does he have privileges with a hospital,
9  or his own clinic?
10 A  He is a gastroenterologist.
11 Q  Okay.
12 A  As a matter of fact, they just moved. I don't
13 know where they moved to. He is a specialist. I
14 don't see him often like I see --
15 Q  Is his office on University?
16 A  I'm not from here, so I have to look at my
17 navigation. I think it took me to University. I
18 think it did.
19 Q  If you saw one that says --
20 A  Because I have to go to -- I mean, I go to his
21 office. But I have to -- for ulcerative colitis, I
22 have to go to outpatient for the colonoscopy. So,
23 it's a different location.
24 Q  Okay. Have you talked about this lawsuit with
25 anyone besides your attorneys or your family?

Page 35

1  A  No. No.
2  Q  And Ed Reflect, does that take you into the
3  schools?
4  A  Who?
5  Q  What was it called. Ed what?
6  A  Ed Report.
7  Q  Ed Report?
8  A  It doesn't take me into the schools, no.
9  Q  So, you haven't been back to any of the high
10 schools?
11 A  No, not at all, no.
12 Q  Well, I mean, you have been to your son's
13 events?
14 A  Yes, yes. I'm very active when it comes to my
15 son.
16 Q  That may be all I have, Ms. Townsend. Anything
17 that I didn't ask that you want to add?
18 A  I just think it's a great disservice to being in
19 the position, when the people that need to make the
20 decisions were circumvented that is required by law to
21 make that decision, and they were actually
22 circumvented, and the person that was not allowed to
23 make decisions, or shouldn't be making decisions, were
24 making the decisions, along with the Board. So, I
25 just have concerns with that.

Page 36

1  Q  You are referring to Doctor Warren?
2  A  Yeah. Because she was superintendent at the
3  time.
4  Q  What are your thoughts on Doctor McNulty and him
5  having input, since he was going to be coming in for
6  the '18-'19 school year?
7  A  Input as far as consulting, when they have a
8  superintendent.
9  Q  Well, you recognize at the time the decision was
10 made by whoever to cut these positions, he had been
11 hired as the new superintendent to come in for the
12 '18-'19 school year?
13 A  Right. But our current superintendent had
14 already made the decision.
15 Q  Right. I'm not arguing with you.
16 A  Yes.
17 Q  I'm just asking, do you think he should have had
18 input since this was going to be his administration?
19 A  And he wasn't an employee at the time? I'm
20 trying to make sure I understand your question.
21 Q  Yes. I'm just asking, he was coming in as the
22 new superintendent. So, I'm asking, do you think he
23 should have had any input into hiring decisions?
24 A  I guess my concern is, how could we make input
25 if you have not observed the situation, collected data

Page 37

1  on what needs to happen.
2  Q   Okay.
3  A   And that was the question I asked him.
4  Q   And what was his response?
5  A   It was fiscal. And he did say that he went to
6  go meet -- he just had a meeting with the person
7  regarding the budget that day.
8  Q   Okay.
9  A   But again, as an administrator, as a principal,
10 and going through several superintendents and just
11 understanding the process -- and understanding the
12 process, and just making that decision based on what
13 -- he answered the question, he did answer my
14 question.
15 Q   When he said "fiscal"?
16 A   Yeah, he gave me an answer, but it wasn't the
17 answer. Because we had a superintendent.
18         MR. KEES: All right. Thank you for
19     your time, ma'am. I appreciate it.
20         (WHEREUPON, at 12:21 p.m., the taking of
21     the above-entitled deposition was concluded.)
22             ---o---
23
24
25

Page 38

1  Exhibit One.

Page 39

1  Exhibit Two.

Page 40

ERRATA
PAGE\LINE      SAYS:         SHOULD SAY:

40

Page 41

SIGNATURE

I, Nicole Townsend, do hereby certify that I have read the foregoing pages, and the same is a true and correct transcription of the proceedings that occurred, except for the corrections (if any) that appear on the Errata Sheet.

_____
Nicole Townsend

STATE OF ARKANSAS)
        ) ss.:
COUNTY OF _____)

WITNESS MY HAND AND SEAL, this _____ day of _____, 2019.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

41

Page 42

CERTIFICATE

STATE OF ARKANSAS  )
        ) ss.:
COUNTY OF PULASKI  )

I, DEBBYE L. PETRE, Certified Court Reporter and notary public in and for the County of Pulaski, State of Arkansas, duly commissioned and acting, do hereby certify that the witness herein was by me first duly sworn to testify the whole truth and nothing but the truth prior to taking down in Stenotype the questions, answers, and proceedings during said deposition, and from such recordation was thereafter reduced to print by means of computer-assisted transcription, and the same fully, truly, and correctly reflects the proceedings had.

I FURTHER CERTIFY that the above deposition was given by the witness and taken at the times and in the place hereinabove set forth.

I FURTHER CERTIFY that I am not attorney or counsel of any of the parties, nor am I relative or employee of any attorney or counsel or party connected

42

Page 43

with the action, and have no interest in the outcome or results of this litigation.
    WHEREFORE, I have subscribed my signature and affixed my notarial seal as such notary public at the City of Little Rock, County of Pulaski, State of Arkansas, this the 10th day of June, 2019.

_____
DEBBYE L. PETRE, CCR
NOTARY PUBLIC IN AND FOR
PULASKI COUNTY, ARKANSAS

My Commission Expires:

August 4, 2020.

---0---

43