## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

-----------------------------------------------------

JENNIFER BEASLEY; DR. KIFFANY
PRIDE; LAURA SHIRLEY; and
NICOLE TOWNSEND,

PLAINTIFFS,

VS.          NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools
of the Pulaski County Special School
District; PULASKI COUNTY SPECIAL SCHOOL
DISTRICT BOARD OF DIRECTORS; and
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
a public body corporate,

DEFENDANTS.

-----------------------------------------------------

---o---

DEPOSITION

OF

KIFFANY PRIDE

---o---

THURSDAY, OCTOBER 24, 2019

---o---

## Page 2

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

JOHN WALKER, ESQUIRE
JOY SPRINGER, Administrative Assistant
   John Walker Law Firm
   1723 South Broadway Street
   Little Rock, Arkansas  72206

ON BEHALF OF DEFENDANTS:
W. CODY KEES, ESQUIRE
   Bequette, Billingsley and Kees
   425 West Capitol Avenue
   Suite 3200
   Little Rock, Arkansas  72201

ALSO PRESENT:
MS. SHAWN BURGESS
   ---o---

2

## Page 3

### INDEX

WITNESS:                              PAGE:

KIFFANY PRIDE
   Direct Examination............................ 5

---o---

### EXHIBITS

(None marked.)

---o---

Reporter's Certificate.............................. 58

---o---

3

## Page 4

1        The deposition of Kiffany Pride was
2    taken before me, Debbye L. Petre, Certified Court
3    Reporter and notary public within and for the County
4    of Pulaski, State of Arkansas, duly commissioned and
5    acting, on Thursday, October 24, 2019, beginning at
6    the hour of 12:30 p.m., at the offices of John Walker
7    Law Firm, 1723 South Broadway, Little Rock, Pulaski
8    County, Arkansas.
9        Said deposition being taken in
10   accordance with the Rules of Federal Procedure and
11   pursuant to the provisions of the Arkansas Rules of
12   Civil Procedure at instance of counsel for the
13   Defendant in the above-styled case in the United
14   States District Court, Eastern District of Arkansas,
15   Western Division.
16            ---o---
17   THEREUPON, the following proceedings were had,
18   to-wit:
19            ---o---
20

EXHIBIT
7

Page 5

```
1           PROCEEDINGS
2    WHEREUPON,
3           KIFFANY PRIDE,
4    having been called for examination, and having been
5    first duly sworn, was examined and testified as
6    follows:
7           DIRECT EXAMINATION
8    BY MR. KEES:
9    Q    Would you state your name for the record, ma'am?
10   A    Kiffany Pride.
11   Q    All right.  And what is your middle name, Doctor
12   Pride?
13   A    Rochelle.
14   Q    And where do you live?
15   A    In Little Rock.
16   Q    What is your address?
17   A    1301 Louisiana, Little Rock.
18   Q    Okay.  And you work for the department?
19   A    Yes.
20   Q    What is your position there?
21   A    Director of Curriculum and Assessment.
22   Q    And have you ever given a deposition before?
23   A    No, not that I can remember.
24   Q    I think you attended --
25   A    I attended.
```

Page 6

```
1    Q    You attended the depositions of Doctor Remele and
2    McNulty?
3    A    I did.
4    Q    So, just briefly, I'm just going to ask you some
5    questions, I don't have a lot for you today, regarding
6    the lawsuit that you and three other ladies have
7    filed.  And you are familiar with that lawsuit?
8    A    Correct.
9    Q    And the main thing is, let me finish my question
10   before you answer so Ms. Petre can get a record.  And
11   if you don't understand anything I ask, ask me to
12   rephrase it.  Okay?
13   A    Okay.
14   Q    So, Director of Curriculum and Assessment.  Who
15   do you report to there?
16   A    Stacy Smith.
17   Q    Is she one of the assistant commissioners?
18   A    She is, of Learning Services.
19   Q    Do you know -- of course, I can look it up.  But
20   offhand, do you know what your pay is there?
21   A    I know my contract is like $92,000.00, and I
22   don't know the exact change.
23   Q    $92,000.00 and change?
24   A    Uh-huh.  (Indicated yes.)
25   Q    And was that --
```

Page 7

```
1    A    No.  I think it is straight $92,000.00.
2    Q    $92,000.00?
3    A    Yes.
4    Q    It's highly unlikely it's a straight $92,000.00.
5    A    No.  I think it is.
6    Q    Oh, wow.  Okay.  And how many months is that?
7    A    I just started this job August the 8th.
8    Q    Okay.  Of what?
9    A    Of this year, 2019.
10   Q    How many days is your contract?
11   A    It's a 12-month contract.
12   Q    12-month.
13   A    I don't know the exact days, but excluding
14   holidays.
15   Q    Do what?
16   A    I said, I don't know the exact days.  I'm sure
17   there's a number.  But it's a 12-month contract.
18   Q    Twelve months.  You get holidays, and you get,
19   what, ten paid days a year?
20   A    Uh-huh.  Yeah.  So -- no.  You accrue vacation
21   days.  So, 12.
22   Q    Twelve?
23   A    Uh-huh.  A vacation day a month.
24   Q    Okay.  So, your nonrenewal at the district went
25   into effect July 1, 2018; correct?
```

Page 8

```
1    A    Correct, to my best recollection of that date.
2    Q    Yes.  So, operating off that date, did you gain
3    employment after that date?
4    A    Yes, after that date.  So, yeah.  Yes.
5    Q    So, what was your first job after your nonrenewal
6    at the district?
7    A    I worked for the State Personnel Development
8    grant as an RTI coordinator for literacy.
9    Q    So, Response to Intervention for?  What is the
10   name?
11   A    It's a State Personnel Development grant.
12   Q    Who operates that grant?
13   A    Well, it was out of the Great Rivers Cooperative.
14   Q    Oh, Great Rivers.  Okay.  So, did you go over to
15   the Co-op?
16   A    No.  I worked in Little Rock.
17   Q    Okay.
18   A    So, there is an office in Little Rock in the
19   Victory Building.  But the Co-op was where I was
20   funded through.
21   Q    Do you report to Doctor Atwell?
22   A    No.  So, it was to Tia Frazier, who was the
23   Director of the State Personnel Development grant.
24   Q    And you started that job when?
25   A    Sometime in August.
```

Page 9

1  Q   Say it again.  State Person --
2  A   State Personnel Development grant.
3  Q   You started that August, roughly?
4  A   Yes.  I can't remember the exact date.
5  Q   Of 2018?
6  A   Yes.
7  Q   Through Great Rivers?
8  A   Uh-huh.  (Indicated yes.)
9  Q   And do you remember your salary?
10 A   Yes.  $72,000.00.
11 Q   Do you remember what you were making at the
12 district when you left?
13 A   It was well in the 80s.  80 something, like 88.
14 Q   Whatever your contract was?
15 A   Something like that.  I can't remember exactly.
16 Q   Yes, I've got your contract.  It will reflect it.
17 A   I took a loss, I can tell you that.
18 Q   When you went to Great Rivers?
19 A   That's right.
20 Q   And I'm saying Great Rivers, but it's the State
21 Personnel Development grant?
22 A   It was still Great Rivers, that's where the
23 funding came from.
24 Q   And then, you were there until when?
25 A   I was there until maybe about, I want to say

Page 10

1  February I moved over to Learning Services for a
2  special project.
3  Q   At ADE?
4  A   Uh-huh.  (Indicated yes.)
5  Q   So, February --
6  A   Well, I still was funded out of Southeast Co-op.
7  Q   Oh, goodness.
8  A   So, I moved over to the Southeast Co-op, but it
9  was really for a special project to work with Learning
10 Services.
11 Q   Southeast Co-op in February of 2018?
12 A   Uh-huh.  (Indicated yes.)
13 Q   Do you remember your salary there?
14 A   No.  It wouldn't have been of 2018.  It would
15 have been --
16 Q   Oh, 2019?
17 A   It would have been 2019.
18 Q   Yes, this year.
19 A   So, basically, it was just a lateral move, and
20 the funding was just moved to a different Co-op.  So,
21 it would be within that same salary.
22 Q   $72,000.00, whatever it would reflect?
23 A   It would be within that same -- it was the same
24 pay.
25 Q   And then, when did you go to your current

Page 11

1  position?
2  A   That was in August of 2019.
3  Q   And so, your salary now is higher than it was
4  when you left PCSSD?
5  A   That is correct.  For this new start, this new
6  start.  So, just as of August.
7  Q   Yes.  One of the remedies in a case like this is
8  reinstatement.  Would you want to be reinstated to
9  your job at Pulaski County?
10 A   I would not.
11     MR. WALKER:  Yes, she would.
12     THE WITNESS:  I would, yes.
13     MR. WALKER:  And --
14     THE WITNESS:  I need clarity.
15     MR. WALKER:  It depends on her
16 circumstance.
17     THE WITNESS:  Right.
18     MR. WALKER:  Because she has secure
19 employment at the county, and the state is
20 not.
21     THE WITNESS:  Right.  Absolutely.
22     MR. WALKER:  That's political.
23 BY MR. KEES:
24 Q   Are you on contract at ADE?
25 A   I am.

Page 12

1  Q   Are you on a Teacher Fair Dismissal contract?
2  A   No.
3  Q   What kind of contract are y'all on?
4  A   I think it's at-will.  I mean, it's -- but I
5  don't know, I would have to look at that.  But it's
6  not like a teacher contract, it's not, because I'm a
7  state employee.
8  Q   What would you want to change at PCSSD to have
9  employment there again, if you were offered
10 employment?
11 A   First of all, I would like to not be treated,
12 excluded, and oppressed as a black woman.
13 Q   What do you mean by that?
14 A   I felt like I was excluded as a black woman.  For
15 example, as literacy program administrator, there were
16 things related to literacy that I was not even
17 involved in as a black woman.
18 Q   Are we talking about prior to the nonrenewal?
19 A   Yes, yeah.
20 Q   So, like going back to when?
21 A   What I would want to change would be predicated
22 on when I was there.  So, I think it goes back
23 specifically to -- I could probably track it all the
24 way back to the start of the School of Innovation
25 initiative.

## Page 13

1  Q   What year was that?

2  A   I don't know the exact year.

3  Q   School of Innovation, who ran that?

4  A   Yeah. We could go back, they will be able to

5  tell you when it was initiated. I'm not exactly sure.

6  I can't recall the date.

7  Q   That was under Will Reid?

8  A   It was under Will Reid and John Tackett.

9  Q   And at that time, what did you feel, or what was

10  happening to you?

11  A   I felt like I was excluded, as well as other

12  black women that I worked with, we were excluded from,

13  number one, opportunities that other people who were

14  involved in the initiative received, like visits to

15  Schools of Innovation, we weren't invited. Planning

16  sessions for School of Innovation, we were not

17  invited. However, our role would indicate that we

18  would be directly involved into that initiative.

19  Q   So, with the School of Innovation, you weren't

20  invited to participate in certain activities that

21  others were?

22  A   Absolutely.

23  Q   And who were the others?

24  A   Well, there were five program administrators.

25  The two white administrators were invited to the

## Page 14

1  table, the three blacks were not.

2  Q   Now, what were you over in the program as a

3  program administrator?

4  A   Initially, I worked all literacy, because there

5  was no one else there until last year when they added

6  Bobette Ray. So, initially, I represented literacy,

7  and I also helped with social studies. There were

8  only two of us to start. And then, when this

9  initiative came on, there were other people added.

10  Q   So, when Bobette Ray was there, what grades did

11  you have?

12  A   What what?

13  Q   What grades did you cover?

14  A   Elementary, elementary grades, and as well as I

15  supported her in her new role for secondary, I helped

16  her with middle school, or whatever she needed I

17  helped her.

18  Q   So, Ray was secondary?

19  A   She was secondary.

20  Q   Are we talking about the '17-'18 school year?

21  A   She came in '17-'18, yes.

22  Q   And who else was secondary as a program

23  counselor?

24  A   As a program administrator?

25  Q   Right.

## Page 15

1  A   Brandy. I can't remember her last name right

2  now. I can't remember her last name right now. But

3  Brandy, she was math, over math.

4  Q   And she was white?

5  A   She was white.

6  Q   And those two --

7       MS. SPRINGER: Beckman.

8  BY MR. KEES:

9  Q   Beckman?

10  A   Beckman, yes.

11  Q   Beckman and Ray were invited to attend activities

12  with the School of Innovation?

13  A   Yeah. They were in all the planning meetings,

14  they also went on the trip. Not to mention those

15  white -- the white ladies who were down in Technology

16  under Will Reid, they were all involved. But the

17  three of us, three black women were excluded.

18  Q   And were the three black administrators, did

19  y'all have -- y'all had duties over elementary?

20  A   So, okay. I'm going to go back for you. I had

21  been -- Jennifer and I had been there for quite some

22  time. So, we covered all content areas. Okay? When

23  they were hired on, we still had to support them

24  because they were new, if that makes sense. So,

25  though I was designated for K-5, I still had to do

## Page 16

1  quite a significant amount of supplementing support in

2  secondary because she was new to her role.

3  Q   So, as far as who was exclusively secondary, that

4  would have been Beckman and Ray?

5  A   That's correct.

6  Q   And in the role of secondary, exclusively, they

7  attended activities at the School of Innovation that

8  you did not?

9  A   Exactly. And there is a second thing, too.

10  Q   What else?

11  A   You said what else would have to change.

12  Q   Right.

13  A   Also, I felt like, you know, my professional --

14  felt like I was oppressed in my -- in the ability for

15  me to provide professional judgment. So, basically we

16  were -- Doctor Tackett basically asked us not to

17  really voice a professional opinion about School of

18  Innovation, because we had some concerns that it was

19  -- would be at the detriment of black children, the

20  way that it was designed.

21  Q   Why did you think that?

22  A   Number one, it was -- I mean, it was the way it

23  was designed. We asked questions about, how would

24  this support our students who maybe were struggling,

25  if they were -- and we knew our subgroup that was

## Page 17

1  shown to be at a deficit were some of our
2  African-American subpopulations, specifically in our
3  Mills feeder. And we brought that to his attention
4  and it upset him. In fact, he yelled at me, and I
5  didn't find that to be professional. And so, things
6  like that would happen. In one instance, I gave him
7  some feedback and he told me he didn't want my
8  feedback. I said, why was I there. He said so that I
9  could be able to answer the way that he is saying that
10 it's being marketed and designed.
11 Q   And you said Doctor Tackett yelled at you?
12 A   Oh, yes, several occasions.
13 Q   What did he say to you?
14 A   I mean, it's just like -- okay. If I say
15 something, it's like, "Well, I'm not asking you for
16 that purpose. I'm just showing you the market" -- he
17 would yell and be, you know, like, hit the table and
18 interject in that way. (Indicating.) It's just a
19 very aggressive form of communicating with me. And I
20 would say, well, "I'm just giving my professional
21 opinion and taking into consideration those things
22 that are" -- "we are supposed to be following," like
23 Plan 2000.
24 Q   So, who was present during these meetings?
25 A   Jennifer was there, Bobette was there. It would

## Page 18

1  be some program administrators. There were so many
2  occasions, I would say you probably could ask several
3  people -- the whole floor, ask the whole floor. There
4  was one meeting we had with a program he brought in to
5  be the learning management system from Utah, which
6  that's where they went to visit a lot. When they
7  brought them in, we brought to his attention that
8  there were significant errors in content. He was not
9  happy with that. There was another additional meeting
10 of Learning Services in which he expressed his
11 disdainment for us to express our professional opinion
12 about it. So, we were basically not to say anything.
13 Q   Did he tell you not to say anything?
14 A   To some degree. He told us he was not asking for
15 that. (Indicating.) "That's not what I'm here to
16 tell you, I'm here to show you what is out there."
17 (Indicating.) And I specifically asked him, "Are you
18 saying this has already been completed and
19 everything?" He said, "Yes, marketing is done,
20 everything is done. This is ready to go. I'm only
21 informing you." (Indicating.) Which is a form of
22 oppression and exclusion, considering I'm a literacy
23 person, right, and I have the tenure to have been
24 there, and I'm supporting those people who are there.
25 They would often have to come to me and ask questions.

## Page 19

1  So, how is it that you all of a sudden -- I'm all of a
2  sudden excluded and I can't have a voice.
3  Q   Well, he let you tell what you thought; correct?
4  A   No, he did not. And when I asked a question, he
5  let me know he wasn't asking me.
6  Q   What do you mean, he wasn't asking you that when
7  you asked a question?
8  A   So, for example, if you are showing me School of
9  Innovation and all the marketing things going on, and
10 I say, "Well, I have a question about something that
11 is on here. I would like to express that this may be
12 against Plan 2000. It may not be working to our
13 advantage of making sure all kids are included." He
14 told me, "I was not asking you for that professional
15 opinion." He was telling me, "I'm only showing you
16 what has been done so you will be able to say what has
17 been done and not go against it."
18 Q   So, he was informing you on what Learning
19 Services was going to do regarding that plan?
20 A   Right. Because, remember, we had been excluded.
21 We were not in on planning, we were not in on review,
22 we were not in on going to visit schools, none of
23 that. So, now you are about to launch, now you bring
24 in the three black women that you have excluded. And
25 we asked questions because that's the nature of our

## Page 20

1  job, is to ensure that what's going forth in terms of
2  curriculum, resources, materials, that those things
3  are at the benefit of all students and in
4  consideration of Plan 2000, because we were under a
5  mandate that we adhere to the law.
6  Q   Was Will Reid involved in these meetings where
7  Doctor Tackett was telling you what School of
8  Innovation was going to do?
9  A   He was in some instances.
10 Q   Did he ever offend you with what he said?
11 A   I would say Will Reid basically let us know that
12 he was going to hire curriculum people in his area
13 that could help him achieve his goal.
14 Q   Was that a problem?
15 A   It's a form of exclusion.
16 Q   To hire people?
17 A   Okay. So, I'm already doing that -- so, if you
18 know anything about education, you would know that
19 technology is an enhancement, right, it's a support,
20 okay, curriculum, technology enhances. So, the
21 natural progression of that, which it was established
22 that way, anyway, in terms of supporting classroom and
23 curriculum supports, technology would do that. So,
24 that would be an integration, not an exclusion.
25 Q   So, you thought it was exclusion because he was

## Page 21

1   hiring people in his department for programming?
2   A    No. I think you are mincing words here. What
3   I'm saying is, he did not include us. It wasn't an
4   integrated model, which it should be. And curriculum
5   should always have technology integrated in, because
6   it is a resource.
7   Q    And that's your opinion as to how that should
8   operate?
9   A    Well, you can find research to back up that
10  that's the best practice, and that's what we do when
11  it comes to schools, we do evidence-based practices.
12  And you will find that. There's a lot of research
13  that can help you with that.
14  Q    And Will Reid, his judgment regarding that was
15  different?
16  A    I can't speak to his judgment. What I can tell
17  you is that he told us what he was going to do, and
18  that's hire people to carry out his vision for that.
19  Q    Okay. Well, I want to know everything that you
20  have -- that you are complaining about. I got the
21  exclusion part.
22  A    It's a fact. I don't know, you are saying
23  "complaining". I'm expressing what happened to me as
24  a black woman.
25  Q    Well, it was exclusion, what does it have to do

## Page 22

1   with you being black?
2   A    Okay. So, because there was a pattern
3   established. The three black women who -- first it
4   was two black women who were already there and we were
5   already in the midst and we had the institutional
6   knowledge, and the one black woman added, we were the
7   three that were excluded.
8   Q    Who was the one added?
9   A    Nicole Townsend came in with Bobette Ray and
10  Brandy Beckman. So, it was exclusion.
11  Q    Who did Will Reid involve in his decision-making?
12  A    He used Brandy Beckman, Leta Ray, and his three
13  people that he hired. And they were three white
14  women.
15  Q    And those were in his department, the three white
16  women we are referring to?
17  A    Yes.
18  Q    And so, aside from this one time where he said he
19  was going to hire, am I saying this right, program
20  people for his department?
21  A    I don't know what was their direct title. It
22  would have been something like -- something with
23  instructional technology or something probably. I'm
24  not sure of the title.
25  Q    Were there other occasions where you felt like

## Page 23

1   Will Reid excluded you?
2   A    Well, the whole process was a combination of
3   Doctor Tackett and Will Reid working together. Okay?
4   So, it was both of them working together. So, they
5   were partners in this.
6   Q    Did they ever express to you that they were
7   excluding you or excluding Ms. Townsend or Ms. Beasley
8   because of your race?
9   A    No. But they did not invite us to meetings.
10  Q    I understand that. I'm just asking, did they
11  ever say it was because of your race?
12  A    No.
13  Q    Okay.
14  A    But you don't have to say that for it to be that.
15  Q    Did they ever make any racial comments to you,
16  either Mr. Tackett or Mr. Reid?
17  A    No, not in comments. It was their actions.
18  Q    That we have just discussed?
19  A    I think it was exclusion and an oppression of our
20  professional judgment and our professional right
21  entitled to our positions in terms of making sure that
22  School of Innovation fit as it should according to
23  best practice and the law for Plan 2000.
24  Q    So I'm clear, he didn't make racial comments to
25  you or say it was because of your race, you are basing

## Page 24

1   it on what you have told me now?
2   A    Okay. So, I want you to clarify your question.
3   What are you asking me exactly? Because I feel like
4   you are -- I don't know if you are trying to ask it a
5   different way. But I'm telling you, he didn't say --
6   he didn't call me like a racial slur, if that's what
7   you are asking.
8   Q    Right.
9   A    But his actions, and we know that racism is based
10  on -- can be based on actions, he excluded us, okay,
11  and we were not allowed to work in our capacity for
12  our jobs in relation to curriculum initiatives.
13  Q    So, if Mr. Tackett or Mr. Reid would have been
14  black males, would you have still been offended by
15  their actions?
16  A    If they would have excluded us as black women,
17  yes. You know, they excluded us as black women. And
18  the pattern was that the only people brought to the
19  table were white people. Would you feel excluded?
20  Q    So, even if they were black men, you are saying
21  you still would have felt excluded?
22  A    I mean, I feel like it's a pattern of that, that
23  that was a pattern for them, and I felt excluded as a
24  black woman. I don't know another way to tell you
25  that. I felt excluded because -- I felt racism

Page 25

```
 1   because I was excluded as a black women. There was a
 2   pattern of that over time. I don't know what other
 3   way to tell you that.
 4   Q    Did you ever express your concerns regarding
 5   being -- that you felt like you were being excluded as
 6   a black woman to the HR Department?
 7   A    No.
 8   Q    Why not?
 9   A    I would say maybe the first reason is because it
10   took me a while to see the pattern. I knew I was
11   being excluded, then I saw a pattern of other black
12   people being excluded. So, at some time you have to
13   take a step back and look at how the pattern is
14   beginning to develop. Okay, so we are being excluded
15   as black women. Why? So, I think it took me to step
16   back and to see all of those patterns come together.
17   And it was because -- I feel like it was because I was
18   black, a black woman with a professional opinion that
19   they didn't value.
20   Q    And my question was, why did you not express that
21   concern to district administrators?
22   A    Well, in hindsight, you know, I just -- I
23   probably just didn't, in hindsight. I'm not sure
24   exactly why.
25   Q    So, the first time you felt this exclusion was
```

Page 26

```
 1   around the time that we were starting the School of
 2   Innovation?
 3   A    Yeah. I think it's around that time that I began
 4   to notice it.
 5   Q    Was that prior to Ms. Townsend's arrival?
 6   A    Yes. I think School of Innovation had started
 7   before her, to my best recollection.
 8   Q    And so, like I'm trying to find a timeframe.
 9   Would it have been a year before she got there?
10   A    I'm going to tell you, I don't know.
11   Q    And did it continue that last year of your
12   employment?
13   A    Oh, yeah, it was ongoing.
14   Q    And so, you did not make a complaint until you
15   filed your EEOC charge?
16   A    So, you mean, some type of official complaint?
17   Q    Right.
18   A    Okay. No other official complaint, no.
19   Q    Did you make an unofficial complaint?
20   A    Well, no. But I knew what was going on. In my
21   head, I knew I was being excluded as a black woman.
22   Q    I understand that, and I'm not trying to take
23   that away from you.
24   A    No, no, no, no.
25   Q    So, as far as complaints, no?
```

Page 27

```
 1   A    No.
 2   Q    Any other individuals in the district that you
 3   have complaints, concerns, grievances, disputes with?
 4   I need to know anything regarding other district
 5   members as relates to your lawsuit.
 6   A    Okay. So --
 7   Q    So, do you want me to explain that, because it's
 8   pretty loaded.
 9   A    Yes, I need you to tell me what you mean.
10   Q    You told me your complaints about Will Reid in
11   regard to race, and John Tackett in regard to race.
12   A    Uh-huh. (Indicated yes.)
13   Q    Do you have any complaints against Paul Brewer?
14   A    I think he was part of it. I think he was part
15   of it. He helped them carry this out. They met
16   together. He told us that in a Board meeting that he
17   met with them and they gave him marching orders to get
18   rid of us.
19   Q    Paul Brewer at a Board meeting --
20   A    Yes.
21   Q    -- you said that he what?
22   A    He said he met with those two individuals --
23   Q    Tackett?
24   A    -- Tackett and Reid and was charged with getting
25   rid of us, which was to cut us, to target us.
```

Page 28

```
 1   Q    But he never used those words?
 2   A    To some degree, he did. It was an exclusion to
 3   curriculum; right?
 4   Q    These are the Board minutes that you were -- I
 5   don't know. Did you record them?
 6   A    I have recorded several sessions, yes.
 7   Q    So, we would know what he said; correct?
 8   A    Yeah. He basically said they told him what to
 9   do. So, he was part of the plan. I mean, he was part
10   of it.
11   Q    Any other complaints against Paul Brewer in
12   regards to race?
13   A    I mean, I think that's significant enough.
14   Q    So, that's a "no"?
15   A    I would say that is inclusive of just all of his
16   actions. So, that would be the end of it.
17   Q    Any other employees at the district that you have
18   complaints about in regards to race?
19   A    I'm not sure exactly how Doctor McNulty played a
20   role, but he seemed to fit right into their plan. He
21   came right in in April and met with us before he was
22   superintendent and basically went along with
23   everything.
24   Q    What do you remember from the meeting you had
25   with Doctor McNulty?
```

Page 29

```
 1    A   He told us that this was part of his decision,
 2   that -- but that he was going to try to restructure,
 3   and that if the strategist positions were still there,
 4   that we would be recalled to those, because by law, if
 5   it's the same position, it's still there, we would be
 6   recalled, and that he had other positions that he was
 7   restructuring.  But he totally admitted that he was
 8   helping them to eliminate or restructure.
 9    Q   Learning Services?
10    A   Well, he didn't really say Learning Services, he
11   really just talked about the five of us.
12    Q   The five program administrators?
13    A   Uh-huh.  (Indicated yes.)
14    Q   Did you record any meetings with Doctor McNulty?
15    A   I did.
16    Q   Okay.  Have you provided those?
17    A   I did.
18            MR. KEES:  I will check, Joy, and see if
19        I have -- I know I got recordings from Board
20        meetings.
21            THE WITNESS:  You've got those
22        recordings.
23            MS. SPRINGER:  Yes, I sent those to you.
24            THE WITNESS:  You've got it.
25            MR. KEES:  You may have.
```

Page 30

```
 1   BY MR. KEES:
 2    Q   Why did you record the meeting with Doctor
 3   McNulty?
 4    A   Because at that time I had already -- I had come
 5   to the conclusion that we were being excluded and that
 6   we were being targeted.  And so, I was just
 7   distrustful.  And number one, he was not even the
 8   superintendent at that time, so I didn't understand
 9   why he was meeting with us.  We had a superintendent.
10    Q   Did you understand that he was going to be the
11   superintendent?
12    A   I'm clear about that, but I'm also clear about
13   the law that he should not have been there at that
14   time because he wasn't the superintendent, not to be
15   giving us directions about our jobs.
16    Q   Was he giving you directions or was he --
17    A   He kind of was.  He gave us directions to create
18   like a spreadsheet of what it is that we do, how we
19   contribute.  He basically was sort of like
20   interviewing us.
21    Q   Was he trying to understand what you did in that
22   position?
23    A   You would have to ask him that.
24    Q   So, he asked you to create a spreadsheet as to
25   what you did?
```

Page 31

```
 1    A   It was like an interview, basically.  And he let
 2   us know -- it was basically like an interview.  He
 3   basically let us know.
 4    Q   Did you interview for the two positions that came
 5   back open in the program instructional strategists?
 6    A   No.
 7    Q   Why did you not interview for those positions?
 8    A   Because, by law, there should have been a recall.
 9   Why would I interview for that?
10    Q   Well, once you found out that you weren't
11   recalled and that you had to interview, why did you
12   choose not to interview?
13    A   Because I thought, by law, I should have been
14   recalled.  Why would I do that if, by law, I'm
15   supposed to be recalled?  Why would I do that?
16    Q   Well, if you are right and the district wasn't
17   going to recall you, why did you not interview?
18    A   Because, by law, they should have.  They should
19   have recalled us, by law.
20    Q   At what point did you know -- at what point did
21   you learn they were not recalling you for the
22   position?
23    A   I mean, not until after they didn't do it.
24    Q   So, when did you learn that there were going to
25   be two new positions that Doctor McNulty had created?
```

Page 32

```
 1    A   Well, he gave us -- I mean, he told that he might
 2   do that.  But he said those were going to be the same
 3   positions and that he did not intend for us to
 4   interview for those if those were the same positions.
 5    Q   Okay.
 6    A   So, that's why.  That's something he also
 7   articulated in April.
 8    Q   And then, did you meet with him again after the
 9   April meeting?
10    A   Yeah.  I think it was like maybe a May 1st, I'm
11   not sure the exact date, but it was something like
12   that, a couple of days later.
13    Q   After you had been nonrenewed?
14    A   Uh-huh.  (Indicated yes.)
15    Q   And what did he tell you at that meeting?
16    A   Basically the same message.  I mean, it wasn't
17   really a different message.  It was again explaining
18   his plan to restructure.
19    Q   And did you see the two new positions?  Do you
20   know what they were called?
21    A   Something like a strategist or something.
22    Q   It had a different title?
23    A   It had a different title, but he said they
24   basically would be the same.
25    Q   Did you see those when they were posted online?
```

## Page 33

1  A   I saw them at some point, I'm not sure exactly
2  when.
3  Q   What action did you take when you saw those?
4  A   I don't understand your question.
5  Q   What do you not understand?
6  A   What action? I don't understand what you mean,
7  "what action".
8  Q   Did you call anybody and say, "I'm interested"?
9  Did you send a letter, did you send an e-mail?
10 A   No. Why would I do that? It was supposed to be
11 -- I should have been recalled for that.
12 Q   So, you were just waiting for Shawn Burgess to
13 call you?
14 A   No.
15 Q   Well, how does a recall work?
16 A   A recall work -- yeah, I would get some
17 notification. And you are naming Shawn, but Shawn was
18 involved in this process. It was Paul Brewer that
19 came to us and told us this. So, it wouldn't have
20 been Shawn Burgess, anyway.
21 Q   Well, you were waiting for Paul Brewer to call
22 you?
23 A   Well, basically, or Doctor McNulty, as he said,
24 we would be recalled.
25 Q   So, you were just waiting -- did you think they

## Page 34

1  were going to recall you?
2  A   I didn't just -- what do you mean, "just wait"?
3  Q   Well, we know you weren't -- you knew they
4  weren't going to recall you. So, I'm asking why you
5  didn't apply?
6  A   Because I was not -- why would I apply for
7  something we're supposed to be recalled for? Can you
8  explain that to me?
9  Q   Well, I think we can all agree that there was no
10 recall.
11 A   But it should have been. Can we agree on that?
12 Q   No, I'm not -- I'm just asking questions.
13 A   Okay. Well, I'm just asking you can we agree on
14 that.
15 Q   No. Because it was a different position.
16 A   Okay. Well, that's not what he said.
17 Q   Nicole Townsend applied. Do you know that?
18 A   She told me she did.
19 Q   So, you thought it was going to be a recall, but
20 you didn't call anybody at central office to get
21 information on the position?
22 A   Doctor McNulty told me when he met with us that
23 he did not have any -- first of all, Bobette asked him
24 would we have to apply for those positions, and he
25 said, "My intention is not for you to do that, because

## Page 35

1  they would be the same thing that you are doing now."
2  He said, "I'm not sure how many of those we would
3  have." But again, it goes backs to if he had
4  intentions of three, if he would have brought three,
5  he would have brought probably three black women back.
6  Again, there is another pattern.
7  Q   He told you his intention was to bring those
8  back, but he didn't tell you anything was confirmed?
9  A   Well, he was pretty sure that he had leverage,
10 that he needed to see what number he could bring back.
11 He was pretty sure.
12 Q   But it wasn't confirmed at that point how many?
13 A   He was pretty sure, that's what I will tell you.
14 Q   But then, ultimately, you are aware that two new
15 positions were created?
16 A   Like what?
17 Q   Instructional strategists, the ones that you just
18 named.
19 A   Well, they are not really new, they were renamed.
20 They were the same thing we did. I was aware of that.
21 Q   Have you seen the job description?
22 A   When I saw it on the website, I saw it.
23 Q   So, you have seen it?
24 A   Uh-huh, it's the same thing.
25 Q   Okay. So, you were aware of the position being

## Page 36

1  posted?
2  A   Okay. We just said that. I mean, I'm confused
3  about the question, because you just asked me that.
4  Q   You shouldn't be confused about that.
5  A   I'm confused that you keep asking me the same
6  question over and over again. Okay. I saw it on the
7  website, yes.
8  Q   And when did you see it posted?
9  A   I'm not sure the exact date.
10 Q   But it was posted as an opening?
11 A   That's the only way it would be posted.
12 Q   Okay. So, when you saw it, it was available for
13 people to apply?
14 A   It was a position posted on the website.
15 Q   And you just said that it's only posted if it's
16 open?
17 A   It was posted on the website. That's how I'm
18 going to answer that. You know, yes, you know the
19 answer to that. Yes.
20 Q   And you chose not to apply?
21 A   Why would I --
22 Q   That's a "yes" or "no". You chose not to apply;
23 correct?
24 A   I shouldn't have had to apply for a job that I
25 had, and I was supposed to be recalled, by law.

Page 37

1    Q    You chose not to apply?
2    A    I don't know what you mean by I chose not to
3    apply for a job I already had.
4    Q    Now, is there like -- when you see the posting,
5    and I don't know this, you click on it and do an
6    application?
7    A    There is a way to click a button and apply.
8    Q    You did not click that button?
9    A    I did not for a job I already had, that I was
10   supposed to be recalled for.
11   Q    Did you have it when you were nonrenewed as of
12   June 30th?
13   A    I don't understand the question.
14   Q    Well, you didn't have a job after June 30th.
15   A    Okay.  Yeah.
16   Q    You admit that?
17   A    Well, you know, we just talked about that, as of
18   June 30th, my job -- that job was RIFed.
19   Q    Right.  Or it ceased.  You didn't have that job?
20   A    Yeah.
21         MR. WALKER:  She answered it.
22         THE WITNESS:  I have answered it so many
23   times.  You asked me the same question like
24   15 times in a row.
25         MR. WALKER:  She has answered it.

Page 38

1    BY MR. KEES:
2    Q    Yes, I get to do that, Ms. Pride.  And you're on
3    your lunch break.  We will be here all day if I want
4    to.
5    A    Sure, come on.
6    Q    You want to be hostile, that's fine.
7    A    I'm not hostile.  You just keep asking me the
8    same question.
9    Q    I mean, I do this for a living so it doesn't
10   bother me.
11   A    Okay.  Come on.
12   Q    I can take a break if I want to.
13   A    You can.
14   Q    Have you sought any other employment in the
15   district?
16   A    I did, I applied for other positions.
17   Q    What were those?
18   A    I applied for the deputy position, Deputy
19   Superintendent position, and the -- I think it was the
20   position for down in Federal Programs, the position
21   that Sam Althsul had, that Doctor Bell has now.
22   Q    So, Deputy Superintendent of Federal Programs.
23   Any other ones?
24   A    I tried to apply for a principal's position.
25   Q    What do you mean "tried"?

Page 39

1    A    I sent an e-mail to apply for that position, but
2    I was not able to apply for that position.
3    Q    Why is that?
4    A    Because they said it was -- that the position had
5    changed, that there was a precursor to be -- or a
6    pre-qualification to be an assistant principal, and I
7    had not been that.
8    Q    Who did you learn this information from?
9    A    Kim -- what is Kim's last name?
10   Q    White?
11   A    Yes.
12   Q    And what did she say the precursor was?
13   A    The pre-qualification was that you had to be an
14   assistant principal.
15   Q    And you had not been that?
16   A    I had not been that.
17   Q    So, based on the information she gave you, you
18   didn't apply?
19   A    Well, I wasn't -- the portal wasn't open for me
20   to apply.
21   Q    Is that an online listing, assistant principal --
22   or the principal?
23   A    Well, it is one.  It was one at that time.
24   Q    And it wouldn't allow you to apply?
25   A    Well, okay.  So, Doctor McNulty told us those

Page 40

1    were positions that were open, and so we were given
2    the option to apply for it after it had closed,
3    because he told us at that point, and maybe he didn't
4    know it was closed, but he offered that.  And so, they
5    didn't open it up for me to apply, because I wasn't an
6    assistant principal.
7    Q    Okay.  So, it had closed to like the general
8    public, but they were going to open it up to the
9    program administrators?
10   A    Uh-huh.  (Indicated yes.)
11   Q    But she didn't open it up for you because you
12   didn't --
13   A    Right.
14   Q    -- based on what she told you, you didn't meet
15   this pre-qualification?
16   A    Exactly.
17   Q    Did you interview for the Deputy Superintendent
18   of Federal Programs?
19   A    No.
20   Q    You weren't given an interview, or you chose not
21   to?
22   A    I was employed.  No.
23   Q    So, you applied, but had already gained other
24   employment?
25   A    Yes.

Page 41

```
 1   Q    So, as far as Deputy Superintendent, did you
 2   submit the application?
 3   A    Yes.
 4   Q    And then, did you withdraw your application?
 5   A    I think at some point, yes.
 6   Q    Prior to the selection?
 7   A    I can't remember if it was prior to selection.
 8   I'm not sure. I can't remember.
 9   Q    Did you ever get a call about an interview?
10   A    Huh-uh, no.
11   Q    Okay. I guess I'm just not clear on this one.
12   Did you want the Deputy Superintendent position, but
13   then you gained other employment?
14   A    Yes.
15   Q    This one through the Co-op?
16   A    Yes.
17   Q    So, you then chose -- you didn't want to go
18   forward with the Deputy Superintendent?
19   A    Yes, at that time.
20   Q    And then, Federal Programs, the same thing?
21   A    Yes, at the time.
22   Q    What do you mean "at the time"?
23   A    You said I didn't want to move forward with the
24   position, I said, "Yes, at that time."
25   Q    Which would have been the summer of 2018?
```

Page 42

```
 1   A    Well, it had to be well after August. It had to
 2   be into August, I think, those positions were hired.
 3   Q    Okay.
 4   A    It was after I had -- yeah.
 5   Q    After you had started working for the grant
 6   program?
 7   A    Yes.
 8   Q    Even if the positions were paying more?
 9   A    What positions?
10   Q    Like the Deputy Superintendent, if it was paying
11   more than $72,000.00?
12   A    Well, I didn't know the pay at the time.
13   Q    Okay. Any other positions that you applied for,
14   besides Deputy Superintendent, Federal Programs, and
15   then the conversation we had about --
16   A    In Pulaski County?
17   Q    Yes.
18   A    That's it.
19   Q    Before you took the job with Great Rivers, or the
20   State Personnel Development grant, did you have other
21   job offers?
22   A    Before I took -- no.
23   Q    Okay. So, your background, where did you
24   graduate high school?
25   A    Sylvan Hills.
```

Page 43

```
 1   Q    And what year was that?
 2   A    '92.
 3   Q    And your college was where?
 4   A    Hendrix.
 5   Q    What, '96?
 6   A    '96.
 7   Q    And your Masters was?
 8   A    I have two Masters. One was at UALR, and then
 9   one I got online at Walden.
10   Q    What is the one at UALR?
11   A    Middle childhood education.
12   Q    What year was that?
13   A    I don't know the exact year. It had to be early
14   2000s, something like that.
15   Q    What was the other Masters?
16   A    It's in reading and literacy.
17   Q    At which?
18   A    At Walden.
19   Q    And then, where is your doctorate?
20   A    My doctorate is from Harding.
21   Q    What is that? What year did you obtain that?
22   A    2017.
23   Q    What is that in?
24   A    Educational Leadership.
25   Q    And when did you go work for the Pulaski County
```

Page 44

```
 1   School District?
 2   A    In 2012. I think 2012.
 3   Q    What was your first position?
 4   A    It was a program administrator.
 5   Q    So, the position you always held?
 6   A    Uh-huh. (Indicated yes.)
 7   Q    So, of the six -- or of the five program
 8   administrators that were nonrenewed, were you there
 9   the longest?
10   A    Yes.
11   Q    After your second meeting with Doctor McNulty
12   that you described earlier, sometime around May 1,
13   have you had any other conversations with him?
14   A    General. I have seen him in passing, general
15   conversations, "Hello, how are you?" That's it.
16   Q    Do you do any work with Pulaski County through
17   the department?
18   A    I have not.
19   Q    Would you have the occasion to in your position?
20   A    It could come up. it could.
21   Q    Do you have communication with anybody at the
22   district regularly?
23   A    You mean, in terms of what?
24   Q    Like who from the district contacts you? Do you
25   have contact with particular positions?
```

### Page 45

1  A   Probably no. No, not in that direct way. So,
2  there would be people maybe that work under me that
3  might have direct contact.
4  Q   Okay. And you had a meeting with Paul Brewer
5  with all the other administrators where he first said
6  that the allocations were going not to include your
7  position?
8  A   Yes.
9  Q   Did you ask questions at that meeting?
10  A   I don't think I asked any questions. I pretty
11  much listened.
12  Q   And then, you were at the Board meeting, the next
13  meeting where --
14  A   Yes.
15  Q   -- your position was cut?
16  A   Yes.
17  Q   You were there?
18  A   Yes.
19  Q   Did you have discussions with Doctor Warren about
20  this?
21  A   About --
22  Q   The position being cut?
23  A   RIFed. So, I did ask her -- I mean, I have
24  talked to her about it when I was working there. And
25  I basically asked her was it her recommendation, and

### Page 46

1  she told me, "No."
2  Q   Did she say anything else about the decision?
3  A   She told me it wasn't her decision. That was the
4  basis of our conversation.
5  Q   Was there anybody else there when you had that
6  conversation?
7  A   No. I mean, I have heard her say it publicly in
8  Board meetings, too, as well.
9  Q   Okay.
10  A   So, in that regard, yes.
11  Q   Did you have any conversations with any Board
12  members about your position being cut?
13  A   No, I have never come in contact with Board
14  members about my position being cut.
15  Q   Well, you had a hearing; correct?
16  A   Yes. But I'm saying, I thought you meant like
17  individually.
18  Q   That's what I did mean. That's what I was
19  asking, you had a hearing?
20  A   I did have a hearing.
21  Q   Okay. Just to make sure I'm clear on this, I had
22  asked you about any complaints or issues regarding
23  race, and we talked about Mr. Reid, Mr. Tackett, Mr.
24  Brewer, and then you gave me your general concerns.
25  Am I missing any individuals at PCSSD that you have

### Page 47

1  any complaints or issues with while you were there
2  regarding race?
3  A   No, I can't remember. I can't think of anybody
4  else. Those were the people I felt like were part of
5  that.
6  Q   And did you ever file a district grievance of any
7  sort regarding anything?
8  A   District grievance, no.
9  Q   But this lawsuit, this is the only litigation you
10  have been involved in?
11  A   Yes.
12  Q   So, your entire tenure at the district you were
13  located in central office?
14  A   Yes.
15  Q   Who was your supervisor before Tackett?
16  A   So, Doctor Warren, when she was elementary, and
17  then -- okay. So, I also had Doctor Remele, Doctor
18  Warren. I'm trying to see who else. What is her name
19  that was temporary? I can't think of her name right
20  now.
21  Q   Was it Goodwin?
22  A   Yeah, Ms. Goodwin.
23  Q   And you are divorced from Kenneth Davis?
24  A   Yes.
25  Q   And no children?

### Page 48

1  A   No children.
2  Q   You are not currently married?
3  A   No.
4  Q   Do your parents live in the area?
5  A   Yes. My mother lives in Little Rock and my
6  father lives in Little Rock.
7  Q   What are their names?
8  A   Dorothy Williams and Eddie Pride.
9  Q   Is Dorothy Williams -- where does she live?
10  A   She lives in Little Rock, right here in Little
11  Rock.
12  Q   She is not the Board member at North Little Rock?
13  A   No, she doesn't -- no, she is retired. She
14  doesn't do anything like that.
15  Q   Do you have siblings in Little Rock?
16  A   No.
17  Q   Have you had any medical treatment related to
18  your Complaint against the district?
19  A   No.
20  Q   Well, we all have doctors.
21  A   Yeah, I have been to the doctor.
22  Q   I'm asking, have you seen a doctor specifically
23  related to --
24  A   No.
25  Q   Well, let me just make sure I'm clear. Have you

## Page 49

1   seen a doctor specifically related to your Complaints
2   against the district in regards to this lawsuit?
3   A    No.
4   Q    Did you ever file for unemployment following the
5   nonrenewal?
6   A    Yes.
7   Q    But that was only, what, a few -- did you get
8   unemployment?
9   A    No.  No.
10   Q    Because you gained the other employment, or you
11   were denied?
12   A    Well, basically, you have to wait so many weeks
13   before you can get unemployment.  And at that time, I
14   had been contracted but not paid, but it still didn't
15   matter.  So, you just have to go without pay.
16   Q    How did you -- strike that.
17       You were without pay for roughly a month and a
18   half?
19   A    Probably a little longer than that, because it
20   takes you like three weeks to get paid on your current
21   position.
22   Q    And what did you do to get by during that time?
23   A    I had to depend on people that -- like I had to
24   acquire some debt, and depend on people to help me
25   that were close to me.

## Page 50

1   Q    Do you have any dependents?
2   A    No.
3   Q    I see an e-mail, it says, "Doctor Warren, I sent
4   Kim White an e-mail, she did not respond, and this
5   morning I spoke with Ms. Burgess and she stated that
6   we do not qualify for the position."  And this is
7   referencing an elementary principal position?
8   A    Uh-huh.  (Indicated yes.)
9   Q    Earlier, you told me Kim White --
10   A    She did initially tell me that.
11   Q    Okay.
12   A    Then I had to go verify.
13   Q    And you verified that with Ms. Burgess?
14   A    Yes.
15   Q    Did you disagree with that?
16   A    Do I disagree with me not being able to apply?
17   Q    Yes.
18   A    Yeah.  I don't think it should be a
19   pre-qualification, no, to be an assistant principal.
20   Q    Okay.
21   A    So, yeah, I did disagree with that.
22   Q    And I understand that.  You agree that that was a
23   qualification for PCSSD?
24   A    Right.
25   Q    So, what is your licensure?

## Page 51

1   A    It's -- I have several licensures.  So, K-8,
2   middle school English, curriculum program
3   administrator, building level administrator, I have a
4   coaching endorsement on there.  I'm trying to see what
5   else I've got on there.  That about sums it up.
6   Q    What were you prior to coming to PCSSD?
7   A    I worked in the Little Rock School District as a
8   teacher.
9   Q    So, you have never been a building level
10   administrator?
11   A    No.  I worked for the district level in Little
12   Rock, but not a building level administrator.
13   Q    I thought you were a teacher?
14   A    Well, that's the job I had prior to coming.  But
15   I had several positions in Little Rock.  I worked
16   there 15 years.
17   Q    So, you went from a building level -- or a
18   district administrator back down to a teacher?
19   A    Yeah.  I worked on a grant-funded position.
20   Q    What was that grant-funded position?
21   A    It was a Reading First Technical Assistant.
22   Q    At the district level?
23   A    Yes.
24   Q    And then, the grant expired?
25   A    Yes.

## Page 52

1   Q    And you went back to teaching?
2   A    For a year, yes.
3   Q    At an elementary school?
4   A    Middle.
5   Q    Middle school.  Okay.  So, the complaints that we
6   have discussed today were based on your race.  Any
7   other complaints that you had while at PCSSD in the
8   last -- in the five years prior to your employment
9   based on age?
10   A    On age?
11   Q    Right.
12   A    No.
13   Q    And would it be fair you also had complaints
14   regarding your gender, because you said "black women"?
15   A    Yes, I feel like gender was part of it.  I think
16   gender, as well, in addition to.
17   Q    Any complaints about your religion?
18   A    No religion.
19   Q    Okay.  All right.  I'm about done.  Have you ever
20   been terminated from any position?
21   A    No.
22   Q    Ever filed for bankruptcy?
23   A    No.
24   Q    Does the ADE contribute to your Arkansas Teacher
25   Retirement?

Page 53

1    A    Yes.
2    Q    At 14 percent?
3    A    Yes.
4    Q    Did you get a Teacher Retirement contribution
5    when you were at Great Rivers and Southeast?
6    A    Yes.
7    Q    And who is your supervisor -- Stacy Smith, you
8    told me?
9    A    Yes.
10   Q    Just so I'm clear.  On Brewer, when you had the
11   first conversation and he advised that these cuts were
12   going to be part of the allocations, did he give you
13   any information about other positions at that time,
14   open positions?
15   A    No.  He said he wanted to give -- he wanted to
16   give Doctor McNulty an opportunity to restructure.
17   So, he said we wouldn't know anything until Doctor
18   McNulty came and met with us.
19   Q    Was Laura Shirley in that meeting with you?
20   A    I don't think so.  I think it was the five
21   program administrators, is my best recollection of
22   that.
23   Q    Do you ever remember being in a meeting with
24   administration and Ms. Shirley being present?
25   A    You mean, regarding the RIF?

Page 54

1    Q    Yes, regarding this nonrenewal?
2    A    No, I don't really remember that.
3    Q    All right.  Have you understood everything I have
4    asked today, ma'am?
5    A    Yes.
6         MR. KEES:  All right.  Thank you for
7    your time.
8         THE WITNESS:  Thank you.
9         (WHEREUPON, at 1:20 p.m., the taking of
10   the above-entitled deposition was concluded.)
11         ---o---
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 55

ERRATA

PAGE\LINE          SAYS:          SHOULD SAY:

Page 56

SIGNATURE

I, Kiffany Pride, do hereby certify
that I have read the foregoing pages, and the
same is a true and correct transcription of the
proceedings that occurred, except for the
corrections (if any) that appear on the
Errata Sheet.

_____
Kiffany Pride


STATE OF ARKANSAS)
                 ) ss.:
COUNTY OF _____)

WITNESS MY HAND AND SEAL, this _____

day of _____, 2019.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

Page 57

CERTIFICATE

STATE OF ARKANSAS )
                  ) ss.:
COUNTY OF PULASKI )

    I, DEBBYE L. PETRE, Certified Court Reporter
in and for the County of Pulaski, State of Arkansas,
duly commissioned and acting, do hereby certify that
the witness herein was by me first duly sworn to
testify the whole truth and nothing but the truth
prior to taking down in Stenotype the questions,
answers, and proceedings during said deposition, and
from such recordation was thereafter reduced to print
by means of computer-assisted transcription, and the
same fully, truly, and correctly reflects the
proceedings had.

    I FURTHER CERTIFY that the above deposition
was given by the witness and taken at the times and in
the place hereinabove set forth.

    I FURTHER CERTIFY that I am not attorney or
counsel of any of the parties, nor am I relative or
employee of any attorney or counsel or party connected

57

Page 58

with the action, and have no interest in the outcome
or results of this litigation.

    WHEREFORE, I have subscribed my signature and
affixed my notarial seal as such notary public at the
City of Little Rock, County of Pulaski, State of
Arkansas, this the 12th day of November, 2019.


_____
DEBBYE L. PETRE, CCR
NOTARY PUBLIC IN AND FOR
PULASKI COUNTY, ARKANSAS



---o---

58