Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

---

JENNIFER BEASLEY; DR. KIFFANY PRIDE; LAURA SHIRLEY; and NICOLE TOWNSEND,

    PLAINTIFFS,

VS.    NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official capacity as Superintendent of Schools of the Pulaski County Special School District; PULASKI COUNTY SPECIAL SCHOOL DISTRICT BOARD OF DIRECTORS; and PULASKI COUNTY SPECIAL SCHOOL DISTRICT, a public body corporate,

    DEFENDANTS.

---

---o---

DEPOSITION

OF

JENNIFER BEASLEY

---o---

TUESDAY, OCTOBER 8, 2019

---o---

Page 2

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

    JOHN WALKER, ESQUIRE
    JOY SPRINGER, Administrative Assistant
    John Walker Law Firm
    1723 South Broadway Street
    Little Rock, Arkansas 72206

ON BEHALF OF DEFENDANTS:
    W. CODY KEES, ESQUIRE
    Bequette and Billingsley
    425 West Capitol Avenue
    Suite 3200
    Little Rock, Arkansas 72201

ALSO PRESENT:
    MS. NICOLE TOWNSEND
    MS. SHAWN BURGESS

---o---

2

Page 3

INDEX

| WITNESS: | PAGE: |
|---|---|
| JENNIFER BEASLEY | |
|   Direct Examination | 5 |

---o---

EXHIBITS

| Exhibit One | 18 |
|---|---|

---o---

| Reporter's Certificate | 67 |
|---|---|

---o---

EXHIBIT 8

Page 4

```
 1       The deposition of Jennifer Beasley was
 2   taken before me, Debbye L. Petre, Certified Court
 3   Reporter and notary public within and for the County
 4   of Pulaski, State of Arkansas, duly commissioned and
 5   acting, on Tuesday, October 8, 2019, beginning at the
 6   hour of 10:15 a.m., at the offices of John Walker Law
 7   Firm, 1723 South Broadway Street, Little Rock, Pulaski
 8   County, Arkansas.
 9       Said deposition being taken in
10   accordance with the Rules of Federal Procedure and
11   pursuant to the provisions of the Arkansas Rules of
12   Civil Procedure at instance of counsel for the
13   Defendants in the above-styled case in the United
14   States District Court, Eastern District of Arkansas,
15   Western Division.
16            ---o---
17   THEREUPON, the following proceedings were had,
18   to-wit:
19            ---o---
20
21
```

Page 5

1    PROCEEDINGS
2    WHEREUPON,
3            JENNIFER BEASLEY,
4    having been called for examination, and having been
5    first duly sworn, was examined and testified as
6    follows:
7            DIRECT EXAMINATION
8    BY MR. KEES:
9    Q    Good morning, Ms. Beasley. My name is Cody
10   Kees, and I represent the Pulaski County Special
11   School District in a lawsuit that you and three other
12   ladies have filed. And I'm going to take your
13   deposition today. Okay?
14   A    Yes, sir.
15   Q    Have you ever given a deposition before?
16   A    No.
17   Q    So, you are under oath, and this is an
18   opportunity for me to ask you questions about your
19   lawsuit and your knowledge and your background in
20   preparation for the trial of the matter. Okay?
21   A    Yes.
22   Q    And everything is being typed down by Ms. Petre
23   here. So, make sure and give me audible answers,
24   "yes", "no", "I don't understand," et cetera. Okay?
25   A    Yes.

Page 6

1    Q    And on that note, if I ask a question and you
2    don't understand, just simply tell me, "I don't
3    understand," or, "Can you rephrase that," because the
4    record, I want to make sure it reflects accurately
5    what you told me.
6    A    Yes.
7    Q    And you know Ms. Burgess?
8    A    Yes.
9    Q    She is here for the district. Let's start, what
10   is your date of birth?
11   A    June 7th, 1973.
12   Q    And to make things easier, I'm going to run
13   through some discovery responses and you can just tell
14   me if they are right or wrong.
15   A    Okay.
16   Q    You're still married to Derick?
17   A    Yes, sir.
18   Q    And you still live at 16303 Ironton Road?
19   A    Yes.
20   Q    I-R-O-N-T-O-N?
21   A    Yes.
22   Q    And I count that you have a daughter and three
23   sons?
24   A    Yes.
25   Q    And do they still all live in the residence with

Page 7

1    you?
2    A    Yes. My daughter is in college, but, yes.
3    Q    Destiny?
4    A    Yes.
5    Q    Where is she in college?
6    A    Grambling State University.
7    Q    Okay. That's great. Where do Keith, Denzel,
8    and Derick go to school?
9    A    Keith and Denzel go to Parkview High School,
10   Derick goes to Horace Mann Middle School.
11   Q    So, you are zoned in Little Rock?
12   A    Yes.
13   Q    What does your husband do, Ms. Beasley?
14   A    He is disabled. So, he had his left leg
15   amputated, so he is disabled.
16   Q    I'm sorry to hear that. Was he military?
17   A    No.
18   Q    Work accident?
19   A    Motorcycle accident, yes.
20   Q    So, his only income is from his disability
21   income?
22   A    Disability, and we have rental property, yes.
23   Q    Property, more than one?
24   A    Yes. We have properties, yes, in Little Rock,
25   one, two -- we have sold a couple since. I think it's

Page 8

1    three.
2    Q    Are your parents living?
3    A    My dad is living.
4    Q    What is his name?
5    A    Oliver Walter Thomas, Senior.
6    Q    Thomas is your maiden name?
7    A    Yes.
8    Q    T-H-O-M-A-S?
9    A    Yes.
10   Q    Do you have any siblings that live in the
11   central Arkansas area?
12   A    Yes. I have a brother, Oliver Thomas, Junior.
13   He lives in Conway.
14   Q    No other siblings?
15   A    Not in this area, no.
16   Q    And your mother is deceased?
17   A    Yes.
18   Q    Any other close relatives?
19   A    In this area? I have a stepson and a
20   stepdaughter. Stepson lives in Little Rock.
21   Q    So, Derick was previously married?
22   A    Yes, twice.
23   Q    Okay. What are your stepchildren's names?
24   A    Derick Beasley, II, and Cameria Beasley -- what
25   is her last name, Cameria Beasley. What is her last

Page 9

1 name? Hold on. Blake.
2 Q Blake?
3 A Yes.
4 Q Okay.
5 A She lives in Conway, Arkansas.
6 Q Where were you born?
7 A Magnolia, Arkansas.
8 Q You told me that earlier. And where did you go
9 to college?
10 A I went to Grambling State University, Louisiana
11 Tech University, and I finished my program at
12 Northeast Louisiana. Now it's University of
13 Louisiana, Monroe.
14 Q That's where you finished your Bachelors degree?
15 A Yes.
16 Q And did you go from high school directly to
17 college?
18 A Yes.
19 Q And then, did you complete college in how many
20 years?
21 A Five.
22 Q Five?
23 A Uh-huh. (Indicated yes.)
24 Q And then, did you -- do you have any
25 post-college education?

Page 10

1 A Yes.
2 Q Masters?
3 A I have two Masters and I'm a doctoral candidate.
4 Q You submitted a resume, did you not?
5 A Yes.
6 Q Let me just pull it up, it will make things
7 faster. Where are you a doctoral candidate?
8 A Yes.
9 Q Where?
10 A Grand Canyon University. Can we go back? You
11 asked were we zoned in Little Rock. We are zoned in
12 Pulaski County. My kids go to school in Little Rock.
13 Q Okay.
14 A Because I worked there, and then my property is
15 there. So, we are not zoned in Little Rock.
16 Q Oh, okay. So, your property is in Pulaski
17 County?
18 A Yes.
19 Q You worked there prior to --
20 A Prior to working for PCSSD.
21 Q Okay. I have seen your resume this morning,
22 that would probably make it easier. I think I'm
23 missing page one. Do you have that with you, by
24 chance?
25 A I do. Exhibit Number Three. It's -- my

Page 11

1 education, it's kind of behind that. So, it's number
2 three.
3 Q Oh, then I have it, then?
4 A Yes. And it's page two, three, four, five.
5 Q So, you have your Bachelors, you have a Masters
6 in instructional technology?
7 A Yes.
8 Q You have a Masters in administration?
9 A Yes.
10 Q From Grand Canyon University?
11 A Yes.
12 Q That was online?
13 A Yes.
14 Q What does "administration" mean?
15 A Education administration, K-12.
16 Q So, two Masters degrees; correct?
17 A Yes.
18 Q And you have a certificate for curriculum
19 program administrator from Arkansas State?
20 A Yes.
21 Q Was that a combination of online and going to
22 the university?
23 A It was online, strictly online. It was a
24 certification program.
25 Q When did you do this, at home, at night, on

Page 12

1 weekends?
2 A Yes.
3 Q So, your degree was in radiologic technology?
4 A Yes. I was a registered radiologic technology.
5 Q So, did you want to work in a medical setting?
6 A I started out biology pre-med. So, I'm
7 nontraditional. I was registered 1996 through 1999.
8 Q When did you locate to Little Rock?
9 A 2001, April 2001.
10 Q Was that soon after you were married?
11 A Two years after I got married. I got married in
12 1998, December 31st, 1998.
13 Q Did you live in south Arkansas then?
14 A Lived in Camden for two years. And then, April
15 2001, we moved to Little Rock, Arkansas.
16 Q For your work?
17 A We wanted to move. So, my husband had just
18 became -- well, he was disabled, he just stopped
19 working, because he worked five years.
20 Q Did he work at the paper mill?
21 A No. He worked at Camden Housing Authority for
22 18 years.
23 Q Okay.
24 A And he finally stopped working. So, we moved up
25 here for me.

Page 13

1  Q   Okay. And then, so, employment -- oh, I
2  remember reading, you worked for the prosecuting
3  attorney?
4  A   Yes.
5  Q   That's interesting.
6  A   It was.
7  Q   And then, your first teaching job, am I correct,
8  public school district was LRSD?
9  A   It was -- I think on our thing, it was over 20
10 years ago, I didn't put it down, but it was --
11 Q   Kids Express?
12 A   It was before that. Red River Parish in
13 Coushatta, Louisiana. That was in 1996. So, it was
14 over 20 years ago.
15 Q   When you were in school?
16 A   No. Right after school.
17 Q   Okay. So --
18 A   I wasn't certified then.
19 Q   I got you. So, your first certified position?
20 A   Was in Little Rock.
21 Q   All right. And you were at MLK?
22 A   Yes.
23 Q   You were interim assistant principal there?
24 A   Yes, my last year.
25 Q   So, you were there from 2006 to 2012?

Page 14

1  A   Yes.
2  Q   And while you were there, did you get your admin
3  certificate?
4  A   Yes. I didn't get my certificate. I got my
5  degree while I was a classroom teacher.
6  Q   The Masters degree?
7  A   Yes.
8  Q   Which allowed you to be an admin?
9  A   Yes.
10 Q   Was that the one, the Masters of Education you
11 got at AIU online?
12 A   No, that's instructional technology. It was the
13 one at Grand Canyon.
14 Q   Okay. Masters of Education?
15 A   Yes.
16 Q   Got it. All right. So, six years at LRSD, the
17 entire time was at MLK Elementary?
18 A   Yes.
19 Q   And you left there to go work at PCSSD?
20 A   Yes.
21 Q   You also spent some time at Arkansas Baptist
22 College?
23 A   Yes. I was an adjunct professor.
24 Q   While at --
25 A   While at PCSSD. I did evening classes.

Page 15

1  Q   What did you teach?
2  A   I taught intro to computers.
3  Q   Great. So, you did a lot of things in the
4  evening, school or work?
5  A   Yes.
6  Q   I know you work in the home with your kids. But
7  does your husband have responsibilities in the home?
8  A   Yes.
9  Q   Like helping with the kids?
10 A   Yes, pick up. He picks up when they were in
11 elementary, after school, middle school.
12 Q   Is he able to drive?
13 A   Yes, he can drive. He has a prosthetic leg.
14 Q   Okay. And then, so, you go to PCSSD, you start
15 there, I'm assuming, July 1, 2013?
16 A   2012. It was actually July 9th, 2012.
17 Q   Oh, excuse me. Yes, I got that. Exactly. All
18 right. So, I'm going to put July 1 of 2012 through
19 July 1 of 2018.
20 A   Yes.
21 Q   All right. Or actually, I guess, it would be
22 like June 30th of 2018.
23 A   Yes, June 30th was my last day.
24 Q   So, six years in the district?
25 A   Yes.

Page 16

1  Q   And you started out in what position at PCSSD?
2  A   Instructional technology specialist.
3  Q   Is that the same position you held up until your
4  termination?
5  A   No.
6  Q   What did you call it, instructional what?
7  A   Instructional technology specialist.
8  Q   Was that Central Office?
9  A   Yes.
10 Q   All right. So, what were the various positions
11 you held?
12 A   I was a school improvement specialist.
13 Q   After instructional?
14 A   After.
15 Q   So, instructional technology specialist, then
16 you became a school --
17 A   Improvement specialist. I still kept my duties
18 that I had with instructional technology.
19 Q   Then, what?
20 A   Then I was a dyslexia therapist, I assisted with
21 the dyslexia.
22 Q   Was that full-time dyslexia therapist?
23 A   It was all while we were working. Doctor Pride
24 was over dyslexia, and she recruited me to help her.
25 So, we tested kids, and we did intervention with kids.

Page 17

1  alongside of our full-time job.
2  Q  I will ask your duties. But just looking at
3  your title, you were instructional technology
4  specialist?
5  A  Uh-huh. (Indicated yes.)
6  Q  Then, your title went to school --
7  A  School improvement specialist.
8  Q  And while doing that, you were a dyslexia
9  therapist?
10 A  Yes. And then, my last official title was
11 program administrator for K-12 science.
12 Q  K-12 science?
13 A  Yes.
14 Q  All right. So I'm clear, in your six years, you
15 held three titles?
16 A  Yes.
17 Q  Instructional technology specialist?
18 A  Yes.
19 Q  School improvement specialist?
20 A  Yes.
21 Q  And then, program administrator, K-12, science?
22 A  Yes.
23 Q  Aside from your pay increasing because of the
24 steps, did it increase because of rank?
25 A  Well, it actually went down when I went to

Page 18

1  school improvement specialist, and then it went up
2  like a little bit, $3,000.00, probably, when I became
3  program administrator, because I was on a different
4  pay scale.
5  Q  Okay.
6  A  Administrative support staff and then certified
7  administrator. So, my first job was higher paying.
8  Q  It was admin?
9  A  Yeah. Both of them were, but it was support
10 admin. It was a different scale.
11 Q  Okay. I have your contract the last year you
12 worked. It says you made $76,546.65?
13 A  Uh-huh, yeah. And I had just got back up to
14 that. Because I made $76,000.00 when I first got
15 there.
16 Q  Okay.
17 A  I made $72,000.00, then $76,000.00. It went up
18 to $78,000.00, then it dropped back down to
19 $71,000.00, and then it got back up to $76,000.00 my
20 last contract year.
21 Q  Okay.
22    (WHEREUPON, Exhibit Number One was
23    marked for identification.)
24 BY MR. KEES:
25 Q  When you were the instructional technology

Page 19

1  specialist, who did you report to?
2  A  Will Reid. Well, first it was Susan, Susan --
3  Lord have mercy. Susan, Susan, Susan. I cannot
4  remember her last name.
5     MR. KEES: Do you remember?
6     MS. BURGESS: Fletcher.
7     THE WITNESS: Thank you.
8  BY MR. KEES:
9  Q  Susan Fletcher?
10 A  Susan Fletcher.
11 Q  She can't testify for you, but she can help you.
12 A  I know. But thank you for asking her.
13 Q  She can help you. Susan Fletcher, then Will
14 Reid?
15 A  Then Will Reid, yes, sir.
16 Q  That was all your -- those were your only two
17 supervisors?
18 A  No, sir.
19 Q  Oh.
20 A  When I became --
21 Q  No. I'm just talking about the instructional.
22 A  Oh, yes, sir, that was the only two.
23 Q  And where did this department report to?
24 A  First it was Learning Services and we reported
25 to the elementary and secondary director. And then,

Page 20

1  we moved to Information Technology, that's when I was
2  under Will Reid, and we reported directly to Will
3  Reid.
4  Q  Okay. All right. Let's go to school
5  improvement specialist. Was that always under
6  Learning Services?
7  A  It was Learning Services, yes, and we reported
8  to the deputy superintendent.
9  Q  Doctor Bednar?
10 A  Yes, sir.
11 Q  So, that was your direct report?
12 A  Yes, sir.
13 Q  The entire time you held that position?
14 A  Yes, sir.
15 Q  And then, were you reporting to Doctor Pride
16 with dyslexia?
17 A  No. I assisted her.
18 Q  Okay.
19 A  But we were like lateral.
20 Q  I got you. And then, program admin?
21 A  I reported to two directors, Doctor Tackett for
22 secondary director, and Ms. Linda Goodwin for
23 elementary.
24 Q  Okay. Were you just there one year in that
25 position?

Page 21

1  A   Yes. That was my last year.
2  Q   Your last year was program admin?
3  A   Yes, that was my last year.
4  Q   Goodwin?
5  A   Yes.
6  Q   All right. I'm going to use the term
7  "termination". So, that's a legal term, it's not
8  implying that you were terminated, nonrenewed, that's
9  for me and John to argue about. That's what I mean.
10 I'm going to say "terminated".
11 A   Okay.
12 Q   All right. Following your termination from
13 PCSSD, it looks like you did a whole lot of stuff.
14 So, walk me through what positions or jobs you took
15 and now hold.
16 A   So, educational consultant for McGraw Hill,
17 that's a contracted position. And another contracted
18 position --
19 Q   McGraw Hill, that's $37.00 an hour?
20 A   Yes, $37.50.
21 Q   $37.50. Do you know about -- are you paid
22 weekly, monthly?
23 A   Whenever I do a job. So, sometimes it may be
24 once a month, sometimes maybe twice, sometimes five
25 times a month. It's not a steady.

Page 22

1  Q   What do they -- you are an independent
2  contractor?
3  A   Yes.
4  Q   So, do they send you over like a W-9?
5  A   W-9, yes.
6  Q   Would you have had a W-9 issued for 2018?
7  A   Yes.
8  Q   And then, you will have one issued for 2019?
9  A   Yes.
10 Q   Do you remember what your W-9 was for calendar
11 year '18?
12 A   I don't. No.
13 Q   Okay. Well, I will request that from John, just
14 so I can see what your earnings were. But do you
15 think it was -- let's say for this year, do you
16 anticipate making under $10,000.00, over $10,000.00?
17 A   Under.
18 Q   Under?
19 A   Yeah, I had surgery, so under.
20 Q   And what do you do, kind of in a nutshell?
21 A   I provide professional development. When they
22 buy products from McGraw Hill, I go in and provide
23 professional development products on any books or
24 technology programs that they purchase.
25 Q   Okay.

Page 23

1  A   And sometimes I just visit the school just to
2  follow up. So, that's basically what I do.
3  Q   You had surgery. And in deposition, this is an
4  opportunity for me to kind of get to know more about
5  what is going on in your life. That doesn't
6  necessarily mean we will talk about it in front of a
7  jury. But what kind of surgery did you have?
8  A   It was supposed to be a hernia surgery, but it
9  ended up my uterus was lodged in a scar.
10 Q   It was what?
11 A   My uterus.
12 Q   Yes.
13 A   Was lodged in a scar that I had from previous
14 C-sections. And so, they removed two cysts instead of
15 just the hernia. So, it caused me to be out, instead
16 of four weeks, eight weeks.
17 Q   You were out for eight weeks?
18 A   Yes.
19 Q   And you had that surgery when?
20 A   July 24th.
21 Q   Okay.
22 A   My first day stepping back really into a school
23 was, I think, September 18th, I think. It was
24 sometime in September.
25 Q   Were you at the depositions that John took at

Page 24

1  the district?
2  A   I was.
3  Q   So, was that before July 24th?
4  A   It was in June.
5  Q   Okay.
6  A   It was about a month and a half before.
7  Q   Are you fully recovered now?
8  A   No.
9  Q   Are you still missing work?
10 A   I'm not traveling as much. And you didn't ask
11 me about the other place.
12 Q   Okay.
13 A   But I do schedule -- I do have scheduled visits
14 for schools. I thought I had some contracts with
15 PCSSD, but they fell through. So, I have to revamp
16 now.
17 Q   So, McGraw, do you travel outside of Little
18 Rock?
19 A   Yeah, across -- like from Little Rock and up to
20 east Arkansas, that's her territory, my rep's
21 territory. So, I could travel in Brinkley or Lake
22 Village.
23 Q   Little Rock, all the east side of the state?
24 A   All the east side, north, south, and east of
25 Little Rock.

Page 25

1  Q  Okay.
2  A  She calls them "A", "B", "C" districts. But the
3     smallest district is a thousand, and her largest
4     client is Little Rock School District.
5  Q  Is Pulaski County a client?
6  A  It's a client, yes.
7  Q  So, do you go into Pulaski County for McGraw
8     Hill?
9  A  Sometimes I will, because they have corrective
10    reading. And so, I may check on them for that.
11 Q  Do you get paid for your travel?
12 A  Yes.
13 Q  So, it's $37.50 for --
14 A  No. It's different.
15 Q  Okay.
16 A  $37.50 if I'm doing a PD. If I'm traveling just
17    to go somewhere, they pay mileage plus the time I have
18    to travel, I think it's like $12.00 or $13.00 an hour.
19    And if I'm just going to talk to someone, or e-mail,
20    it's $15.00 an hour. So, it's different.
21 Q  Sure. All right. So, your other employment, I
22    have as Arkansas AIMS?
23 A  Yes. It's Arkansas AIMS. And it stands for
24    Math and Science Initiative.
25 Q  Is the "A", what does that stand for?

Page 26

1  A  I have forgot.
2  Q  So it's A-I-M-S, and it's math and science?
3  A  Initiative, yes.
4  Q  Who --
5  A  I should know that.
6  Q  Who is over it? I mean, what is this?
7  A  It's a nonprofit organization that's housed at
8     UALR. And they get their ideas from National Math and
9     Science Initiative in Dallas, Texas. So, they started
10    out with AP, providing services for AP teachers and
11    pre-AP. I came in last year because they just started
12    with middle schools, and Horace Mann and Mills Middle
13    was their first two middle schools. Now, I also see
14    North Little Rock Middle School, sixth grade campus
15    and seventh and eighth grade campus.
16 Q  Who funds Arkansas AIMS?
17 A  It's a nonprofit. They have a Board, so they
18    get donations from various people. And then, they are
19    housed at -- it's a U of A type of system, you know,
20    it's grant funded.
21 Q  Right. You don't know of a particular family?
22 A  No, I don't. It's grant funded.
23 Q  So, your rate of pay, it's by the day, $250.00 a
24    day?
25 A  It's by day, yes. If I stay a full day is

Page 27

1  $250.00, half a day is $125.00.
2  Q  So, this year, any estimate of how much you will
3     make?
4  A  No. Because like I said, I just -- I worked
5     three -- my check should be $375.00 for September,
6     because I was out for surgery.
7  Q  I got it. And you get a W-9, as well?
8  A  Get a W-9.
9  Q  Because you are an independent contractor?
10 A  Yes.
11 Q  Or it may be a 1099. I will have to check.
12 A  Well, I know with Arkansas AIMS I filled out a
13    W-9 and gave it back to them.
14 Q  Okay.
15 A  I have that copy. And 1099, it may be 1099 for
16    McGraw Hill.
17 Q  Right. I think you fill out a W-9.
18 A  W-9, but it's a 1099. You're right, it's a 1099
19    position. You are correct.
20 Q  Okay. I will get with John and Joy to get your
21    1099s, just so we can see what your pay was.
22 A  Okay.
23 Q  And then, you founded The Learning Tree
24    Educational Solutions?
25 A  Yes, I did. That came because I was doing it,

Page 28

1  but a principal asked me to come help her at school.
2  So, I looked for job after job, and I just said, "Why
3  not?" Because I'm good at it, and I did it.
4  Q  Well, who is the principal?
5  A  Lisa Watson from Mills Middle School.
6  Q  So, you -- let me back up. McGraw Hill takes
7     you to Pulaski County on occasion?
8  A  On occasion, yes.
9  Q  AIMS does not?
10 A  Yes.
11 Q  Oh, they do?
12 A  Because Mills Middle is one of their first
13    middle schools that asked them for support.
14 Q  AIMS, Lisa did?
15 A  AIMS, yes.
16 Q  And then, Lisa Watson also asked you for help,
17    and you created this LLC, The Learning Tree?
18 A  Yes. Yes. I started it, and then I officially
19    got my LLC January 2018. Because she wanted me -- I
20    was going there like --
21 Q  January 2019?
22 A  Yeah. 2019. Thank you.
23 Q  Yes.
24 A  January 2019. So, I probably went to her school
25    like from three to four days a week. And out of those

Page 29

1  three to four days, two were for AIMS, and then the
2  others were from my company. Sometimes -- and I
3  volunteer after school tutoring. That was volunteer.
4  Q  So, with The Learning Tree, are you paid by the
5  district?
6  A  No. I was paid from her school through funds,
7  yes.
8  Q  Through funds allocated to Mills Middle?
9  A  Allocated to Mills Middle, yes.
10 Q  Is that the only school you are servicing as The
11 Learning Tree?
12 A  Well, this year, I'm not servicing any schools.
13 I was asked to service four schools, but then I was
14 told that I couldn't do it because of conflict of
15 interest.
16 Q  What schools -- who asked you to service
17 schools?
18 A  Mills Middle, Lisa Watson, Doctor Yvette
19 Dillingham from Harris Elementary School, Ms. Masako
20 Christian at Lawson Elementary, and Ms. Felicia
21 Hamilton at Clinton Elementary School.
22 Q  They asked that you service their schools
23 through your company?
24 A  Yes. They asked either through e-mail or phone
25 call. And I e-mailed them a proposal. I e-mailed --

Page 30

1  Ms. Watson, Mills Middle School, I e-mailed her May
2  2019, and it was approved last year. And so, I
3  planned my year based on my schools and my time,
4  because it's me. We also do ACT prep, but I have a
5  team. But schools, it's me, I go to the schools.
6  Q  And who told you about a conflict of interest?
7  A  The principals told me that they were told by
8  Ms. Smith that it was a conflict of interest due to
9  the lawsuit that we have, so I wouldn't be able to
10 provide services for them. And I said, "Okay."
11 Q  Who gave you that information, Lisa?
12 A  Ms. Lisa Watson, Ms. Masako Christian, Doctor
13 Yvette Dillingham, at three different times. I
14 e-mailed Ms. Hamilton to follow up to see if I could
15 -- when I was going to her school, to tell her the
16 day, she didn't e-mail me back.
17 Q  So, three of the four --
18 A  Three of the four told me that.
19 Q  -- told you that it was a conflict?
20 A  Yes, that they were told it was a conflict.
21 Q  And they routed that back to Ms. Smith?
22 A  Well, Ms. Watson, Doctor Bell came and told her
23 that Ms. Smith told him to tell her.
24 Q  Okay.
25 A  But the other two specifically said that they

Page 31

1  had a conversation with her. Because we were getting
2  ready -- I was getting ready to go. And I had gone to
3  Harris Elementary and planned with another consultant
4  for one day.
5  Q  Okay.
6  A  And so, I stopped.
7  Q  So, this school year, what schools does The
8  Learning Tree service?
9  A  No one. We service students for ACT prep this
10 year.
11 Q  So, I mean, I know you wouldn't know this. But
12 do you anticipate your 2019 total earnings, do you
13 have a number?
14 A  I had a number, but now I don't have a number.
15 I mean, I have to revamp, I have to start back over.
16 Q  Okay. What had you anticipated the number to
17 be?
18 A  $60,000.00.
19 Q  But it will be less than that?
20 A  It will be less, yes, sir.
21 Q  Okay. All right. So, like tomorrow, what does
22 a typical day look like for you now that you are
23 recovered from your surgery?
24 A  Well, tomorrow I actually will be going to Mills
25 Middle School for Arkansas AIMS to provide -- because

Page 32

1  I provide math and science. So, tomorrow is a science
2  day.
3  Q  Okay.
4  A  So, I will go in and work with teachers, observe
5  them, we will meet, talk about our next step, model
6  for them. That's my typical day. I model for
7  teachers, I work with kids. We look at the data, we
8  make plans. I actually planned with them this summer
9  because they had over a ten percent growth in the
10 Science Department. Well, ten percent in seventh
11 grade, like five percent in like sixth grade, and five
12 percent, something like that, in eighth grade. So, it
13 was growth.
14 Q  At Mills Middle?
15 A  At Mills Middle in science. That was my
16 targeted area last year. So, we planned based on
17 that, based on the work we did last year.
18 Q  What are you doing for insurance now?
19 A  I was paying my insurance, $665.00 for private
20 insurance. I'm not going to be able to meet that
21 premium this month. So --
22 Q  So, that's your family plan?
23 A  For myself and my children. Of course, my
24 husband gets his insurance through disability.
25 Q  Who are your kids covered through?

## Page 33

1  A    Through me, through my private insurance. The
2  $665.00 covers me and four children.
3  Q    You listed Doctor Keith Cooper as a doctor that
4  you saw regarding issues that you raise in your
5  Complaint. Is that accurate?
6  A    That's just my doctor, so if you need my medical
7  records.
8  Q    Well, I don't need them unless you treated
9  because of some type of issue related to this lawsuit.
10 A    No. I mean, I go to him for high blood
11 pressure. I had it before. It's kind of hereditary.
12 Q    Well, you know, in employment cases, the reason
13 I ask is, sometimes employees will say, "The loss of
14 my job caused me, you know, anxiety or medical
15 issues." Is there any of that that happened for you?
16 A    No.
17 Q    Okay.
18 A    I mean, my body is just -- no.
19 Q    So, none of your medical issues were exacerbated
20 or worsened after your termination from Pulaski
21 County?
22 A    He put me on a stronger dosage, but I can't
23 honestly say that was it. I'm not going to say that
24 was it.
25 Q    Stronger dosage of what?

## Page 34

1  A    For my high blood pressure.
2  Q    Are you still actively looking for employment in
3  a nonconsulting role?
4  A    I haven't, no, not this year. Like I said, I
5  actually have to start back over. So, it's going to
6  have to get to that if I don't get back into the
7  regular routine of making a salary I'm used to making
8  for my family.
9  Q    So, do you have like a time that you have given
10 yourself, if you can't build your company, you are
11 going to go look for something else?
12 A    Yes. Yes, because I actually spoke to probably
13 like 35 to 40 college recruiters for ACT -- it was
14 called Improving Your ACT Scores, I was asked to speak
15 to them. And I got ten potential clients from that.
16 So, if that doesn't pan out -- if I can't secure a
17 contract, I have given myself until December, I will
18 get back out there looking. I might be before then,
19 because I have to take care of my family.
20 Q    Sure.
21 A    I have a daughter in college. So, we are going
22 into our savings now, you know.
23 Q    So, you have given yourself this self-imposed
24 deadline of December to build up your LLC?
25 A    Yes.

## Page 35

1  Q    And if not, then you are going to look to what?
2  A    Start back again. What was your question?
3  Q    Like a teaching position?
4  A    I actually looked for a teaching position. I
5  haven't been blessed to get back in -- people tell me
6  I don't belong in a classroom, that I should be out
7  there helping people. So, I mean, I don't mind
8  teaching. I wasn't offered a teaching position. I
9  applied to Little Rock for a pre-K. I think you may
10 see that in there.
11 Q    Yes, I see the list.
12 A    And I have applied for several things that I
13 have experience, not only certification and
14 qualification, but experience. I don't know why I
15 didn't get asked to be a classroom teacher.
16 Q    Did you apply at PCSSD for a classroom position?
17 A    I wasn't offered the opportunity, because the
18 thing -- but this is -- I have been nonrenewed before
19 because of instructional technology, and that's how I
20 got school improvement specialist that was offered. I
21 also was offered classroom teacher, but I was school
22 improvement specialist. But this time, nothing was
23 offered. I asked for my bumping rights, I wrote a
24 letter to get my bumping rights, because that's how
25 PCSSD typically does things. It was not offered to

## Page 36

1  me, said that they weren't following that policy this
2  year. So, I applied for different jobs there, I
3  didn't get an interview for any of them. I was told
4  that I couldn't apply for principal -- well, Doctor
5  Pride and I were told we couldn't apply for principal.
6  One year it said you could be district administration
7  or have two years. That year, it was only two years.
8  I asked why they just decided to change it.
9  Q    Well, let's back up.
10 A    Okay.
11 Q    So, all six years you were in the district, was
12 that considered district level?
13 A    Yes, it was, not classroom. I never taught in
14 Pulaski County.
15 Q    Right. Okay. So, are you aware after the five
16 program administrators were eliminated that then there
17 were two instructional strategist positions created?
18 A    Yes. I didn't apply for that job.
19 Q    So, my question is, why did you not apply for
20 the instructional strategist position that was opened
21 in the summer of 2018?
22 A    Because when I read that it was the same job I
23 did, and I didn't want to apply for it, because it was
24 more responsibilities with, it seemed to be, less pay,
25 because you had to start back over. It didn't make

Page 37

1  sense to me.
2  Q  So, you read the -- what do you call when you
3  put it online, advertisement?
4  A  Well, Doctor McNulty actually -- when he visited
5  with us, actually went over that job description with
6  us --
7  Q  Okay.
8  A  -- in a meeting that he had with me and the
9  other program administrators and shared that with us.
10 Q  Okay.
11 A  It was basically the same job description.
12 Q  And he had made changes to the title?
13 A  The title, yes.
14 Q  And did he make any changes to the duties?
15 A  It was the same duties, from my recollection.
16 Q  So, he said, "This is a new position that I'm
17 creating"?
18 A  Yes.
19 Q  Okay. And he invited you to apply for it?
20 A  Yes. And I not only applied for that, but other
21 positions that were open.
22 Q  Wait, you did not apply for that?
23 A  Did not apply for what?
24 Q  The instructional strategist position?
25 A  I didn't. I applied for the other positions

Page 38

1  that he asked us to apply for.
2  Q  Okay. Let me make sure I'm hearing you. You
3  said you did not?
4  A  I did not, no.
5  Q  And what is the reason, again, that you did not
6  apply for it?
7  A  Basically, I didn't want to. It was the same
8  job description. I didn't understand being cut from
9  that position, having the same position, but you're
10 going from five to two. It didn't make any sense to
11 me, professionally.
12 Q  Okay.
13 A  Although I thought I probably could do it, but
14 two people doing it with a district size of 12,000
15 plus students, it would be -- I wouldn't say
16 impossible, but very hard. I would have had to work
17 day and night.
18 Q  Were you qualified for it?
19 A  Yes.
20 Q  And he invited you to apply?
21 A  Yes.
22 Q  Okay. Were there other -- okay. The meeting
23 with McNulty, was that attended by you and who else?
24 A  Well, we had two meetings with him. The first
25 meeting it was me, Doctor Pride, Brandy Beckman, Leta

Page 39

1  Ray - Bobette Kelly the same person, and Nicole
2  Townsend. That was the first meeting. And then,
3  before he --
4  Q  Was this meeting that you had with him, the
5  first one, was it before or after your hearing that
6  you had in front of the Board?
7  A  It was before.
8  Q  Was that over the phone or in person?
9  A  In person.
10 Q  Tell me about that meeting.
11 A  He met with us and he told us that he was coming
12 in and making changes, it was strictly fiscal, meaning
13 that the district had to cut $5 to $8 million. And
14 so, that's why our positions were being cut. And he
15 was trying to restructure, and maybe he would
16 restructure and he would try to get three of us,
17 hopefully four, but he would see what he could do.
18 But he encouraged us to reapply. And maybe -- that's
19 the day maybe when he asked us to bring our job
20 descriptions, or exactly what we did. So, he had
21 planned just to have that meeting, but he requested
22 another meeting with us.
23 Q  So, this first meeting, it was after you had
24 been given your letter on May 1st that your --
25 A  It was before we were given our letter.

Page 40

1  Q  Before?
2  A  We were told we were being cut, but it was
3  before.
4  Q  So, that was in late April?
5  A  It probably was April 30th. It probably was.
6  Q  April 30?
7  A  Because the second meeting was probably May 2nd,
8  something around there.
9  Q  So, the first meeting was before you had
10 received your letter from Doctor Warren?
11 A  Yes.
12 Q  Official Notice of Nonrenewal letter?
13 A  Yes, I believe it was, yes. Because I remember
14 -- it might have been before, it might have been the
15 day. I was remembering they were in a scurry trying
16 to get it done before May 1st.
17 Q  Was it a Friday before the Saturday Board
18 meeting?
19 A  When was the Saturday Board meeting, was it
20 April 16th or April --
21 Q  No, no. It was April 30th, or 31st.
22 A  April 31st? April --
23 Q  Hold on.
24 A  Can I ask Ms. Townsend about the date, because
25 she remembers better than I do.

Page 41

1  Q   Yes.
2       MR. KEES: Go off real fast.
3       (WHEREUPON, a brief discussion was held
4   off the record.)
5       THE WITNESS: She said the Board meeting
6   -- did you hear her?
7  BY MR. KEES:
8  Q   Yes, you go ahead and say it.
9  A   Okay. She said the Board meeting was April
10 28th, and we met with him April 30th, and we received
11 the letter April 30th, after we met with him.
12 Q   Okay.
13 A   I knew we met with him before we got our letter.
14 Q   Got it.
15 A   Because, you know, I still thought, "We don't
16 have our letter yet, there is still some hope." And
17 the 28th, that was the day.
18 Q   Were you at the Board meeting on the 28th?
19 A   I was.
20 Q   So, were you aware that, while not official, you
21 anticipated that a nonrenewal letter was coming?
22 A   Well, I didn't, because Doctor Warren testified
23 at the meeting that she didn't recommend it, she
24 didn't want to do it.
25 Q   Right.

Page 42

1  A   And the Board told her, "We know you don't want
2  to do it, we know it's not your plan, but it's our
3  plan, and we are telling you to sign this letter."
4  Q   Okay.
5  A   So, that's why -- I mean, I know school law and
6  I know if the superintendent doesn't recommend or
7  sign, it's not legal. And I know that the School
8  Board cannot do that.
9  Q   So, then, you had a meeting. Was anybody else
10 in the meeting on the 30th besides the five program
11 administrators and Doctor McNulty?
12 A   No, sir.
13 Q   No other staff?
14 A   No other staff, no other administrators, no,
15 sir.
16 Q   Okay. All right. You said they invited you to
17 apply for the instructional strategist. And did he
18 give you the job description at that time for the
19 instructional strategist position?
20 A   He was talking about it, and he asked us for our
21 jobs. The second meeting, he gave -- he showed us on
22 paper --
23 Q   Okay.
24 A   -- this one, that's when we read it and saw it
25 on paper.

Page 43

1  Q   All right. At that April 30th meeting with
2  Doctor McNulty, did he tell you about other positions
3  that were open?
4  A   Yes. He told us about the Deputy Superintendent
5  of Curriculum, he said, I believe -- he said, may not
6  be a direct quote, but something like, "I believe we
7  have some principal positions." Because I know I
8  applied for the pre-K-four director, I have experience
9  in pre-K certified early childhood teacher. So, I
10 applied for that job.
11 Q   So, tell me what jobs you applied for.
12 A   I applied for -- I think I applied for Federal
13 Programs, I was certified, qualified for that.
14 Q   Hold on. Federal programs?
15 A   Yes.
16 Q   That Doctor Bell received?
17 A   Yes.
18 Q   Did you get an interview?
19 A   No, I didn't.
20 Q   So, you are saying that you applied online for
21 the Federal Programs director position?
22 A   Yes.
23 Q   And you did not get an interview?
24 A   Yes. And the day before -- I didn't get an
25 interview, but I knew they were having interviews. I

Page 44

1  think I pulled mine the night before the interview.
2  Then, before that, I applied for the pre-school
3  director's position.
4  Q   Pre-school director. Over the entire pre-K?
5  A   Yes.
6  Q   The one that Nicky is in?
7  A   Yes. I didn't get an interview for that.
8  Q   Pre-K director, no interview?
9  A   No interview.
10 Q   But you submitted everything online?
11 A   Yes, I did.
12 Q   All right. What else?
13 A   And I told you about the Federal Programs?
14 Q   Federal Programs and pre-K.
15 A   Yes. And I -- I mean, I wasn't qualified, but I
16 did apply for Deputy Superintendent of Curriculum.
17 But I didn't expect to interview for that, but I did
18 apply online for that, just the experience of doing
19 it.
20 Q   Did you apply for any principals' positions?
21 A   I was told I couldn't apply for it.
22 Q   By who?
23 A   I was told by Shawn Burgess. Because we
24 received the e-mail on -- we received an e-mail from
25 Doctor Warren, I can't remember the exact date.

## Page 45

1   telling us it was closed, but she wanted us to apply
2   because Doctor McNulty invited us to apply.
3   Q   Yes.
4   A   That was like after he talked to us. So, she
5   told us to go talk to Kim -- e-mail Kim White.
6   Q   Right.
7   A   So, Kiffany, Doctor Pride wasn't there that day,
8   I told her, "Hey, you are not here, but you have to do
9   this right now. So, you have to" -- I forwarded her
10  the e-mail that Doctor Warren sent us, just to make
11  sure she got it. And I e-mailed Kim, Kim told me what
12  to do, and I went down there to talk, and she said,
13  "Well, you need to talk to Shawn." So, Shawn was
14  like, well, you know, she told me the job description
15  said two years of assistant principal position. And I
16  said, "Okay. But last year, which was 2017, it had
17  district administration or two years, what was the
18  difference?" She said, "Well, we just decided, you
19  know, as a team to go back to two years." I said,
20  "Okay," and I walked away.
21  Q   So, the meeting that Doctor McNulty encouraged
22  you to apply for principal, was that that first
23  meeting that you had with him, April 30th?
24  A   Yes. It was both of the meetings.
25  Q   Okay. When was the second meeting with McNulty?

## Page 46

1          THE WITNESS: It was May 2nd or May 1st?
2          MS. TOWNSEND: May 2nd at that time.
3          THE WITNESS: May 2nd, it was May 2nd.
4   BY MR. KEES:
5   Q   I guess he had been on campus the entire time?
6   A   Yes. He was visiting schools and meeting with
7   people.
8   Q   What was that meeting about?
9   A   Because the first meeting, he told us about the
10  position, the second meeting, he actually showed us.
11  Q   Was it with the same attendees?
12  A   Except for Ms. Townsend, Nicole Townsend.
13  Q   She couldn't be there?
14  A   She couldn't be there.
15  Q   But administration-wise, it was just Doctor
16  McNulty?
17  A   Just Doctor McNulty.
18  Q   And it was four program administrators,
19  including yourself?
20  A   Yes.
21  Q   And he had a job description for the
22  instructional strategist?
23  A   Yes. It was a draft.
24  Q   And again, he encouraged you to apply for it?
25  A   Yes.

## Page 47

1   Q   And then, did he mention the other positions?
2   A   Yes, he did.
3   Q   Anything else notable about that meeting?
4   A   No, not notable.
5   Q   Anything else you recall from the meeting?
6   A   I mean, the same story about fiscal -- it
7   totally being fiscal. But it was his decision, he
8   just wanted to restructure some things. And he talked
9   about his experience in Waterloo working with
10  department heads. And we talked about -- I do
11  remember -- I think it was the first meeting, I do
12  remember asking him about online summer school,
13  because I administered that and was over teachers, I
14  asked him about that, what would happen. Because we
15  were kind of like -- we knew Doctor Warren was the
16  superintendent, but he was talking to us. So, I'm
17  like, I asked him, "Do I still plan for that or what
18  do I do?" And he said he would have to get back with
19  us, but for sure talk to Doctor Warren about it.
20  Q   Did he ever say that it was his decision to
21  restructure this program administrator to the
22  instructional strategist?
23  A   He said it was his decision to restructure,
24  period.
25  Q   Okay. Was he referring to the Learning

## Page 48

1   Services?
2   A   Yes, to program administrators the way it was
3   set up, yes.
4   Q   He said that was his decision to restructure?
5   A   Yes. He said it was based on -- it was fiscal.
6   Q   And then, in addition to fiscal, did he talk
7   about things he wanted to implement from his prior
8   administrative experience?
9   A   Not necessarily implement. But he just told us
10  some things he did, dealing with department chairs.
11  I'm saying this because it's a school district that is
12  doing what he said, how department chairs would kind
13  of like be more over teachers as far as leading
14  teachers, instructional coaches.
15  Q   Okay.
16  A   Which, as a science program administrator,
17  that's all who I worked with.
18  Q   Okay.
19  A   I worked with the department chairs. So, I was
20  like, "Yeah, it makes sense to me, that part does."
21  But it's things like that, about helping -- continuing
22  to improve achievement.
23  Q   And are those the only two times you met with
24  Doctor McNulty?
25  A   Before our termination, yes.

Page 49

1  Q   Before the hearing?
2  A   Yes, before the hearing. I'm reflecting. While
3      I was still working there, he was -- we had an AIMS
4      training for elementary teachers, and he was at
5      Maumelle Middle, I spoke to him.
6  Q   But not about this position?
7  A   No, no.
8  Q   So, in terms of talking to him about you working
9      at Pulaski County, it was just these two meetings?
10 A   Yes, sir.
11 Q   Okay. And at either of those meetings did he
12     ever talk about race, ethnicity, equity, any of those
13     things?
14 A   He did, yes.
15 Q   Tell me about that.
16 A   Because that was our determining factor as a
17     team, was to Plan 2000, you know, increasing
18     achievement. We knew that we had to -- that was one
19     of the areas we had to work on in Facilities. So, we
20     asked him about that. He talked about racial
21     disparity. He called it -- he didn't say "disparity".
22     It started with an "M". Because I wondered why he
23     used that term.
24         MS. TOWNSEND: Marginalize.
25 BY MR. KEES:

Page 50

1  Q   Marginalized?
2  A   Yes.
3  Q   Or marginalization?
4  A   Yes, instead of disparity. Thank you. And I
5      questioned to myself why he used that term. Because
6      my thing is, there is a disparity between blacks and
7      nonblacks in Pulaski County that was obvious to me,
8      being in both of the districts. It was very apparent
9      at PCSSD.
10 Q   So, you talked about those issues with him?
11 A   Well, briefly, yes.
12 Q   Okay.
13 A   "This is what we do, this is why we are doing
14     it. We have seen an increase in growth," just talking
15     to him about that. And then, he started talking about
16     his experience with Waterloo and the way it was
17     structured in Waterloo, which I have looked it up and
18     that's a -- you know, because when you are being told
19     you are being nonrenewed, terminated, or whatever, you
20     look and see who is coming in, what is the structure
21     there. So, in my mind, I'm trying to see, is this
22     where you are going.
23         And we asked him about things like that, you
24     know, "I notice you have this and that." Like they
25     had a Director of Secondary. I believe he was over

Page 51

1      the high schools in Waterloo, because he was over
2      Curriculum. So, he had a middle school person and
3      then an elementary person, and he was over the high
4      schools as the Superintendent of Curriculum. So,
5      that's what I remember from researching. And so, I
6      was curious about that, is that, you know, "I notice
7      you had this. Is that what you plan on doing here?"
8          Pulaski County was a little bit larger. 2,000
9      may not seem like a lot, but that's a lot of kids.
10     That's like four elementary schools more, maybe two
11     more high schools, maybe three more middle schools.
12     So, I'm a numbers person, that's what I work with day
13     to day to instruct, so I'm always thinking about
14     things like that. So, just curious about, you know,
15     "What would you do different than what we are doing
16     now?" Because our job was to close this gap, you
17     know, amongst black and nonblack students. That's
18     what we talked about every day. Every day we met,
19     that's all we talked about.
20 Q   Okay. Thank you. So, let me ask a more
21     specific question. In the context of race, equity,
22     did he ever say that his decision to nonrenew the
23     five program administrators and then restructure to
24     two instructional specialists, did he ever say that
25     was because of the race or ethnicity of the

Page 52

1      employees?
2  A   Not to -- no, he didn't say that specifically,
3      no.
4  Q   Okay. What do you mean by "specifically"? Has
5      he said it unspecifically?
6  A   I mean, he said it was fiscal, that's what he
7      said.
8  Q   Okay.
9  A   That's what he said.
10 Q   I mean, my question is really a direct one. Did
11     he ever say anything to the extent of, "Ms. Beasley,
12     because of you being African-American, that played
13     into my decision"?
14 A   No, he didn't say that.
15 Q   And I wouldn't think he did, but I just wanted
16     to make sure.
17 A   Yeah. He didn't say that directly, yeah -- or
18     indirectly, he didn't say it.
19 Q   Do you know what the term "animus" means, bad
20     feelings, hard feelings? Did he show any racial
21     animus in any of these meetings?
22 A   I was feeling like it was -- and I probably
23     said, "I know it's not directly you," but I was
24     feeling animus feelings about the decision. Because
25     it had nothing to do with performance or fiscal.

Page 53

1  Q   Right. So, you agree it had nothing to do with
2  performance?
3  A   I agree with that.
4  Q   And where did you feel this animus was coming
5  from?
6  A   Just the series of things that happened. Like
7  I'm comparing two different districts, because I
8  didn't teach in Pulaski County, but I definitely see a
9  disparity amongst expectations with students, namely,
10 black students and low performing students. I don't
11 have the same idea or concept, because I worked with
12 -- when I work with kids, they are going to grow, they
13 are expected to grow one year. And I felt like just
14 because of the disparity in the buildings, that I had
15 animus feelings about race. I voiced that out in a
16 principal's meeting in December 2017 that it was
17 definitely a difference between Mills High School and
18 Robinson Middle School, and it shouldn't be.
19 Q   You are talking about their academics?
20 A   I'm talking about the building, first.
21 Academics, that was my mantra, that we have to do
22 better. Kids can do better, it doesn't matter what
23 color they are. That's what -- we are professionals,
24 we are certified, that's what we do, we help kids. It
25 doesn't matter what color, doesn't matter if they are

Page 54

1  poor, rich, or whatever.
2  Q   So, what is this you are referring to in the
3  principals' meeting that you expressed, or concern?
4  A   In our Complaint, Doctor Warren gave reference
5  to the disparity and to the schools and mentioned what
6  was in the paper about how the funds were spent. And
7  she had us to do an activity about feelings or how we
8  felt. And it just rose -- something rose up in me,
9  and I spoke out against it -- I spoke out against it.
10 I said, "We see what is going on. I have been telling
11 people that it's not fair. You see what's going on as
12 principal. If you allow teachers to teach" -- "to
13 treat kids differently, you are the problem, also." I
14 said that at that meeting December 2017. That's when
15 I -- I felt it before, but that's when I saw change, a
16 difference, and kept saying, "Something is about to
17 happen." Because when you speak out against wrong,
18 it's just natural, nobody is going to be happy about
19 that. It's just normal.
20 Q   So, when did you speak out, at this principals'
21 meeting?
22 A   Yes, December 2017.
23 Q   Okay. And did anybody say anything to you after
24 the meeting?
25 A   During the meeting, people were crying, and the

Page 55

1  principals, I can remember Tracy Allen speaking out.
2  Q   Tracy Allen?
3  A   Yes. He said something about -- because he was
4  a coach at Mills, you know, he believed that Mills
5  should have a high school. But he also believed that
6  Sylvan Hills needed an addition, because he was
7  principal over there. But I spoke out against that.
8  Did anybody say anything to me in particular about
9  that, I mean, the devil is smart, so they are not
10 going to say anything. But did they do anything, yes,
11 I noticed it. Yes, I heard people say, yeah, that
12 those black kids, you know, or those kids in those
13 apartments, or those -- "That's why they are not doing
14 anything, that's why we can't get our scores up." And
15 my comment to them was, "What I know, we teach
16 standards and we look at data and we move kids, that's
17 what we do. I hear you, I hear what you are saying,
18 but that's what we do." About those kids, who are
19 those kids. What we do is our job, and that's what we
20 did. And we got pushed back. But it doesn't matter,
21 kids' lives are at stake.
22 Q   Did anybody ever at Pulaski County School
23 District make racial remarks or disparaging comments
24 to you directly?
25 A   About when they said, "These kids can't learn,"

Page 56

1  or, "Those kids." But to me --
2  Q   No. I'm saying, to you, Ms. Beasley, did they
3  ever say anything racially disparaging or
4  inappropriate to you?
5  A   They didn't come out and say -- because I have
6  been called the "N" word before. I mean, I'm from
7  south Arkansas.
8  Q   You are talking about in other contexts?
9  A   Well, before. So, did they say the "N" word or
10 did they say, "You are black," or, "You can't do it,"
11 no, they didn't --
12 Q   Okay.
13 A   -- say anything -- say that.
14 Q   Okay. Well, I just need to know that, because,
15 I mean, this is a race-based lawsuit.
16 A   Yes.
17 Q   So, as we sit here, I'm asking if there was
18 anybody at Pulaski County that ever made a racially
19 disparaging comment to you?
20 A   Not a comment to me. But did they make me feel
21 that way, yes. Because when they were planning --
22 that's another big component, on DRIVEN. I was
23 isolated from that, from secondary, because I was the
24 only black program administrator on secondary. So, it
25 was me, it was Brandy Beckman and Leta Ray. I wrote

Page 57

1  an e-mail to Doctor Tackett asking why, if I'm being
2  over science, why wasn't I included in the planning,
3  why did Leta Ray have to tell me about science when
4  she was literacy. I e-mailed Doctor Tackett that.
5  Q   When was this?
6  A   It might have been January 2018.
7  Q   Okay. And did Doctor Tackett respond?
8  A   He responded, and he gave me some dates that
9  they were meeting. So, it started out that I went to
10 a couple of meetings, and then later he had a meeting
11 with me, Ms. Townsend, Doctor Pride, and Brandy
12 Beckman was there because she had to tell about -- she
13 had to tell about it, because I didn't know about it,
14 about what they were doing with secondary. Now, I'm a
15 part of the secondary team, part of both teams, K-12.
16 And so, when we asked about DRIVEN, and I can remember
17 me saying, "Well, how is that different from ALE?"
18 So, Doctor Tackett, he got mad and was like, "Well" --
19 he couldn't answer us, and he kind of got upset.
20 Then, after that, we were saying, "Well, how is that
21 going to help our disparage between black and
22 nonblack?" He couldn't give an answer with that. So,
23 Doctor Pride asked him, "Well, then, why are we here?"
24 And he really got upset and started yelling -- he
25 raised his voice at her. And Ms. Townsend asked,

Page 58

1  "Well, as a parent, how is it going to help my black
2  son when he needs" -- like that, "he is achieving, he
3  needs help and to be pushed." And he told her, "Well,
4  it may not be for your son. I guess it's not for your
5  son." That was in a DRIVEN meeting. It might have
6  been January, February.
7  Q   Is this the only lawsuit you have been a part
8  of?
9  A   Yes.
10 Q   I think I read, you had filed for bankruptcy --
11 A   Yes.
12 Q   -- in 2007?
13 A   No. I got released in 2007. It might have been
14 2003, something like that. But we were released in
15 2007.
16 Q   Released?
17 A   Yeah.
18 Q   So, in terms of income, you have listed all of
19 the income that you currently receive?
20 A   Yes.
21 Q   And your husband is limited to his SSI?
22 A   Yes. It's SSA, yeah, to that.
23 Q   Have you kept any ongoing notes or diaries
24 regarding this litigation?
25 A   No. I mean, we meet with them, we get our

Page 59

1  complaints or whatever. But just keeping ongoing
2  diaries. I did start when I was told that -- I did
3  record -- or when I say "record", write, and I
4  e-mailed that to Joy about being told that I couldn't
5  work in the district due to a conflict of interest
6  because of the lawsuit. I wrote the days down that
7  they said it. And I e-mailed that to Joy last week.
8  Q   Was it a recording?
9  A   No. It was -- I took the notes on my phone, on
10 my notes in my phone.
11 Q   Okay.
12 A   I didn't record anything. I said "record", but
13 writing record.
14 Q   So, you did record the meeting with Doctor
15 McNulty?
16 A   I didn't record it.
17 Q   Well, you know there was a recording?
18 A   Yeah. I know it was recorded. I didn't record
19 it.
20 Q   But you don't have any other recordings --
21 A   No.
22 Q   -- regarding anything in this litigation?
23 A   No.
24 Q   Ms. Beasley, did you understand everything I
25 asked today?

Page 60

1  A   I did.
2  Q   This is your time. Anything that you need to
3  clear up or clarify or add that I didn't talk about or
4  ask you about?
5  A   When you asked me about racial things, I was
6  concerned because three white men made the decision to
7  terminate or nonrenew us, and excluded the chief
8  officer who was a black woman, and then the white
9  female did not know about it until -- Ms. Goodwin
10 didn't know about that we got notice until after Paul
11 told her. And Doctor Warren, Paul, her subordinate,
12 told her right before he told us.
13 Q   So, the three white men, you are referring to
14 Paul Brewer?
15 A   Paul Brewer, Doctor Tackett, and Will Reid. And
16 in that hearing on that Saturday, Paul Brewer was
17 like, "Well, I'm not the only one. Y'all are blaming
18 me, but I asked Doctor Tackett and Will, and they
19 suggested their names, they gave me their names."
20 Q   It was the entire -- it was all the program
21 administrators; correct?
22 A   It was all of them. But out of the three, one
23 of them was rehired -- out of five of us, the white
24 female was rehired, and the other female had a job,
25 and she told me Doctor Tackett helped her get that job

Page 61

1  at Benton. I heard -- she was talking to Ms. Darlene
2  Serfaty and she said, "Yes, Doctor Tackett gave us a
3  good recommendation." And it kind of startled me,
4  because before then he wasn't returning our phone
5  calls or coming to the office right before he left.
6  So, I just thought that was interesting.
7  Q   Okay. I don't know if that's true or not. But
8  my question would be, is that a problem for him to
9  give her a reference?
10 A   Well, it's a problem if we -- no, not to give a
11 reference.
12 Q   Okay.
13 A   But it's a problem that you are communicating,
14 and when I'm calling you for something that has to do
15 with work and you don't call us back or you are asking
16 us to meet you at another school to get my evaluation,
17 and not coming to work, to our central location. So,
18 you talk to people when you want to, is my thinking.
19 That's a problem.
20 Q   And you heard that from Ms. Beckman?
21 A   Yes.
22 Q   You overheard her telling somebody that --
23 A   Yes.
24 Q   Doctor Tackett had given her a
25 recommendation?

Page 62

1  A   Yes. And I came over and said, "Oh, really,"
2  you know. I interjected myself.
3  Q   Anything else to add, Ms. Beasley?
4  A   No. I'm done.
5       MR. KEES: Thank you, ma'am. Thank you
6  for your time.
7       (WHEREUPON, at 11:28 a.m., the taking of
8  the above-entitled deposition was concluded.)
9            ---o---

Page 63

1  Exhibit One.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 64

ERRATA

PAGE\LINE      SAYS:          SHOULD SAY:

64

16 (Pages 61 to 64)

Page 65

SIGNATURE

I, Jennifer Beasley, do hereby certify that I have read the foregoing pages, and the same is a true and correct transcription of the proceedings that occurred, except for the corrections (if any) that appear on the Errata Sheet.

_____
Jennifer Beasley

STATE OF ARKANSAS)
            ) ss.:
COUNTY OF _____ )

WITNESS MY HAND AND SEAL, this _____ day of _____, 2019.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:
_____

65

Page 66

CERTIFICATE

STATE OF ARKANSAS )
                 ) ss.:
COUNTY OF PULASKI )

I, DEBBYE L. PETRE, Certified Court Reporter and notary public in and for the County of Pulaski, State of Arkansas, duly commissioned and acting, do hereby certify that the witness herein was by me first duly sworn to testify the whole truth and nothing but the truth prior to taking down in Stenotype the questions, answers, and proceedings during said deposition, and from such recordation was thereafter reduced to print by means of computer-assisted transcription, and the same fully, truly, and correctly reflects the proceedings had.

I FURTHER CERTIFY that the above deposition was given by the witness and taken at the times and in the place hereinabove set forth.

I FURTHER CERTIFY that I am not attorney or counsel of any of the parties, nor am I relative or employee of any attorney or counsel or party connected

66

Page 67

with the action, and have no interest in the outcome or results of this litigation.

WHEREFORE, I have subscribed my signature and affixed my notarial seal as such notary public at the City of Little Rock, County of Pulaski, State of Arkansas, this the 10th day of June, 2019.

_____
DEBBYE L. PETRE, CCR
NOTARY PUBLIC IN AND FOR
PULASKI COUNTY, ARKANSAS

My Commission Expires:

August 4, 2020.

---o---

67